UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

MARILYN Y. ARMSTRONG, MARSHALL R. MAZYCK,    **JURY TRIAL DEMANDED**
LILIAN ALVARADO, GORDON URQUHART,
BLAKE J. WILLETT, BRYAN HENRY,    **COMPLAINT**
KENNETH DAVIS, ERIC MOORE, NZINGHA M.
KELLMAN, and MICHAEL BENJAMIN

<div style="margin-left:2em">Plaintiffs,</div>

<div style="margin-left:3em">-against-</div>

METROPOLITAN TRANSPORTATION AUTHORITY,
ELLIOT SANDER, EXECUTIVE DIRECTOR AND
CHIEF EXECUTIVE OFFICER OF THE MTA, WILLIAM
MORANGE, DEPUTY EXECUTIVE DIRECTOR/
DIRECTOR OF SECURITY OF THE MTA,
KEVIN MCCONVILLE, CHIEF OF THE MTA POLICE
DEPARTMENT, and TERRANCE CULHANE, ASSISTANT
DEPUTY CHIEF OF THE MTA POLICE DEPARTMENT,

<div style="margin-left:3em">Defendants.</div>



Civ.
07 CV 3561
ECF Case

JUDGE LYNCH

RECEIVED
MAY 0 4 2007
U.S.D.C. S.D. N.Y.
CASHIERS

-----------------------------------------------------------------------X

Plaintiffs MARILYN Y. ARMSTRONG, MARSHALL R. MAZYCK, LILIAN

ALVARADO, GORDON URQUHART, BLAKE J. WILLETT, BRYAN HENRY, KENNETH

DAVIS, ERIC MOORE, NZINGHA M. KELLMAN, and MICHAEL BENJAMIN, by their

attorneys, NORMAN SIEGEL, ESQ. and McLAUGHLIN & STERN, LLP, as and for their

COMPLAINT, upon information and belief, allege the following:

### INTRODUCTION

The METROPOLITAN TRANSPORTATION AUTHORITY ("MTA") is a public-benefit

corporation created by the New York State legislature to oversee and provide mass transportation

1

in the New York City metropolitan area. As part of its operation it has established a police department merging the forces of the Long Island Railroad, Metro-North, and Staten Island Railroad, to comprise a department of approximately 681 officers. The Chief of the Department, KEVIN MCCONVILLE is appointed by and reports directly to the Deputy Executive Director/Director of Security, WILLIAM MORANGE.

Since its inception the MTA Police Department has condoned and encouraged racial discrimination so that African Americans and Hispanics have been subjected to disparate treatment by reason of their race.

The disparate treatment has continued to the present day and, as set forth below, has resulted in the Plaintiffs bringing this case. While each of the Plaintiffs has suffered from varying instances of discrimination, the common pattern is that they have all been denied opportunity for career advancements, have earned less compensation, and have been subjected to a continuous hostile and racially charged work environment because they are African American and Hispanic. Worse, when Plaintiffs exercised their protected rights to seek redress of this condition, the MTA responded with retaliation.

The systemic and pervasive discrimination within the MTA has resulted in a supervisory staff that is predominately Caucasian. Eighty-six percent of all Sergeants, Detective Sergeants, and Lieutenants are Caucasian. At the command level of Captain and above, ninety-six percent are Caucasian.

Plaintiffs now seek to vindicate their rights under 42 U.S.C. Section 1981 of the Civil Rights Act of 1866, as amended ("§1981"), 42 U.S.C. §1983 of the Civil Rights Act of 1871, as

2

amended ("§1983"), and the New York City Administrative Code §8-107 *et seq.* (the "New York City Human Rights Law").

## JURISDICTION AND VENUE

1.    This Court has jurisdiction of the action pursuant to 28 U.S.C. §1343(3-4) and the principles of ancillary jurisdiction, under §1981, §1983, and the New York City Human Rights Law.

2.    Venue properly lies in this judicial district pursuant to 28 U.S.C. §1391(b) and (c), in that the Defendant METROPOLITAN TRANSPORTATION AUTHORITY maintains an office within this judicial district, and a substantial part of the events constituting the discrimination have taken place within this judicial district.

3.    Jurisdiction to grant declaratory judgment is conferred by 28 U.S.C. §§ 2201, 2202. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1998.

## PARTIES

4.    At all relevant times herein, Plaintiffs were employees of the MTA Police Department.

5.    Plaintiff MARILYN Y. ARMSTRONG ("ARMSTRONG") is an African American female. She is a citizen and resident of the State of New York, residing in North Babylon, NY. ARMSTRONG was hired in 1990 and has been employed as a detective in MTA's Eastern District since 2000.

6.    Plaintiff MARSHALL R. MAZYCK ("MAZYCK") is an African American male. He is a citizen and resident of the State of New York, residing in Freeport, NY. MAZYCK was hired in 1980 and has been employed as a detective in MTA's Eastern District since 1991.

3

7.    Plaintiff LILLIAN ALVARADO ("ALVARADO") is a Hispanic female. She is a citizen and resident of the State of New York, residing in Valley Cottage, NY. ALVARADO was hired by the MTA in 1980 and has been employed as a detective in MTA's Eastern District since 1994.

8.    Plaintiff GORDON URQUHART ("URQUHART") is an African American male. He is a citizen and resident of the State of New York, residing in Huntington, NY. URQUHART was hired in 1981 and was employed as a detective in the MTA's Eastern District beginning in 1990. He retired in December 2006.

9.    Plaintiff BLAKE J. WILLETT ("WILLETT") is an African American male. He is a citizen and resident of the State of Florida, residing in Orlando, FL. WILLETT was hired in 1982 and was employed as a detective in the MTA's Eastern District beginning in 2000. He retired in December 2006.

10.    Plaintiff BRYAN HENRY ("HENRY") is an African American male. He is a citizen and resident of the State of New York, residing in Hyde Park, NY. HENRY was hired in 1985 and has been employed as a lieutenant in the MTA's Northern District since 1991.

11.    Plaintiff NZINGHA M. KELLMAN ("KELLMAN") is an African American female. She is a citizen and resident of the State of Delaware, residing in North Wilmington, DE. KELLMAN was hired in 1999 and has been employed as a Sergeant in MTA's Eastern District since 2003.

12.    Plaintiff KENNETH DAVIS ("DAVIS") is an African American male. He is a citizen and resident of the State of New York, residing in, Coram, NY. DAVIS was hired in 1985

and was employed as a detective in the MTA's Eastern District beginning in 1994. He retired in January 2007.

13.    Plaintiff ERIC MOORE ("MOORE") is an African American male. He is a citizen and resident of the State of Pennsylvania, residing in Pocono Summit, PA. MOORE was hired in 1994 and is employed as an officer in MTA's Eastern District.

14.    Plaintiff MICHAEL BENJAMIN ("BENJAMIN") is an African American male. He is a citizen and resident of the State of New York, residing in Elmont, NY. BENJAMIN was hired in 2002 and is employed as an officer in the MTA's Eastern District.

15.    Defendant METROPOLITAN TRANSPORTATION AUTHORITY ("MTA"), is a New York State chartered public-benefit corporation, established in 1967 pursuant to New York State Public Authorities Law §1263. Its headquarters are located at 347 Madison Avenue, New York, NY. The MTA is empowered by the Public Authorities Law § 1266-h to maintain a Police Department which acts as its agent in the areas of security and law enforcement and for which it is ultimately responsible. In 1998 the Police Departments of the Long Island Railroad and Metro-North Railroad merged to become the MTA Police Department. The MTA Police Department provides full police services throughout the three regions of the MTA system.

16.    Defendant ELLIOT SANDER ("SANDER") is the Executive Director and Chief Executive Officer of the MTA, and was acting in such capacity at all times relevant herein. He is sued in his official capacity.

17.    Defendant WILLIAM MORANGE ("MORANGE") is the Deputy Executive Director/Director of Security for the MTA, and was acting in such capacity at all times relevant herein. He is sued in his official and individual capacity.

5

18.    Defendant KEVIN MCCONVILLE ("MCCONVILLE") is Chief of the MTA Police Department, and was acting in such capacity at all times relevant herein. He is sued in his official and individual capacity.

19.    Defendant TERRANCE CULHANE ("CULHANE") is an Assistant Deputy Chief in the MTA Police Department, and was acting in such capacity at all times relevant herein. He is sued in his official and individual capacity.

20.    Executive Director SANDER, Director of Security MORANGE, Chief MCCONVILLE, and Assistant Deputy Chief CULHANE are collectively referred to as "the Individual Defendants."

21.    At all times relevant herein, the Individual Defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers in the MTA Police Department, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the MTA at all times herein, with the power and authority vested in them as officers, agents and employees of the MTA and incidental to the lawful pursuit of their duties as officers, employees and agents of the MTA.

## FACTS ON WHICH CAUSES OF ACTION ARISE

22.    The Plaintiffs in this case have been, and continue to be, subjected to systemic and pervasive discrimination in the MTA Police Department. The MTA permits its supervisors to exercise unbridled discretion to deny African Americans and Hispanics opportunities for career advancement and equal earning opportunities while allowing for them to create a racially charged and hostile work environment. When the Plaintiffs have complained about this discrimination,

6

their supervisors have retaliated against them. The MTA is aware of this discrimination and the retaliation faced by the Plaintiffs and has not taken actions to rectify the situation. The MTA's failure to remedy the situation, or stem the abusive use of discretion, has created a pattern and practice of racial discrimination which pervades the MTA Police Department.

## DENIAL OF OPPORTUNITIES FOR CAREER ADVANCEMENT

23.    The MTA allows its supervisors to exercise discretion and control over the career advancements of those in their charge. Supervisors engage in discrimination and deny African American and Hispanic officers the ability to advance through the ranks at the same rate as their Caucasian counterparts because of their race.

24.    An MTA officer can advance their career by applying for transfer into a special unit within their own division or can apply for appointment to the Detective Division.

25.    Officers transferred into special units such as the Canine Unit, the Highway Unit, the Anti-Crime unit (now disbanded), and the Training Unit enjoy increased opportunities for career advancement and higher salaries.

26.    African American and Hispanic officers are more often denied entrance into the most favorable specialized units than Caucasian officers because of their race. The majority of specialized units have been headed by Caucasian supervisory staff. Additionally, several specialized units have been headed by officers who had previously engaged in racially discriminatory conduct. For these reasons, minority membership in these specialized units remains extremely low.

27.    Officers appointed to the position of Detective in the Detective Division, enjoy increased opportunities for career advancement and higher salaries.

7

28.    As part of an ongoing pattern and practice, the MTA Police Department delays the advancement of African American and Hispanic officers in an amount of time that is over twice as long as those of Caucasian officers.

29.    Officers wishing to become Detectives, or to transfer into special units, are required to submit applications, called "abstracts" in response to Personnel Orders which notify the candidates of available positions. Despite this seemingly straight forward policy, supervisors exercise discretion by selecting the officers they wish to promote. Supervisors abuse this discretion to discriminate against African Americans and Hispanics by selecting Caucasian officers with lesser experience.

30.    Upon information and belief, prior to 2003, abstracts were not collected for appointments to Detective or transfers into special units. Instead, supervisors approached selected officers and offered them appointment to the Detective Division or transfers into specialized units. This resulted in a disproportionate number of Caucasian officers advancing through the ranks at a faster rate than minorities.

31.    The advent of abstracts in 2003 did not cure the discriminatory abuse of supervisory discretion for the following reasons:

(a)    Not all available positions are announced with Personnel Orders. Caucasian officers have received prestigious transfers prior to, or in the absence of, an official announcement. African American and Hispanic officers are denied the ability to apply for the positions.

(b)    Abstracts are often solicited where the recipients of the positions have already been determined. Supervisors create, or reserve, spaces for Caucasian officers of their

8

choice and collect abstracts as a formality, without considering their merit. African American and

Hispanic officers often hear of these positions but are discouraged from applying after learning

that the position was specially created for one of their Caucasian counterparts, or supervisors

refuse to sign their abstracts.

(c)    Supervisors have the discretion to select a less qualified candidate where

abstracts are considered. Caucasian applicants are awarded prestigious positions even when they

have less seniority, less work-related experience, and fewer commendations than African

American and Hispanic applicants. Supervisors are permitted to select less qualified Caucasian

officers without the MTA's intervention.

32.    Even where abstracts are collected and properly reviewed, African American and

Hispanic officers are often disadvantaged by the prior discriminatory actions of their supervisors.

Supervisors deny them training, assign them to less favorable positions that offer limited job

experience, deny them recognition for exemplary performance, and subject them to disparate

disciplinary procedures, and weaken them as candidates.

(a)    Supervisors more often deny African American and Hispanic officers

special training because of their race. Those who are denied specialized training are precluded

from applying for positions that require such training. Further, even where abstracts do not

require a particular course, their abstracts are weakened by the absence of training. When a

supervisor denies an African American or Hispanic officer training they limit their ability to be

promoted.

(b)    Supervisors more often deny African American and Hispanic officers job

assignments that allow for career growth and department recognition because of their race. Those

who have been denied favorable assignments have abstracts that appear less qualified than Caucasian officers who have been given favorable job assignments. When supervisors deny an African American or Hispanic officer a favorable job assignment in order to assign it to a Caucasian, they are ensuring that the Caucasian officer will advance more easily than African American and Hispanic officers.

(c)     Supervisors more often deny African American and Hispanic officers commendation in recognition of exemplary performance because of their race. Those denied are disadvantaged when applying for prestigious positions. When a supervisor denies commendations of African American and Hispanic officers and awards them to Caucasian officers who have achieved lesser tasks, they are ensuring that Caucasian officers enjoy more speedy promotions.

(d)     Supervisors more often subject African American and Hispanic officers to disparate disciplinary penalties for minor violations because of their race. Those who are penalized for minor infractions, and receive a permanent letter in their files, are greatly disadvantaged with regard to promotion. When supervisors take disciplinary action against African American and Hispanic officers for minor violations while ignoring the same of Caucasian officers they are ensuring that Caucasian officers will appear as more attractive candidates for advancement.

(e)     Supervisors more often label African American and Hispanic officers "difficult to get along with" or "crazy" by their supervisors because of their race. Those who are disparaged by their supervisors face difficulties with regard to promotion. When supervisors, who have already engaged in discriminatory conduct, discredit African American and Hispanic officers, they destroy their potential for advancement.

10

33.    The Plaintiffs in this case have been harmed by the discretionary acts of their

supervisors which have impeded, or greatly slowed, their ascension through the ranks.

## DENIAL OF EQUAL EARNING OPPORTUNITY

34.    Supervisors within the MTA have discretion over the earnings of those under their

charge. Although there is a Collective Bargaining Agreement in place between the PBA and the

MTA which sets forth salaries for each level of employment, supervisors dictate the earning

potential of officers by denying or granting transfers and appointments, by allocating or denying

overtime, and by determining the amount officers can contribute to their pensions.

35.    African American and Hispanic officers are less likely than Caucasian officers to

hold positions in special units and achieve high ranks. Thus, African American and Hispanic

officers earn less money than their Caucasian counterparts.

36.    African American and Hispanic officers are more often denied the opportunity to

earn overtime. Favorable allocation of overtime hours adds additional monies to an officer's

annual salary. The MTA has a policy in place which dictates that overtime is to be allocated

based on seniority. However, supervisors exercise discretion over the allocation of overtime.

37.    Supervisors deny African American and Hispanic officers overtime by disregarding

seniority and allocating anticipated overtime to less senior Caucasian officers. Supervisors have

granted overtime to Caucasian officers instead of following MTA policy by giving the hours to

more senior African American and Hispanic officers.

38.    Supervisors also deny African American and Hispanic officers overtime by denying

them assignment to cases likely to carry overtime, or by assigning them less cases. Supervisors

have assigned less experienced Caucasian detectives high profile cases that involve extensive

investigation while assigning more experienced senior African American and Hispanic detectives lower profile cases. In doing so, not only have supervisors discriminated against African American and Hispanic officers but they endangered the public by assigning cases to less qualified Caucasian officers for the purpose of increasing their pay.

39.    Supervisors also deny African American and Hispanic officers overtime by not allowing them to complete administrative tasks associated with their investigations on overtime while allowing Caucasian detectives to remain after their shift to complete such tasks. African American and Hispanic officers have been sent home immediately after their shifts end while their Caucasian counterparts have remained.

40.    Supervisors also deny African American and Hispanic officers the right to earn overtime by denying them training courses which will prepare them for assignments requiring overtime. Supervisors have granted specialized training courses to less senior Caucasian officers thereby ensuring that they will be able to earn extra overtime where African American and Hispanic officers will be denied.

41.    African American and Hispanic officers are more often denied overtime during the years in which they are establishing a pension. Pensions are calculated based on the salaries of an employee's highest three consecutive years within a five-year time period. Supervisors have allowed Caucasian officers to increase their salaries with excessive overtime in their final years, so that they may retire with a larger pension package while denying African American and Hispanic officers overtime to which they are entitled.

12

## HOSTILE WORK ENVIRONMENT AND RACIAL HARASSMENT

42.    The MTA condones, tolerates, and allows supervisors to engage in conduct that creates a hostile work environment based on race.   The hostile work environment has been continuous and ongoing and has had an adverse affect on the work performance of African American and Hispanic officers.

43.    Supervisors in the MTA subject African American and Hispanic officers to racial jokes, racially offensive and derogatory statements and acts, and racial epithets.  The MTA has known of this activity and has not taken action when its command personnel and supervisors have engaged in such conduct.

44.    The following statements have been made to, or in the presence of African American and/or Hispanic officers:

(a)    An Assistant Chief said, "What am I, a nigger?" in front of an African American officer and has made racially offensive remarks.  On a separate occasion at a company picnic, he told an African American officer to remove his sunglasses so he could see his face while not requesting the same of Caucasian officers.

(b)    A Sergeant referred to an African American officer as "I be late Blake" and intoned the phrase in a racially derogatory manner.

(c)    A Sergeant used the word "Ebonics" to disparage a report written by an African American and accused another African American officer of dressing like Puff Daddy. When a Caucasian officer suggested that he'd like to offer training at a particular school she responded by asking why he'd want to go to a "black school."

(d)    A Chief sent an email containing a racially offensive video clip entitled "Hispanic Shooting Range" to high ranking officials in the department including an African American Lieutenant.

(e)    A Sergeant shouted, "What are you going to do about it, nigger?" to an African American officer.

(f)    A Lieutenant openly expressed his view that the Fraternal Guardian Organization was just a black radical group and an "angry black man" organization.

45.    Language of this nature has long been tolerated by the MTA Police Department which has created a culture of tolerance for racial discrimination.

(a)    A currently retired Sergeant said, "we don't want niggers in this unit" to an African American officer interested in a transfer.

(b)    A currently retired Inspector was observed yelling at African American suspects and calling them "niggers". When questioned by an African American officer about the use of the derogatory term, he replied, "some people are niggers because of the way they act but not all black people are niggers."

(c)    A currently retired Captain told an African American who was complaining of discrimination that, "Your problem is you're big. You're black. You're intimidating. And your father does not work here."

(d)    An administrator in the Special Operations Unit displayed his disapproval of an inter-racial marriage by refusing to acknowledge the Caucasian wife of an African American officer.

46.    The MTA Police Department is permeated with discriminatory intimidation, ridicule, and insult whereby supervisors disparage the abilities of African American and Hispanic officers and cause them to feel as though they are continually at risk of disciplinary action.

47.    Supervisors subject African American and Hispanic officers to disparate disciplinary penalties. Supervisors also subject them to excessive scrutiny with regard to office procedures, sick days, and by recording the arrival and departure times of African American and Hispanic officers and requiring memos of explanation for lateness while disregarding the comings and goings of Caucasian officers and not requiring explanations.

## **RETALIATION**

48.    The Plaintiffs in this action have attempted to remedy their situations by reporting the discriminatory treatment. Between 2003 and 2007, seven (7) Plaintiffs complained internally to the MTA about the treatment that they were receiving. The MTA failed to take remedial action and subjected the plaintiffs to retaliation.

49.    In 2004 ARMSTRONG filed a complaint with the SDHR. In May 2006 they issued a finding of good cause of discrimination. Between June and July 2006, Plaintiffs MAZYCK, ALVARADO, URQUHART, WILLETT, HENRY, DAVIS, MOORE and KELLMAN filed complaints with the SDHR. In January 2006, BENJAMIN filed a charge with the EEOC.

50.    As a result of the complaints Plaintiffs have been subjected to retaliation including denial of promotion, denial of training, disparate disciplinary penalties, assignment of menial tasks and demeaning jobs, unnecessary and demeaning job transfers, hostile acts of supervisors, and denial of overtime.

## ONGOING PATTERN AND PRACTICE

51.   Notwithstanding that the MTA has been made aware of the discriminatory and retaliatory animus of its supervisors towards African American and Hispanic officers, it has not taken action to rectify the racial discrimination and retaliation suffered by the plaintiffs.

52.   The MTA continues to permit its supervisors unfettered discretion over the opportunities offered to African American and Hispanic officers for career advancement and equal earnings thereby allowing African American and Hispanic workers to be deprived the benefits enjoyed by Caucasian workers.

53.   The MTA has failed to sanction its supervisors who create a hostile work environment and use racially derogatory language without repercussions and upon information and beliefs has even promoted supervisors after being made aware of their discriminatory conduct.

54.   By promoting those who have engaged in discriminatory conduct to supervisory positions, and by denying promotions to African American and Hispanic officers to supervisory positions the MTA has allowed for the continuation of discrimination and a hostile work environment.

55.   Executive Director SANDER, as the Executive Director and Chief Executive Officer of the MTA, knew or should have known of the events described herein and took no action to rectify them.

56.   Director MORANGE, as the Director of Security for the MTA, knew or should have known of the events described herein and took no action to rectify them.

57.    Chief MCCONVILLE, as the Chief of the MTA Police Department, knew or should have known of the events described herein and took no action to rectify them.

58.    Chief CULHANE, as an Assistant Deputy Chief of the MTA Police Department, knew or should have known of the events described herein and took no action to rectify them.

59.    This discrimination, retaliation and Defendants' failure to rectify it are part of an ongoing policy, practice and/or custom.

## CLAIMS OF INDIVIDUAL PLAINTIFFS:

## MARILYN Y. ARMSTRONG

60.    MARILYN Y. ARMSTRONG is an African American female.  She was hired in 1990 and was promoted to Detective in 2000.  She currently holds the rank of Detective and works in the Administrative Unit of the Operations Support Division.  Throughout her seventeen (17) years in the Department ARMSTRONG has been subject to a pattern of continuous and pervasive discrimination.  Despite a satisfactory employment record, the MTA has delayed her career advancement, and denied her transfers, training, favorable job assignments, and overtime. She has also been subjected to a continuous hostile work environment by her supervisors and has endured derogatory comments.  In 2003, ARMSTRONG submitted a complaint to MTA's Office of Civil Rights ("OCR") and in May 2004 to the SDHR.   Since filing the complaint to the MTA's OCR in 2003, ARMSTRONG has been retaliated against in the form of denial of transfers, training, favorable job assignments, overtime, and hostile work environment.  In May 2006, the SDHR issued a finding of good cause for discrimination against the MTA.

61.  As part of an ongoing pattern and practice, the MTA Police Department delayed her career advancement because of her race, in that ARMSTRONG was not appointed to Detective

for ten (10) years. The MTA did so in part by denying her the training necessary for

advancement. During the same time, numerous Caucasians officers with less than five-years of

experience were appointed to Detective.

62.    ARMSTRONG was subject to a continuous racially hostile work environment by

her supervisors. A Sergeant accused ARMSTRONG of writing her reports in "Ebonics", a

racially derogatory characterization. ARMSTRONG reported the incident to her supervisors and

the PBA. No action was taken against the Sergeant.

63.    In 2003, ARMSTRONG filed a complaint with the MTA's OCR based on the

hostile work environment and the "Ebonics" statement. Immediately following the complaint

she was retaliated against and subject to increased hostility and scrutiny from her supervisors.

The hostile work environment was severe and pervasive and altered the conditions of

ARMSTRONG's employment and caused her immense emotional stress for which she received

psychological treatment.

64.    In May 2004, before the OCR made its final determination, ARMSTRONG

submitted her claim to the SDHR.

65.    In 2004, ARMSTRONG requested a transfer into the Inter Agency Counter

Terrorism Task Force ("ICTF") so that she no longer had to work under her supervisors.

Despite fourteen (14) years on the force, a high arrest record, commendations, and letters of

support from civilians and supervisors, she was denied entrance into the ICTF because of her

race and in retaliation for her complaints. Shortly afterward, MTA transferred a Caucasian

Detective with less experience into the unit.

66.    In 2005, ARMSTRONG transferred into the Application Investigations Unit ("AIU"). Despite the transfer, the discrimination, hostile work environment and retaliation continued.

67.    ARMSTRONG's supervisor scrutinized her work and kept detailed lists of her comings and goings but did not subject the Caucasian detective under her charge to the same.

68.    Further, ARMSTRONG was continuously denied overtime because of her race and in retaliation, while her supervisor and a Caucasian Detective continued to earn overtime. The denial of overtime has had particularly detrimental effects on ARMSTRONG's salary and pension. Her pension will be calculated based on her highest three consecutive years within the five-year time period prior to her retirement. Her pension will be lower than Caucasian Detectives who have been allowed to increase their salaries and pensions with excessive overtime in their final years.

69.    During this time, ARMSTRONG was also denied training for "Homicide Investigation" on one occasion and training for "Sex Crimes and Child Abuse" on two occasions. Additionally, ARMSTRONG was denied training directly applicable to her transfer into the AIU, in that she was not given"Applicant Investigations Training" which was provided to a Caucasian detective.

70.    In May 2006, the SDHR issued a finding of good cause for a discrimination in response to ARMSTRONG's 2004 complaint. In retaliation, on June 26, 2006, ARMSTRONG was subjected to an excessive act of hostility by her supervisor and was threatened with disciplinary action.

19

71.    In July 2006, in retaliation for her complaints, ARMSTRONG was transferred out

of the AIU and into the Operation Support Unit where she was assigned the task of overtime

polling. Overtime polling is an assignment commonly held by an officer of lower rank or one

who has been placed on light duty. There are no Caucasian detectives with ARMSTRONG's

field experience and seniority assigned to the position.

72.    As a result of this discrimination, hostile work environment and retaliation,

ARMSTRONG has suffered economic and emotional injuries.

**MARSHALL R. MAZYCK**

73.    Plaintiff MARSHALL R. MAZYCK is an African American male. He was hired in

1980 and was promoted to Detective in 1991. MAZYCK currently holds the rank of Detective

and works in the AIU. Throughout his twenty-six (26) years in the Police Department,

MAZYCK has been subject to a pattern of continuous and pervasive discrimination. Despite a

satisfactory employment record, the MTA has delayed MAZYCK's career advancement, and

denied him transfers, training, favorable job assignments, and overtime. He has also been

subjected to a continuous hostile work environment including racial epithets, racially derogatory

statements and acts, and the hostility of supervisors. MAZYCK has complained about the

discriminatory treatment internally with the MTA and to the SDHR. Since making these

complaints MAZYCK has been retaliated against.

74.    As part of an ongoing pattern and practice, the MTA Police Department delayed

MAZYCK's career advancement because of his race, in that MAZYCK was not appointed to

Detective for eleven (11) years. During the same time, numerous Caucasians officers with less

than five-years of experience were appointed to Detective.

75.    MAZYCK has been subjected to a continuous racial hostile work environment throughout his career. The hostile work environment has been severe and pervasive, altered the conditions of MAZYCK's employment and caused him emotional stress. MAZYCK has been subject to racial epithets and racially derogatory statements and acts, including *inter alia*, (a) a statement by a Sergeant that "we don't want niggers in this unit" referring to MAZYCK's requested transfer into the Anti-Crime Unit, (b) a black cross painted on his locker, and (c) statements by supervisors asking about his performance while in the academy, where he was the only African American male, such as "how's the black guy doing?"

76.    Further, early in MAZYCK's career as a Detective he was given low-level assignments including undercover street narcotics sales which he had done as an officer while his Caucasian counterparts were assigned high profile investigations.

77.    From 1998 to present, MAZYCK has complained to MTA Police Department command personnel, including MCCONVILLE, and the then Executive Director of the MTA, Kathryn Lapp, about the ongoing pervasive discrimination and hostile work environment encountered by himself and other African Americans and Hispanic members of the Department. He did so individually and as President of the MTA Fraternal Guardian Organization (the "Guardians"). The mission of the Guardians is "[t]o increase the awareness of the community, to be the conscience of the criminal justice system, and to enhance the quality of life in the African American community." In effect, the Guardians are a voice against discrimination in the Department, and create a community for officers who have been ostracized and subject to a hostile work environment. A Lieutenant has called the Guardians, "an angry black man" association. MAZYCK has intervened and testified on behalf of numerous African Americans

and has been, and continues to be a proponent that discrimination and hostile work environment exists in the Department.

78.    Because of MAZYCK's complaints and his work through the Guardians, he has been subject to retaliation, discrimination, and hostile work environment.  MAZYCK has been denied training, transfers, has experienced substantial salary decreases due to the denial of overtime, has been given demeaning assignments, has been scrutinized about previously cleared medical conditions, and was denied access to personnel files that were previously within his control.

79.    MAZYCK has requested to attend the following training courses:  "Instructor Certification Training", "Cooper Institute Training", "Counter Terrorism Training" and "Applicant Investigations Training."  All of the requests were denied.

80.    In 2005, while MAZYCK was assigned to the AIU, he was subject to excessive scrutiny with regard to tardiness and attendance because of his race and in retaliation for his complaints.  His supervisor has kept a detailed list of the his arrivals, departures, and lunch hours but has not recorded the same information for a Caucasian Detective.

81.    In 2005, MAZYCK requested"Executive Protection Training" and was denied where a Caucasian Detective earlier received the training.  The Caucasian Detective has since been assigned overtime hours working in executive protection.  MAZYCK's requests for executive protection overtime have been denied purportedly on the basis that he has not received the training.

82.    Beginning in 2005, MAZYCK has been continuously denied overtime because of his race and in retaliation for his complaints, while his supervisor and a Caucasian Detective

22

continued to enjoy overtime. The reduction in hours was so drastic that Plaintiff MAZYCK saw

a decrease in his salary of close to twenty thousand dollars ($20,000). The denial of overtime has

had particularly detrimental effects on MAZYCK's pension. His pension will be calculated

based on his highest three consecutive years within the five-year time period prior to his

retirement. His pension will be lower than Caucasian Detectives who have been allowed to

increase their salaries and pensions with excessive overtime in their final years.

83.    In 2006, MAZYCK, ALVARADO, and ARMSTRONG were informed that the AIU

was going to be downsized. MAZYCK, ALVARADO, and ARMSTRONG volunteered for

transfers into the ICTF but were denied because of their race and in retaliation for their

complaints. They were given the purported reason that there were no positions available.

However, the ICTF soon thereafter hired two junior Caucasian detective.

84.    In July 2006, MAZYCK filed a complaint with the SDHR. In 2006, MAZYCK was

told that the AIU was going to be downsized. He requested a transfer into the ICTF and was

denied because of his race. He was given the purported reason that there were no positions

available. However, the ICTF soon thereafter hired a very junior Caucasian detective.

85.    As a result of this discrimination, hostile work environment and retaliation,

MAZYCK has suffered economic and emotional injuries.

**LILLIAN ALVARADO**

86.    Plaintiff LILLIAN ALVARADO is a Hispanic female. She was hired in 1980 and

was promoted to Detective in 1994. Throughout her twenty-six (26) years in the Department

ALVARADO has been subject to a pattern of continuous and pervasive discrimination. Despite

a satisfactory employment record, the MTA has delayed her career advancement, and denied her

23

transfers, training, favorable job assignments, and overtime. She has also been subjected to a

continuous hostile work environment by her supervisors. ALVARADO has complained about

the discrimination internally to the MTA and has also filed a complaint with the SDHR. Since

making her complaints, ALVARADO has been retaliated against in the form of denial of

transfers, training, favorable job assignments, overtime, and hostile work environment.

87.    As part of an ongoing pattern and practice, the MTA Police Department delayed

ALVARADO's career advancement because of her race, in that ALVARADO was not promoted

to Detective for fourteen (14) years. The MTA did so in part by denying her training necessary

for advancement and imposing disparate disciplinary penalties on her, where her Caucasian

partner, an equal participant in the activity received none. During the same time, numerous

Caucasians officers were appointed to detective with less than five-years experience.

88.    During 2005, while assigned to the AIU, ALVARADO was subjected to a hostile

work environment, in that her supervisor applied excessive scrutiny with regard to her attendance

and arrivals and departures, and her compliance with office procedures, because of her race. The

same level of scrutiny was not directed at a Caucasian detective within the unit.

89.    During the same time, ALVARADO was continuously denied overtime while her

supervisor and a Caucasian Detective continued to enjoy overtime. The reduction in hours was

so drastic that Plaintiff ALVARADO saw a decrease in her salary of close to twenty thousand

dollars ($20,000). The denial of overtime has had particularly detrimental effects on

ALVARADO's pension. Her pension will be calculated based on her highest three consecutive

years within the five-year time period prior to her retirement. Her pension will be lower than

Caucasian Detectives who have been allowed to increase their salaries and pensions with excessive overtime in their final years.

90.    ALVARADO was also unable to earn overtime on an executive protection assignment due to the fact that she was denied "Executive Protection Training" because of her race. This denial resulted in a loss of overtime hours that a Caucasian detective within the unit was allowed to earn.

91.    In July 2006 ALVARADO submitted a complaint to the SDHR. The following month, in retaliation for the complaint she filed, she was subjected to the hostility of her supervisor which resulted in a discriminatory and unsupported charge of insubordination.

92.    In December 2006, ALVARADO was transferred, after eight years of service, out of the AIU and into the general detective division. She is currently working with brand new Detectives while Caucasian Detectives at her rank with her number of years, and many with much less experience, worked in specialized units. ALVARADO was told that the transfer was due to budget restraints, and that there would be no new candidates to process. However, two weeks after her transfer a new class of candidates were brought in for processing. In March 2007, a junior detective who had also been reassigned was allowed to remain in the unit the department to assist with the hiring process.

93.    As a result of this discriminatory treatment, ALVARADO has suffered economic and emotional injuries.

## GORDON URQUHART

94.    Plaintiff GORDON URQUHART is an African American male. He was hired in 1981 and was promoted to Detective in 1990. He retired in December 2006. Throughout his twenty-five (25) years in the Department URQUHART was subject to a pattern of continuous and pervasive discrimination. Despite a satisfactory employment record, the MTA delayed his career advancement, and denied him transfers, training, favorable job assignments, and overtime. He was also subjected to a continuous hostile work environment by his supervisors. URQUHART complained about the discrimination internally to the MTA and also filed a complaint with the SDHR. After making his complaints, URQUHART was retaliated against.

95.    As part of an ongoing pattern and practice, the MTA Police Department delayed URQUHART's career advancement because of his race, in that URQUHART was not promoted to Detective for nine (9) years. The MTA did so in part by denying him training necessary for advancement. During the same time, numerous Caucasians officers were appointed to detective with less than five-years experience.

96.    URQUHART was subjected to a continuous racial hostile work environment throughout his career. The hostile work environment was severe and pervasive, altered the conditions of his employment and caused him emotional stress. He was subject to intimidation, insults, and ostracization because of his race and racially derogatory acts.

97.    URQUHART was discriminated against by his supervisor who displayed his disapproval for URQUHART's interracial marriage by refusing to acknowledge URQUHART's Caucasian wife.

98.    In 1999, URQUHART was told by his supervisor that "he would shut overtime down before giving him hours." Thereafter, he complained to the PBA that the allocation of overtime and hours was discriminatory.  When URQUHART's complaints got back to his supervisors, the hostile work environment escalated and he was retaliated against because of his complaints.  His supervisors started asking URQUHART's fellow detectives, "[y]ou don't like working with Urquhart, right?"  URQUHART was isolated from his unit and reassigned to a unit where he was the only working Detective.  There he received only email communications from his supervisors. In an effort to prevent URQUHART from making any other claims about overtime, he was no longer allowed to prepare his own time-sheets.  When URQUHART requested copies of time-sheets, information on Caucasian officers was redacted so that he could not compare his overtime with that granted to Caucasians.

99.    His supervisors further criticized URQUHART's reports for grammar inconsistencies.  At the same time they did not criticize a Caucasian detective for whom reports were being prepared and to whom high profile cases were assigned, even though he was considered barely literate.  That same Caucasian Detective was later promoted to Detective Sergeant and transferred to a prestigious unit.

100.    Further, his supervisors assigned URQUHART low-level and demeaning jobs. Although he had a high arrest record, and was a seasoned detective, he was assigned to lost property cases while his fellow Caucasian detectives received high profile cases.  The hostile work environment was so severe and pervasive and altered the conditions of his employment that URQUHART applied for and received a transfer to the ICTF.

27

101.    From 2003 through 2006 URQUHART was further discriminated and retaliated against in that he was assigned within a division of the ICTF where he was not allowed to take on investigatory cases which necessitate overtime. As a result he received less overtime and earned far less than Caucasian detectives within the ICTF . The denial of overtime has had particularly detrimental effects on URQUHART's pension. His pension was calculated based on his highest three consecutive years within the five-year time period prior to his retirement. His pension is lower than Caucasian Detectives who have been allowed to increase their salaries and pensions with excessive overtime in their final years.

102.    In July 2006, URQUHART filed a complaint with the SDHR. In December 2006 URQUHART retired.

103.    As a result of the discrimination and retaliation, URQUHART has suffered economic and emotional injuries.

**BLAKE J. WILLETT**

104.    Plaintiff BLAKE J. WILLETT is an African American male. He was hired in 1982 and was promoted to Detective in MTA's Eastern District in 2000. He retired in December 2006. Throughout his twenty-four (24) years in the Department WILLET was subject to a pattern of continuous and pervasive discrimination. Despite a satisfactory employment record, the MTA delayed his career advancement, and denied him transfers, training, favorable job assignments, and overtime. He was also subjected to a continuous hostile work environment by his supervisors and endured racially derogatory statements and jokes. WILLET complained about the discrimination internally to the MTA and also filed a complaint with the SDHR.

28

105.    As part of an ongoing pattern and practice, the MTA Police Department delayed WILLETT's career advancement because of his race, in that WILLETT was not promoted to Detective for eighteen (18) years.  The MTA did so in part by denying him training necessary for advancement and imposing disparate disciplinary penalties. During the same time, numerous Caucasians officers were appointed to detective with less than five-years experience.

106.    WILLETT was subjected to a continuous racial hostile work environment throughout his career. The hostile work environment was severe and pervasive, altered the conditions of his employment and caused him emotional stress.  He was subject to racially derogatory comments, racial epithets, racial jokes, and the racial animus of his supervisors.

107.    When WILLETT entered the Eastern Region he was informed that a Sergeant said of him, "[t]his officer is nothing but a moolie." During that same period, his supervisors referred to WILLETT as "I be late Blake."  The nickname was made even more offensive by the discriminatory inflections added every time they repeated the words.

108.    When WILLETT complained about the hostile work environment to the Internal Affairs Unit ("IAU") he was told by a Captain "[y]our problem is you're big. You're black. You're intimidating.  And your father doesn't work here."

109.    While WILLETT and DAVIS were stationed in Penn Station with a group of Caucasian Detectives, one Caucasian Detective said, "Now the office is going to be full of chicken bones." When WILLETT and DAVIS complained to their supervisors they were removed from the assignment and sent to a less favorable assignment. The Caucasian Detectives were not disciplined or removed from their assignment.

110.    When WILLETT became a Detective in 2000, the environment grew even more hostile. After just three weeks as a Detective, his supervisor sent WILLETT out alone at night to investigate a death. When WILLETT asked why he was going alone when it was against policy for a junior Detective to investigate death without a supervisor in attendance, his supervisor said, 'You're a Detective now. You got it." WILLETT was placed in the same situation a few months later.

111.    As a Detective, WILLETT was regularly denied training in favor of less senior Caucasian Detectives and did not receive specialized training until he became a senior Detective.

112.    Beginning in 2002 and until 2005, WILLETT was not offered positions in the ICTF where less senior Caucasian officers were given the positions without submitting abstracts.

113.    WILLETT was also denied overtime throughout his career as Detective. From 2003 until his retirement, his supervisors denied WILLETT overtime to complete the administrative tasks that were associated with his cases, while his Caucasian counterparts were granted overtime. The denial of overtime has had particularly detrimental effects on WILLETT's pension. His pension was calculated based on his highest three consecutive years within the five-year time period prior to his retirement. His pension is lower than Caucasian Detectives who have been allowed to increase their salaries and pensions with excessive overtime in their final years.

114.    WILLETT has been denied commendations throughout his career for high profile cases in which he played an essential role. In June 2006, an award ceremony was held at Penn Station for the Detectives involved in the investigation of an Amtrak accident. An award was

given to the entire group even though Plaintiff WILLETT was the only person that investigated the case.

115.    As a result of this discriminatory treatment, WILLETT has suffered economic and emotional injuries.

## BRYAN HENRY

116.    Plaintiff BRYAN HENRY is an African American male. He was hired in 1985 and was promoted to Lieutenant in MTA's Northern District in 1991. Throughout his twenty-two (22) years in the Police Department, HENRY has been subject to a pattern of continuous and pervasive discrimination.   Despite a satisfactory employment record, the MTA has denied him promotion, assigned him demeaning jobs, transferred him unnecessarily, and subjected to disparate disciplinary penalties. He has also been subjected to a continuous hostile work environment including racial epithets, racially derogatory acts, and the racial animus of supervisors.   HENRY has complained about the discriminatory treatment internally with the MTA and to the SDHR. Since making these complaints HENRY has been retaliated against.

117.    HENRY has been subjected to a continuous racial hostile work environment throughout his career. The hostile work environment has been severe and pervasive, altered the conditions of his employment and caused him emotional stress. HENRY has been subject to racial epithets, racially derogatory statements and acts, and the racial animus of his supervisors. After becoming a Sergeant he was told that white members of the department believed that the "niggers" were taking over the department. A fellow officer told HENRY that "undesirable" minorities were hired so that they could be easily fired during the probationary period.

118.    In 1995, HENRY was promoted in place to Captain.  As Captain he was threatened by a Chief who told him "I'm going to take you out."  HENRY was subjected to a number of unnecessary transfers and his authority was commonly derided by assigning him to tasks that were below his ranking.

119.    In 2002, HENRY and four other members above the rank of Captain voluntarily stepped down and assumed the title of Lieutenants as part of a Collective Bargaining Agreement between the PBA and the MTA.  Around the beginning of 2004, three of the Caucasian Captains and Inspectors (the fourth retired prior to this event) who had voluntarily stepped down with HENRY were privately approached to be re-promoted. Two retired instead of accepting the re-promotion, and two were promoted to Deputy Inspector and Inspector.  No abstracts were collected for these positions.  HENRY was not re-promoted to Captain because of his race. In 2007, HENRY submitted an application, which is still pending, for the position of Captain.

120.    HENRY's supervisors have discriminated against and subjected him to a hostile work environment.  In 2005, they brought HENRY up on fabricated disciplinary charges. They ordered HENRY to write an evacuation plan for Grand Central Station.  When he contacted a fellow member of the security committee to discuss plans, he was told to cease writing the report and was brought up on disciplinary charges for sending the email.  The disciplinary procedure lasted over one year.  HENRY was advised to accept the charges by the PBA who told him that they had 150 pages of emails and documentation that could be used to get HENRY fired.  The charges were eventually reduced from 40 hours suspension to a Letter of Instruction.

121.    HENRY has been continually taunted, and his authority as Lieutenant has been undermined. He has been falsely accused of not completing work, and subjected to a hostile work environment.

122.    In 2005, Plaintiff HENRY received an email sent by a Chief McLaughlin containing a racially offensive video clip entitled "Hispanic Shooting Range". The video clip featured Hispanic men carrying a car door while shooting their pistols.

123.    In 2006, Plaintiff HENRY made numerous internal complaints about the mistreatment he was receiving from his direct supervisors. In July 2006, he filed a complaint with the SDHR. As a result of his internal and external complaints, HENRY has been retaliated against and subjected to the increased hostility and scrutiny of his immediate supervisors. His supervisors have ordered HENRY to complete demeaning and menial tasks that are not in the job description for Lieutenant and not assigned to his fellow Caucasian Lieutenants, including completion of meaningless reports.

124.    As a result of the retaliation and discrimination, HENRY has suffered economic and emotional injuries.

**NZINGHA M. KELLMAN**

125.    Plaintiff NZINGHA M. KELLMAN is an African American female. She was hired in 1999 and was promoted to Sergeant in MTA's Eastern District in 2003. Throughout her eight (8) years in the Department KELLMAN has been subject to a pattern of continuous and pervasive discrimination. Despite a satisfactory employment record, the MTA has delayed her career advancement, and denied her promotions, training, and has faced disparate disciplinary penalties. She has also been subjected to a continuous hostile work environment by her

33

supervisors. KELLMAN has complained about the discrimination internally to the MTA and has also filed a complaint with the SDHR. Since making her complaints, KELLMAN has been retaliated against.

126.    As part of an ongoing pattern and practice, the MTA Police Department has delayed KELLMAN's career advancement because of her race, in that KELLMAN was not promoted to the Detective Division despite four applications in 2003, June 2004, July 2004, and October 2005. The MTA did so in part by denying her training necessary for advancement and denying her transfers into special units which would have offered her additional experience. During the same time, numerous Caucasians officers were appointed to detective with less than five years experience.

127.    In 2003, KELLMAN submitted an abstract to become a detective. The MTA denied her application because of her race. The MTA promoted two Caucasian officers with notably less experience. That same year KELLMAN took and passed the exam to become a Sergeant with the intent of later entering the Detective Division.

128.    KELLMAN has been denied appointment to Detective Sergeant three times within the last four years. In June 2004, KELLMAN's application was denied because of her race. The MTA's pretextual reason for the denial was because she had not taken the requisite training course "Dignatory Protection." KELLMAN had twice previously requested this training but was denied because of her race in favor of two Caucasian officers who were subsequently appointed to Detective Sergeant. In July 2004, KELLMAN again submitted an abstract for consideration as a Detective Sergeant, which was denied because of her race. The MTA's purported reason was

34

her lack of detective experience. However, numerous Caucasian Sergeants have advanced to the level of Detective Sergeant without prior Detective experience.

129.    KELLMAN submitted an application again in October 2005. Prior to submitting her abstract she was told that the position was created for a Caucasian Detective, and that it would be futile to apply. KELLMAN nevertheless submitted her application and was denied the position.

130.    Plaintiff KELLMAN has been denied training on several occasions because of her race in favor of less senior Caucasian officers. In 2004, she was twice denied "Dignitary Protection Training." In July 2005, KELLMAN requested and was denied the relevant course "Land Transportation Antiterrorism Training." At the time, KELLMAN was supervising thirty patrol officers in Grand Central Station, a recognized terrorist target. The MTA offered the training instead to a Caucasian officer. Since that time, the Caucasian officer has been promoted to Detective.

131.    In 2005, KELLMAN sent a letter to her supervisors requesting that she be considered for all future courses that were relevant to her position. Around the same time Caucasian co-workers in KELLMAN's unit were scheduled to attend "Incident Command System Training." KELLMAN was denied the training. In July 2006, KELLMAN submitted a request to attend "Plainclothes Tactical Training." Her request was denied while Caucasian officers under KELLMAN's command were approved for the training.

132.    Plaintiff KELLMAN submitted a complaint to the MTA OCR in 2005 complaining about the discriminatory denial of training and promotions.

133.    In 2005 and 2006, KELLMAN was subjected to excessive scrutiny and disparate disciplinary treatment by her supervisors in retaliation for making her complaints. In December 2005, one month after submitting the complaint to the OCR, KELLMAN was subjected to increased hostility of her supervisors who sent the Delaware Police to her home on false pretenses. She has also been denied three training opportunities. In July 2006, KELLMAN filed a complaint with the SDHR.

134.    As a result of this discrimination and retaliation, KELLMAN has suffered economic and emotional injuries.

**KENNETH DAVIS**

135.    Plaintiff KENNETH DAVIS is an African American male. He was hired in 1985 and was promoted to Detective in MTA's Eastern District in 1994. He retired in January 2007. Throughout his twenty-two (22) years in the Police Department, DAVIS was subject to a pattern of continuous and pervasive discrimination. Despite a satisfactory employment record, the MTA denied him favorable assignments and overtime. He was also subjected to a continuous hostile work environment including racially derogatory statements , and the racial animus of supervisors. DAVIS has complained about the discriminatory treatment internally with the MTA and to the SDHR. Further, DAVIS has been a board member of the Guardians since its inception. He has been retaliated against for his complaints and involvement.

136.    As part of an ongoing pattern and practice, the MTA Police Department delayed DAVIS's career advancement because of his race, in that DAVIS was not promoted to Detective for nine (9) years. The MTA did so by assigning him low-level jobs that carried little opportunity

for recognition and advancement. During the same time, numerous Caucasians officers were appointed to detective with less than five years experience.

137.    DAVIS was subjected to a continuous racial hostile work environment throughout his career. The hostile work environment was severe and pervasive, altered the conditions of his employment and caused him emotional stress. He was subject to racially derogatory comments, racial jokes, and the racial animus of his supervisors.

138.    A Sergeant derided DAVIS for dressing like P. Diddy, a well-known African American performer, and questioned a Caucasian Detective in front of DAVIS who wanted to offer a training course at a "Black school." She also criticized DAVIS about a report on an investigation he had written in front of a room of people including a new detective that DAVIS was training. The same supervisor did not criticize the reports of a Caucasian Detective who was considered barely literate.

139.    His supervisors also denied commendations to DAVIS because of his race. In 2002, he was involved in a high profile investigation with the FBI. The FBI awarded him while his own unit, and the MTA denied his request. Shortly thereafter his supervisor mis-attributed a robbery investigation completed by Plaintiffs DAVIS to a Caucasian Detective who was later named Cop of the Year despite his low arrest record. In 2003, DAVIS was involved in a difficult case involving theft of ticket vending machines. After solving the case, DAVIS requested, but did not receive, a commendation. Caucasian Detectives were awarded commendations for similar cases.

140.    In 2003, DAVIS complained about the hostile work environment and discrimination to his supervisors and requested a transfer. DAVIS accepted a transfer to the

ICTF, that added hours to his commute so that he would not have to work with his former supervisors.

141.   Between 2003 and his retirement, DAVIS continued to be discriminated against because of his race and was retaliated against because of his complaint. He was denied favorable assignments in the ICTF because of his race.

142.   In 2005 and in 2006, DAVIS submitted requests for a special assignments which is usually offered to senior Detectives. He was told that a newly appointed Caucasian Detective was offered the position because it was closer to his school.

143.   DAVIS was also continually denied overtime where a less senior Caucasian Detective was given Pre-planed Overtime on a weekly basis, and was able to earn a significant amount more than DAVIS and the other Plaintiffs. The denial of overtime has had particularly detrimental effects on DAVIS' pension. His pension was calculated based on his highest three consecutive years within the five-year time period prior to his retirement. His pension is lower than Caucasian Detectives who have been allowed to increase their salaries and pensions with excessive overtime in their final years.

144.   In July 2006, DAVIS filed a complaint with the SDHR.

145.   As a result of this discrimination and retaliation, DAVIS has suffered economic and emotional injuries.

**ERIC MOORE**

146.   Plaintiff ERIC MOORE is an African American male. He was hired in 1994 and is an Officer. Throughout his thirteen (13) years in the Department MOORE has been subject to a pattern of continuous and pervasive discrimination. Despite a satisfactory employment record,

38

the MTA has delayed his career advancement, and denied him promotion, transfers, training, and recognition for exemplary performance.

147.    As part of an ongoing pattern and practice, the MTA Police Department has delayed MOORE's career advancement because of his race, in that MOORE was not promoted to Detective, despite four applications in 2000, 2002, 2005 and 2007. The MTA did so in part by denying him training necessary for advancement and denying him transfers into special units which would have offered him additional experience. During the same time, numerous Caucasians officers were appointed to detective with less than five years experience. Specifically in March 2005, MOORE was denied the appointment while a Caucasian officer with less experience was accepted. His February 2007 abstract is still pending

148.    Beginning in 1996, MOORE applied for specialized training. These requests were denied because of his race. In 1999, in recognition of his work ethic and congenial attitude, MOORE was selected to take a week-long Field Training Officer Program. The class qualified MOORE to train new recruits. He has been denied all other specialized training opportunities that would allow him to increase his own position.

149.    In 2002, MOORE requested a transfer into the Anti-crime Unit. MOORE was denied the transfer because of his race. He was told that he lacked sufficient experience. However, two Caucasian officers were offered positions in the unit with less experience than MOORE.

150.    In 2005, several Caucasian officers attended "Plain Clothes Training." At the time a Personnel Order was not issued announcing the course. MOORE asked his supervisor if he could attend the course. His supervisor told him that the class had been cancelled and that all

special training had to be approved by Chief CULHANE. The assertions of his supervisor were untrue and in 2006 he was permitted to attend the training.

151.    In 2006, Plaintiff MOORE prepared an abstract in response to a Personnel Order for the Canine Unit. Prior to submitting the abstract he was told that no new abstracts were being accepted, and that the candidates were coming from a group of abstracts submitted in response to a 2005 Personnel Order. For every available position an abstract is produced. MOORE sent a letter directly to the unit's supervisor requesting consideration for the position. He was denied because of his race.

152.    In 2005, Plaintiff MOORE requested a commendation for disarming a suspect. His application is still pending while Caucasian officers have been awarded for lesser achievements.

153.    In July 2006, MOORE filed a complaint with the SDHR.

154.    As a result of this discriminatory treatment, MOORE has suffered economic and emotional injuries.

**MICHAEL BENJAMIN**

155.    Plaintiff MICHAEL BENJAMIN is an African American male. He was hired in 2002 and is currently an Officer in MTA's Eastern District. Throughout his five (5) years in the Department BENJAMIN has been subject to a pattern of continuous and pervasive discrimination. Despite a satisfactory employment record, the MTA has delayed his career advancement, and denied him promotions. He has also been subjected to a continuous hostile work environment by his supervisors and has endured racial epithets, racially discriminatory comments and the racial animus of his supervisors. BENJAMIN has complained about the

40

discrimination internally to the MTA and has also filed a charge with the United States Equal

Employment Opportunity Commission ("EEOC").

156.    In November 2005, a Sergeant called BENJAMIN a "nigger" while working an

overtime shift under his charge.  BENJAMIN immediately complained about the incident to

MTA OCR and sent a letter to Chief McCONVILLE.

157.    Immediately after this incident, BENJAMIN reported that he was emotionally

upset because he had just been called a "nigger."  The MTA, deciding that BENJAMIN was

stripped him of his gun and badge, sent him home on a recorded sick day, required him

to get clearance from a psychiatrist before returning to work, and then placed him on desk duty

for four days.  Following this incident McCONVILLE found BENJAMIN insubordinate and

charged him with a twelve hour suspension.  No action was taken against the Sergeant.

158.    As part of an ongoing pattern and practice, the MTA Police Department has

delayed BENJAMIN's career advancement because of his race.  BENJAMIN applied for the

position of Detective on two separate occasions, in 2003 and in 2004 and was denied in favor of

Caucasian officers.  Recently BENJAMIN considered submitting another abstract but was told by

a Lieutenant that it would be futile because the candidates had been already been pre-selected.

The candidates were Caucasian.

159.    BENJAMIN filed a charge with the EEOC in January 2006.

160.    As a result of this discriminatory treatment, BENJAMIN has suffered economic

and emotional injuries.

**DEMAND FOR JURY TRIAL**

161.    Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981a.

**AS AND FOR A FIRST CLAIM FOR RELIEF**
(Under §1981)

162.    Plaintiffs repeat and reallege each and every allegation set forth in paragraph "1" through "161" as if set forth in full herein.

163.    Plaintiffs are members of a protected class who have been subjected to discrimination that has interfered with their protected rights under §1981 to enjoy all "benefits, privileges, terms and conditions of the contractual relationship."

164.    When the Plaintiffs accepted employment with the MTA, the Plaintiffs entered into contracts with the MTA whereby they were entitled to enjoyment of all the same benefits, privileges, terms, and condition of the contractual relationship as their Caucasian counterparts.

165.    When the MTA denied Plaintiffs the opportunity for promotions, training, overtime, and disparate disciplinary penalties, it interfered with the contracts with Plaintiffs and otherwise denied Plaintiffs the benefits and privileges of their contracts based upon their race.

166.    When the MTA subjected Plaintiffs to a hostile work environment it interfered the contracts with Plaintiffs and otherwise denied Plaintiffs the benefits and privileges of their contracts based upon their races.

167.    In addition, when the MTA retaliated against Plaintiffs for reporting the discrimination, it violated the contractual rights to engage in a protected activity.

42

168.    The MTA's denial of the benefits and privileges of the contracts with Plaintiffs was intentional, malicious and otherwise in reckless disregard of Plaintiffs' rights under Section 1981 of the Civil Rights Act of 1866.

169.    As a result of the MTA's interference with the contracts with Plaintiffs and denial to Plaintiffs of the benefits and privileges of their contracts with the MTA, Plaintiffs have sustained injury to their careers and have suffered economic and emotional injuries.

170.    By reason of the foregoing the MTA and the Individual Defendants have violated Section 1981 of the Civil Rights Act of 1866 and Plaintiffs are entitled to the following:

(a)    an injunction ordering Defendants to cease its discriminatory and retaliatory practices as hereinafter described;

(d)    compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars; and

(e)    punitive damages in the amount of not less than Two Million ($2,000,000.00) Dollars for the overt discrimination practiced by the named Individual Defendants; and

(f)    attorneys' and expert fees and costs in an amount not presently capable of ascertainment.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Under §1983)

171.    Plaintiffs repeat and reallege each and every allegation set forth in paragraph "1" through "161" and "163" through "170" as if set forth in full herein.

172.    Defendants' actions as alleged herein were committed under color of state law.

43

173.    By Defendants' acts and practices in, denying promotions, denying training, denying overtime, and subjecting Plaintiffs to disparate disciplinary penalties and a hostile work environment on the basis of their races and their complaints of discrimination, Defendants have discriminated and retaliated against Plaintiffs as employees with respect to their compensation, and terms, conditions and privileges of employment in deprivation of their rights, privileges and immunities secured by the United States Constitution and laws and the Civil Rights Act of 1871 (42 U.S.C. § 1983).

174.    As a result of Defendants' discrimination and retaliation against Plaintiffs, Plaintiffs have suffered economic and emotional injuries.

175.    By reason of the foregoing Defendants have violated Section 1983 of the Civil Rights Act of 1871 and Plaintiffs are entitled to the following:

(a)    an injunction ordering Defendants to cease its discriminatory and retaliatory practices as hereinafter described;

(b)    economic and compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(c)    punitive damages from Defendants the amount of not less than Two Million ($2,000,000.00) Dollars; and

(d)    attorneys' and expert fees in an amount not presently capable of ascertainment.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Under New York City Human Rights Law)

176.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1"

through "161" and "163" - "170", and "172" through "175" as if set forth in full herein.[fix

paragraphs]

177.    Defendants' denial of Plaintiffs' requests for promotion, training, and overtime

was based on Plaintiffs' races and in retaliation for their complaints of discrimination, and was

contrary to Defendants' treatment of Caucasian officers and officers who had not complained of

discrimination.

178.    Defendants' disparate disciplinary penalties and subjection of Plaintiffs to a hostile

work environment was based on Plaintiffs' race and in retaliation for  their complaints of

discrimination, and was contrary to Defendants' treatment of Caucasian officers and officers who

had not complained of discrimination.

179.    Defendants' conduct was in violation of Plaintiff's protected rights under the New

York City Human Rights laws.

180.    Defendants' conduct was intentional, malicious and otherwise in reckless

disregard of Plaintiffs' protected rights under the New York City Human Rights laws.

181.    As a result of Defendants' discrimination against Plaintiffs, Plaintiffs have

sustained injury to their careers and suffered economic and emotional injuries.

182.    By reason of the foregoing Plaintiffs are entitled to the following:

(a)    an injunction ordering Defendants to cease its discriminatory and

retaliatory practices as hereinafter described;

(b)    economic and compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(c)    punitive damages from Defendants the amount of not less than Two Million ($2,000,000.00) Dollars; and

(d)    attorneys' and expert fees in an amount not presently capable of ascertainment.

WHEREFORE, Plaintiffs requests that this Court issue a judgment granting the following relief to Plaintiffs:

1.    Issuing a declaratory judgment finding as follows:

(a)    Defendant METROPOLITAN TRANSPORTATION AUTHORITY has violated the provisions of 42 U.S.C. Section 1981, *et seq.*;

(b)    Defendants have violated the provisions of 42 U.S.C. Section 1983, *et seq.*;

(c)    Defendants have violated the provisions of the New York City Administrative Code Section 8-107 *et seq.*

2.    Issuing an injunction ordering Defendants to cease their discriminatory actions with regard to the denial of opportunities for career advancement for African American and Hispanic officers, and to advance the Plaintiffs as they would have been advanced in the absence of discrimination, and to cease discriminatory actions with regard to denial of opportunity for earnings and to offer Plaintiffs overtime they would have received in the absence of discrimination, and to cease discriminatory actions with regard to aspects of a hostile workplace by taking action against supervisors who have engaged in discriminatory practices,

46

and to cease acts of retaliation against the Plaintiffs and to restore them, where they have been transferred, to the positions that they would have if not for the retaliation.

3.    Awarding Plaintiffs damages as follows:

### ON THE FIRST COUNT

(a)    economic and compensatory damages as permitted by statute, but not less than Two Million ($2,000,000.00) Dollars; and

(b)    punitive damages in the amount of not less than Two Million ($2,000,000.00) Dollars; and

(c)    attorneys' and expert fees in an amount not presently capable of ascertainment.

### ON THE SECOND COUNT

(a)    economic and compensatory damages as permitted by statute, but not less than Two Million ($2,000,000.00) Dollars; and

(b)    punitive damages in the amount of not less than Two Million ($2,000,000.00) Dollars; and

(c)    attorneys' and expert fees in an amount not presently capable of ascertainment.

### ON THE THIRD COUNT

(a)    economic and compensatory damages in the amount of not less than Two Million ($2,000,000.00) Dollars;

(b)    punitive damages in the amount of not less than Two Million ($2,000,000.00) Dollars; and

(c)    attorneys' and expert fees in an amount not presently capable of

ascertainment.

Dated:        New York, New York
              May 4, 2007

NORMAN SIEGEL (NS 6850)
260 Madison Avenue - 18th Floor
New York, NY 10016
(212) 532-7586


McLAUGHLIN & STERN, LLP

By:

Steven J. Hyman (SH 2097)
Deanna R. Waldron (DW 2611)
Rachel D. Nicotra (RN 6770)
260 Madison Avenue
New York, NY 10016
(212) 448-1100