# EXHIBIT D

———————————————————————————————— x

## IN THE MATTER OF ARBITRATION BETWEEN

MTA,

           **Employer**

                                             **ARBITRATION AWARD**

      and                                  AAA Case # 13 300 02671 06

                                               re: P.O. Michael Benjamin

MTA, PBA,

           **Union**

———————————————————————————————— x

### APPEARANCES:

*For The Employer:*      Michael Stanisich........  Assistant Director Labor Relations
                                Jeffrey Giel.................. Sergeant
                                  Alfred Schreck............... Police Officer

*For the Union:*           Christopher Rothemich....... Attorney
                                  Vincent Provenzano.............. Area VP
                                  Mark Scocchera.................... Area VP
                                  Lawrence Loughlin............... Police Officer
                                  Michael Benjamin.................Grievant

       The above named Union and Employer are parties to a Collective Agreement that provides for the Arbitration of unresolved disputes that may arise during  the term of the Agreement.  In accordance therewith and with the consent of both parties the undersigned was designated as Arbitrator to hear and determine the following issue in this case as set forth in the submission agreement dated March 21. 2007.

### Issue:

Was there just cause for the discipline (12 hour suspension) to be imposed upon PO Michael Benjamin as a result of the 2/17/06 Charges and Specifications? And if not, what shall the remedy be?

A hearing was held on March 21, 2007, at the office of the American Arbitration Association located at 1633 Broadway, New York, New York, at which time both parties appeared with their witnesses and proof. Full opportunity was afforded the parties to be heard, offer evidence and argument and to examine and cross examine witnesses. At the conclusion of the hearing both parties stated they had presented their respective cases in full.

### A W A R D

On the substantial and credible evidence of the case as a whole, the Arbitrator sustains and denies in part the 2/17/06 Charges and Specifications against PO Michael Benjamin as follows:

Charge #1, Specification #1    -    not guilty

Charge #2, Specification #1    -    guilty

As and for the remedy, the 12 hour suspension of PO Michael Benjamin is reduced to a six hour suspension.

I so award.

Dated: April 27, 2007                    Roger E. Maher, Arbitrator

2

**AFFIRMATION**

STATE OF NEW YORK)
COUNTY OF KINGS)
The undersigned under penalty of perjury affirms that he is the
arbitrator in the within proceeding, and signed same in
accordance with arbitration law of the State of New York.


                                              Roger E. Maher


**BACKGROUND**

This instant arbitration is the result of the MTA, PBA
(Union) contending that PO Michael Benjamin (Grievant) is not
guilty of the two charges and specifications as set forth in the
2/17/06 Notice of Intent to Discipline issued by the MTA Police
Department (Employer) which resulted in the Chief of Police
assessing a twelve hour suspension to be imposed upon the
Grievant.

In relevant part this Notice of Intent to Discipline states
as follows:

"An investigation has been conducted relative to your
actions on November 19, 2005, while on duty assigned to a traffic
detail at Hallock Avenue and Columbia Street in Port Jefferson,
Suffolk County.

This investigation has revealed a direction violation of the
MTA Policies and Procedures Manual, to wit:

3

Charge #1: Violation of Section #2-01, "Rules of Conduct", page 1 of 5, Section II, "Policy", sub A "Prohibited Conduct", 1. "General Rules", paragraph b. to wit:

"Members shall not exhibit insubordinate behavior, either verbally or by their actions, towards a supervisor."

Specification #1: On November 19, 2005, at approximately 0805 hours, while on duty assigned to a traffic detail at Hallock Avenue and Columbia Street in Port Jefferson, Suffolk County, you were verbally insubordinate to Sergeant Giel in that you, after being told to move traffic through the intersection as previously instructed, called him a "racist motherfucker' and "a piece of shit." Additionally you stated to him that he "can't tell you what to do", that he would have to "make you return to your RMP", and that you asked him, "What the fuck kind of supervisor are you?"

Charge #2: Violation of Section #2-01, "Rules of Conduct", page 5 of 5, Section III, "Procedures", sub C "General Duties and Responsibilities", paragraph 3, to wit:

"A Member shall promptly obey lawful orders, instructions, directions, and requests of any Supervisor."

Specification #1: On November 19, 2005, at approximately 0805 hours, while on duty assigned to a traffic detail at Hallock Avenue and Columbia Street in Port Jefferson, Suffolk County, you failed to obey the orders of Sergeant Giel in that you, after being told to move traffic through the intersection as previously instructed, stated to him that he "can't tell you what to do",

4

and that when he instructed you to return to your RMP, you refused and stated "You can't make me."

On 8/25/06, Chief of Police Kevin McConville, issued his determination, and "upon reviewing all of the facts and circumstances of this matter", he concluded the Grievant was guilty of all the charges and specifications contained in the Notice of Discipline, and assessed a 12 hour suspension as the disciplinary penalty for this matter.

The record reflects the Union appealed these charges and specifications at an appeal conference held on 10/10/06, wherein by a written decision dated 11/17/06, the MTA Director of Labor Relations designee, Michael Stanisich, Assistant Director of Labor Relations, "sustained in their entirety", the charges and specifications listed in the Notice of Intent to Discipline dated 2/17/06.

Additionally the Grievant filed an employment discrimination complaint with the MTA Orifice of Civil Rights claiming that Sergeant Jeffrey Giel (Giel) subjected him to discrimination based upon his race and color in violation of the MTA's Equal Employment Opportunity Policy.

On 4/21/06 Deputy Director Naeem Din from the MTA Office of Civil Rights issued a decision which in relevant part states: "Based upon our investigation there is no reasonable cause to believe that Sergeant Giel engaged in conduct that violates MTA's EEO Policy."

**OPINION**

Essentially the record before this Arbitrator can be characterized into two subsets. The first is Sergeant Giel's claim that the Grievant on 11/19/05 at the start of a routine overtime traffic direction assignment was grossly insubordinate to him, failed to adequately direct traffic as ordered, used vulgarities towards him (Giel) and falsely accused him (Giel) of being a racist. All of which form the basis for the discipline to be imposed and the charges and specifications against the Grievant. The second subset is PO Benjamin's (the Grievant) claim in response to Giel's allegation that he, PO Benjamin, during his traffic assignment was publicly disrespected by Giel because of the traffic backup and Giel called him a "nigger".

The record also reflects that neither Giel or the Grievant had worked with each other prior to the 11/19/05 incident. There is no prior claim of animus between each officer, and the record is devoid of a previous similar claim by either officer.

The 11/19/05 incident is a first and only occurrence wherein the allegations each officer makes against the other is deemed by the Arbitrator to be uncharacteristic of each officer given the absence of claimed like or similar instances in the past.

The undisputed evidence established that on 11/19/05, Sergeant Giel supervised an overtime traffic detail with Officers

6

Benjamin (Grievant), Pugliese, Savage, Loughlin, and Schreck. This overtime, routine traffic duty was to redirect vehicle traffic over alternative railroad crossings at or nearby the Port Jefferson train station, Port Jefferson, New York while an LIRR construction gang replaced a track switch.

The undisputed evidence also established that the police traffic detail arrived at Port Jefferson at 0735 hours, and Giel assigned Officers Schreck and Loughlin to the north side of the crossing, officers Savage and Pugliese to the south side of the. crossing, and the Grievant was assigned to the Hallock and Columbia Road crossing.

Testimony and memo books further established that Giel at 0745 hours assigned the Grievant to the aforementioned intersection and instructed him to put on his orange safety vest, advised him not to let traffic back up and direct traffic against the light when necessary.

Thereafter 20 minutes later, at 0805 hours the testimony and memo books of Giel and the Grievant diverge from each other as to what occurred.

Sergeant Giel's testimony and prior written statements establish that after assigning all officers to their posts as he was driving east on Hallock Street at 0805 hours he observed a traffic backup of several blocks, and then drove his RMP with lights on in the opposite lane to bypass traffic and get to the Grievant's intersection.

7

Giel maintains that when he approached the intersection he observed the Grievant on the corner of the intersection with his hands in his pockets watching traffic, rather than in the intersection directing traffic. Giel said he yelled to the Grievant to get into the intersection and direct traffic, and in response the Grievant began to aggressively approach him and curse him.

Giel said he again instructed the Grievant to move the cars through the intersection, and in another display of insubordination, the Grievant replied, "You can't tell me what to do."

Giel said the situation quickly escalated to a yelling match between he and the Grievant. And in order to diffuse it Giel said he backed off and radioed PBA Trustee Officer Schreck who was at a nearby intersection post and told him to report to the Grievant's intersection post immediately.

Officer Benjamin's testimony and prior written statements contend that at 0805 hours he had just started to direct traffic, and at 0810 hours while in the intersection he observed Giel's RMP arriving at full speed. The Grievant claims Giel immediately exited the car and began to curse at him. The Grievant states he did not curse at Giel, but did tell him not to address him as he had in public. The Grievant said that Giel responded, "I'm your supervisor, I can talk to you however I want to."

8

The Grievant contends Giel then began to point his finger at him and near his face and said, "What are you going to do about it nigger?" And then Giel told the Grievant to shut up and given him his memo book.

The Grievant that at 0820 hours Giel told him he was going to send him home. The Grievant said Officer Schreck arrived at the scene to diffuse the situation.

At 0940 hours the Grievant's memo book entry,  as well as his testimony at this hearing, which is confirmed by Officer Loughlin,  is that when Loughlin came to relieve the Grievant the Grievant told him the sergeant had called him a nigger.

The Arbitrator notes the Grievant's claim that Giel used a racial epithet towards him was not reported by the Grievant to officer Schreck when he arrived moments after the alleged racial comment was made. This glaring omission is confirmed by the Grievant's testimony that he did not mention Giel's racial epithet towards him to Schreck when Schreck arrived in effect to mediate between the Sergeant and Grievant.

Based upon the totality of the testimony and evidence the Arbitrator holds that within 15-20 minutes of the Grievant being assigned his railroad intersection post he was unable to maintain traffic control as evidenced the several blocks of traffic backup.

The Arbitrator also concludes that the Grievant was not in the intersection directing traffic from the time he was assigned

9

to this post to the time that Sergeant Giel arrived at it, but was on the corner watching the traffic.

It is also evident to the Arbitrator that Giel was annoyed at the Grievant when upon his arrival he observed that the Grievant had not entered the intersection to direct traffic to clear the backup, a duty the Sergeant believed was self evident. The sergeant's annoyance was probably heightened because in his testimony he said words to the effect that had the Grievant been in the intersection attempting to direct traffic it would not have been so bad because he was giving it effort. Rather Giel saw the Grievant on the side of the road doing nothing to attempt to clear the intersection and in effect he had lost control of the intersection within minutes of being assigned to it.

The Arbitrator holds it would be unreasonable to conclude that without prior work experience between these two officers or a claimed history of a conflict between them, that Giel upon arriving at the Grievant's intersection at 0805 hours would just begin cursing and demeaning the Grievant for no apparent reason. The Arbitrator holds the mere fact a supervising officer in a public area with vehicular traffic that needed to be controlled and managed can yell instructions and directions at subordinate officers and may even yell to correct the deficiencies at subordinate officers, and such yelling of orders or corrections of deficiencies in implementing orders is not deemed discriminatory or hostile.

10

Clearly these two officers engaged in a verbal altercation. Each officer's testimony and memo book are consistent on only one point, they were both yelling at reach other, however, there is a lack of persuasive testimony for this Arbitrator to conclude that either officer engaged in discriminatory and or defaming language toward the other.

It is also unreasonable to conclude that Sergeant Giel would precipitously threaten to send PO Benjamin home if he did not engage in challenging Giel's instructions. The seriousness of this situation is further underscored by Giel's radioing for assistance from PBA Trustee PO Schreck to immediately respond to the intersection where Giel and the Grievant were in order to diffuse the situation.

The Arbitrator opines that the testimony of PO Schreck was central to his determination in this matter. In weighing the polar opposite statements and testimony of Giel and the Grievant, PO Schreck, while not an eye witness to the initial exchange between Giel and the Grievant, was present at scene very soon after their exchange began. Specifically Schreck's testimony established upon his arrival at 0810 hours at the intersection he places Giel in the intersection directing traffic while the Grievant was standing on the corner. Schreck also confirms he was called to the scene to diffuse the situation by virtue of his position as a PBA Trustee, and because Giel had told him upon

11

arrival that he was threatening to put the Grievant out of
service for insubordination.

Schreck credibly testified he cautioned Giel to be patient
and allow him to speak to the Grievant. Schreck said he spoke to
the Grievant alone and away from the intersection while Giel was
in the intersection directing traffic.

Schreck maintains he told the Grievant that Giel wants you
out of service, insubordination is serious, and do what the
Sergeant says in order to avoid repercussions.

Schreck said he then told Giel the situation was resolved,
the Grievant will direct traffic wherein Giel relents on the
threat to put the Grievant out of service and the matter would
instead be reduced to a sergeant memo in the Grievant's memo book
which is commonly referred to as a to from memo.

Schreck said he then started to report back to his post
observing the Grievant directing traffic at his post.

Officer Schreck, an MTA PBA Trustee, faced no credibility
challenges. His testimony and his prior written statement were
clear that the Grievant never mentioned to him that Giel had
called him a nigger. Schreck said all the Grievant claimed was
that Giel disrespected him by pointing his finger in his face.

The Arbitrator holds it is hard to ignore the fact that the
Grievant failed to tell Schreck some minutes after Giel's alleged
racial epithet toward him was made that this had occurred. Rather
the Grievant's claim that Giel used the nigger word was initially

12

made to officer Loughlin, a disinterested party, who relieved the Grievant at 0940 hours approximately 1.5 hours after the alleged comment was made.

The Arbitrator believes the only way to explain why the Grievant who alleges Giel used a racial epithet against him and knowing that Giel threatened to put him out of service failed to tell Schreck about it some minutes after it is alleged to have occurred, yet tells Loughlin about this racial allegation 1.5 hours later, is that the Grievant had realized that serious repercussions would occur including likely discipline or that it did not happen as he claimed. In any event the Arbitrator is unable to conclude that in fact Giel used a racial epithet towards the Grievant given the paucity of credible evidence to establish such a claim.

For all these reasons the Arbitrator is unable to substantiate the claim that Giel defamed, cursed and used racial epithet at the Grievant or the fact the Grievant was verbally insubordinate by the use of vulgarities and a display of aggressive and threatening behavior. However, the Arbitrator does find the Grievant failed to perform his duties as directed by Giel, that being to direct traffic and prevent backups on 11/19/05 in a timely manner. Accordingly the charges and specifications are sustained and denied in part.