1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

2

3    ------------------------------------X
                                        :
4    ARMSTRONG, et al.,                 :    07-CV-3561
                                        :
5                   Plaintiff,          :
                                        :
6              v.                       :    May 14, 2008
                                        :
7    METROPOLITAN TRANSPORTATION        :    500 Pearl Street
     AUTHORITY, et al.,                 :    New York, New York
8                                       :
                    Defendants.         :
9    ------------------------------------X

10            TRANSCRIPT OF CIVIL CAUSE FOR GENERAL
11        PRETRIAL SUPERVISION AND DISCOVERY DISPUTES
            BEFORE THE HONORABLE HENRY B. PITMAN
12             UNITED STATES MAGISTRATE JUDGE

13

     APPEARANCES:
14
     For the Plaintiffs:            DEANNA WALDRON, ESQ.
15                                  RACHEL NICOTRA, ESQ.

16

17

     For the Defendant:            CRAIG BENSON, ESQ.
18                                 STEPHEN FUCHS, ESQ.

19

20

21

     Court Transcriber:            SHARI RIEMER
22                                 TypeWrite Word Processing
                                   211 N Milton Road
23                                 Saratoga Springs, New York 12866

24

25

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

1          THE CLERK: Armstrong v. MTA.

2          Counsel, please state your name for the record.

3          MS. WALDRON:  Deanna Waldron of McLaughlin and Stern

4   for plaintiffs.  I'm here with Rachel Nicotra and my co-counsel

5   Mr. 1.

6          MR. SIEGEL: Norman 1, 260 Madison Avenue.

7          MR. BENSON:  My name is Craig Benson along with

8   Stephen Fuchs from the law firm of Littler Mendelson P.C.

9   Along with us is Rhonda Mull who is in-house counsel for the

10  MTA.

11         THE COURT: Good afternoon all.  Judge Lynch has

12  referred the matter to me to resolve discovery disputes.

13  Actually for the purpose of general pretrial supervision,

14  excuse me, which includes resolving discovery disputes and

15  scheduling issues.  He's also sent me the party's joint letter

16  of May 5, 2008 which is the -- which outlines the disputes that

17  brings us here.

18         With respect to the scheduling issue, I'm going to

19  grant -- both sides I take it want the additional ninety days.

20         MS. WALDRON: Yes, Your Honor.

21         THE COURT: The discovery is extended by ninety days.

22  You should contact Judge Lynch's staff about the June 13

23  conference to see what he wants to do with that.  I can't

24  control Judge Lynch's calendar so you should contact his staff.

25         The next issue -- the substantive discovery issue,

1   the real discovery issues are the production of personnel files

2   and the extent to which they should be produced.  They seem to

3   fall into two categories I think in terms of comparators and

4   non-comparators.  Why don't we talk about -- one thing which

5   might be helpful to start and maybe we can get this from

6   counsel for defendant.

7          Can counsel for defendant tell me generally the

8   classes of information that are in personnel files for the MTA

9   police?  Is there some kind of matrix of what goes into a

10  personnel file?

11         MR. BENSON: There's no matrix, Your Honor.  There are

12  files that come from several different areas in the MTA that go

13  into a police officer's file.  There's an Internal Affairs file

14  which would include the applicant investigation when the police

15  officer was first interviewed, the extensive background check

16  that goes in.  There's disciplinary files.  There could be a

17  file if the person was employed by the Long Island Railroad

18  prior to the MTA PD being created.  There would be a file with

19  that or the Metro North Railroad.  There would be a training

20  file.  There could be a benefits file.  There are several

21  different components that come from different areas of the MTA

22  structure, all of which are generated with response to the

23  documents that were responsive to the original discovery

24  request for a police officer.  So there's a lot of different

25  pieces of file encompassing the discovery request could be

4

1   quite large depending on how long the police officer had been

2   employed or how extensive the background for that police

3   officer was.

4           THE COURT: Let me turn to the -- let's address the

5   comparators first because maybe that's the easier issue.  With

6   respect to the comparators, maybe plaintiffs can start by

7   telling me exactly what do you want with respect to the

8   comparators and why.  It seems to me the whole file might well

9   be overbroad but I'm happy to hear what you have to say.

10          MS. WALDRON: Well, Your Honor, we may be able to not

11  need the medical or benefits file portion of it but the

12  portions that we do are very interested in are the

13  disciplinary, the training files and any other -- we don't

14  really know exactly what's in the files either but any relevant

15  part of the file that shows commendations that they're awarded,

16  applications that they've gone for any positions because the

17  reason why that we need these files is because we claim that

18  these people are similarly situated to some of our claims. It's

19  not all ten but some who are applying for positions, promotions

20  to detective, for trainings, for positions in special units and

21  that these are some of the comparators. We've limited, Your

22  Honor, quite a lot to what we think that we -- there may be

23  additional comparators that we would like but we're limiting it

24  to these people who were promoted to detective in the past four

25  years and also persons who received transfer into one of the

5

1  special units called the Inter Counter Terrorism Task Force.  I

2  hope I got that right.  ICTF is what everyone calls it in our

3  case.  So that's the why.

4        We have plaintiffs who applied for and were not

5  promoted to detective in that same time period and who also

6  applied --

7        THE COURT: I should have said this before.  If you'd

8  like to remain seated if you're more comfortable.  Whatever

9  your pleasure is.  It goes for everybody.  Go ahead.  I'm sorry

10  for interrupting.  Go ahead.

11        You were talking about the ICTF --

12        MS. WALDRON: Transfer -- we claim that these, the

13  people whose files, the comparators that we're looking for is

14  the files are people who were promoted to detective were

15  transferred into special units or received training within the

16  past few years that certain of our plaintiffs also were

17  claiming for.  That's why we seek for these comparators.

18        Then in addition, comparators actually fall into two

19  different categories.  Your Honor, the other category of

20  comparators are people who -- members of the police department

21  who were given or not given discipline based on incidents that

22  we believe were either more egregious than incidents that our

23  plaintiffs were subject to -- were disciplined for or -- yes,

24  that's about it.

25        THE COURT: Well, presumably if there was a charge

6

1 that would be in the disciplinary files whether or not it

2 resulted in sanctions.

3          MS. WALDRON: We don't know, Your Honor.  We have only

4 seen our plaintiff's files.  So we don't know what's in the

5 other files.

6          THE COURT: If someone did something inappropriate

7 that they were never written or possibly inappropriate that

8 they were never written up for, it would seem that there would

9 not be any paper record.

10          MS. WALDRON: Well, Your Honor, some of them

11 there's -- that's the other reason why we were asking for

12 particularly sometimes greater than just the disciplinary file

13 because sometimes they put things -- they're almost unofficial

14 memos about things that people have done but that they don't

15 rise to the level of a disciplinary charge and those are --

16 we've seen that happen in at least -- in some of own

17 plaintiff's case.  The five disciplinary comparators that we're

18 seeking disciplinary files for though were -- there are charges

19 filed and if the question is that the way that that

20 disciplinary was handled and also the level of discipline that

21 was given for incidents that we believe are much more egregious

22 than things that our plaintiffs were involved in and some of

23 our plaintiffs have been subject to discipline that we think

24 was unwarranted.  So there's definitely an issue in this case

25 about discipline and who gets it and how and what kind of

7

1   discipline.

2          THE COURT: So with respect to comparators what I

3   understand you'd be looking for are the disciplinary file or

4   other documents reflecting some type of misconduct.  The

5   training file, I guess their initial application which would

6   have their credentials and the applications for promotion.

7          MS. WALDRON: And applications for transfers and

8   trainings.  That would include supervisor recommendations.

9   Again, we don't know exactly what it looks like but that's what

10  we believe that it looks like.

11         THE COURT: All right.  Who wants to address the issue

12  from defendant's side?

13         MR. BENSON:  I will, Your Honor.  From our standpoint

14  the whole case revolves around the concept of similarly

15  situated in comparators because I think we're all in agreement

16  that in order for us to have to produce these things they have

17  to be legitimate comparators.

18         THE COURT: The ultimate -- I read that in the letter

19  but the ultimate issue of whether someone is an appropriate

20  comparator or not is ordinarily a question of fact for the

21  jury.  Look, I'm not trying to foreclose the issue but if you

22  want to resist discovery on the grounds that these individuals

23  are not appropriate comparators don't I need a factual

24  submission establishing that the punitive comparators are so

25  differently situated that no reasonable jury could find that

8

1  they're comparators.

2      MR. BENSON:  I don't disagree with Your Honor's

3  assessment of that and we have never taken the position that

4  they're not entitled to legitimate evidence when it comes to

5  comparators, but what we're talking about here, for example,

6  is -- Ms. Waldron said that these are individuals who were

7  promoted to detective and some of the plaintiffs weren't.

8  Well, these individuals were promoted to detective at a time

9  when not a single one of the plaintiffs applied to be a

10  detective.

11      So, yes, if the plaintiffs had gone for a position

12  and these individuals had gone for the same position and were

13  appointed and the plaintiffs weren't, we have no problem giving

14  the applications over and they have a legitimate right to

15  compare them.  But we're talking here about apples and oranges.

16  Simply because somebody at one point in time applied to be a

17  detective and was appointed a detective does not mean that that

18  opens up their personnel file for all kinds for anybody in the

19  future who might ultimately apply for detective down the road

20  and not get appointed.  Different times, different decision

21  makers, different everything.  I mean they are not even close

22  in terms of similarly situated from a comparison standpoint.

23      Again, in terms of training, anything.  We've made it

24  clear to the plaintiffs that to the extent that they can

25  identify any single individual who was allegedly provided with

9

1   an opportunity that any one of the plaintiffs was denied, we

2   are more than willing to give them relevant documentation with

3   respect to that individual.  They have failed to come forward

4   with any such contention.

5          THE COURT: Well, the law with respect to discovery

6   though is that the party resisting discovery ordinarily bears

7   the burden of establishing that the discovery sought is

8   inappropriate.  Look, it's theoretically possible that the

9   individuals that the plaintiffs have designated as comparators

10  are so dissimilarly situated than plaintiffs are that perhaps

11  as a matter of law they could not be considered comparators.

12  That may well be the case but -- I don't know if it is or

13  isn't, but before I can reach that conclusion isn't it

14  incumbent upon the defendants as the party resisting discovery

15  to make a factual showing that the individuals who are

16  designated as comparators by plaintiffs are so differently

17  situated that they're not appropriate comparators as a matter

18  of law which doesn't -- and in turn doesn't that then require a

19  showing that comparator number one is different from plaintiff

20  1 through 10 because fill in the blank?  Comparator 2 is

21  different from plaintiffs 1 through 10 because fill in the

22  blank.

23          MR. BENSON:  Well, as I've stated, Your Honor, all --

24          THE COURT: Go ahead.

25          MR. BENSON:  If I may.  I don't mean to interrupt

1   you.

2          THE COURT: I'm sorry, go ahead.

3          MR. BENSON  All comparators to the extent that these

4   were individuals who were "promoted to detective" were promoted

5   to detective at a time when not a single one of the plaintiffs

6   applied to be a detective and I would think that that would

7   satisfy exactly the standard that Your Honor just articulated.

8   I mean similarly situated does have meaning and it -- if

9   they're going to establish that they were discriminated against

10  they need to show that they were treated differently from

11  similarly situated individuals.  Individuals who were promoted

12  several years before or at a time when none of them applied are

13  not similarly situated, and this brings me to the second point

14  which sort of is important for us to address as we look at this

15  entire dispute and that is that this is not a pattern and

16  practice case.  It cannot be a pattern and practice case

17  because it is not a class action.  It is essentially ten

18  separate individual disparate treatment lawsuits and in a

19  disparate treatment lawsuit the burden is on the plaintiff

20  ultimately to show that they were discriminated against vis-a-

21  vis similarly situated individuals.

22          So the fact that there may have been at another point

23  in time while one could potentially argue that --

24          THE COURT: Well, one of the ways you show intent

25  though or one of the ways you can show intent is through

11

1  similar act evidence.  Morgan -- was it Morgan v. Amtrak

2  expressly notes that and 404 of the Federal Rules of Evidence -

3  - I don't know if it's 404 or 403 says that one of the ways you

4  can -- [inaudible] mimic is the way I learned it in law school,

5  motive, intent, absence of mistake, identity, common plan or

6  scheme where the issue -- the issues on which you can show --

7  are the issues on which you can show similar act evidence.

8          So intent is ordinarily something -- an issue on

9  which similar act evidence is admissible.

10          MR. BENSON: That may be true.  However, when you're

11  talking about discrete acts.  For example, when you're talking

12  about promotions, when you're talking about training, things

13  like that that happened in a discrete point in time the case

14  law is very clear that you cannot go back and pull in that sort

15  of general comparative evidence.  The Supreme Court was very

16  clear on that.

17          THE COURT: No, the issue -- if X is the plaintiff or

18  the -- let's assume the plaintiff is an X and make X any

19  protective characteristic you want to be and if the plaintiff

20  is saying I was not promoted because I'm X and if you can show

21  that the decision maker at another point in time said we have

22  too many X's around the shop, we don't need any more of these

23  X's well, that would be admissible.

24          MR. BENSON:  Depending on -- depending on temporal

25  proximities.

1           THE COURT: Exactly.  If it's twenty years before the

2    decision maybe not but let's assume it's within two years of

3    the decision it would be admissible --

4           MR. BENSON:  But that's a discrete smoking gun sort

5    of -- that goes into the whole stray remark different type of

6    evidentiary issue, but my point is simply that is that the case

7    law is clear that when you are dealing with discrete acts that

8    happened at a point in time that you can't go into that sort of

9    continuing violation type evidence that Your Honor is speaking

10   about and --

11          THE COURT: Well, but we may be getting off -- it's a

12   fascinating discussion but we may be getting a little far

13   afield of the comparator discovery issue.

14          MS. WALDRON: As far as I know factually, Your Honor,

15   we have allegations from our plaintiffs that they did apply at

16   the same time as some of these individuals and they also

17   applied in the year before and the year after and there's a

18   question of fact here about these abstracts or applications or

19   postings that they call it at the MTA, abstracts, call for

20   abstracts that we believe that it's not clear who applied when

21   so that we picked the people who were promoted in 2004 which is

22   not even calling into -- anything about the statute of

23   limitations issue that as we all say philosophically has raised

24   at this point, but these are people in the past -- statute of

25   limitations period and these are people -- plaintiffs --

13

1    factually we agree.  There would have to be a hearing on

2    whether these people are similarly -- we believe they are

3    similarly situated because plaintiffs have applied within the

4    year -- that year and the year before and the year after for

5    the similar positions and it's not just having to do with,

6    again -- Your Honor is right.  Having to do with the motive and

7    intent and all of that.  Also, for discrimination claims we

8    believe it's completely relevant for --

9            THE COURT: It seems to me unless the defendant can

10   make a factual showing -- I'm happy to give the defendant the

11   opportunity, to chance to do that and I'll give plaintiff a

12   chance to respond but unless the defendant makes a factual

13   showing that the punitive comparators are so differently

14   situated that as a matter of law they could not reasonably be

15   held or could not reasonably be found to be comparators the

16   plaintiffs are entitled to discovery of the personnel files to

17   the extent of disciplinary files or documents reflecting the

18   charges of misconduct, training files, the initial application,

19   applications for promotion, applications for training.

20           If you want to make -- if you want to endeavor to

21   make a factual showing that these people are so different that

22   they couldn't be comparators as a matter of law I'm happy to

23   give you the chance to do that, Mr. Benson.

24           MR. BENSON: Yes.

25           THE COURT: If you want to do that we'll set a

14

1  schedule.

2          MR. BENSON: Why don't we set a schedule and we will

3  endeavor to resolve this separate and apart from that schedule

4  and hopefully not use it.

5          THE COURT: All right.

6          MR. BENSON: How's that?

7          THE COURT: All right.  If you want to make the

8  factual showing can you -- what I'm thinking about is your

9  submission a week from today and plaintiff's submission the

10  29th, a week from tomorrow.  I'm inclined to give them one more

11  day because of the Memorial Day weekend.  Or do you want some

12  other schedule?  What do you think?

13          MR. BENSON: Your Honor, if we could have a little

14  more time than one week.

15          THE COURT: How much time do you want?

16          MR. BENSON: The following Monday would be --

17          THE COURT: It would be the following Tuesday, the

18  27th.

19          MR. BENSON: The following Tuesday the 27th.

20          MS. WALDRON: Your Honor, we would request the same

21  amount of time.

22          THE COURT: All right.  So that's going to be

23  plaintiff's submission on the 27th --

24          MS. WALDRON: Defendant's.

25          THE COURT: I'm sorry, defendant's submission.  I'm

15

1   sorry.  The 27th.  So that's thirteen days from today.  So

2   thirteen days from the 27th is going to be May -- June 9th I

3   guess.

4          MS. WALDRON: Your Honor, I'm sorry to ask again.  Ms.

5   Nicotra and I both have -- we're actually going to be out of

6   the office the 4th, 5th and 6th.  So if we could have just a

7   few more days.  Just not on the 9th.

8          THE COURT: What do you want?

9          MS. WALDRON: The 11th.

10          THE COURT: Any objection to that?

11          MR. BENSON: No objection.

12          THE COURT: So the response on the 11th.  If you can

13   work it out just all --

14          MR. BENSON: Just so I understand Your Honor that if

15   we were going to produce it would be limited to the discipline

16   file, it would be limited to the training file, it would be

17   limited to the application for detective, and I think you also

18   said the initial application and that's the part that's a

19   little troubling to me is the initial application to become a

20   PD.

21          THE COURT: I presume if somebody -- it's relevant I

22   suppose because if someone has a Ph.D. in criminology from

23   Harvard, if Harvard gives such degrees, and someone else has an

24   associate's degree from a lesser institution I presume that's

25   relevant to why one person got promoted and one person didn't.

16

1  That's why I thought the initial qualifications might be

2  relevant.  If someone comes to the MTA police force having

3  spent ten years on the New York City police force and you've

4  got somebody else who comes to the MTA police force fresh out

5  of high school or fresh out of college I would think that would

6  be relevant.

7           MR. BENSON: That's a fair point.  Again, just so we

8  don't split hairs here.  We're talking about the application,

9  not like the Internal Affairs investigation that goes along

10 with it.

11          THE COURT: No, not the Internal Affairs.

12          MR. BENSON: The initial application.

13          THE COURT: The things that show their qualifications.

14          MR. BENSON: That's fine.

15          THE COURT: What you'd put on a resume or CV, that

16 type of information.

17          The other thing is one thing you didn't list, Mr.

18 Benson, which I had listed and this was in response to Ms.

19 Waldron's comments, if there are any other documents in the

20 file even if they're outside the disciplinary file that

21 reflects some kind of misconduct.  She was concerned about

22 people who were -- may have engaged in misconduct and weren't

23 prosecuted for for want of a better word.  So if there were

24 other documents in the file reflecting on the job misconduct

25 whether they're in the disciplinary file or not --

17

1          MR. BENSON: I would -- they would have to be but

2     I'll -- we'll endeavor to look if in fact they're not.

3          MS. WALDRON: The other thing, Your Honor, that wasn't

4     mentioned but I'm assuming it will be -- we may not have a

5     problem about this, but application for transfer to the special

6     units and also commendations because the commendations would

7     also be something that would go into whether someone is getting

8     a position or not.

9          MR. FUCHS:  Just a point of clarification on the way

10    these documents work, Your Honor.

11         THE COURT: Hold on one second before you get to that

12    point of clarification.

13         Is there any objection to applications for transfer

14    and commendations?

15         MR. BENSON: Other than the big picture objection, no.

16         THE COURT: Mr. Fuchs, what did you want to say?

17         MR. FUCHS:  As I was stating, one of the articles

18    that's at issue here is something called an abstract.  That's

19    something that an officer submits in response to a notice that

20    there's an opportunity to apply for a certain unit or for

21    detective.  Those documents may not necessarily be within the

22    personnel files that have been requested and have been produced

23    separately.  So --

24         MR. BENSON:  They've already been produced.

25         MR. FUCHS: They have already been produced.

18

1          MS. WALDRON: We have them already.  We don't want

2     them again.

3          THE COURT: The next -- the other half of the issue

4     here -- I guess there's also a third piece with respect to the

5     rosters.  The supervisors and decision makers.  Let me hear

6     from plaintiff's side first on exactly what they're looking for

7     and why.

8          MS. WALDRON: Well, Your Honor, we believe that the

9     supervisors here -- it's a twofold argument.  One, that they

10    have themselves are similarly situated to our plaintiffs in the

11    sense that they have committed their own serious infractions

12    that -- and other issues, disciplinary penalties that they have

13    had some incidents but that they haven't been disciplined as

14    harshly as our plaintiffs have been.  So there's that.

15          Then these are also -- most of these individuals that

16    we requested or all of them are what we call the decision

17    makers in the case -- at least one or more of our plaintiff's

18    cases and that to show what's in their files is again relevant

19    to as Your Honor said before the intent in a discrimination

20    case.  While they have -- the defendants have purported to give

21    over -- turn over to us things such as civilian complaints and

22    other complaints file with their internal OCR which is their

23    EEOC office.  We know that -- it's come up in at least one of

24    our plaintiff's case where she claims that one of her

25    supervisors claims that she wrote her reports in ebonics which

1    she thinks is a racially discriminatory remark.  She makes the

2    complaint about it but that did not show up in the production.

3    So that it's just an example, Your Honor, of how things that

4    they say -- without getting the full personnel file we don't

5    know how they're categorizing things.  Just because they're not

6    putting it in the disciplinary file or they're not putting

7    it -- calling it something that's supposed to be regarding

8    discrimination that we didn't -- it wasn't produced to us.

9            So we believe that's why for the supervisors we

10   believe that this is -- there's other supervisors who have been

11   similarly --

12           THE COURT: If they're supervisors aren't they

13   dissimilarly situated by definition?

14           MS. WALDRON: No, Your Honor, because while they

15   were -- some of these events -- this is where again I guess

16   we're starting to come into -- this is a hostile work

17   environment continuing -- continued violation that's been going

18   on.  Some of these supervisors have done things over the years

19   yet they're not disciplined in the same way.  Under National

20   Railroad, as you had recognized, this would be background

21   evidence but it is potentially relevant to our case to show

22   that the supervisors are treated -- not just supervisors but

23   these specific --

24           THE COURT: Well, supervisors are always treated

25   differently. That's nothing new.

20

1          MS. WALDRON: Some of this happened while they weren't

2     supervisors is what we're trying to get at.  So how they were

3     treated while they were could be relevant background evidence

4     and also the fact that these people did these things and yet

5     they still get promoted to supervisor while our plaintiffs were

6     having difficulty with this sort of -- and --

7          THE COURT: Then you're saying they're comparators.

8          MS. WALDRON: As I said, there's two -- some of these

9     supervisors we do admit they're similarly situated and just

10    with respect to the discipline. So with the disciplinary files

11    we need somewhere where we could actually accept --

12    disciplinary files or other documents that would reflect on

13    discipline whether it's not specifically in the disciplinary

14    file.

15          But, in addition, these supervisors, as I said,

16    they're promoted despite having had allegations of

17    discrimination against them and also, like I said, Your Honor,

18    there's at least -- we have one incident, at least one that we

19    can document where there is not any record that's been

20    produced.  It's regarding Sergeant Kim Riley who made -- who

21    our plaintiff, named plaintiff or first plaintiff Marilyn

22    Armstrong has complained that she made a remark about ebonics

23    to her and that -- we received no discovery on that.

24          THE COURT: Do the supervisors for whom you're seeking

25    files, did they all have seniority to the plaintiffs?

1          MS. WALDRON: At this point they do.

2          THE COURT: If you're not claiming that they're

3    comparators I'm not sure that -- it seems to me that the

4    request for all disciplinary charges is more of a stretch.

5          MS. WALDRON: Your Honor, I was saying that there's

6    really a two pronged argument.  They are similarly situated

7    when it comes to discipline and --

8          THE COURT: Well, not when they're supervisors and the

9    plaintiffs are not supervisors.

10          MS. WALDRON: But -- some of the incidents that we're

11    claiming the discovery regarding -- occurred before they were

12    supervisors.

13          THE COURT: Right.  If that's a different point in

14    time then the point in time at which the plaintiffs were

15    disciplined for similar conduct the relevance becomes extremely

16    attenuated.  If you have, for example -- if you have someone

17    who is a supervisor in 2005 who's disciplined in 1990 for

18    having a sloppy uniform --

19          MS. WALDRON:  They're a little more egregious than

20    sloppy uniforms, Your Honor.  It's like drunk driving and

21    things of this sort and things that our plaintiffs did which

22    were not.

23          Your Honor, I forgot.  There was one other point

24    here.  There is a hostile work environment claim here that

25    we -- our plaintiffs began working at the MTA back in the '80s.

22

1         THE COURT: But disparate discipline doesn't bear on

2    hostile work environment.

3         MS. WALDRON: I believe it can, Your Honor, if it's of

4    such a nature of that it's showing intimidation, insult,

5    ridicule, that you're being brought up on charges that for our

6    plaintiffs are quite minor or being written up for these memos

7    that I was talking about before where they're not actually then

8    later brought up on the charges but they're just intimidated by

9    this.  Yet there's people who then later have become

10   supervisors have things like drunk driving or assault or

11   improper arrests and they're then still promoted to supervisor

12   we think it is relevant because we believe it's still

13   continuing on into today.

14        THE COURT: So for the supervisors and the decision

15   makers you're looking for documents reflecting charges of

16   misconduct?

17        MS. WALDRON: Again, not just -- the disciplinary file

18   but then also, Your Honor --

19        THE COURT: I'm using that language to get outside the

20   disciplinary file.

21        MS. WALDRON: Yes.  Right, yes.  Memos, we would say

22   any memos with regard to misconduct.

23        THE COURT: Yes.  Documents reflecting charges of

24   misconduct.

25        MR. BENSON:  May I be heard, Your Honor?

23

1          THE COURT: Yes, please.

2          MR. BENSON: It's important for you to understand that

3    when we're dealing with the term supervisor now that

4    anything -- and that would include anybody from sergeant,

5    lieutenant, captain, chief, these are --

6          THE COURT: I'm sorry to interrupt you.  Maybe I'm

7    misunderstanding.  I thought there were specific individuals

8    that they've named.

9          MR. BENSON: They have.  But I just want you to

10   understand these individuals that they've named hold these

11   ranks.

12         THE COURT: Go ahead.  I'm sorry.

13         MR. BENSON: The only way that one gets promoted to

14   those ranks is by passing a civil service test and promotion is

15   then based on one's rank on a civil service test.  It does not

16   involve subjective assessments on the part of individuals in

17   the MTA.  There's no allegation in this case that any of the

18   plaintiffs have applied for and didn't become sergeants or

19   lieutenants or anything of that nature.  In other words, nobody

20   is claiming that they took and passed a test and were somehow

21   then discriminated against.  So that's -- I give that as

22   backdrop for you to understand how different these individuals

23   are.

24         MS. WALDRON: Your Honor, I'm sorry to interrupt but

25   there are at least two plaintiffs who make those allegations.

24

1          MR. BENSON: What allegations?

2          THE COURT: Let Mr. Benson finish.  I'll give you a

3   chance to respond.

4          MS. WALDRON: Sorry.

5          THE COURT: Go ahead.

6          MR. BENSON: So you are dealing with individuals who

7   are truly in a dissimilar position than any of the plaintiffs.

8   Judge Lynch directly addressed this issue in a conference

9   before him because it was these individuals' personnel files

10  where this subject was originally brought up and he held that

11  any instances of -- any allegations of discrimination against

12  these individuals is relevant and he went so far as to say any

13  allegations of improper force because of the connection between

14  improper force and race that might be relevant.  So we produced

15  those things as well.  His ruling was very limited in that

16  respect and in essentially holding and rightfully so that any

17  other aspects of their files as it pertains to their role in

18  this case as alleged discriminators was not relevant.

19         To claim now, to try to go around that ruling and get

20  at this information by alternatively arguing that these

21  individuals are comparators because, again, in terms of

22  discriminators Judge Lynch has ruled is disingenuous and is not

23  called for by any rule of evidence or anything else.  I mean

24  these individuals are not remotely similarly situated with the

25  plaintiffs.  Their promotion to sergeant or lieutenant or

1   whatever was again based on their passing a test that had

2   nothing to do with someone's subjective assessment of whether

3   they had engaged in discipline or not and I think does not

4   justify us providing their statutorily protected personnel

5   files.

6           THE COURT: Ms. Waldron.

7           MS. WALDRON: Well, first of all, I take issue with

8   Mr. Benson's characteristic if I can put it that way of Judge

9   Lynch's decision.  We take the opposite view that Judge Lynch

10  was merely saying that these were -- I think we've quoted his

11  text.  He said these were the personnel files of the bread and

12  butter.  I don't think there's a transcript from that. I wish

13  there was, bread and butter of discrimination cases and that

14  the contents were relevant and then he just simply had gone on

15  to list which parts of that file he felt were particularly

16  relevant.  I didn't in any sense get the sense and neither does

17  my co-counsel that the judge was limiting us to those.

18  Otherwise we would not have been continuing to seek this, these

19  kinds of files.  That's my first point.

20          The second point is that there are allegations in

21  this case.  There's one of our plaintiffs who was a -- had

22  achieved a level of captain and then was -- there's an issue

23  about why he is not a captain any more and that he was --

24          THE COURT: He was demote -- one of the plaintiffs was

25  demoted?

26

1          MS. WALDRON: They voluntarily -- this captain along

2     with three other white captains voluntarily took a demotion

3     because for collective bargaining reasons.  While the others

4     then were re-promoted he was not.  So there's an issue in the

5     case about that that is very relevant and impacts upon at least

6     -- it's Inspector Terrett and Inspector Dunn where that is

7     directly relevant because those are the two who were captains

8     with Mr. -- Bryan Henry and now took the demotion and then got

9     re-promoted whereas Henry did not.

10          Your Honor, this is a very complicated case in that

11    there's ten plaintiffs. They're at various different points in

12    their careers but everything we've asked for there's a reason.

13    We're not just -- we're not on a fishing expedition.  We have

14    specific reasons for each one that if we parse through each one

15    we will go through but we were attempting to --

16          THE COURT: The notion that they're comparators --

17    unless one of the supervisors engaged in similar misconduct in

18    connection -- in misconduct that was similar to the misconduct

19    that one of the plaintiffs engaged in at or about the same time

20    as the plaintiff and while the supervisor held the same rank as

21    one of the plaintiffs --

22          MS. WALDRON: That would be Inspectors --

23          THE COURT:  -- it seems to me that it's almost --

24    it's awfully close, maybe it's there, they're not similarly

25    situated as a matter of law.

27

1          MS. WALDRON: Well, Inspectors Dunn and Terrett are

2   perfect examples how they were similar situated to Captain

3   Henry -- to Lieutenant Henry when he was a captain and so that

4   at the time we should be entitled to have those files of when

5   he was -- they were -- at the same rank and there are issues

6   about that.  That's why I say, Your Honor, that if we have to

7   take each one on a -- each individual on a point by point.  As

8   I said before, we're willing to accept less for the supervisors

9   with regard to disciplinary and the other parts of that that --

10  the discipline that's not specifically in the disciplinary file

11  but that may impact upon it like misconduct.

12          Your Honor, we honestly -- we asked for these because

13  we've been told this but we can't -- without the files we don't

14  know what's in -- we don't know specifically.  There's

15  allegations of this and they're in our complaint but we don't

16  know the specifics of it because we don't have the files.

17          THE COURT: Let me ask Mr. Benson. Mr. Benson, have

18  you seen -- just answer this question yes or no.  Have you seen

19  the files of the individuals who are identified as supervisors

20  or decision makers or has someone on defendant's side seen

21  them?

22          MR. BENSON: I have, Your Honor.

23          THE COURT: Is the fight about real issues or is it a

24  theoretical fight?  Just yes or no.  Unfortunately I had this

25  come up with the NYPD with requests for disciplinary files and

28

1  often times -- I shouldn't say often times but sometimes what

2  happens is I order that the file be produced and there's

3  nothing in there anyway.

4         MR. BENSON: It's a real issue in the sense that if

5  you order the production of a disciplinary file for someone in

6  a supervisory position which going back to the commencement of

7  their employment there could be things -- Ms. Waldron mentioned

8  drunken driving.  I don't know that any of the plaintiffs are

9  complaining about how they were disciplined for drunken

10  driving.  We're talking about very different kinds of

11  discipline and with all of the individuals that they've asked

12  for if you go back to the commencement of their employment a

13  review of anything that they were disciplined for is just not

14  going to be comparable to what the plaintiffs are complaining

15  about.  If the plaintiffs were complaining that -- make a

16  showing I was disciplined for X and we don't believe so and so

17  was disciplined in the same way in a relevant time period but

18  that's not what's happening here.  They want to say that so and

19  so, Inspector So and So was not disciplined for drunken driving

20  and I got written up for talking back to someone or I got

21  written up for an incomplete memo book entry and seeking to

22  discover the entire disciplinary history is a way of showing

23  this general pattern and practice of allegedly blacks and

24  Hispanics receiving harsher discipline.

25         We think they need to make a showing.  If it had been

29

1    articulated that Inspector Terrett and Inspector Dunne were re-

2    promoted to captain and Inspector Henry was not, we're willing

3    to piece that out and produce portions of files that relate to

4    that.   That makes them in our view -- that's a valid comparison

5    but the issue is wholesale disclosure of all of these

6    supervisor's entire disciplinary histories is an intrusion and

7    we think we're duty bound to push back on this under the

8    statutory protection.

9              THE COURT: There are things there -- there really is

10   something there to fight over.

11             MR. BENSON: I would say it's a fair statement there's

12   something to fight over in all of these files.

13             THE COURT: You've looked at the files?

14             MR. BENSON: Yes, Your Honor.

15             THE COURT: What offenses are the plaintiffs claiming

16   they were unfairly disciplined for?

17             MS. WALDRON: Well, they're not as egregious as drunk

18   driving.

19             THE COURT: Do we have a list of what the plaintiffs

20   claim they were unfairly disciplined for?

21             MS. WALDRON: Well, it's a -- it spans a large -- from

22   things like being late and not reporting -- not writing the

23   reports to I think one of our -- assault.

24                         [Pause in proceedings.]

25             MS. WALDRON: I think that's the range, Your Honor, of

30

1  where it goes from.  So very, very minor to more significant.

2  I don't have an exact list right in front of me given that

3  there's ten people but I know it spans a wide array.

4         Then, Your Honor --

5         THE COURT: The problem that I'm having though is that

6  it sounds like you've got different times, the decision about

7  discipline is being made by different individuals.  We don't

8  know if the supervisors had the same rank as the plaintiffs at

9  the time of the alleged misconduct.  It seems like there are a

10  lot of differences which attenuate the relevance of what you're

11  seeking here.

12         MS. WALDRON: But the part that's all the same is that

13  this is -- there does seem, even though we are all arguing over

14  the use of this word pattern, there does seem to be some sort

15  of a practice that goes on there where people who then like

16  members have had things happen and that yet --

17         THE COURT: The fact that individuals who are of

18  higher rank are treated differently than people of a lower rank

19  though doesn't evidence anything.

20         MS. WALDRON: But they may not have been of a higher

21  rank, Your Honor, at the time which is the allegations that

22  are -- this is -- some of the allegations as I said -- Captain

23  Henry is a perfect example.  Captain Henry and Dunne and

24  Terrett were all captains at the same time.

25         THE COURT: But then the problem is if the person

31

1 who's the supervisor today got a slap on the wrist for being

2 five minutes late ten years ago and one of the plaintiffs is

3 more seriously disciplined today for being late by a different

4 decision maker --

5            MS. WALDRON: I don't --

6            THE COURT: The relevance is attenuated.

7            MS. WALDRON: Well, we don't believe that that's

8 what -- we believe that there is more similarities to some of

9 these supervisors to the plaintiffs at the time than -- then as

10 I'm saying, these are what we are being told by our plaintiffs

11 and we need records. We can't disprove it or prove it unless

12 we have records to show that. We have some allegations. We

13 have some examples but we're going based on what the plaintiffs

14 who were there at the time are telling us. That's all we can

15 go on. We know -- at least Henry was of the same rank as two

16 of the people that we're looking for their files for, at least

17 during a portion of the -- we're looking for here.

18            I believe that that aids the case with other of the

19 supervisors on the list, that these supervisors weren't always

20 supervisors for twenty years while our plaintiffs were under

21 them. I think Sergeant Taylor was also just most recently

22 promoted.

23            MR. BENSON: If I may be heard, Your Honor.

24            THE COURT: Yes.

25            MR. BENSON: Under that logic every single personnel

32

1   record of every single member of the department would be

2   relevant and we would have an obligation to turn them over

3   because that's how removed this is.  It is a fishing expedition

4   because they don't know, they don't have any idea of whether

5   these people are similar or not.  As you said they were many,

6   many years removed with different people and different decision

7   makers involved.  Even if something existed there's no way that

8   it could be relevant from -- or admissible from an evidentiary

9   perspective.  These -- every situation is different and some

10  are closer than others but these are way out of bounds.

11          MS. WALDRON: The other -- Your Honor, I'll just go

12  back to again what I was saying earlier is that we -- in a

13  hostile work environment claim how you're treated if you're

14  treated to intimidation by being written up for minor

15  infractions while you know that other people in the department

16  have not been written up for things that are more serious I

17  believe that goes to a hostile work environment. If it's based

18  on -- if we can then show that those things were done because

19  of race.

20          THE COURT: Well, it would seem to me though that if

21  there's a disproportionate penalty assessed for a minor

22  infraction it has -- whatever relevance it may have to a

23  hostile work environment is going to exist whether there's a

24  comparator or not.

25          MS. WALDRON: But it would also -- Your Honor, it

33

1   would show that if you're the -- some of our plaintiffs know

2   that if one of the sergeants or lieutenants or inspectors have

3   been -- or lieutenants have had some more serious things happen

4   and they're subject to -- that could show evidence of the MTA's

5   intent and motive here that if white officers are white -- are

6   not then how would that make that -- that would go to show the

7   hostile work environment because they're like well, white

8   officers can get away with a lot more than African-American and

9   Hispanic officers.  That would show a hostile work environment.

10          THE COURT: I'm not sure that is necessarily the case

11   but that's not something I have to decide.

12                     [Pause in proceedings.]

13          THE COURT: What about the fact that in all

14   probability the decision makers for the supervisors are going

15   to be different individuals than the decision makers who are --

16   the decision makers with respect to the plaintiff's

17   infractions?

18          MS. WALDRON: Your Honor, without seeing the records I

19   can't tell you if that was true or not.  If I don't know the

20   decision makers I can't tell you that they definitely were not

21   the same decision makers.  The department does not have that

22   high of a turnover.  It's very likely that they could have

23   possibly been.  When I''ve been sitting in depositions I keep

24   hearing some of the same names come up over and over again.  So

25   I'm not being speculating but I think that there is -- from

34

1    what we've seen there is a lot of the same decision makers in

2    this case.  I think that that's -- then rises to a level of

3    like the Culhane and the McConville.  I think that these --

4    they were involved in some of this.

5            The only other thing that Your Honor -- that I can

6    see is that if -- somehow for either Your Honor to do an in

7    camera inspection review first and then for us to be able to

8    tell -- without -- we only have the plaintiff's allegations.

9            THE COURT: An in camera review for what?

10           MS. WALDRON: To see if what these supervisor -- if

11   you're concerned that they don't -- that there's nothing there

12   or that there's no relevance then look at them.  We believe

13   that they are relevant.  We believe that some of the decision

14   makers are going to be the same decision makers that were

15   involved in our plaintiff's case and that I believe if that was

16   the case if a plaintiff sees a decision maker when -- make one

17   sort of a decision for a white member of the unit or the

18   department and makes a different decision based on -- for him

19   who's -- he's African-American or Hispanic then how is that --

20   I believe that goes directly to a hostile work environment.  If

21   you feel like you're being treated differently for minor

22   infractions when -- and in addition to all the other comments

23   that we say that have been made over the years.

24           THE COURT: Well, the difference in treatment is not

25   enough unless the parties -- unless the comparator is similarly

1  situated the difference in treatment doesn't make a difference.

2  Court of Appeals judges have more floor space than magistrate

3  judges but that doesn't mean magistrate judges are the victims

4  of discrimination.

5          MS. WALDRON: What happens if all happened -- what if

6  they were promoted at the same time you were magistrate judge

7  with them and that's where we're getting at, Your Honor,

8  because some of these people were at the same level at the same

9  time as some of our plaintiffs.  Again, if a hostile work

10  environment does not have a statute of limitations on it it can

11  go past the three or four years that we're working with in this

12  case and that's clear under National Railroad Morgan that that

13  is the case. If it's not it can go to background evidence.  It

14  could go to motive.  It could go to intent.  Lots of different

15  things.  We're talking about discovery here.

16          THE COURT: As you're getting temporally remote and

17  you have different decision makers involved the relevance

18  diminishes.

19          Let me just ask this question of Mr. Benson.

20          MS. WALDRON: Right.

21          THE COURT: What I'm thinking as a starting point

22  here -- let me just get your thoughts on it -- is limit -- with

23  respect to supervisors and decision makers limit the production

24  of the personnel file to those -- to any documents that reflect

25  allegations of discrimination, allegations of excessive force,

1  the two things that you say Judge Lynch already covered and

2  then have plaintiff prepare a list of the infractions for which

3  they've been disciplined and that they believe they've been

4  disciplined disproportionately and any similar charges of

5  misconduct against the supervisors.  What are your thoughts on

6  that proposal?

7         MR. BENSON: Well, again, we've already produced the

8  discrimination and excessive force documents.  With respect to

9  the other aspect of it, it would depend on the time period and

10 whether or not the same decision maker was involved.  To the

11 extent that they can identify any alleged disparate discipline

12 that took place between one of these individuals and one of the

13 plaintiffs for the same --

14        THE COURT: They're not going to know what the

15 supervisor/decision maker's disciplinary record is.  So asking

16 them to identify it creates an impossible task I think.

17        MR. BENSON: No.  I mean they're going to identify the

18 discipline that the plaintiffs allegedly -- that they claim was

19 somehow untoward and then we're going to look at the files and

20 then we're going to see whether there was something that was

21 similar within a reasonable time period and involving a same

22 decision maker.  If somebody falls into that category which is

23 a legitimate comparator then that documentation would be

24 provided.  If it falls outside of that then it should not

25 rightfully be provided because for all the reasons that we've

1  indicated.

2        So our position from the beginning has always been we

3  will produce reasonable comparative evidence and that falls

4  into that.

5        MS. WALDRON: Your Honor, I think for the excessive

6  force was not necessarily when Judge Lynch made his ruling was

7  not limited to race, excessive force.  If that's all that we

8  have --

9        THE COURT: If I understood Mr. Benson correctly I

10  don't think -- it's not my understanding that the defendant's

11  production of excessive force is limited to racially --

12        MR. BENSON: It was not, Your Honor.

13        MS. WALDRON: I'm sorry.  We only received the ones

14  that had to do with race.

15        THE COURT: With respect to the disciplinary files of

16  the supervisors and decision makers this is what I'm going to

17  do is to direct the plaintiffs to provide a list of the

18  infractions that plaintiffs believe they were

19  disproportionately disciplined for and the date of the

20  infraction.

21        With respect to the supervisors or decision makers,

22  the defendants are either to produce documents reflecting

23  charges of misconduct to the same infractions --

24        MS. WALDRON: Your Honor -- I'm sorry.

25        THE COURT: One second.

38

1          Or explain why the charge with respect to the

2    supervisor decision maker is so remote either temporally or for

3    other reasons that discovery should not be made.  If you choose

4    the latter course you can do it in a way that doesn't disclose

5    to whom the infraction relates.  You can use a pseudonym or

6    just one of the -- you don't have to identify the supervisor or

7    decision maker by name.

8          What did you want to say, Ms. Waldron?

9          MS. WALDRON: The --

10         THE COURT: This doesn't capture more serious

11    infractions --

12         MS. WALDRON: That's what I was just -- more serious

13    infractions.

14         THE COURT:  -- for which they got a slap on the wrist

15    but if the plaintiff doesn't know about the more serious -- if

16    the plaintiffs don't know about the more serious infractions

17    for which they got a slap on the wrist even under your theory

18    it couldn't contribute to a hostile environment.

19         MS. WALDRON: But no.  That's what I was going to say.

20    Your Honor, we also would like to submit what the -- I will

21    gather from my plaintiffs the allegations of the more serious

22    infractions where they believe there was a slap on the wrist

23    and we will include that in our submission then.

24         THE COURT: Well --

25         MS. WALDRON: Because then Your Honor could see what

39

1    we have.

2            THE COURT: If there's specifics --

3            MS. WALDRON: I will.  I don't have them now.

4            THE COURT: Why don't you raise those with Mr. Benson

5    in the first issue -- in the first instance but if there's

6    specifics maybe yes, maybe no, but at this point I'm not --

7    because we don't have specifics I'm not addressing that.

8            MS. WALDRON: If Your Honor -- after we raise it with

9    Mr. Benson the first instance which I anticipate they'll say

10   they know can I then submit it to Your Honor?

11           THE COURT: Yes, sure.

12           MS. WALDRON: Thank you.

13           THE COURT: I think that resolves the issues with

14   respect to the personnel files but let me ask counsel.  Have I

15   overlooked anything with respect to the personnel files?

16           MS. WALDRON: Well, Your Honor, the only other thing

17   is the -- for the two named plaintiffs we don't have -- we

18   weren't even given anything at all.  We believe that these were

19   decision makers for --

20           THE COURT: I'm sorry.  I think you misspoke.  You

21   said the two named plaintiffs?

22           MS. WALDRON: Defendants, defendants.  I'm sorry if I

23   misspoke, Your Honor. Named defendants, Culhane and McConville

24   that we believe that we're entitled to some evidence about

25   their -- they're defendants.  We believe that they -- any

40

1    documents regarding what their career records are, their

2    resumes, something of that sort just because we believe that

3    they were decision makers through most of what's happened in

4    this case and so that that kind of evidence -- that would be

5    relevant for us.

6              THE COURT: How does that bear on whether or not there

7    was discrimination?  What if somebody went to college A or

8    college B or --

9              MS. WALDRON: Not just college.  It's what their

10   career track is, what their -- basically their positions that

11   they held, what their -- it's really more for background

12   evidence.  I can't believe that we don't have that.  In every

13   other case that I have a defendant I get this kind of evidence

14   for defendants.  That's why I'm a little surprised but they're

15   objecting to every piece of it.  So we have to --

16             THE COURT: You want what positions they've held

17   within the MTA?

18             MS. WALDRON: Yes, career records, resumes.  Then

19   we'll get to -- we believe some of these, I think those two

20   individuals also would fall into the other category of what

21   this infractions but --

22             THE COURT: People often ask about this kind of

23   information at depositions.  I've never seen it used at a

24   trial.

25             Let me see what Mr. Benson's thoughts are first.

41

1          MR. BENSON: Well, again, we're talking about the

2   sanctity of the personnel files and presumably they're going to

3   depose these individuals and to the extent that they want to

4   find out the credentials of the individuals they can ask them

5   and we don't have to impact their personnel files.

6          THE COURT: I'm not sure there's sanctity attached to

7   personnel files.

8          MR. BENSON: No, there is sanctity attached to

9   personnel files.

10         THE COURT: Even in today's world I wouldn't go quite

11  that far.

12         MR. BENSON: Pursuant to Rule 50(a) of the New York

13  Civil Service --

14         THE COURT: That's not what sanctity means.  That's a

15  statutory protection.  That's not sanctity.

16         MR. BENSON: I misspoke, Your Honor.  But my point is

17  that again we're going through the same thing that we went

18  through with Judge Lynch and he identified the portions of

19  their files that he believed were relevant with respect to the

20  claims at issue in this case and we have provided those to the

21  plaintiffs.  Anything outside of that is really not relevant to

22  the allegations that are at issue here.

23         Again, to the extent that they will have the

24  opportunity to depose these people and presumably find out

25  certain information that will fill in the blank so to speak,

42

1 but it's really not a personnel file issue.

2          THE COURT: I'm not sure how someone's career track

3 within the MTA makes it more likely or less likely that he or

4 she will engage in discriminatory conduct.  I'm not sure how

5 one establishes -- how one is relevant to the issue in the

6 case.

7          MS. WALDRON: Well, Your Honor, again we've made an

8 allegation that despite people knowing about discrimination,

9 despite people having been discriminators they're still seem to

10 manage to become supervisors or higher levels within the MTA.

11 So that would be -- this is really back --

12          THE COURT: Someone's career track, I don't see how --

13 we're talking about the two named defendants here and I don't

14 see how their career track makes it more likely or less likely

15 that they discriminated against the plaintiffs.

16          MS. WALDRON: Well, Your Honor, it's really having to

17 do with also -- it's starting to get into the next argument --

18 the next segment of documents, the command rosters.  It's

19 really to state who was in what position -- what position were

20 they in at the time when some of the discrimination was

21 happening and if we can get it from the command rosters that

22 may also be -- we're trying a lot of different avenues here,

23 Your Honor, in that we're in the discovery phase and we're

24 trying -- we're not doing fishing but we believe that these

25 were things that will help the case, that there's evidence that

43

1  it's relevant to how the MTA is being run, where --

2          THE COURT: You're going to depose the individual

3  defendants?

4          MS. WALDRON: I guess we're going to have to.

5          THE COURT: I presume you're going to want to do that

6  in any event.

7          MS. WALDRON: Right.  But without these records though

8  we're going to have to.

9          THE COURT: If all you're looking for is track your

10 career with the MTA --

11         THE COURT: In addition.  In addition to the other

12 things we've already discussed, Your Honor.

13         THE COURT: I understand that's on par of what you're

14 looking for but isn't it -- is there any objection to that

15 question being asked at the deposition?

16         MR. BENSON: None, Your Honor.

17         THE COURT: You just do it at a deposition.

18         MS. WALDRON: Again, Your Honor, your ruling is your

19 ruling.  I have received that in other cases but -- the command

20 rosters are of the same --

21         THE COURT: Let's talk about the command rosters.

22 Maybe the defendant can do this in the first instance.  Can you

23 tell me exactly what the command roster is?

24         MR. BENSON: The documents we're referring to for the

25 time period we produced from 2003 to 2007 are a series of

44

1    charts which have boxes and lines and show the hierarchy in

2    department by department within the MTA PD and we produced

3    those four years back from the time of the complaint.  And a

4    little box with this deputy chief and who's underneath that

5    person and so on.

6              THE COURT: It's only supervisors I take it.

7              MR. BENSON: Some of them are more complete year by

8    year than others.  So they might not necessarily be a

9    supervisor but it doesn't go down to rank and file, uniform

10   police officers.  It can go down to the lowest person that has

11   a certain function.

12             THE COURT: I see.

13             MR. BENSON: As I said, it's not consistent.  What

14   they've asked for now goes back to the inception of the MTA PD

15   in 1998 to show the same kind of materials and the MTA's

16   position is this is not going to be background information for

17   a sexual harassment claim.  It is reaching way back beyond the

18   limitations period and --

19             THE COURT: And you produced it for what period of

20   time?

21             MR. BENSON: We produced it for a four-year period

22   going back from the date of the complaint which would be the

23   limitations period under 42 U.S.C. 1981 which is the longest

24   limitations period.

25             THE COURT: So what is that, '03 to '07?

45

1        MR. BENSON: Correct.

2        MS. WALDRON: Yes, Your Honor, but we -- as I've

3   stated numerous times today, we have a hostile work environment

4   claim which does not limit by that statute of limitations

5   and --

6        THE COURT: Who was in what particular box?  How did

7   that bear on hostile work environment?

8        MS. WALDRON: Because, Your Honor, while we were going

9   through -- we're asking for this evidence because we believe

10  it's actually going to be help for time saving and efficiency

11  purposes that when we're looking through who were the

12  supervisors at the time. If a plaintiff can't remember or he

13  does remember but where were they exactly at the time, these

14  command rosters have actually been very helpful for showing us

15  where everybody was at the time.  We're talking about a one

16  page document each.  We're not trying to go back twenty years.

17  We're only saying back to 1998 which was when the MTA and Long

18  Island Railroad merged which appears to be a date that they

19  can't seem to get documents before anyway.  So it's not -- this

20  is not a burdensome request.  This would be very helpful --

21        THE COURT: I'm not sure what it's relevant to though.

22  If the plaintiff can't remember who somebody was it's unlikely

23  that that person was responsible for a hostile work

24  environment.

25        MS. WALDRON: It's not just who they were but what

1    their position was.  They know who it is but they may not know

2    exactly where they were in the command at that time.

3              THE COURT: If they know who they were what does the

4    position matter?

5              MS. WALDRON: Because that would show -- Your Honor,

6    if it's someone -- what level they're at definitely shows it --

7    it's evidence for us to show how the level is and how -- to

8    infer how much of this can you infer to the MTA, how high level

9    that person is at.

10             Your Honor, the other thing is we're going to be --

11   if I look at the chart when I get it and I say oh, that person

12   was a lieutenant at the time I may then say I want to take that

13   person's deposition. If I find out he was just maybe a sergeant

14   I may not need to.  There's a lot of discovery in this case

15   that we're having to choose -- pick and choose who are we

16   deposing, who are we not and these command rosters that go back

17   to '98 may help us to -- not even may.  They will help us to

18   narrow the case, narrow the issues or narrow depositions of

19   that sort.

20             THE COURT: I'm not sure how it's going to narrow the

21   depositions.

22             MS. WALDRON: We may not need to take a deposition of

23   someone if they're not of a sufficiently high level when -- to

24   make a claim.

25             THE COURT: Well, I would think that if you had

47

1  someone involved in egregiously hostile conduct you're going to

2  want to take that person's deposition regardless of their rank.

3  Even if you had a non supervisor making --

4          MS. WALDRON: But then, Your Honor, the next

5  question --

6          THE COURT:  -- hostile remarks, aren't you going to

7  want to depose that person?

8          MS. WALDRON: We won't know -- we wouldn't necessarily

9  know who that person's supervisor is and that person may then

10 come back with I don't remember who my -- oh, 1998.  A lot of

11 these people don't remember the dates and we've seen that come

12 up in our depositions so far.  I don't remember exactly where I

13 was in 2002 but I think this is where I was and this is who --

14 where these command rosters place people exactly where they

15 were at that time.

16         THE COURT: Let me ask defendant.  What's the

17 objection?

18         MR. BENSON: The objection, Your Honor, is we produced

19 18,000 pages of documents in this case.  They're continually

20 asking for things outside of the statute of limitations period.

21 We have -- we think there's no relevance to the request in

22 general but we provided it for the relevant time period out

23 of -- to avoid issues but there's a point when it's just not

24 appropriate and our position here is that pursuant to the rules

25 of evidence, pursuant to the rules of discovery there is

48

1    absolutely no relevance to this document whatsoever.  If an

2    individual is accused or supposedly engaged in in conduct that

3    led to a racially hostile working environment it is

4    unfathomable to me that the person who was making that

5    accusation did not know who they were at the time, what rank

6    they were at the time, who their supervisor was, and if they

7    don't they can notice them for deposition and ask them.  It's

8    just putting a burden on us.  These are not documents that are

9    easily obtainable.  They're not single page documents.  They're

10   a pain in the neck to recreate and go back and try to find and

11   there's no relevance to them and we shouldn't have to produce

12   them because again there's just nothing that's going to come

13   from them that plaintiffs can't somehow get from some other

14   source or to the extent that there was relevance which I don't

15   see any.

16        MS. WALDRON: When we have to notice another ten

17   depositions or twenty depositions to then find out who the

18   supervisor was of this alleged harassment with the hostile work

19   environment then we'll see why we need these.  Not everyone --

20   people remember who made the comment at the first level but

21   there's issues in this case of how high then it went up above

22   that, that supervisor.  There's a chain of command, Your Honor,

23   you know in police departments, and so then there's certain

24   things that these supervisors -- should they have gone to their

25   command officer -- the next command.  Who was it at the time.

49

1   So that's really where we're going, but if Mr. Benson would

2   rather have me take depositions of all the supervisors and

3   their supervisors when we're ready -- we only have three more

4   months to finish discovery in this case.

5           MR. BENSON: Your Honor, I have no problem if for

6   plaintiff's counsel to pick up the phone and ask me who -- if

7   there's somebody who falls into this category to call me up and

8   ask me and I'll give you an answer.

9           MS. WALDRON: Then will I be able to submit that

10  evidence in court some day?

11          THE COURT: This is --

12                  [Pause in proceedings.]

13          THE COURT: With respect to the command rosters for

14  the period prior to 2003, I'm going to sustain the objection

15  but at the same time I'm going to grant plaintiff's leave to

16  serve interrogatories seeking relevant information regarding

17  the chain of command.  If you have a situation where someone

18  says I don't remember who my supervisor was, you can serve an

19  interrogatory and they're going to have to answer it without

20  regard to Local Rule 33.3 and for the --

21          MR. BENSON: We're okay with that, Your Honor.

22          THE COURT: I'm sorry.

23          MR. BENSON: I said that was what we were suggesting.

24          THE COURT: You'll get it in admissible form then.

25          MS. WALDRON: Yes.  That's fine, Your Honor.  We did

50

 1   serve interrogatories of this nature and we got objections on

 2   it.  We didn't pursue it because we thought we would get

 3   documents too but we will serve additional ones.

 4            THE COURT: All right.  Well, this is eliminating the

 5   Rule 33.3 objection.  If the defendant wants to make a

 6   relevance objection, the relevance objection they can still

 7   make and if there's a problem we'll resolve it but presumably

 8   it won't be -- what I don't contemplate is identify the entire

 9   chain of command.  What I contemplate are interrogatories

10   asking about specific supervisors because there's been --

11   they've been referenced in other discovery responses or they've

12   been referenced by plaintiff.  It's not an invitation to ask

13   for the command roster through interrogatories.

14            MR. BENSON: Your Honor, I'm sorry.  There's two

15   issues with respect to the personnel files that were not

16   previously covered.

17            THE COURT: Okay.  Go ahead.

18            MR. BENSON: Two additional what they would phrase as

19   disciplinary comparators are raised in a joint letter.  One is

20   a group of four or five individuals who were involved in an

21   incident at Penn Station involving an assault of a civilian and

22   none of the -- two uniformed police officers, a sergeant and a

23   lieutenant.  None of the plaintiffs were involved in this

24   incident.  None of the plaintiffs have alleged that they've

25   been involved in a comparable incident and we objected to this

51

1  in that it has nothing to do with any discipline that the

2  plaintiffs allege they've been disproportionately assessed

3  with.  Essentially, they're trying to show that -- as they

4  said, this is a -- what they claim would be a particularly

5  egregious incident that did -- they claim did not result in

6  discipline.  We don't think it has anything to do with anything

7  the plaintiffs are claiming.

8       The second item would be there's an individual named

9  Sergeant Quinn who is involved in a case with another

10 individual who counsel represents in the Division of Human

11 Rights where there was an altercation between the sergeant and

12 the claimant -- complainant in that case.  They have identified

13 him as a comparator.  None of the plaintiffs in this case had

14 anything to do with that and this is simply seeking that

15 individual's personnel file for purposes of that other case

16 although they may claim that they want to show that he wasn't

17 disciplined for that incident.  None of the individuals here

18 are alleging that they were in a physical altercation and were

19 in a comparable incident where comparable discipline could be

20 assessed.

21       THE COURT: Tell me about the assault on the

22 individual in Penn Station first.  What happened?

23       MR. BENSON: There was an incident where an individual

24 at Penn Station was assaulted by a police officer.  That police

25 officer resigned rather than be terminated.

52

1          THE COURT: What happened to the individual?

2          MR. BENSON: The individual was a homeless individual

3   at Penn Station who engaged in an altercation with a police

4   officer and complained of physical injuries as a result, an

5   African-American civilian homeless person in Penn Station.

6   These individuals --

7          THE COURT: Did he or she wind up going to the

8   hospital?

9          MR. BENSON: I believe -- that's likely the case, Your

10  Honor.

11         THE COURT: Were any of the officers disciplined?

12         MR. BENSON: Yes.

13         MR. FUCHS: He resigned.  He no longer has a job.

14         MR. BENSON: One officer resigns.  Another -- a

15  supervisor was terminated and two officers who came forward and

16  cooperated were not.  Again, this was a criminal proceeding.

17  It was a separate proceeding.  We don't think that has anything

18  to do with the plaintiff's claims and we don't want to open up

19  the door to extensive discovery about this other proceeding.

20  We don't see how it compares to any discipline that the

21  plaintiffs claim have been disproportionately assessed with.

22         THE COURT: The individuals involved in the assault on

23  the homeless person, did they have the same supervisors as any

24  of the plaintiffs --

25         MR. BENSON: Not that I'm aware of, Your Honor.

53

1          THE COURT:  -- at the time?

2          MS. WALDRON: I think there was a possibility that

3     there was, Your Honor.  We can check.  There's ones that we can

4     easily find out.  I didn't bring the [inaudible] because I

5     thought it was covered by [inaudible] but we believe they're

6     comparators, similarly situated people to some of our

7     plaintiffs and this is exactly why we wanted the discipline

8     files and the other misconduct issues.  I thought that was

9     covered by your ruling already.

10         THE COURT: Were any charges filed against the

11    individual who was assaulted?

12         MR. BENSON: Against the civilian who was assaulted?

13         THE COURT: Yes.

14         MR. BENSON: I don't believe so, Your Honor.

15         MR. FUCHS: I don't know the answer to that.  But

16    disciplinary charges were filed in connection with both the

17    individual accused of the assault and that person's supervisor,

18    both of whom are no longer -- no longer work for us.  One who

19    resigned other than face discipline and the other who lost his

20    job as a result of a discipline.

21         THE COURT: There were two other individuals involved

22    who were not --

23         MR. FUCHS: Who are witnesses not involved in the

24    assault who cooperated and provided testimony in the

25    disciplinary proceedings and they were not.

54

1          MR. BENSON:  The reason these are being sought is the

2     two witnesses -- I guess the plaintiffs are under the

3     impression that -- I'm sorry.  They seek the files of all

4     involved here.  Again, none of the plaintiffs were involved in

5     this incident.

6          MR. FUCHS: Or any similar incidents.

7          MS. WALDRON: Well, we do --

8          THE COURT: What are your thoughts, Ms. Waldron?

9          MS. WALDRON: Well, Your Honor, we have -- we chose

10    these incidents because we felt that they were similarly

11    situated in a sense that at least one of our plaintiffs was

12    involved in an assault and received very different kinds of

13    penalties.  There was -- as far as we understood, there was

14    issues about the penalties that were more lenient either it was

15    because they were suspended but they were receiving payroll,

16    they were suspended.  There's issues in these cases that we

17    believe do overlap and just because -- the Sergeant Quinn issue

18    because we represent the --

19          THE COURT: Put Sergeant Quinn aside just for a

20    moment.

21          MS. WALDRON: Just the Penn Station issue.  We have a

22    plaintiff in our case who was allegedly involved in an assault

23    who was --

24          MR. BENSON: Who?

25          MS. WALDRON: Would you like me to release --

55

1        THE COURT: Just direct -- I want you directing your

2   comments to me.

3        MR. BENSON: I'm sorry.

4        THE COURT: Go ahead.

5        MS. WALDRON: So, Your Honor, we believe that there

6   was issues in how that was treated and the penalties that were

7   given at the time and whether it was delayed in the penalties

8   and whether they were suspended.  This is a question about

9   whether they were suspended with or without pay and how our

10  plaintiff, one of our plaintiffs had been treated with regard

11  to when he was involved with an assault issue.  Then -- we --

12       THE COURT: It sounds as if it's ambiguous evidence.

13  If you have two people who were -- who left the MTA and two

14  people who were not disciplined I'm not sure that gives rise to

15  any inference but --

16       MS. WALDRON: If we have -- if one of our plaintiffs

17  was involved in an assault and was disciplined then that's --

18  there would be issues here, Your Honor.

19       THE COURT: Well, was the plaintiff terminated?

20       MS. WALDRON: He was not terminated bu the was

21  suspended without pay for a period of time.

22       THE COURT: So one of the individuals involved in the

23  Penn Station assault was treated worse than your plaintiff.  He

24  was terminated.

25       MS. WALDRON: But some were treated better.

56

1          MR. BENSON: Your Honor --

2          THE COURT: So it's ambiguous.

3          MR. BENSON: If I may be heard.  They're speaking

4    about an MTA police officer named Mark Thomas who's not a

5    plaintiff in this case.  He was the one who was involved in the

6    Sergeant Quinn case.

7          THE COURT: Who is the plaintiff who was involved in

8    the assault?

9          MS. WALDRON: As far as we know we're not talking

10   about Mark Thomas.  We're under the belief based on allegations

11   told to us by our plaintiffs about Mr. Blake Willett who's

12   different.

13         Your Honor, again, we don't -- we have not ever seen

14   these records.  This is the first time we're hearing that

15   people were terminated and not just suspended. But I do believe

16   that some were treated better and some were treated worse.

17   There is evidence there and it also --

18         THE COURT: There's evidence there that points in

19   those directions.

20         MS. WALDRON: But let me just -- if I could address

21   that.  If you're terminated because you put -- you assault

22   somebody and put them in the hospital then that maybe is

23   appropriate discipline for one time but if our plaintiff only

24   assaulted someone or didn't assault someone who was not found

25   to be assaulted and then was suspended then there is an issue

57

1    of -- here if it's not --

2            THE COURT: With respect to the assault in Penn

3    Station I'm going to direct that the files be produced but

4    there's an argument for relevance that the plaintiff is making

5    here which -- this is subject to my earlier proviso that the

6    defendants have the option of making the submission to --

7    making a factual submission to show that the punitive

8    comparators are so differently situated that they were not

9    comparators as a matter of law.  But unless you elect to go

10   down that route I'm not going to accept the files with respect

11   to the Penn Station assault.

12           Tell me a little bit more about Sergeant Quinn.

13   Sergeant Quinn is one of the comparators, one of the

14   individuals they designate as a comparator?

15           MS. WALDRON: We believe that we did because he was

16   engaged at the time --

17           THE COURT: I'm sorry.  Sergeant Quinn is designated

18   as a comparator?

19           MS. WALDRON: We have him under the comparator file.

20   He was involved in an altercation with an African-American

21   officer and made a derogatory comment to that officer.  That

22   African-American officer is not a plaintiff in this case but we

23   do believe that this is again evidence that would bear on

24   how -- that the African-American officer is similarly situated

25   to our -- this is evidence of --

58

1          THE COURT: Wow, wow. Let me make sure I understand

2     the situation correctly.  Sergeant Quinn was engaged in an

3     altercation with an African-American officer and made a

4     derogatory comment to that African-American officer?

5          MS. WALDRON: Yes.

6          THE COURT: And he was not disciplined for it?

7          MS. WALDRON: I'm sorry, Your Honor. What was your

8     question?  Was he disciplined for that?

9          THE COURT: Was he disciplined for it?

10         MS. WALDRON: No, that's what we believe.  He was not

11     disciplined for it.

12         THE COURT: Did the plaintiffs make racially

13     derogatory remarks about anybody?

14         MS. WALDRON: Did plaintiffs?

15         THE COURT: Yes.  The infraction you're saying that

16     Quinn committed was the racially derogatory remark.

17         MS. WALDRON: In addition to there was some sort of a

18     physical altercation and then he was not disciplined for that,

19     Your Honor.

20         THE COURT: Have the plaintiffs engaged in similar

21     conduct?

22         MS. WALDRON: That plaintiff -- that African-American

23     officer --

24         THE COURT: No.  The plaintiffs that you're

25     representing in this case, were they involved in similar

59

1   conduct, altercations with other members of the police force or

2   making racially derogatory remarks?

3           MS. WALDRON: Yes, Your Honor.

4           THE COURT: The first or second or both?

5           MS. WALDRON: The second where -- one of our

6   plaintiffs was involved in an altercation with a supervisor

7   where a racially derogatory comment was made by that supervisor

8   to the officer.

9           THE COURT: No.  Did the plaintiffs make racially

10  derogatory remarks?

11          MS. WALDRON: Well, they --

12          THE COURT: The question here is --

13          MS. WALDRON: Yes.

14          THE COURT: On the comparator theory it was -- was

15  Quinn -- did Quinn receive -- did Quinn receive more favorable

16  treatment for similar misconduct?

17          MS. WALDRON: Uh-hum.

18          THE COURT: So I'm trying to determine whether or not

19  any of the plaintiffs engaged in misconduct similar to the

20  misconduct Quinn made -- Quinn is attributed to.

21          MS. WALDRON: I don't know of any plaintiffs who made

22  racially derogatory comments because we're all of minority

23  race.  So I don't know of --

24          THE COURT: Anyone can do anything in today's world.

25          MS. WALDRON: I understand.  Actually, no.  You know

60

1    what, we do have one.  Yes, we do.  One of our plaintiffs

2    was -- there is an allegation that he made some remarks to

3    another member or minority which we believe were unfounded and

4    part of this --

5              THE COURT: He was disciplined for those --

6              MS. WALDRON: He wasn't disciplined though, Your

7    Honor.  He wasn't disciplined.

8              THE COURT: He was treated the same as Quinn?

9              MS. WALDRON: I guess he was treated the same.  They

10   don't discipline for making racially derogatory comments.

11             THE COURT: So what does Quinn get you?

12             MS. WALDRON: The file is having to do with how

13   under -- there's a recent Supreme Court decision that came out,

14   Sprint, where it was talking about similarly situated -- other

15   employees not necessarily just similarly situated -- the

16   supervisors don't have to be similarly situated but if there's

17   evidence of an employee who's similarly situated, if he was

18   treated and I think that falls -- this falls under that

19   category about how this other African-American officer was

20   treated.  Maybe the way we worded our requests --

21             THE COURT: No, it's not how the other African-

22   American officer was treated.  It's how Quinn was treated is

23   the inquiry.

24             MS. WALDRON: But within that altercation, Your Honor.

25   So both Thomas and how Quinn was treated within that

61

1  altercation.  Both sides of that altercation is what I'm

2  talking about.

3            THE COURT: I don't understand your point.

4            MS. WALDRON: That --

5            THE COURT: I thought you wanted Quinn's disciplinary

6  file.

7            MS. WALDRON: We do because we don't --

8            THE COURT: But it sounds like Quinn -- it sounds like

9  Quinn's treatment and the treatment of the plaintiff for making

10  a racially derogatory remark was the same.

11            MS. WALDRON: No, Your Honor.  It was a different

12  point that I was trying to make was that how he was treated

13  with an alteration with an African-American officer.  That's

14  what we were focusing in on.

15            THE COURT: Were any of the plaintiffs disciplined for

16  engaging in an altercation?

17            MS. WALDRON: With other members of the -- yes.

18            MR. BENSON: May I be heard, Your Honor?

19            THE COURT: Yes.  Go ahead.

20            MR. BENSON: Quinn is a sergeant.  Officer Mark Thomas

21  who is the subject of another proceeding and not a plaintiff

22  was his subordinate and his direct report.  Officer Thomas

23  physically assaulted Sergeant Quinn and was brought up on

24  disciplinary charges for that.  Officer Thomas accepted

25  discipline, signed a waiver accepting discipline in connection

62

1   with the entire incident where he acknowledged wrongdoing, he

2   admitted guilt to the conduct that was charged and he waived

3   his right to challenge it or go to any disciplinary proceeding.

4   There was never any finding of anything other than Officer

5   Thomas' admission that he engaged in the wrongdoing at issue

6   and his signing a waiver.

7           So Quinn, who has never been the subject of -- he

8   didn't do anything wrong.  Thomas admitted he was wrong in

9   connection with the incident and --

10          THE COURT: So no charges were ever brought against

11  Quinn?

12          MR. BENSON: No.  He didn't do anything wrong.

13  Charges brought against Thomas --

14          THE COURT: So then there are no documents to produce.

15  What documents are there to produce then?

16          MR. BENSON: They're asking for the entire personnel

17  file including any discipline --

18          THE COURT: I never ordered the production of

19  anybody's entire personnel file.

20          MS. WALDRON: Your Honor, it seems that we're talking

21  about the discipline files.

22          THE COURT: There are no documents I've just been

23  told.

24          MR. BENSON: In connection with that absolutely not.

25  He was not brought up on charges.

63

1          THE COURT: So there's nothing to produce then.  Am I

2    misunderstanding something?

3          MR. BENSON: There's nothing to produce.

4          MR. FUCHS: There would be no documents relating to

5    that incident, discipline against Sergeant Quinn for that

6    incident.

7          THE COURT: Then there's nothing to produce.

8          Is there anything else that plaintiffs want to raise?

9          MS. WALDRON: I thought it was all covered.

10         THE COURT: I'm sorry.

11         MS. WALDRON: No, Your Honor.

12         THE COURT: Is there anything else defendants want to

13   raise?

14         MR. BENSON: Nothing, Your Honor.

15         THE COURT: Thank you all.

16         Just one general request as the case goes on.  If

17   there's a request for documents for which the defendants

18   object, first make sure there are responsive documents.  What

19   oftentimes happens in a lot of cases is there's a fight over --

20   on the basis of the request itself and you never go to your

21   client and find out there's really nothing there anyway.  It

22   will save everybody time and trouble I think.

23         Thank you all.

24

25

64

1                        * * * * *

2         I certify that the foregoing is a court transcript from an

3    electronic sound recording of the proceedings in the above-

4    entitled matter.

5

6                       _____

7                                Shari Riemer

8    Dated:   August 8, 2008

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25