UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
NZINGHA M. KELLMAN,

                Plaintiff,

                                  07 Civ. 3561 (DAB)
    v.                              OPINION

METROPOLITAN TRANSPORTATION AUTHORITY,
ELLIOT SANDER, WILIAM MORANGE, KEVIN
McCONVILLE, and TERRANCE CULHANE,

                Defendants.
--------------------------------------X
DEBORAH A. BATTS, United States District Judge.

    Plaintiff Nzingha M. Kellman ("Plaintiff" or "Kellman"), an

African-American female, together with eight African-American

plaintiffs and one Hispanic plaintiff, all of whom are current

or former employees of the Metropolitan Transportation Authority

("MTA") Police Department ("MTA PD"), commenced this action

against the MTA and four MTA executive officers (collectively,

"Defendants"), alleging violations of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2002e et seq., the New York

State Human Rights Law ("NYSHRL"), the New York City Human

Rights Law ("NYCHRL"), and 42 U.S.C. §§ 1981 and 1983. Plaintiff

maintains that MTA discriminated against her on the basis of her

race and sex by denying her promotions and training, subjecting

her to a hostile work environment, and engaging in a pattern or

practice of racial discrimination, and retaliated against her

for complaining to the MTA Office of Civil Rights ("OCR") and

the New York State Division of Human Rights ("SDHR") about alleged discrimination. Defendants now move pursuant to Fed. R. Civ. P. 56 for Summary Judgment on each of Plaintiff's claims.[1]

For the reasons set forth herein, Defendants' Motion for Summary Judgment is granted in part, denied in part, and the Court reserves decision in part.

## I.   FACTUAL BACKGROUND

A. The Parties

Defendant MTA is a New York State public benefit corporation that provides public transportation services to the Greater New York City area. Defendant Elliot Sander served as the Executive Director and Chief Executive Officer of MTA from January 1, 2007 to May 7, 2009. Defendant William Morange was MTA Director of Security from July 2003 to December 2010. Defendant Kevin McConville was the Chief of MTA PD from October 2005 to January 2008. Defendant Terrance Culhane was an Assistant Deputy Chief of MTA PD from 2004 to July 2010.

Plaintiff Nzingha M. Kellman joined MTA PD as a police officer on July 6, 1999. (Pl.'s 56.1 Stmt. ¶ A.)

---

[1] In a Scheduling Order dated September 24, 2010, the Court allowed separate Motions for Summary Judgment to be submitted for each individual Plaintiff in this action. This Memorandum and Order addresses only the Motion for Summary Judgment filed with respect to the claims instituted by Plaintiff Nzingha M. Kellman.

B. Plaintiff's Employment with MTA PD

Plaintiff was first assigned to the Communications Unit and in 2001 transferred to District 3. (Pl.'s 56.1 Stmt. ¶¶ C-D.) She alleges that she experienced race- and sex-based harassment during both assignments. (Id.) For instance, MTA PD members barred Kellman from going to the bathroom until male officers finished using the facilities, called her a "fucking bitch" and a "skell," physically threatened her, wrote graffiti on her locker, and ordered her to deviate from her MTA-approved, pregnancy-related desk duty. (Id. ¶¶ E-K; Defs.' Resp. Pl.'s 56.1 Stmt. ¶ K.) MTA did not investigate Plaintiff's complaints of harassment. (Pl.'s 56.1 Stmt. ¶¶ G, EEE.)

In October 2003, Plaintiff was promoted to Sergeant, a nondiscretionary promotion resulting from her performance on the Sergeant's examination. (Id. ¶ N.) She was assigned to District 5 – Grand Central in October 2003, where she was supervised by Deputy Inspector Robert Terrett and Inspector Thomas Dunn. (Id.) At Grand Central, Kellman was a patrol sergeant, and as such, was responsible for supervising patrol officers who reported from Grand Central. (Id.; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 7R.)

C. Plaintiff's Requests for Training

MTA's Training Bureau disseminates information about discretionary training courses to district commanding officers. (Pl.'s 56.1 Stmt. ¶ O.) Commanding officers may recommend particular members of their command for training courses, regardless of whether those members request the training. (Id.; Defs.' Resp. Pl.'s 56.1 Stmt. ¶ O; Terrett Dep. 152:22-25.) Alternatively, MTA PD members may request that their supervisors assign them to particular training courses. (Defs.' Resp. Pl.'s 56.1 Stmt. ¶ P.) However, no operational orders announce training opportunities to MTA PD members, and Kellman typically learned about discretionary training courses only after viewing Personnel Orders assigning other MTA PD members to those courses. (Pl.'s 56.1 Stmt. ¶¶ P-Q.) Defendants note that MTA PD members can look at other agencies' websites to learn about training courses offered by those agencies, and that since 2007, MTA has emailed notices about trainings offered by the Department of Criminal Justice Services to MTA PD members. (Defs.' Resp. Pl.'s 56.1 Stmt. ¶¶ O-P.)

Plaintiff repeatedly requested that Defendants consider her for all future training courses. (Pl.'s 56.1 Stmt. ¶¶ S-T.) In March 2004, Kellman requested assignment to Executive Protection Training after viewing a Personnel Order assigning others to the

4

Training.[2] (Id. ¶ EE.) Terrett, Plaintiff's direct supervisor, denied her request, stating that Executive Protection Training was specialized training given only to members of specialized units. (Kellman Decl. ¶ 15.) In June 2004, a Personnel Order stated that MTA sought abstracts[3] for promotion to Detective Sergeant, particularly from members with Executive Protection Training. (Jeremias Decl. Ex. AA.) After seeing the Personnel Order, Plaintiff again requested assignment to Executive Protection Training, and Terrett told her, "You don't need the training. It's specialized." (Pl.'s 56.1 Stmt. ¶ EE; Kellman Dep. 226:4-5.) On May 28, 2011, after seeing a Personnel Order assigning employees to a June 2, 2011 Executive Protection Training, Plaintiff emailed Captain John Berlingieri to request assignment to the Training. (Jeremias Decl. Ex. KKK, at P06326.) Berlingieri's response, which he did not send until June 6, 2011, stated, "Should you see this class again please let me know and I will forward it up the chain of command for their consideration." (Id. at P06324.)

According to the record, four of the sixteen employees who received Executive Protection Training after the 1998 formation

---

[2] Executive Protection Training is also known as Dignitary Protection Training or Specialized Protection Training. (Pl.'s 56.1 Stmt. ¶ DD.) It will be referred to as Executive Protection Training throughout this Memorandum and Order.
[3] MTA PD refers to applications as "abstracts." (Pl.'s 56.1 Stmt. ¶ L.)

of MTA PD[4] were African American and two were women. (Barreto Dep. 92:2-16; Fuchs Decl. Ex. 21; Jeremias Decl. Ex. T; Jeremias Decl. Ex. KKK, at P06335; Urquhart Dep. 176:4-8.) When they received the Training, all sixteen were detectives or assigned to ICTF, a unit specializing in counterterrorism.[5] (Defs.' 56.1 Stmt. ¶ 36; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 36R; Defs.' Reply Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Stmt. ¶ LL; Barreto Decl. ¶¶ 3, 5-6; Barreto Dep. 46:2-6, 91:7-92:10; Fuchs Reply Decl. Ex. 21; Jeremias Decl. Ex. T; Jeremias Decl. Ex. KKK, at P06335; Urquhart Dep. 176:4-8.) Wilfredo Barreto, an Executive Protection Unit supervisor, affirms that when full-time members of the Executive Protection Unit are unavailable to perform executive protection duties, other MTA PD detectives are asked to do executive protection duties. (Barreto Decl. ¶ 2; Barreto Dep. 81:10-24, 132:8-19.) A larger group of detectives

---

[4] In 1997, the New York State Legislature created MTA PD, and on January 1, 1998, all Long Island Railroad Police Department and Metro-North Commuter Railroad Company Police Department employees were transferred to MTA PD. (Defs.' 56.1 Stmt. Supp. Mot. Summ. J. Against Gordon Urquhart ¶ 7; Pl.'s Resp. Defs.' 56.1 Stmt. Supp. Mot. Summ. J. Against Gordon Urquhart ¶ 7R.)

[5] Plaintiff argues that Sergeant Thomas Farney was assigned to the Communications Unit, and not ICTF, when he received the Training. (Pl.'s 56.1 Stmt. ¶ FF; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 36R & n.29.) However, time sheets make clear that Farney was assigned to ICTF at the time of the Training (Fuchs Reply Decl. Ex. 21; Jeremias Decl. Ex. T, at P 04286), and the evidence Plaintiff offers in support of her contention shows only that Farney was assigned to the Communications Unit three months after the Training took place (Fuchs Decl. Ex. 35, at D00024404, D00024406; Jeremias Decl. Ex. CC, at D00024404, D00024406).

6

and/or ICTF members provides another type of executive protection, site security at high-risk events. (Barreto Reply Decl. ¶ 2; Barreto Dep. 130:9-132:7.) MTA PD began providing the Training to ICTF members in 2004, allegedly so that they would be better prepared to perform executive protection duties. (Barreto Reply Decl. ¶ 5.) In 2008, MTA PD began providing the Training to non-ICTF detectives so that they too would be better able to perform executive protection duties. (Barreto Reply Dec. ¶ 5; Barreto Dep. 124:9-19, 130:21-132:19.)

In July 2005, after viewing a Personnel Order assigning members to Land Transportation Antiterrorism Training, Plaintiff asked to attend the Training. (Pl.'s 56.1 Stmt. ¶ S; Jeremias Decl. Ex. U.) Her request was denied. (Pl.'s 56.1 Stmt. ¶ S.) Defendants allege that they denied the Training because it was not relevant to Kellman's duties or within MTA's needs. (Defs.' 56.1 Stmt. ¶ 40.) Terrett, however, states that he denied Plaintiff's request because "it would have created a scheduling problem, leaving [Grand Central] with one less Patrol Sergeant than was normally scheduled." (Terrett Reply Decl. ¶ 5.) Terrett did not supervise any of the seven members selected for the training. (Id.) Of those seven, one was an African American man and one was an African American woman. (Defs.' 56.1 Stmt. ¶ 37.)

Also in 2005, Plaintiff requested assignment to Incident Command Systems ("ICS") Training, and her request was denied.

7

(Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 38R.) The Parties dispute whether Plaintiff made her request before or after the publication of a Personnel Order assigning three MTA PD members to an October 2005 ICS Training. (Kellman Decl. ¶ 18; Terrett Decl. ¶ 6.) Defendants initially alleged that Plaintiff was denied ICS Training because the Training was not required for performance of her duties and was not within MTA's needs. (Defs.' 56.1 Stmt. ¶ 40.) In his Reply Declaration, however, Terrett alleges that he denied Plaintiff the Training because Plaintiff requested it too late for him to arrange for her to attend. (Terrett Decl. ¶ 6; see Jeremias Decl. Ex. W.)

Of the three members assigned to the October 2005 ICS Training, two were Caucasian patrol sergeants and one was an African American lieutenant. (Defs.' 56.1 Stmt. ¶ 38; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 38R.) One of the assigned sergeants, Rosalie Grascia, also worked in District 5 – Grand Central and was supervised by Terrett. (Kellman Decl. ¶ 18.) The assigned lieutenant, co-plaintiff Bryan Henry, attended the October 2005 Training in order to meet MTA's requirement that all lieutenants take ICS 300 Training. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 38R; Defs.' Reply Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 38.) All seven sergeants who attended an ICS Training course between March 2005 and October 2006 were Caucasian, and only one was a woman. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 38R; Jeremias Decl. Ex. W.)

Plaintiff requested assignment to Plainclothes Tactical
Training in July 2006. (Pl.'s 56.1 Stmt. ¶ T.) Dunn denied
Plaintiff's request, writing, "[A]t this time, plain clothes
training is being offered to police officers." (Jeremias Decl.
Ex. V, at P04276.) In 2005 and 2006, Plainclothes Tactical
Training was given exclusively to police officers, at least
eleven of whom were African American and at least seven of whom
were female. (Defs.' 56.1 Stmt. ¶ 39.) One detective sergeant,
three detective lieutenants, and one sergeant were assigned to
Plainclothes Training in 2009. (Jeremias Decl. Ex. V, at
D00042175, D00040245.) Although Plaintiff attended a training
called Policy Review - Plainclothes Encounters in June 2009, she
affirms that she continues to be denied access to Plainclothes
Tactical Training. (Defs.' Resp. Pl.'s 56.1 Stmt. ¶ T; Fuchs
Decl. Ex. 19, at D00042898; Kellman Decl. ¶ 19.)


   D. Plaintiff's June 2004 Application for Promotion to
      Detective Sergeant

   In June 2004, Defendants issued a Personnel Order
requesting abstracts for promotion to Detective Sergeant with
assignment to ICTF. (Jeremias Decl. Ex. AA.) Although the
Personnel Order explicitly sought individuals with Executive
Protection Training, MTA interviewed two individuals who did not
have that Training, Kellman and Daniel Eivazi. (Pl.'s 56.1 Stmt.

¶ KK; Jeremias Decl. Ex. AA.) In July 2004, MTA promoted three Caucasian men, Eivazi, Thomas Farney, and Lawrence Cudia, to the position. (Jeremias Decl. Ex. Y.)

Defendants allege that Farney, Cudia, and Eivazi were chosen over Plaintiff because they had been sergeants for longer and because they had more investigative or supervisory experience. (Defs.' 56.1 Stmt. ¶ 42.) As compared to Kellman's eight months as a sergeant, Farney, Cudia, and Eivazi had been sergeants for fourteen months, at least three years, and fourteen months, respectively. (Jeremias Decl. Ex. Z, at D00007397; Jeremias Decl. Ex. DD, at D00024552, D00024557, D00024566, D00024571, D00024575, D00024580, D00024593, D00024598; Kellman Decl. ¶ 11.) Farney and Cudia gained investigative experience during their assignment to ICTF, with Farney gaining further experience from his work with the Applicant Investigations Unit. (Defs.' 56.1 Stmt. ¶ 42; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 42R(b)-(c); Defs.' Reply Pl.'s 56.1 Stmt. ¶ 42.) Farney and Cudia both mentioned their investigative experience at their interviews, and most interviewers remarked on that experience. Jeremias Decl. Ex. CC, at D00024405-06, D00024409-10, D00024416, D00024419, D00024428, D00024434, D00024437, D00024446; Jeremias Decl. Ex. DD, at D00024458, D00024576, D00024585.) In contrast, in response to the question, "What value can you bring to this unit?", neither Eivazi nor

Kellman mentioned investigative experience. (Jeremias Decl. Ex. X, at D00007422, D00007431, D00007440, D00007449; Jeremias Decl. Ex. BB, at D00024508, D00024517, D00024526, D00024535.) Interviewer Ernest Pucillo wrote that Plaintiff "[h]as limited investigative experience." (Jeremias Decl. Ex. X, at D00007455.) Though Eivazi had little investigative background, he had six months more supervisory experience than Kellman. (Id. at D00007421; Jeremias Decl. Ex. Z, at D00007397; Jeremias Decl. Ex. BB, at D00024516.) Pucillo wrote that Eivazi "[h]as good supervisory background" (Jeremias Decl. Ex. BB, at D00024532), and interviewer James Flanagan wrote that Kellman "has little time as a spvr" (Jeremias Decl. Ex. X, at D00007428).

Plaintiff argues that the Personnel Order did not list supervisory and investigatory experience as qualifications, and instead listed, inter alia, "[k]nowledge in terrorist related computer investigations," "[a]bility to act as liaison with federal, state, and local law enforcement agencies," "[k]nowledge of databases for statistical analysis of intelligence," and "[d]evelop interagency coordination for emergencies with other city, state, and federal agencies." (Jeremias Decl. Ex. AA.) Kellman noted proficiency in Microsoft Word, Excel, and Powerpoint on her application and mentioned her computer skills and relationships with other law enforcement agencies at the interview. (Jeremias Decl. Ex. X, at D00007415,

D00007440.) However, none of the interviewers mentioned these skills in their interview notes, even when reviewing Plaintiff positively. (Id. at D00007428, D00007437, D00007446, D00007455.) Plaintiff alleges that, among other weaknesses, the promoted candidates had weaker computer skills and relationships with other agencies than she did. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 42R.) In addition, one of the interviewers reviewed Kellman more positively than Eivazi. (Crawford Dep. 88:20-89:1.)

E. Plaintiff's July 2004 Application for Promotion to Detective Sergeant

In July 2004, Defendants requested abstracts for promotion to Detective Sergeant and assignment to the Detective Division. (Jeremias Decl. Ex. FF.) Stephen Conner interviewed Kellman and Sergeants Dirk Jordan, Alexander Lindsey, Lee Dittrich, and Andre Csizmadia for the position. (Pl.'s 56.1 Stmt. ¶¶ PP-QQ) Although two Detective Sergeant positions were available, only Jordan, an African American man, was promoted. (Id. ¶ PP.) Conner later stated that he did not fill the second slot because of a "lack of investigative experience for those candidates that were not selected." (Jeremias Decl. Ex. GGG, at D00013001.) Conner's interview notes on Kellman state, "Needs more 'supervisory investigative' knowledge that she doesn't have now.

In time may deserve consideration but is not ready yet. Not recommended." (Jeremias Decl. Ex. EE, at D00013002.)

Plaintiff, who does not argue that she was more qualified for the position than Jordan, argues that she was more qualified than the other interviewees, all Caucasian men, and points out that Conner's interview notes include positive comments about her. (Defs.' 56.1 Stmt. ¶ 45; Pl.'s 56.1 Stmt. ¶ OO-QQ.) Of the fourteen detectives whom Conner promoted over his career, eleven were Caucasian men and one was a woman. (Pl.'s 56.1 Stmt. ¶ RR.)

F. Plaintiff's October 2005 Application for Promotion to Detective Sergeant

In October 2005, Defendants requested abstracts for promotion to Detective Sergeant. (Jeremias Decl. Ex. PP.) The Personnel Order stated that Defendants sought individuals with, inter alia, detective experience and five years law enforcement experience, and listed the Criminal Investigators Course ("CIC Training") as a requirement. (Id.) Because Kellman had never requested or received CIC Training, her supervisor, Terrett, disapproved her abstract, and she was not interviewed for the position. (Pl.'s 56.1 Stmt. ¶ XX; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 46R n.37.) Defendants interviewed Sergeant Joseph Johnston and Detective Andrew Roderick, both Caucasian men, for the position, and promoted Roderick. (Pl.'s 56.1 Stmt. ¶¶ XX, AAA.)

13

Plaintiff alleges that prior to submitting her abstract, several officers told her that the October 2005 Detective Sergeant position and the Personnel Order qualifications were designed specifically for Roderick, who had only five months supervisory experience. (Pl.'s 56.1 Stmt. ¶ ZZ; Jeremias Decl. Ex. H, at D00012962.) Before October 2005, some Caucasian members promoted to Detective Sergeant did not have detective experience or CIC Training, and Plaintiff alleges that Johnston had never received CIC Training. (Pl.'s 56.1 Stmt. ¶¶ AAA-CCC.) However, Johnston attended the Fairfield County Detective Conference, which, according to Conner, was one of several equivalent CIC Trainings to which MTA PD sent its members. (Fuchs Reply Decl. Ex. 10; Conner Dep. 125:16-126:9.) Plaintiff argues that she too attended a training that covered the basic principles of CIC Training, the Sex Crimes and Child Abuse Investigators Course. (Pl.'s 56.1 Stmt. ¶ WW.)

G. Plaintiff's Complaint to MTA's Office of Civil Rights

On or around November 10, 2005, Plaintiff scheduled an appointment with MTA's OCR. (Pl.'s 56.1 Stmt. ¶ GGG; Jeremias Decl. Ex. H, at D00001213-14.) After an OCR employee informed Terrett of the scheduled meeting, Terrett allegedly called Kellman and threatened to transfer her from Grand Central to the Communications Unit. (Pl.'s 56.1 Stmt. ¶ GGG; Jeremias Decl. Ex.

14

H, at D00012964, D00001213-14.) Had Plaintiff been transferred, she would have lost her supervisory responsibilities and would not have been able to make arrests or conduct investigations. (Pl.'s 56.1 Stmt. ¶ GGG.) On November 14, 2005, Plaintiff filed a Complaint of discrimination with OCR. (Id.; Jeremias Decl. Ex. H, at D00012960-61, D00012966-68.) On November 23, 2005, Plaintiff submitted additional allegations of discrimination to OCR. (Jeremias Decl. Ex. H, at D00012962-65.)

A citywide transit strike occurred from December 20 to December 22, 2005, during which time MTA PD advised its members that no one would be granted unscheduled days off. (Defs.' 56.1 Stmt. ¶ 52; Timothy Williams & Sewell Chan, "State Mediators' Plan Clears Way to Resolve 60-Hour Ordeal," N.Y. Times, Dec. 22, 2005, http://www.nytimes.com/2005/12/22/nyregion/22cnd-strike.html.)[6] Defendants argue that, notwithstanding this directive, Plaintiff tricked co-plaintiff Henry into approving two days off during the strike. (Defs.' 56.1 Stmt. ¶ 52; Dunn Dep. 240:11-20.) Plaintiff contends that she made her request after the strike ended. (Jeremias Decl. Ex. I, at P04296; Kellman Decl. ¶ 22; Kellman Dep. 200:13-24; 207:9-13.) Henry likewise affirms that there was no moratorium on vacation time

---

[6] "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

when Kellman made her request, and does not state that she
tricked him. (Henry Dep. 339:4-340:24.)

After discovering that Henry had authorized the days off,
Dunn instructed him to inform Kellman that she could not take
the vacation time. (Dunn Dep. 242:21-22.) According to Henry,
Dunn's only stated rationale for rescinding Plaintiff's vacation
time was that approving vacation time "was Lieutenant [Diane]
Nash's job." (Henry Dep. 339:6-8, 340:2-7.) Dunn agrees that
Nash, and not Henry, was "in charge of granting time off," but
affirms that the primary reason Henry should not have granted
Plaintiff's request was because the requested days off were
during the strike. (Dunn Dep. 240:7-9, 241:24-242:4.) Kellman
did not respond to Henry's calls to her cell phone and home
phone, allegedly because she was in the middle of her commute
home and her cell phone had died. (Kellman Dep. 210:16-211:1.)

After Henry told Dunn that he could not reach Plaintiff,
Dunn either ordered or told Henry that "one of the options
[wa]s" to ask the Delaware State Police to go to Plaintiff's
house and "locate" her. (Defs.' 56.1 Stmt. ¶ 52; Dunn Dep.
243:15-20; Henry Dep. 339:15-16.) Henry relayed the order to the
Delaware State Police, who thereafter went to Plaintiff's house
and searched her property with police dogs. (Pl.'s Resp. Defs.'
56.1 Stmt. ¶ 52R.) A Delaware Canine Officer allegedly told
Kellman that MTA PD had told him that she was sick and MTA PD

was unable to contact her. (Kellman Decl. ¶ 22.) Plaintiff, however, was not sick. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 52R.) Moreover, Plaintiff argues that the situation did not require such urgent action, because the vacation day that Henry approved would not have occurred until a few days later. (Id.) Plaintiff subsequently spoke to Nash, who authorized Plaintiff to take the same vacation day that Dunn had rescinded. (Henry Dep. 340:6-7, 340:22-24; Kellman Dep. 205:21-206:6.)

On May 23, 2006, Dunn issued Plaintiff a Letter of Instruction ("LOI") for failing to ensure that her supervisees prepared District Prisoner Log entries properly during a patrol investigation on December 9, 2005. (Fuchs Decl. Ex. 7.) The LOI was precipitated by an investigation into a civilian's allegations of MTA PD misconduct. (Id.) Plaintiff alleges that it was not her responsibility to make entries in the prisoner log. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 18R.)


H. Plaintiff's Complaints to the State Division of Human Rights

On July 11, 2006, Plaintiff filed a Complaint alleging race and sex discrimination with the SDHR. (Jeremias Decl. Ex. I.)

On August 1, 2006, Terrett asked Plaintiff to explain why she had not completed a May 2006 Activity Report, and forwarded her a June 7, 2006 email, allegedly sent by Sergeant Omeeta

17

Lakeram to Plaintiff, advising her to complete the May Report.
(Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 21R.) Plaintiff affirms that
she does not recall seeing Lakeram's email before August 1.
(Kellman Dep. 118:3-7.) On September 15, 2006, Kellman submitted
a memorandum to Terrett stating, "I was never instructed by Sgt.
Lakeram to prepare any monthly activity reports . . . ." (Fuchs
Decl. Ex. 11.) On October 14, 2006, Plaintiff received and
signed a Notice of Intent to Discipline for "generating a false
and misleading report to a Command Staff Member." (Fuchs Decl.
Ex. 8.) Plaintiff alleges that she signed the Notice because
Lieutenant Christopher Salotto told her that if she did not, she
would be fired. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 23R.) After
going through the Collective Bargaining Agreement ("CBA")'s
grievance and arbitration procedure, on October 28, 2009
Plaintiff signed a settlement agreement in which she "admit[ted]
to misinforming . . . Terrett concerning monthly activity
reports." (Fuchs Decl. Ex. 10.)

At some point on or before October 9, 2006, Plaintiff
requested training from Terrett and Dunn, who advised her to
request a meeting regarding training with Assistant Deputy Chief
Sean McLaughlin. (Pl.'s 56.1 Stmt. ¶ NNN.) Accordingly, on
October 9, 2006, Plaintiff requested that Terrett set up a
meeting between Plaintiff and McLaughlin regarding the lack of
training opportunities afforded to her. (Fuchs Decl. Ex. 15.) On

October 12, 2006, Dunn sent Kellman an email stating that the requested meeting would occur on October 16, 2006 at 7:30 A.M. (Defs.' 56.1 Stmt. ¶ 27.) However, because Plaintiff did not see the email, she did not appear at the meeting. (Fuchs Decl. Ex. 16.) On October 30, 2006, Defendants issued an LOI instructing Plaintiff to review timely all email sent to her by supervisors. (Fuchs Decl. Ex. 9.) Plaintiff notes that the meeting was scheduled for a time when Dunn and MTA PD knew that she would be unavailable due to her childcare obligations. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 27R; Jeremias Decl. Ex. M.)

On December 18, 2006, Plaintiff filed a second SDHR Complaint alleging further discrimination and retaliation. (Pl.'s 56. Stmt. ¶ OOO.) Plaintiff alleges that after she filed her SDHR Complaints her requests for specific training were denied; in particular, she cites the May 2011 denial of her request for Executive Protection Training. (Id. ¶ PPP.)

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A court should grant summary judgment when there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). Genuine issues of material fact cannot be created by

conclusory allegations. <u>Victor v. Milicevic</u>, 361 F. App'x 212, 214 (2d Cir. 2010). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable juror could find in favor of that party. <u>Melendez v. Mitchell</u>, 394 F. App'x 739, 740 (2d Cir. 2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could <u>reasonably</u> find for the plaintiff." <u>Id.</u> (citation omitted). The non-movant may not rely upon speculation or conjecture to overcome a motion for summary judgment. <u>Burgess v. Fairport Cent. Sch. Dist.</u>, 371 F. App'x 140, 141 (2d Cir. 2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." <u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. <u>Id.</u>

B. Disparate Treatment Based on Race and Sex

   1. Title VII and NYSHRL Claims

   Courts in this Circuit analyze Title VII and NYSHRL claims
of employment discrimination according to the three-stage,
burden-shifting framework set forth in McDonnell Douglas Corp.
v. Green, 411 U.S. 792 (1973). Simmons v. Akin Gump Strauss
Hauer & Feld, LLP, 508 F. App'x 10, 12 (2d Cir. 2013). Under
McDonnell Douglas, a plaintiff bears the initial, de minimis
burden of establishing a prima facie case of discrimination.
Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). To
make out a prima facie case, a plaintiff must demonstrate,
through direct or circumstantial evidence, that: (1) he is a
member of a protected class; (2) he was qualified for the
position; (3) he suffered from an adverse employment action; and
(4) the adverse employment action occurred under circumstances
giving rise to an inference of discrimination. Holcomb v. Iona
Coll., 521 F.3d 130, 138 (2d Cir. 2008). A plaintiff may raise
such an inference by showing that his employer subjected him to
disparate treatment, that is, treated him less favorably than a
similarly situated employee outside of his protected group. Ruiz
v. Cnty. of Rockland, 609 F.3d 486, 493 (2d Cir. 2010).

   A plaintiff who makes out a prima facie case establishes a
presumption of discrimination, at which point the burden of
production shifts to the defendant to articulate a "legitimate,

non-discriminatory reason" for the challenged conduct. <u>Woodman v. WWOR-TV, Inc.</u>, 411 F.3d 69, 76 (2d Cir. 2005) (citation omitted). If the defendant produces such a reason, the plaintiff must then, without the benefit of the presumption of discrimination, "raise[] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the [adverse employment action] was based, at least in part," on discrimination. <u>Holcomb</u>, 521 F.3d at 141. Typically, plaintiffs who lack direct evidence of discrimination argue that the employer's stated reason for the challenged conduct is pretextual. <u>Id.</u> "[I]n many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive." <u>Id.</u> However, a showing of pretext is not required. <u>Id.</u> at 141-42. Instead, a plaintiff "alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation." <u>Id.</u> at 142.

Title VII's statute of limitations bars claims based on events occurring more than 300 days prior to filing a charge of discrimination with a state or local employment agency. 42 U.S.C. § 2000e-5(e)(1). Plaintiff filed an administrative complaint with the SDHR on July 11, 2006. (Fuchs Decl. Ex. 2.)

Accordingly, only those incidents that occurred on or after September 14, 2005 are actionable under Title VII. Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004) (noting that Title VII precludes recovery for discrete discriminatory acts that occurred outside the statutory time period even if other acts occurred within the time period). Discrimination claims under the NYSHRL are subject to a three-year statute of limitations. Lange v. Town of Monroe, 213 F. Supp. 2d 411, 418 (S.D.N.Y. 2002). As this action was brought on May 4, 2007, only those incidents occurring on or after May 4, 2004 are actionable under the NYSHRL. Nonetheless, earlier incidents may be cited as background evidence in support of a timely Title VII or NYSHRL claim. Anderson v. Nassau Cnty. Dep't of Corr., 558 F. Supp. 2d 283, 299 (E.D.N.Y. 2008).

Here, Kellman alleges that MTA violated Title VII and the NYSHRL by denying her requests for training and applications for Detective Sergeant on the bases of her race and sex.[7]

---

[7] Although Plaintiff's Amended Complaint alleges that Defendants denied her a promotion to Lieutenant on the basis of her race and gender (Am. Compl. ¶ 153), the Court deems Plaintiff to have abandoned any disparate treatment claims regarding the Lieutenant promotion denial. Defendants' moving memorandum specifically addresses these claims, but Plaintiff's Opposition brief fails to mention them in any way. (Defs.' Rev. Mem. Law Supp. Summ. J. ("Defs.' Mem.") 12.) "[A]rguments not made in opposition to a motion for summary judgment are deemed abandoned." Plahutnik v. Daikin Am., Inc., No. 10 Civ. 1071, 2012 WL 6108236, at *5 (S.D.N.Y. Dec. 6, 2012); see Jain v. McGraw-Hill Cos., Inc., 827 F. Supp. 2d 272, 280 (S.D.N.Y. 2011)

Plaintiff's training-related claims rest on Defendants' denial of four particular training courses: Executive Protection Training, Land Transportation Antiterrorism Training, Incident Command System Training, and Plainclothes Tactical Training.[8] (Am. Compl. ¶¶ 149-50.) First, Plaintiff claims that MTA discriminated on the bases of race and sex when it denied her three requests for Executive Protection Training. Assuming arguendo that Plaintiff set forth a prima facie case of discrimination as to her two requests for Executive Protection Training in 2004, Defendants have stated a legitimate,

---

(holding that plaintiff abandoned six claims when her opposition papers failed to respond to defendants' arguments on those claims); Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011) ("Plaintiff did not address this argument in his opposition papers, which operates as an abandonment of the argument."). It is unclear whether Plaintiff seeks to bring disparate treatment claims related to her allegations of disparate disciplinary penalties. (Am. Compl. ¶ 144.) If so, these claims are likewise deemed abandoned, because Plaintiff's Opposition brief does not respond to Defendants' moving brief's discussion of these claims. (Defs.' Mem. 4-7.)

[8] Plaintiff's 56.1 Statement also discusses Defendants' 2008 denials of her requests for DNA Collection Training and the Handling and Processing of Juveniles Course. (Pl.'s 56.1 Stmt. ¶¶ Y-Z.) These allegations are not mentioned in Plaintiff's Amended Complaint, nor did she seek to file a Second Amended Complaint in order to add these claims. Thus, to the extent that Kellman seeks to allege that these denials constitute additional instances of discrimination, these new discrimination claims are untimely and waived. Malmsteen v. Universal Music Grp., Inc., 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013) ("Because [Plaintiff] failed to include this claim in his Amended Complaint, instead raising it for the first time in opposition to summary judgment, it is waived."); Greenidge v. Allstate Ins. Co., 312 F. Supp. 2d 430, 436-37 (S.D.N.Y. 2004) ("A party cannot assert a cause of action for the first time in response to a summary judgment motion."), aff'd, 446 F.3d 356, 361 (2d Cir. 2006).

nondiscriminatory reason for their decision: Executive
Protection Training was specialized training unrelated to
Plaintiff's duties as a patrol sergeant, and at the time of her
2004 requests, MTA PD was providing the Training only to members
of specialized units such as ICTF. (Defs.' 56.1 Stmt. ¶ 40;
Kellman Decl. ¶ 15; Kellman Dep. 226:4-5.)

Plaintiff has failed to raise evidence sufficient for a
reasonable fact-finder to find that Defendants' rationale is
pretextual. The record reflects that the four individuals
assigned to Executive Protection Training in 2004 were all ICTF
members at the time they received the training.[9] (Defs.' 56.1
Stmt. ¶ 36; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 36R; Defs.' Reply
Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Stmt. ¶ LL;
Barreto Decl. ¶ 5; Fuchs Reply Decl. Ex. 21; Jeremias Decl. Ex.
T.) Barreto's Reply Declaration indicates that MTA PD relied on
ICTF members to perform executive protection duties and provided
them with Executive Protection Training so that they would be
better able to perform those duties. (Barreto Decl. ¶¶ 2, 5.)[10]

---

[9] No reasonable juror could agree with Plaintiff that Farney was
assigned to the Communications Unit when he received the
Training. (See supra n.5; Fuchs Reply Decl. Ex. 21; Jeremias
Decl. Ex. T, at P04286.)
[10] Barreto's Declaration was submitted on reply. "[R]eply papers
may properly address new material issues raised in the
opposition papers so as to avoid giving unfair advantage to the
answering party." Bayway Ref. Co. v. Oxygenated Mktg. & Trading
A.G., 215 F.3d 219, 226-27 (2d Cir. 2000) (citation omitted)
(affirming district court's decision to consider affidavits

Although the four 2004 trainees never performed executive protection duties after receiving the Training (Pl.'s 56.1 Stmt. ¶ GG; Defs.' Resp. Pl.'s 56.1 Stmt. ¶ GG; Barreto Dep. 130:17-20), this fact does not suggest that Defendants' rationale is pretextual. There is nothing perplexing about MTA PD's decision to give Executive Protection Training to individuals assigned to a unit whose members sometimes performed executive protection duties (Barreto Decl. ¶¶ 2, 5), even if the chance of being called on to perform those duties was slight.

Between 2008 and 2011, multiple detectives received Executive Protection Training even though they were not ICTF members. (Barreto Decl. ¶ 5; Jeremias Decl. Ex. T; Jeremias Decl. Ex. KKK, at P06335.) These training assignments, however, are consistent with Barreto's deposition testimony, in which he explains that because some non-ICTF detectives performed executive protection duties, MTA PD decided in 2008 to begin assigning them to Executive Protection Training. (Barreto Dep. 124:9-19, 130:21-132:19; see also Barreto Reply Decl. ¶ 5.)

---

submitted on reply). In her Rule 56.1 Statement, Plaintiff alleged that Barreto "could not understand why Farney received [Executive Protection] training since he did not work dignitary protection assignments" and that the three other 2004 Training recipients did not perform executive protection duties. (Pl.'s 56.1 Stmt. ¶ GG.) The issue of why individuals who did not necessarily perform executive protection duties received Executive Protection Training is new and material, and Barreto's Declaration addresses it directly. Accordingly, the Court will consider the Declaration.

Plaintiff does not allege that she ever carried out the type of executive protection duties performed by detectives. (<u>See</u> Pl.'s 56.1 Stmt.; Barreto Reply Decl. ¶¶ 2, 5.) Moreover, Barreto affirms that patrol sergeants and uniformed police officers do not receive Executive Protection Training (Barreto Reply Decl. ¶ 7), an affirmation supported by the remainder of the record. (<u>See</u> Defs.' 56.1 Stmt. ¶ 36; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 36R; Defs.' Reply Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 36; Pl.'s 56.1 Stmt. ¶ LL; Barreto Decl. ¶¶ 6-7; Barreto Dep. 46:2-6, 91:7-92:10; Fuchs Reply Decl. Ex. 21; Jeremias Decl. Ex. T; Jeremias Decl. Ex. KKK, at P06335; Urquhart Dep. 176:4-8.)

The submitted evidence does not permit a reasonable jury to find by a preponderance of the evidence that MTA's decision was motivated both by legitimate factors and by race or sex. Four of the sixteen recipients of Executive Protection Training after 1997 were African American and two were women. (Fuchs Decl. Ex. 21; Jeremias Decl. Ex. T; Jeremias Decl. Ex. KKK, at P06335; Barreto Dep. 92:2-16; Urquhart Dep. 176:4-8.) Plaintiff emphasizes that a majority of the Executive Protection Training attendees were Caucasian. (Pl.'s Am. Mem. Law Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n") 13.) However, these data are not sufficient on their own to convince a reasonable jury that the denials of Executive Protection Training in 2004 were based, even in part, on discrimination.

Defendants do not address specifically Plaintiff's 2011 request for Executive Protection Training, instead claiming generally that Plaintiff's requests for the Training were denied because the course did not relate to her duties as a patrol sergeant and MTA PD had no need to assign her to it. (Defs.' Rev. Mem. Law Supp. Summ. J. ("Defs.' Mem.") 8; Defs.' Rev. Reply Mem. Law Supp. Mot. Summ. J. ("Defs.' Reply") 5.) However, Berlingieri's June 6, 2011 email does not indicate that these factors were at play in the denial of her 2011 request. (Jeremias Decl. Ex. KKK, at P06324.) The email shows that Berlingieri failed to respond to Plaintiff's request until after the Training had finished and gives no substantive reason for this failure. (Id.) Berlingieri told Plaintiff that if she submitted a new request for Executive Protection Training, he would "forward it up the chain of command for their consideration." (Id.) Had Berlingieri forwarded Plaintiff's 2011 request up the Chain of Command, a superior officer may well have found that the Training was unrelated to Plaintiff's duties and denied her request. The record before the Court, however, raises a material issue of fact as to whether Defendants' rationale is false with regard to Plaintiff's 2011 request.

Here, the possibility that Defendants' rationale is pretextual, in combination with the remainder of the record, could not convince a reasonable jury that the denial of

Plaintiff's 2011 request was based, even in part, on discrimination. See Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he issue as to the sufficiency of the evidence is whether the record as a whole, including whatever reasonable inference the jury could draw from the proffer of a false reason for the discharge, permitted the required ultimate finding of discrimination."). The data regarding the race and sex of the sixteen recipients of Executive Protection Training, in addition to the possibility of pretext and the remainder of the record, could not meet the preponderance of the evidence standard. (See Pl.'s Opp'n 13.)

Next, Plaintiff alleges that Defendants denied her July 2005 request to attend Land Transportation Antiterrorism Training on the basis of her race and sex. Assuming that Plaintiff has set forth a prima facie case of discrimination, Defendants have stated legitimate, nondiscriminatory reasons for the denial: the Training was not required for Plaintiff's duties and MTA had no need to assign her to it. (Defs.' 56.1 Stmt. ¶ 40.) However, Plaintiff has raised a material issue of fact as to whether Defendants' rationales are pretextual. In his Reply Declaration, Terrett states that he denied Plaintiff's request not for the reasons Defendants state but because Plaintiff's attendance at the Training "would have created a scheduling

**problem." (Terrett Reply Decl. ¶ 5.)[11] These "shifting and somewhat inconsistent explanations" are "discrepancies [from which] a reasonable juror could infer that the explanations given by [Defendants] were pretextual." Kwan v. Andalex Group LLC, 737 F.3d 834, 846-47 (2d Cir. 2013) (citation omitted).**

**However, even taking into account this evidence of pretext, no reasonable juror could find that the denial of Plaintiff's July 2005 request was based on her race or sex. The record shows that MTA members who were assigned to a training had either requested that training from their supervisors or been recommended for assignment to that training by one of their commanding officers. (Pl.'s 56.1 Stmt. ¶ O; Defs.' Resp. Pl.'s 56.1 Stmt. ¶¶ O-P; Terrett Dep. 152:22-25, 158:9-17.) Terrett, Plaintiff's supervisor and commanding officer, affirms that he did not supervise any of the seven members assigned to Land Transportation Antiterrorism Training in July 2005, and the record does not indicate that Plaintiff's other supervisor and commanding officer, Dunn, supervised them or was their**

---

**[11] Terrett's Declaration was submitted on reply. "A district court enjoys broad discretion . . . to rely on evidence submitted with the reply papers." Dixon v. NBCUniversal Media, LLC, 947 F. Supp. 2d 390, 396 (S.D.N.Y. 2013) (citation omitted). "[A] court may choose to admit such evidence where the opposing party will suffer no prejudice." Id. Terrett's affirmation that he denied Plaintiff's request due to scheduling concerns, rather than prejudicing Plaintiff, supports her argument by permitting an inference of pretext. Accordingly, the Court will consider this portion of Terrett's Reply Declaration.**

commanding officer. (Pl.'s 56.1 Stmt. ¶ N; Terrett Reply Decl. ¶ 5.)[12] The record, then, indicates that neither Terrett nor Dunn recommended that the seven members receive the Training or granted their requests for the Training. Nor, according to the record, was Plaintiff's request for the Training denied by the same commanding officers who recommended or granted the requests of the seven members. In these circumstances, the data about the race and sex of the seven individuals, in combination with the evidence of pretext and the rest of the record, could not meet the preponderance of the evidence standard.

Next, Plaintiff alleges that Defendants discriminated on the bases of Plaintiff's race and sex when they denied her request for Incident Command System ("ICS") Training. The "denial of professional training opportunities may constitute an adverse employment action, but only where an employee can show 'material harm' from the denial, 'such as a failure to promote or a loss of career advancement opportunities.'" <u>Trachtenberg v.</u>

---

[12] Plaintiff raised a new material issue when her Opposition brief stated, "Kellman's supervisors sent Sergeant Grascia, Caucasian, who reported to the same supervisors in Grand Central, to . . . Land Transportation Antiterrorism . . . training." (Pl.'s Opp'n 13-14.) Nothing in the record supports this statement, including the paragraph of Plaintiff's Response to Defendants' 56.1 Statement to which her brief cites. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 37R.) Terrett's Reply Declaration responds directly to Plaintiff's new argument by stating that he did not supervise any of the people assigned to Land Transportation Antiterrorism Training in July 2005. (Terrett Reply Decl. ¶ 5.) Accordingly, the Court will consider this portion of his Reply Declaration. <u>See</u> <u>supra</u> n.10 (citing case).

<u>Dep't of Educ. of N.Y.C.</u>, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) (citation omitted). Here, Plaintiff has not raised an issue of material fact as to whether she suffered material harm. Plaintiff does not allege that the denial of ICS Training influenced Defendants' denial of her applications for promotion to Detective Sergeant in October 2005 or to Lieutenant in 2007. (Pl.'s Opp'n 12-13.) The only training mentioned in the Personnel Order for the 2005 Detective Sergeant position was the Criminal Investigators Course (Jeremias Decl. Ex. PP), and the record does not indicate that training was relevant to the 2007 Lieutenant promotion process. There is no reason to believe that the denial of ICS Training affected Plaintiff's career advancement or caused any other material harm.

Plaintiff also alleges that Defendants denied her July 2006 request for Plainclothes Tactical Training on the bases of her race and sex. Assuming that Plaintiff has set forth a <u>prima facie</u> case of discrimination, Defendants state a legitimate, nondiscriminatory reason for the denial: at the time of her request, Plainclothes Training was offered only to police officers. (Defs.' 56.1 Stmt. ¶ 39.) Plaintiff has failed to raise evidence sufficient for a reasonable fact-finder to find this rationale pretextual. Dunn informed Plaintiff of this rationale in the email in which he denied her request, and indeed, the only individuals assigned to Plainclothes Training

in 2005 and 2006 were police officers. (Id.; Jeremias Decl. Ex. V, at P04276.) Although four individuals above the rank of police officer were assigned to Plainclothes Training in 2009, this does not call into question Defendants' rationale. (Jeremias Decl. Ex. V, at D00042175, D00040245.) Dunn's email stated, "[A]t this time, plain clothes training is being offered to police officers." (Id. at P04276 (emphasis added).)

Moreover, the submitted evidence does not permit a reasonable jury to find that MTA's decision was motivated both by legitimate factors and by race or sex. The only sergeant who attended Plainclothes Training, assigned in April 2009, was stationed in a different district than Plaintiff and appears to have had different supervisors and commanding officers at the time he was assigned to the Training. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 7R; Jeremias Decl. Ex. V, at D00040245.) Data on the race and sex of the individuals assigned to Plainclothes Training is insufficient, in the context of this record, to meet the preponderance of the evidence standard.

Next, Plaintiff alleges that Defendants denied her June 2004 application for promotion to Detective Sergeant on the bases of her race and sex. Assuming arguendo that Plaintiff has established a prima facie case of discrimination, Defendants have set forth legitimate, nondiscriminatory rationales for their promotion decision: Farney, Cudia, and Eivazi had been

33

sergeants for longer than Plaintiff and had more investigative or supervisory experience than Plaintiff. (Defs.' 56.1 Stmt. ¶ 42.) Plaintiff has failed to raise a material issue of fact as to whether these rationales are pretextual. The evidence submitted shows that Plaintiff indeed had less investigatory experience than Farney and Cudia and less supervisory experience than Eivazi, and had been a sergeant for a shorter period of time than all three. (Id.; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 42R(b)-(c); Defs.' Reply Pl.'s 56.1 Stmt. ¶ 42; Jeremias Decl. Ex. X, at D00007421-22, D00007428, D00007431, D00007437, D00007440, D00007446, D00007449, D00007455; Jeremias Decl. Ex. Z, at D00007397; Jeremias Decl. Ex. BB, at D00024508, D00024514, D00024516-17, D00024523, D00024526, D00024532, D00024535, D00024541; Jeremias Decl. Ex. CC, at D00024405-06, D00024409-10, D00024416, D00024419, D00024428, D00024434, D00024437, D00024446; Jeremias Decl. Ex. DD, at D00024458, D00024552, D00024557, D00024566, D00024571, D00024575-76, D00024580, D00024585, D00024593, D00024598; Kellman Decl. ¶ 11.) The interviewers' write-ups highlighted Farney and Cudia's investigative experience, Eivazi's supervisory experience, and Plaintiff's shortcomings in both areas. (Jeremias Decl. Ex. X, at D00007428, D00007455; Jeremias Decl. Ex. BB, at D00024532; Jeremias Decl. Ex. CC, at D00024405-06, D00024409-10, D00024416,

D00024419, D00024428, D00024434, D00024437, D00024446; Jeremias
Decl. Ex. DD, at D00024458, D00024576, D00024585.)

Plaintiff argues that investigatory experience and
supervisory experience were not listed as "preferred
qualifications" on the June 17, 2004 Personnel Order, and claims
that she was more qualified in the areas listed in the Order
than the three selected sergeants. (Pl.'s Resp. Defs.' 56.1
Stmt. ¶ 42R.) In fact, the Personnel Order did highlight
investigatory and supervisory skills as desired qualifications.
(See Jeremias Decl. Ex. AA (listing "[a]bility to supervise the
assessment of infrastructure of MTA facilities" and "[k]nowledge
in terrorist related computer investigations" as relevant
qualifications).) Although Plaintiff may have had some of the
other listed qualifications, a plaintiff who "seeks to prevent
summary judgment on the strength of a discrepancy in
qualifications ignored by an employer" must have "credentials .
. . so superior to the credentials of the person selected for
the job that 'no reasonable person, in the exercise of impartial
judgment, could have chosen the candidate selected over the
plaintiff for the job in question.'" Byrnie v. Town of Cromwell
Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001) (citation
omitted). Even viewing the facts in the light most favorable to
Kellman, her credentials do not meet this high standard.

Nor does the evidence permit a reasonable juror to find that MTA's decision was motivated both by legitimate factors and by race or sex. Although Plaintiff's application was strong in certain areas, these strengths do not satisfy her burden, even when viewed in combination with the statistical evidence of racial disparities in advancement at MTA PD and the fact that all three promoted individuals were Caucasian men. (See Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 42R; Jeremias Decl. Ex. NN.)

Next, Plaintiff claims that Defendants' denial of her July 2004 abstract for promotion to Detective Sergeant was discriminatory. Assuming that Plaintiff has set forth a <u>prima facie</u> case of discrimination, Defendants have stated a legitimate, nondiscriminatory reason for the denial: Kellman did not have sufficient investigatory and supervisory experience. (Defs.' 56.1 Stmt. ¶ 45.) Plaintiff has failed to raise an issue of material fact as to whether the investigatory experience rationale is pretextual. Conner's interview notes state that Plaintiff and the three other rejected candidates lacked sufficient investigative experience, and Plaintiff had less investigative experience than the promoted candidate. (Jeremias Decl. Ex. EE, at D00013002, D00013018, D00013021; Jeremias Decl. Ex. GG, at D00015943, D00015946; Jeremias Decl. Ex. HH, at D00015963; Jeremias Decl. Ex. II, at D00016044; Jeremias Decl. Ex. JJ, at D00015977.) However, some evidence suggests that

Defendants' emphasis on Plaintiff's lack of supervisory experience is pretextual. The interview notes do not mention the extent of the other candidates' supervisory experience, and the person promoted to Detective Sergeant in November 2005 had less supervisory experience than Kellman. (Fuchs Decl. Ex. 44, at D00016619, D00016621; Fuchs Decl. Ex. 45; Jeremias Decl. Exs. GG-II.) Moreover, although Conner's interview notes state that Plaintiff needs more "'supervisory investigative' knowledge" (Jeremias Decl. Ex. EE, at D00013002), in his Reply Declaration, he states that Plaintiff's application was denied because "she, like all the candidates other than Jordan, lacked the necessary experience as an investigator" (Conner Reply Decl. ¶ 8).

However, even with the evidence that Defendants' supervisory experience rationale may be false, a reasonable jury could not find that the promotion denial was based, even in part, on Plaintiff's race or sex. Plaintiff argues that she was more qualified for the position than the three other rejected candidates. However, Plaintiff's qualifications were not so far superior to the other rejected candidates to indicate that the denial of her application was discriminatory. See <u>Byrnie</u>, 243 F.3d at 103 (cautioning courts against "act[ing] as a super personnel department that second guesses employers' business judgments") (citation omitted). Moreover, the selection of a man for the position, the statistical evidence of racial disparities

in advancement at MTA PD, and the racial and gender breakdown of
the candidates Conner promoted throughout his career are
insufficient to convince a reasonable jury that Plaintiff's July
2004 application was denied because of her race or sex. (See
Pl.'s 56.1 Stmt. ¶¶ PP-RR; Jeremias Decl. Ex. NN.)

    Last, Plaintiff argues that Defendants denied her October
2005 application for promotion to Detective Sergeant on the
bases of her race and sex. Assuming that Plaintiff has put forth
a prima facie case of discrimination, Defendants have stated
legitimate, nondiscriminatory reasons for the denial of
Plaintiff's application: Plaintiff had not received CIC Training
and had never been a detective. (Defs.' 56.1 Stmt. ¶ 46.)
Kellman has failed to raise an issue of material fact as to
whether these rationales are pretextual. The Personnel Order
listed CIC Training as a requirement and detective experience as
a desired qualification. (Jeremias Decl. Ex. PP.) The two
individuals interviewed for the position had received CIC
Training and had detective experience.[13] (Conner Dep. 125:16-

---

[13] Plaintiff claims that Johnston had never received CIC
Training. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 46R.) In support,
Plaintiff cites to a version of Johnston's abstract that is
missing the page listing trainings Johnston participated in.
(Compare Jeremias Decl. Ex. TT with Fuchs Reply Decl. Ex. 10.)
The missing page, submitted by Defendants on reply, states that
in 2002, Johnston attended the Fairfield County Detective
Conference. (Fuchs Reply Decl. Ex. 10.) In Conner's deposition
testimony and Reply Declaration, he notes that the Fairfield
County Detective Conference is one of several equivalent CIC

126:9; Fuchs Decl. Ex. 44, at D00016619-21; Fuchs Reply Decl.
Ex. 10.)[14] Plaintiff argues that the Sex Crimes and Child Abuse
Investigation Course she attended in 2004 was equivalent to CIC
Training, but the evidence she cites in support of this argument
does not raise a genuine issue of material fact. (Pl.'s Opp'n
10.) In Kellman's declaration, she states that the Sex Crimes
Course "closely follows" and "covers the same basic principles
that are covered" in CIC Training. (Kellman Decl. ¶ 13.)
However, because Plaintiff has not introduced evidence to
support a finding that she has personal knowledge of the CIC
Training curriculum, her comparison of the two trainings is
inadmissible. See Fed. Rule Evid. 602 ("A witness may testify to
a matter only if evidence is introduced sufficient to support a
finding that the witness has personal knowledge of the
matter."). The only other evidence Plaintiff cites to[15] is
Pucillo's testimony that a homicide investigation course would

---

Trainings to which he would send detectives. (Conner Dep.
125:16-126:18; Conner Reply Decl. ¶ 7.) Plaintiff has not put
forth any evidence indicating that Conner's testimony is untrue
or that Johnston did not receive CIC Training. Accordingly, the
Court does not find Plaintiff to have raised a genuine issue of
material fact as to whether Johnston received CIC Training.
[14] Plaintiff's submission of a version of Johnston's abstract
missing the page listing his trainings (Jeremias Decl. Ex. TT)
warrants the Court's consideration of the missing page (Fuchs
Reply Decl. Ex. 10). See supra n.10 (citing case).
[15] Plaintiff also cites to Jeremias Decl. Ex. MM, at D00007851.
(Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 46R.) However, Jeremias Decl.
Ex. MM does not include page D00007851. Plaintiff's citation of
Exhibit MM, an MTA PD earnings report from 2004, appears to be a
typographical error. (Jeremias Decl. Ex. MM.)

qualify as a CIC Training and Conner's testimony that several equivalent CIC Trainings existed. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 46R; Conner Dep. 126:2-5; Pucillo Dep. 200:14-17.) None of the cited evidence indicates that the Sex Crimes Course qualified as a CIC Training, and accordingly, any reasonable jury would find that Plaintiff had not received CIC Training.

Plaintiff argues that, even assuming she did not have CIC Training or detective experience, the imposition of these qualifications indicates pretext. (Pl.'s Opp'n 9-11.) Although these qualifications were not in the two prior Personnel Orders announcing Detective Sergeant openings, the June 2004 Personnel Order was for assignment to a different unit (ICTF) than the July 2004 and October 2005 Personnel Orders (the Detective Division). (Fuchs Decl. Ex. 40; Jeremias Decl. Exs. AA, FF, PP.) As such, the person who set the promotion criteria and reviewed candidates in June 2004 (Pucillo) was different than the person who set the promotion criteria and reviewed candidates in July 2004 and October 2005 (Conner). (Fuchs Decl. Ex. 40; Pucillo Dep. 113:10-114:15.) The absence of these qualifications in a Personnel Order for assignment to a different unit with different personnel needs is not probative.

The difference between the July 2004 and October 2005 Personnel Orders is explained in a responsive email sent by Conner to a Human Resources employee the day after publication

of the October 2005 Order. (Fuchs Decl. Ex. 40.) Conner wrote
that although "investigative background was not part of the
[July 2004 Personnel] order," the rejected candidates' lack of
investigative experience caused him to fill only one of the two
Detective Sergeant slots. (Id.) To avoid leaving any slots empty
in October 2005, Conner updated the Personnel Order to reflect a
preference for investigative experience. (Id.) The email
explains why Conner believed investigative experience to be
important for detective sergeants, and why CIC Training and
detective experience were useful proxies for that experience.
(Id.) The two individuals whom Conner promoted to Detective
Sergeant in July 2004 and October 2005 both had detective
experience, had received CIC Training, and had a great deal of
investigative experience. (Fuchs Decl. Ex. 44, at D00016619-21,
D00016625; Jeremias Decl. Ex. GG, at D00015943, D00015946.)
Plaintiff has not raises an issue of material fact as to whether
Conner's October 2005 decision to seek out individuals with
investigative experience and to use CIC Training and detective
experience as proxies for that experience was pretextual.

No reasonable jury could find that the October 2005 denial
was based, even in part, on Plaintiff's race or sex. Plaintiff
argues that she was more qualified for the position than
Roderick and Johnston. However, Plaintiff's qualifications were
not so far superior to Roderick and Johnston's to suggest that

the denial of her application was race- or sex-based. See
Byrnie, 243 F.3d at 103. Moreover, the decision to interview two
Caucasian men for the position, the statistical evidence of
racial disparities in advancement, and the racial and gender
breakdown of the candidates Conner promoted during his career do
not meet the preponderance of the evidence standard. (See Pl.'s
Resp. Defs.' 56.1 Stmt. ¶ 46R; Jeremias Decl. Ex. NN.)

Accordingly, Defendants' Motion for Summary Judgment
regarding Plaintiff's Title VII and NYSHRL disparate treatment
claims is GRANTED.


    2. NYCHRL Claims

The NYCHRL "'explicitly requires an independent liberal
construction analysis in all circumstances,' an analysis that
'must be targeted to understanding and fulfilling what the
statute characterizes as the City HRL's uniquely broad and
remedial purposes, which go beyond those of counterpart state or
federal civil rights laws.'" Bennett v. Health Mgmt. Sys., Inc.,
92 A.D.3d 29, 34 (N.Y. App. Div. 2011) (citation omitted); see
also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d
102, 109 (2d Cir. 2013) ("[C]ourts must analyze NYCHRL claims
separately and independently from any federal and state law
claims, construing the NYCHRL's provisions 'broadly in favor of

discrimination plaintiffs, to the extent that such a

construction is reasonably possible.'") (citation omitted).

> For an NYCHRL claim to survive a summary judgment motion,
>
> the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that "discrimination play[ed] no role" in its actions.

Id. at 110 n.8 (citation omitted). "[S]ummary judgment

dismissing a claim under the NYCHRL should be granted only if

'no jury could find defendant liable under any of the

evidentiary routes--McDonnell Douglas, mixed motive, direct

evidence, or some combination thereof.'" Melman v. Montefiore

Med. Ctr., 98 A.D.3d 107, 113 (N.Y. App. Div. 2012) (citation

omitted). However, these evidentiary routes are not applied to

Title VII and NYCHRL claims in identical ways. For instance, "to

make out the third prong of a prima facie case of discrimination

under the NYCHRL, a plaintiff must simply show that she was

treated differently from others in a way that was more than

trivial, insubstantial, or petty." Williams v. Regus Mgmt. Grp.,

LLC, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011); see also Lytle v.

JPMorgan Chase, No. 08 Civ. 9503, 2012 WL 393008, at *19

(S.D.N.Y. Feb. 8, 2012) (NYCHRL plaintiff "does not need to

demonstrate that he was subject to a materially adverse

employment action."), <u>adopted by</u> 2012 WL 1079964 (S.D.N.Y. Mar 30, 2012), <u>aff'd by</u> 518 F. App'x 49 (2d Cir. 2013).

Plaintiff has not raised an issue of material fact as to whether the alleged denial of Executive Protection Training, Land Transportation Antiterrorism Training, Plainclothes Training, and Plaintiff's applications for promotion were "caused at least in part by discriminatory . . . motives."[16] Mihalik, 715 F.3d at 113. The evidence discussed supra Part II.B.1 and contained in the record does not meet Plaintiff's burden to show that these denials were motivated at least in part by a discriminatory reason, nor does it meet Plaintiff's burden to show that the denial of ICS Training was motivated at least in part by Plaintiff's sex.

However, Plaintiff's race discrimination claim regarding ICS Training, which must be dismissed pursuant to Title VII and the NYSHRL, survives under the NYCHRL. There is no dispute that Plaintiff satisfies the first two elements of her prima facie discrimination case: she is a member of two protected classes and was qualified for her job. The Parties do, however, dispute the third and fourth elements.

---

[16] Because a three-year statute of limitations applies to NYCHRL claims, only those incidents occurring on or after May 4, 2004 are actionable here. N.Y. City Admin. Code § 8-502(d); see Odom v. Doar, 497 F. App'x 88, 89 (2d Cir. 2012).

The denial of ICS Training meets the NYCHRL's definition of "adverse employment action" because it is "more than trivial, insubstantial, or petty." Jeune v. City of New York, No. 11 Civ. 7424, 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014) (citation omitted). Employee trainings provide important educational and vocational benefits, and losing access to training is not a trivial matter. The fact that the denial of ICS Training did not lead to promotion rejections does not bar her NYCHRL claim, even though the denial is not adverse under Title VII's definition. See Williams, 836 F. Supp. 2d at 175-76 (holding that ignoring plaintiff's opinion and communicating with him differently than Caucasian employees was adverse under NYCHRL even though it was probably not adverse under Title VII); see also Forgione v. City of New York, No. 11 Civ. 5248, 2012 WL 4049832, at *5-6 (E.D.N.Y. Sept. 13, 2012) (holding that defendants' referral of plaintiff for psychological evaluation, while not materially adverse under NYSHRL, was not "merely trivial" under NYCHRL); Sotomayor v. City of New York, 862 F. Supp. 2d 226, 255, 257-58 (E.D.N.Y. 2012) (holding that negative observations, evaluations, and letters to file that did not trigger negative consequences for plaintiff's employment were not adverse under Title VII or NYSHRL but were adverse under NYCHRL).

Plaintiff also satisfies the fourth element of a prima facie case. "Under the NYCHRL, 'the inference of discrimination

prong of the prima facie case is satisfied if a member of a protected class was treated differently than a worker who was not a member of that protected class.'" <u>Leon v. Columbia Univ. Med. Ctr.</u>, No. 11 Civ. 8559, 2013 WL 6669415, at *11 (S.D.N.Y. Dec. 17, 2013) (citation and alterations omitted). Here, Plaintiff was denied the ICS Training that Defendants provided to individuals who were not African American. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 38R.)

Defendants state legitimate, nondiscriminatory reasons for the denial of ICS Training: Kellman's duties as a patrol sergeant did not require her to attend the Training, nor was attendance within the needs of MTA. (Defs.' 56.1 Stmt. ¶ 40.) However, Terrett's Reply Declaration and Defendants' Reply brief contradict these rationales. Terrett notes that "ICS Training would have been an appropriate course for Kellman to take in connection with her duties as a Patrol Sergeant." (Terrett Reply Decl. ¶ 6.)[17] He also provides a new rationale for the denial of ICS Training, which Defendants adopt in their Reply brief: "[B]ecause the course was taking place one or two days after the Personnel Order was issued, [he] was unable to make arrangements for Kellman to take the course at that time." (Terrett Reply

---

[17] The Court considers this portion of Terrett's Declaration, submitted on reply, because Plaintiff will suffer no prejudice from its consideration. <u>See</u> <u>supra</u> n.11 (citing case).

Decl. ¶ 6; Defs.' Reply 4.) The shifts in Defendants' rationales alone could convince a reasonable jury that Defendants' stated rationales are pretextual. See <u>Kwan</u>, 737 F.3d at 846-47.

Beyond this indication of pretext, the record contains additional evidence that the denial of ICS Training was, at least in part, motivated by Plaintiff's race. Every sergeant assigned to the ICS Trainings occurring between March 2005 and October 2006 was Caucasian. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 38R.) One of these Caucasian sergeants was Grascia, who, like Plaintiff, worked in District 5 - Grand Central and was supervised by Terrett and Dunn. (Kellman Decl. ¶ 18; Terrett Dep. 152:10-11, 158:15-17, 159:17-160:1.) As discussed above, individuals assigned to particular discretionary trainings had either requested the training from their supervisors or had been recommended for the training by one of their commanding officers. (Pl.'s 56.1 Stmt. ¶ O; Defs.' Resp. Pl.'s 56.1 Stmt. ¶¶ O-P; Terrett Dep. 152:22-25, 158:9-17.) Thus, either Terrett or Dunn was involved in the assignment of Grascia to ICS Training. None of Defendants' three rationales explains sufficiently why Kellman's supervisors would have assigned Grascia to ICS Training but denied Kellman's request for the same Training. The record does not indicate that providing ICS Training to Grascia would have been more within MTA PD's "needs" than providing it to Kellman, also a patrol sergeant stationed

in Grand Central, nor would the Training have been more relevant to Grascia's duties than to Kellman's. As for Terrett's allegation that Plaintiff's request was tardy, there is an issue of material fact as to whether Plaintiff requested ICS Training before or after the publication of the October 2005 Personnel Order assigning Grascia to the Training. (Kellman Decl. ¶ 18; Terrett Decl. ¶ 6.) Even assuming that Plaintiff requested the Training after the October 2005 Order was published, nothing in the record indicates whether Grascia requested the Training. Terrett assigned Grascia to a training that she did not request at least once, and he did not remember if he had ever assigned Plaintiff to discretionary training. (Terrett Dep. 152:10-19; 158:3-8.) Finally, even if Grascia did request ICS Training, Defendants do not explain why Terrett and Dunn chose not to recommend that Plaintiff be assigned to one of the two subsequent ICS Trainings. Considering this evidence as a whole, a reasonable jury could find that Defendants denied Plaintiff ICS Training at least partly because of her race.

However, no reasonable jury could find that the denial of ICS Training was based, even in part, on Plaintiff's sex. The record does not indicate that the four male sergeants assigned to ICS Training when Plaintiff was available to attend the Training had Terrett or Dunn as supervisors or commanding officers. (See Fuchs Decl. Ex. 21; Jeremias Decl. Ex. W, at

D00013039, D00008368.) Accordingly, there is no indication that Terrett or Dunn had anything to do with the four men's assignment to ICS Training. The only person who appears to have been recommended or approved for ICS Training by Plaintiff's supervisors is Grascia, a woman. Under these circumstances, the data about the sex of the sergeants assigned to ICS Training, in combination with the evidence of pretext and the rest of the record, could not convince a reasonable jury that Kellman was denied ICS Training even partly because of her sex.

Thus, Defendants' Motion for Summary Judgment on Kellman's NYCHRL claims is GRANTED, except with regard to her race discrimination claim concerning the denial of ICS Training.

### C. Hostile Work Environment Claims

#### 1. Title VII and NYSHRL Claims

"In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000) (citation omitted). "A hostile working environment is shown when the incidents of harassment occur either in concert or with regularity that can reasonably be termed pervasive."

Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 724
(2d Cir. 2010) (citation omitted). It "can also be established
through evidence of a single incident of harassment that is
'extraordinarily severe.'" Id. (citations omitted). "A work
environment will be considered hostile if a reasonable person
would have found it to be so and if the plaintiff subjectively
so perceived it." Brennan v. Metro. Opera Ass'n, 192 F.3d 310,
318 (2d Cir. 1999). Whether a reasonable person would find a
given work environment hostile depends on the "totality of the
circumstances," consideration of which includes: (1) frequency
of the conduct, (2) severity of the conduct, (3) whether the
conduct is physically threatening or humiliating, or a mere
offensive utterance, and (4) whether the conduct unreasonably
interferes with the employee's work performance. Harris v.
Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Plaintiff bases her hostile work environment claims on
various allegations. Kellman alleges that between 1999 and 2002,
MTA members physically threatened her, wrote a racially
derogatory term on her locker, forced her to use the men's
bathroom, and instructed her to do physical activity from which
she was exempt due to her pregnancy-related light duty status.
(Pl.'s Opp'n 20 n.43; Pl.'s 56.1 Stmt. ¶¶ C, E-G, J-K.) She also
points to her supervisors' behavior after the OCR Complaint
filing, including sending the Delaware State Police to her home,

rescinding her vacation time, and refusing to interact with her. (Pl.'s Opp'n 20; Pl.'s 56.1 Stmt. ¶ HHH; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 52R.) The Opposition brief also relies on Plaintiff's belief that Defendants denied her promotions and training and subjected her to disparate discipline on the bases of her race and sex, and on her personal awareness of racial hostility directed at other African American and female MTA members. (Pl.'s Opp'n 20.) Finally, Kellman argues that co-plaintiffs and Caucasian members perceived MTA PD as racially hostile. (Id. 21; Pl.'s 56.1 Stmt. ¶¶ EEE; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 16R.)

With hostile work environment claims, "the crucial inquiry focuses on the nature of the workplace environment as a whole, [so] a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those instances to support her claim." Cruz, 202 F.3d at 570. It is not necessary that "offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class" for those remarks to support a plaintiff's claim. Id. Even if Plaintiff herself "were not present or were not the target of some of [the] racial remarks, a jury plausibly could find that [the] persistently offensive conduct created an overall 'hostile or abusive environment,' which exacerbated the effect of the harassment [Plaintiff] experienced individually." Id. at 571 (citation

omitted). Defendants have therefore failed to establish that there is no dispute as to any material facts, even assuming they are correct in asserting that, on their own, the comments and actions directed at Plaintiff would be insufficient to make out a hostile work environment claim.

Accordingly, the Court reserves decision on Defendants' Motion for Summary Judgment on Kellman's federal and state hostile work environment claims until after considering fully the Motions for Summary Judgment against Plaintiffs Marilyn Y. Armstrong and Bryan Henry.


2. NYCHRL Claim

NYCHRL claims must be reviewed "separately and independently from any federal and state law claims." Mihalik, 715 F.3d at 109. For the purpose of judicial efficiency, the Court reserves decision on Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL hostile work environment claim until it considers Kellman's state and federal hostile work environment claims in light of fellow Plaintiffs' allegations.


D. Retaliation Claims

1. Title VII and NYSHRL Claims

Plaintiff alleges that she suffered unlawful retaliation for filing complaints with MTA's OCR and the SDHR. She claims

52

that MTA retaliated against her for complaining to the OCR by
threatening to transfer her out of her patrol assignment,
sending the local police to her house, threatening to rescind
previously approved time off, and subjecting her to increased
discipline. Kellman also alleges that MTA retaliated against her
for filing the SDHR Complaint by disciplining her and denying
her specific requests for training.[18]

"Federal and state law retaliation claims are reviewed
under the burden-shifting approach of McDonnell Douglas." Kwan,
737 F.3d at 843. "Under the first step of the McDonnell Douglas
framework, the plaintiff must establish a prima facie case of
retaliation by showing 1) 'participation in a protected
activity'; 2) the defendant's knowledge of the protected
activity; 3) 'an adverse employment action'; and 4) 'a causal
connection between the protected activity and the adverse
employment action.'" Id. at 844 (citation omitted). "[I]f the
plaintiff meets this burden, the defendant employer must then
articulate a legitimate, non-discriminatory reason for its

---

[18] Although Plaintiff's Amended Complaint alleges that Defendants
retaliated against Plaintiff by denying her a promotion to
Lieutenant and harassing her during maternity- and pregnancy-
related leaves of absence (Am. Compl. ¶¶ 153-54), the Court
deems Plaintiff to have abandoned any retaliation claims
regarding the Lieutenant promotion denial or alleged harassment
during maternity and pregnancy leaves. Defendants' moving
Memorandum specifically addresses these claims, but Plaintiff's
Opposition brief fails to mention them in any way. (Defs.' Mem.
19-20.) See supra n.7 (citing cases).

adverse employment action." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 n.6 (2d Cir. 2011). The Supreme Court has recently held that if the employer does so, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer" for his or her Title VII claim to survive. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013). Although it is not yet clear whether the "but-for" standard applies to NYSHRL claims or whether Plaintiff need only "demonstrate that a retaliatory motive was 'a substantial or motivating factor behind the adverse action,'" see Kwan, 737 F.3d at 846 n.5, 847 n.7 (citation and alteration omitted), the Court need not address which standard applies because on this record, the distinction does not alter the Court's conclusions.

Plaintiff first argues that Terrett threatened to transfer Plaintiff to the Communications Unit shortly after he learned that she had scheduled an appointment with OCR. Plaintiff has established a prima facie case of retaliation. Although Defendants do not dispute that Plaintiff has satisfied the first two elements of her prima facie case (Defs.' Mem. 20), they claim that Terrett never threatened to transfer Kellman to the Communications Unit (Defs.' 56.1 Stmt. ¶ 57; Defs.' Resp. Pl.'s 56.1 Stmt. ¶ GGG). Plaintiff's allegation is supported by her deposition testimony, declaration, and OCR Complaint (Kellman

Dep. 182:12-24; Kellman Decl. ¶ 21; Jeremias Decl. Ex. H, at
D00012964), and Defendants' denial of the allegation is
supported by Terrett's deposition testimony (Terrett Dep.
128:14-17). "[A]s a general rule, a district court may not
discredit a witness's deposition testimony on a motion for
summary judgment, because the assessment of a witness's
credibility is a function reserved for the jury." Fincher, 604
F.3d at 725. "Whether [Kellman and Terrett] had a . . .
conversation in which [Terrett] made the remarks that [Kellman]
imputes to him is a question of 'he said, she said,' on which
the court cannot, in the context of this case, take a side at
the summary judgment stage." Id. at 726. Accordingly, viewing
the facts in the light most favorable to Plaintiff, the Court
assumes for the purposes of this Memorandum and Order that
Terrett threatened to transfer Plaintiff to the Communications
Unit shortly after an OCR employee informed Terrett of
Plaintiff's scheduled meeting with OCR.

Defendants next argue that even if Terrett threatened to
transfer Plaintiff, the threat was not a materially adverse
action. Title VII's "antiretaliation provision, unlike the
substantive provision, is not limited to discriminatory actions
that affect the terms and conditions of employment." Burlington
N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). Instead,
in the retaliation context, "a plaintiff must show that a

reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 68 (citation omitted). "[A]ctions that are trivial harms--i.e., those petty slights or minor annoyances that often take place at work and that all employees experience--are not materially adverse." Rivera v. Rochester Genesee Reg'l Transp. Auth., No. 11-762-CV, 2014 WL 518791, at *9 (2d Cir. Feb. 10, 2014) (citation and alteration omitted). "[M]aterial adversity is to be determined objectively, based on the reactions of a reasonable employee." Id. at *10. "But 'context matters, as some actions may take on more or less significance depending on the context,' and 'alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct.'" Id. (citations and alterations omitted).

In keeping with this standard, "a lateral job transfer that does not affect an employee's salary or title may be the basis for a Title VII retaliation claim only if the reassignment would have been viewed by a reasonable employee as being materially adverse." Kaytor v. Electric Boat Corp., 609 F.3d 537, 555 (2d Cir. 2010). The Second Circuit has permitted transfer-based retaliation claims to move past the summary judgment phase when

plaintiffs' new positions involved diminished discretionary, managerial, supervisory, or prestigious functions, increased menial labor, or additional harassment or isolation. See id. at 555-56; Kessler v. Westchester Cnty. Dep't of Soc. Svcs., 461 F.3d 199, 209-10 (2d Cir. 2006).

"[B]ecause the Burlington Northern standard requires consideration of an alleged retaliatory act in the context of the plaintiff's particular circumstances, threats may meet [the material adversity] threshold." Delaney v. LaHood, No. 07 Civ. 471, 2009 WL 3199687, at *19 (E.D.N.Y. Sept. 30, 2009); see also Rivera, 2014 WL 518791, at *11 ("A reasonable juror could find both that [plaintiff's supervisor] threatened [plaintiff] with the loss of his job, and that this threat would 'dissuade a reasonable worker from making or supporting a charge of discrimination.'") (citation and alteration omitted). Just as a lateral transfer may constitute an adverse action, so may threats to transfer an individual be considered materially adverse. See, e.g., Scott v. Cellco P'ship, No. 98 Civ. 7245, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) ("The allegation that plaintiff was threatened, by a manager, with 'transfer to an equivalent position in a different store location,' a location to which three persons whom plaintiff had accused of conduct prohibited by Title VII had been transferred, must, if true, be considered as at least raising an issue of fact as to

whether it amounts to an adverse employment action within
Burlington.") (citation omitted); see also Adams v. City of New
York, 837 F. Supp. 2d 108, 122 (E.D.N.Y. 2011) ("[T]he threat of
being relegated to an allegedly inferior stratum of work
assignments could well dissuade a reasonable worker from taking
advantage of the dispute resolution processes afforded by the
[employer's Office of Equal Employment Opportunity].").

Here, Plaintiff has raised a genuine issue of material fact
as to whether, in the context at hand, a threat of transfer to
the Communications Unit would have dissuaded a reasonable worker
from making a charge of discrimination. Whereas Plaintiff's
assignment in Grand Central involved supervising patrol officers
and conducting arrests and investigations, the Communications
Unit was an administrative unit that involved dispatching other
police officers to respond to major incidents. (Alvarado Decl. ¶
19; Barreto Dep. 23:7-13; Dunn Dep. 234:6-22; Kellman Decl. ¶¶
21, 24.) Plaintiff affirms that she perceived an involuntary
transfer to the Communications Unit "as a demotion because such
an assignment would provide [her] with no opportunity to do
investigations or make arrests which [she] wanted to do to
further [her] aspirations as a detective." (Kellman Decl. ¶ 24.)
A reasonable worker also could have perceived the threatened
transfer as a demotion, because the submitted evidence shows
that it would have entailed diminished supervisory and

investigatory responsibilities and increased administrative duties. See Kaytor, 609 F.3d at 555-56; Kessler, 461 F.3d at 209-10; see also Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 226 (2d Cir. 2006) ("Adverse employment actions may include . . . transfer from library to classroom teaching as an alleged demotion.") (citation omitted). Moreover, Plaintiff had no reason to think that Terrett's statement was an "empty verbal threat[]." Tepperwien, 663 F.3d at 571 (citation omitted). Although Terrett claims that he had no authority to transfer Plaintiff (Terrett Dep. 128:14-17), Defendants submit no evidence that Plaintiff was or a reasonable worker would be aware of her supervisor's alleged powerlessness. Accordingly, Plaintiff has raised a genuine issue of material fact as to whether Terrett's threat to transfer her to the Communications Unit constituted an adverse employment action.

Plaintiff has also established a causal connection between her contact with OCR and Terrett's threat to transfer her. Causation can be established "by showing that the protected activity was closely followed in time by the adverse employment action." Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) (citation omitted). The close temporal proximity between Kellman's scheduling of an appointment with OCR on November 10, 2005 and Terrett's alleged threat at some point between November 10 and November 23, 2005 is plainly adequate to

establish causation. (Pl.'s 56.1 Stmt. ¶ GGG; Jeremias Decl. Ex.
H, at D00012964, D00001213-14.)

Defendants have not offered any explanation for Terrett's
threat. (Defs.' Mem. 20; Defs.' 56.1 Stmt. ¶ 57; Defs.' Resp.
Pl.'s 56.1 Stmt. ¶ GGG; Defs.' Reply Pl.'s Resp. Defs.' 56.1
Stmt. ¶ 57.) Therefore, Defendants have not met their burden
under the second step of the McDonnell Douglas test, and summary
judgment is inappropriate. See, e.g., Flynn v. N.Y. State Div.
of Parole, 620 F. Supp. 2d 463, 491 (S.D.N.Y. 2009) (denying
defendant's motion for summary judgment because plaintiff had
established prima facie case of retaliation and defendant had
not offered legitimate, nondiscriminatory rationale for adverse
action); Vara v. Mineta, No. 01 Civ. 9311, 2004 WL 2002932, at
*14 (S.D.N.Y. Sept. 7, 2004) (same).

Next, Kellman argues that Dunn sent the Delaware State
Police to her home and rescinded her previously approved day off
in retaliation for filing the OCR Complaint. Kellman has
established a prima facie case of retaliation. Defendants do not
dispute that Plaintiff has met the first two elements of a prima
facie case, instead arguing that ordering State Police to an
individual's house and rescinding vacation time do not
constitute an adverse action. (Defs.' Mem. 19-20.) However, a
reasonable jury could find such actions to dissuade a reasonable
worker from making a charge of discrimination. See Rivera, 2014

60

WL 518791, at *11 (holding that supervisor's single use of racial slur "may alone suffice to establish an adverse employment action" in retaliation context); Mihalik, 715 F.3d at 116 ("[A] jury could reasonably find that publicly humiliating [employee] in front of [other employees] and otherwise shunning her was likely to deter a reasonable person from opposing [supervisor's] harassing behavior in the future") (NYCHRL case). A surprise visit from armed State Police in which the Police search an employee's property with dogs is not one of "those petty slights or minor annoyances that often take place at work and that all employees experience." Rivera, 2014 WL 518791, at *9; (Kellman Decl. ¶ 22; Kellman Dep. 206:7-14). It is a harsh and unusual exercise of supervisory power that, viewed objectively, would frighten a reasonable employee. Moreover, the rescinding of Kellman's previously approved vacation time, though likely not materially adverse on its own, "take[s] on greater significance when viewed as part" of Dunn's punitive course of conduct on the date at issue. Rivera, 2014 WL 518791, at *10 (citation omitted). Looked at objectively and in the aggregate, Dunn's behavior might well have deterred a reasonable employee from making future charges of discrimination; accordingly, a rational juror could find it materially adverse.

Defendants also argue that Plaintiff has failed to establish a causal connection between the filing of the OCR

Complaint and the Delaware State Police incident. If Defendants'
version of the facts is to be believed, approximately five weeks
elapsed between the OCR Complaint filing and the Delaware Police
incident. (Defs.' 56.1 Stmt. ¶¶ 52, 56; Williams & Chan, supra.)
Reading the facts in the light most favorable to Plaintiff, the
Delaware Police incident occurred more than five but less than
eight weeks after the OCR Complaint filing. (Jeremias Decl. Ex.
I, at P04296; Kellman Decl. ¶ 22; Kellman Dep. 200:13-24, 207:9-
13; Williams & Chan, supra.) Either way, the proximity between
the two events is sufficient to satisfy the causal connection
prong. See Garrett v. Garden City Hotel, Inc., No. 05 Civ. 962,
2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("A period of
only two months between a protected activity and an adverse
action may permit a reasonable jury to find the acts to be
temporally proximate and causally related.") (citation and
alteration omitted); Cunningham v. Consol. Edison, Inc., No. 03
Civ. 3522, 2006 WL 842914, at *19 (E.D.N.Y Mar. 28, 2006) ("[A]
passage of two months between the protected activity and the
adverse employment action seems to be the dividing line.").

Defendants state a legitimate, nondiscriminatory rationale
for withdrawing Kellman's vacation day and instructing the
Delaware State Police to inform her of the withdrawal: by
approving Kellman's day off during the transit strike, Henry
created a staffing shortage at Grand Central, and because

Kellman was not answering her phone, Defendants needed to ask policemen located closer to her home to contact her in person. (Defs.' 56.1 Stmt. ¶ 52.) Plaintiff, however, has raised an issue of material fact as to the truth of this rationale. Both Henry and Kellman testified that the incident occurred after the transit strike had ended. (Henry Dep. 339:4-340:24; Kellman Dep. 207:9-13.) The undisputed fact that Nash subsequently permitted Plaintiff to take the very same vacation day that Dunn rescinded provides further evidence that there was no staffing shortage. (Defs.' Reply Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 52; Henry Dep. 340:6-7, 340:22-24; Kellman Dep. 205:21-206:6.) Moreover, Henry affirms that Dunn's only stated rationale for rescinding the vacation day and contacting the Delaware State Police was that Nash was responsible for granting vacation days, and accordingly, it was inappropriate for Henry to have granted Plaintiff's request. (Henry Dep. 339:6-8.) Dunn corroborates Henry's testimony, in part, by agreeing that Nash was "in charge of granting time off." (Dunn Dep. 240:7-8.)

Even assuming there was a staffing shortage, Plaintiff provides compelling evidence that contacting the Delaware State Police was unwarranted. It is undisputed that the Delaware State Police incident occurred several days before the vacation day at issue was to occur. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 52R; Defs.' Reply Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 52.) Defendants do not

claim that they were under time-pressure to contact Kellman, nor
do they explain why they did not attempt to contact Plaintiff by
phone that evening or the following day.  (Defs.' 56.1 Stmt. ¶
52; Defs.' Reply Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 52.)

　　"Evidence satisfying the minimal McDonnell Douglas prima
facie case, coupled with evidence of falsity of the employer's
explanation, may or may not be sufficient to sustain a finding
of retaliation." Kwan, 737 F.3d at 847 (quoting James v. New
York Racing Ass'n, 233 F.3d 149, 156-57 (2d Cir. 2000))
(alterations omitted); see id. (holding that plaintiff's prima
facie case plus evidence of pretext sufficed to permit
reasonable juror to infer that retaliation was but-for cause of
adverse action). "[T]he way to tell whether a plaintiff's case
is sufficient to sustain a verdict is to analyze the particular
evidence to determine whether it reasonably supports an
inference of the facts plaintiff must prove." Id. (quoting
James, 233 F.3d at 157). "The relevant factors identified by the
Supreme Court 'include the strength of the plaintiff's prima
facie case, the probative value of the proof that the employer's
explanation is false, and any other evidence that supports or
undermines the employer's case.'" James, 233 F.3d at 156
(quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.
133, 148-49 (2000)) (alterations omitted).

Here, Plaintiff's prima facie case is of adequate strength and her evidence that Defendants' rationale is pretextual is quite strong. A reasonable juror, taking into account the evidence that there was no staffing shortage, that Defendants had several days to contact Plaintiff, and that Plaintiff was ultimately permitted to take the vacation day at issue, could find that the Delaware State Police's search of Plaintiff's home and the withdrawal of Plaintiff's vacation day would not have occurred in the absence of a retaliatory motive. See Kwan, 737 F.3d at 845-47; see also Manning v. Grp. Health Inc., No. 03 Civ. 3892, 2005 WL 2038591, at *1-2, *7-9 (E.D.N.Y. Aug. 22, 2005) (denying summary judgment based only on prima facie case and evidence of pretext, where approximately two months elapsed between protected activity and adverse action); Reiter v. Metro. Transp. Auth. of the State of N.Y., No. 01 Civ. 2762, 2002 WL 31190167, at *6, *9-11 (S.D.N.Y. Sept. 30, 2002) (same). Accordingly, summary judgment is inappropriate on this claim.

Next, Plaintiff argues that Defendants issued the May 23, 2006 LOI in retaliation for the OCR Complaint. (Pl.'s Opp'n 18.) Even assuming that the LOI issuance was an adverse action, the record does not indicate any causal connection between Kellman's OCR complaint and the conduct at issue. Here, the temporal gap of more than six months between the OCR Complaint and the issuance of the LOI is unable to support an inference of

causation that could defeat summary judgment.[19] See Garrett, 2007 WL 1174891, at *21 ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.") (collecting cases); Cunningham, 2006 WL 842914, at *19 ("[A] passage of two months between the protected activity and the adverse employment action seems to be the dividing line.") (collecting cases). The remainder of the record does not provide sufficient evidence of causation. Accordingly, Plaintiff has failed to establish a prima facie case as to the May 2006 LOI.

Plaintiff next argues that Defendants investigated the missing May 2006 Activity Report and filed the related Notice of Intent to Discipline in retaliation for her July 11, 2006 filing of an SDHR Complaint. (Pl.'s Opp'n 18.) Assuming arguendo that Plaintiff has established a prima facie case of retaliation, Defendants have set forth a legitimate, nondiscriminatory rationale for their actions: Kellman failed to complete the May Activity Report even though she was responsible for doing so,

---

[19] Plaintiff appears to state, in her Response to Defendants' 56.1 Statement, that Defendants initiated an internal investigation regarding the conduct discussed in the LOI on December 9, 2005. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 18R.) In fact, the record shows only that the conduct discussed in the LOI occurred on December 9, 2005, and that a civilian filed a Civilian Complaint regarding that conduct at some point thereafter. (Id.; Fuchs Decl. Ex. 7.)

66

and subsequently, Kellman falsely told Terrett that she had not received Lakeram's email instructing her to prepare the Report. (Defs.' 56.1 Stmt. ¶¶ 21-23.)

No reasonable juror could find Defendants' rationale to be pretextual. The record contains an email written by Kellman confirming that she was responsible for preparing activity reports if Lakeram was absent (Fuchs Decl. Ex. 12); Lakeram's June 7, 2006 email asking Kellman to complete the attached May Activity Report by June 10, 2006 (Fuchs Decl. Ex. 13); a Mail Envelope Properties report indicating that Kellman opened Lakeram's email on June 18, 2006 and deleted it on June 25, 2006 (Fuchs Reply Decl. Ex. 7); Kellman's September 15, 2006 Memorandum to Terrett stating, "I was never instructed by Sgt. Lakeram to prepare any monthly activity reports nor did I receive the template Sgt Lakeram used to complete them" (Fuchs Decl. Ex. 11); the signed Notice of Intent to Discipline (Fuchs Decl. Ex. 8); and Plaintiff's October 28, 2009 written admission that she "misinform[ed] . . . Terrett concerning monthly activity reports" (Fuchs Decl. Ex. 10). Plaintiff's primary evidence in opposition is her deposition testimony that she only learned in or after August 2006 that she was responsible for preparing monthly activity reports, that she does not recall seeing Lakeram's June 7, 2006 email until August 2006, and that there would have been no reason for her to ignore Lakeram's

email. (Kellman Dep. 114:17-115:4, 118:3-7, 120:10-13.) When viewed in the context of the record as a whole, this deposition testimony could not convince any reasonable juror that Defendants' rationale is pretextual.

Nor does the record support an inference that retaliation was the but-for cause of or played a substantial role in the investigation and discipline relating to the activity reports. The only evidence in the record that supports an inference of retaliation is Plaintiff's testimony that she was not responsible for preparing activity reports and does not recall receiving Lakeram's email until August 2006, Plaintiff's September 2006 memoranda to Terrett making similar allegations, and Plaintiff's testimony that it would not have made sense for her to ignore Lakeram's email. (Fuchs Decl. Ex. 11; Jeremias Decl. Ex. J, at PBA091; Kellman Dep. 114:10-126:17.) Plaintiff also notes that even though Lakeram returned from vacation in July, Terrett did not contact Plaintiff about the missing Report until August 1. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 21R.) Again, no reasonable juror could find, from this evidence, that the investigation and discipline were retaliatory.

Kellman also alleges that Defendants issued the October 30, 2006 LOI, which instructed her to review properly and timely all Departmental email correspondence, in retaliation for her SDHR Complaint. (Pl.'s Opp'n 18.) Assuming that Plaintiff has

established a <u>prima facie</u> case of retaliation, Defendants have stated a legitimate, nondiscriminatory rationale for the LOI: Plaintiff's failure to review her email between October 12 and October 16, 2006 resulted in her absence at a scheduled meeting with Assistant Deputy Chief McLaughlin. (Defs.' 56.1 Stmt. ¶¶ 27-28.) Kellman has not raised a genuine issue of material fact as to whether this rationale is pretextual. She admits that she did not check her email between October 12 and October 16, 2006. (Pl.'s 56.1 Stmt. ¶ W.) She appears to argue that Defendants should have contacted her in person or via telephone in addition to emailing her, but does not claim that similarly situated individuals were contacted about similar matters in person or via telephone. (<u>Id.</u>) Kellman also argues that Defendants should have known that she would be unable to attend a 7:30 A.M. meeting, because she had standing permission to leave work at 6:30 A.M. so that she could take her daughter to school. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 27R; Jeremias Decl. Ex. M.) However, Kellman's absence at the October 16 meeting was not due to her schedule, but due to her failure to check her email. The LOI chastised Plaintiff for her failure to read her email, not for her inability to attend the meeting. (Fuchs Decl. Ex. 9.) Neither this evidence nor the rest of the record could convince a reasonable juror that Defendants' rationale is pretextual.

Plaintiff also has not raised a genuine issue of material fact as to whether retaliation was the but-for cause of or played a substantial role in the October 30, 2006 LOI. Kellman's primary evidence of retaliation is that Dunn did not call her or contact her in person to tell her about the meeting, that Defendants should have known she was unable to attend the meeting, and that Terrett did not attempt to reschedule the meeting. (Pl.'s 56.1 Stmt. ¶ W; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 27R.) This minimal evidence, in the context of the record, could not convince a reasonable juror that retaliation was a substantial motivation for the LOI.

Finally, Plaintiff argues that Defendants "denied Kellman's specific requests for training" in retaliation for filing the OCR Complaint and the SDHR Complaint. (Pl.'s Opp'n 16.) Plaintiff spends six words on this argument in her Opposition brief, and does not cite to anything in the record. (Pl.'s Opp'n 16-19.) In her 56.1 Statement, Plaintiff speaks generally of retaliatory training denials, but identifies only one particular training denial as retaliatory: the May 2011 denial of Executive Protection Training. (Pl.'s 56.1 Stmt. ¶¶ HHH, PPP.) The temporal gap of nearly five years between the SDHR Complaint and this denial cannot support an inference of causation. See Garrett, 2007 WL 1174891, at *21; Cunningham, 2006 WL 842914, at *19. Because the remainder of the record does not provide

sufficient evidence of causation, Plaintiff has failed to establish a <u>prima facie</u> case as to her denial of training claim.

Accordingly, Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's retaliation claims regarding the threat to transfer her to the Communications Unit, the Delaware State Police incident, and the related rescinding of her vacation day. However, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's retaliation claims regarding the May 2006 and October 2006 LOIs, the investigation into the missing May 2006 Activity Report and related Notice of Intent to Discipline, and the denial of training.

### 2. NYCHRL Claims

"[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." <u>Mihalik</u>, 715 F.3d at 112 (citations omitted). "[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by . . . retaliatory motives, or if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.'" <u>Id.</u> at 113 (citations omitted).

71

Even after taking into account the NYCHRL's "uniquely broad and remedial purposes," no jury could find, based on the submitted evidence, that the issuance of the May 23, 2006 and October 30, 2006 LOIs, the investigation into the missing May 2006 Activity Report and related Notice of Intent to Discipline, and the denial of training were caused even partly by retaliatory motives. See id. at 115 n.12 (citation omitted); Parris v. N.Y.C. Dep't of Educ., 975 N.Y.S.2d 42, 44 (N.Y. App. Div. 2013) ("[W]ithout other evidence, five months is not sufficient to establish the requisite causal connection."). Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL retaliation claims regarding the May 2006 and October 2006 LOIs, the investigation into the missing May 2006 Activity Report and related Notice of Intent to Discipline, and the denial of training is GRANTED. However, Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL retaliation claims regarding Terrett's threat to transfer her to the Communications Unit and the Delaware State Police incident and related vacation day withdrawal is DENIED.[20]

---

[20] "[F]ederal and state civil rights laws [are] a floor below which the City's Human Rights law cannot fall . . . ." N.Y.C. Local Law No. 85 of 2005, at § 1 (Oct. 3, 2005). Thus, the Court denies without further analysis Defendants' Motion for Summary Judgment on Plaintiff's NYCHRL retaliation claims regarding the threat to transfer Plaintiff to the Communications Unit and the Delaware State Police incident and related vacation day withdrawal. See Clarke v. Intercontinental Hotels Grp., PLC, No.

E. Pattern or Practice of Discrimination Claims

Plaintiff maintains that Defendants' conduct towards racial minorities in MTA PD amounted to a pattern or practice of discrimination. (Pl.'s Opp'n 21-22.) Although Title VII initially envisioned that the government would pursue pattern or practice claims, 42 U.S.C. § 2000e-6, courts have unequivocally granted private individuals the right to vindicate those claims. See Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 n.9 (1984). However, "no such pattern-or-practice theory of liability is available to the private non-class plaintiffs in this case." Chin v. Port Auth. of N.Y. & N.J. Inc., 685 F.3d 135, 146 (2d Cir. 2012); see United States v. City of New York, 631 F. Supp. 2d 419, 427 (S.D.N.Y. 2009) ("[I]ndividuals cannot maintain a private, non-class, pattern-or-practice claim.).

Here, Kellman and her fellow plaintiffs have not brought their claims as a class action, and thus cannot assert pattern or practice claims of discrimination. Defendants' Motion for Summary Judgment on these claims is hereby GRANTED.

_____

12 Civ. 2671, 2013 WL 2358596, at *11 n.13 (S.D.N.Y. May 30, 2013) (denying motion to dismiss NYCHRL retaliation claim, "without further analysis," because court had denied defendant's motion to dismiss plaintiff's Title VII retaliation claim).

**F. Claims Against MTA and McConville in His Official Capacity Under 42 U.S.C. §§ 1981 and 1983**

Plaintiff alleges that MTA is liable under 42 U.S.C. §§ 1981 and 1983 for engaging in discriminatory conduct by subjecting her to disparate treatment, a hostile work environment, retaliation, and a pattern and practice of discrimination. Plaintiff also asserts claims under §§ 1981 and 1983 against individual Defendant Kevin McConville in his official capacity.[21] Plaintiff alleges that Defendants' actions deprived her of "rights, privileges and immunities secured by the United States Constitution and laws and [§ 1983]." (Am. Compl. ¶ 216.)

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson, 375 F.3d at 224. Section 1983 provides for an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities

---

[21] Although the Amended Complaint also asserted claims against Elliot Sander, William Morange, and Terrance Culhane (Am. Compl. ¶¶ 16-17, 19), Kellman abandoned these claims when she failed to mention Sander, Morange, or Culhane in opposition to Defendants' discussion of Sander, Morange, and Culhane. (Compare Defs.' Mem. 22-24 with Pl.'s Opp'n 22-24); see supra n.7 (citing cases).

secured by the Constitution and law." 42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights'"; instead, it "merely provides 'a method for vindicating federal rights elsewhere conferred,' such as those conferred by § 1981." Patterson, 375 F.3d at 225 (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). Indeed, "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units . . . ." Id. (quoting Jett v. Dall. Indep. Sch. Dist., 491 U.S. 701, 733 (1989)). Although a § 1983 action may not be brought to vindicate rights conferred only by a statute that contains its own enforcement structure, such as Title VII, id., a Title VII plaintiff may bring a concurrent § 1983 claim "if some law other than Title VII is the source of the right alleged to have been denied." Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993); see also Patterson, 375 F.3d at 225 ("'A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action' . . . 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.'") (citation omitted). Here, the sources of Plaintiff's § 1983 claim are 42 U.S.C. § 1981 and the U.S. Constitution. (Am. Compl. ¶ 216); see also Reed v. Conn. Dep't of Transp., 161 F. Supp. 2d 73, 85 (D. Conn. 2001) (noting that the source of plaintiff's § 1983 claim was § 1981).

Case 1:07-cv-03561-DAB-HBP   Document 333   Filed 03/26/14   Page 76 of 83


"[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality - or an individual sued in his official capacity - the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." Patterson, 375 F.3d at 226 (citations omitted). The policy or custom need not be an express rule or regulation; it is sufficient for a plaintiff to show that the discriminatory conduct is so "persistent and widespread . . . so permanent and well settled as to constitute a custom or usage with the force of law." Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992). Additionally, "a plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional." Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001).

In support of her claim that MTA had a custom or policy of discrimination, Kellman claims that Defendants and employees such as Terrett and Dunn took no action in response to the complaints of discrimination they received and engaged in retaliation. (Pl.'s Opp'n 23-24.) In particular, she points out that when an OCR investigator spoke to McConville about Kellman's Complaint, McConville told the investigator of an incident in which Kellman was allegedly "washing dishes instead of supervising [an] investigation." (Jeremias Decl. Ex. RR, at D00012999.) Plaintiff reads this "washing dishes" comment as a

racist and sexist remark, and states that she has no
recollection of the incident McConville described. (Pl.'s Opp'n
23; Kellman Decl. ¶ 23.) Plaintiff also alleges that McConville
acquiesced in discrimination by signing off on promotional
orders and taking part in disciplinary actions. (Pl.'s Opp'n 23-
24.) Finally, Plaintiff claims that not all MTA supervisors were
well trained in MTA's EEO Policy. (Pl.'s Opp'n 23-24.)

This evidence does not permit a finding that MTA had a
policy or custom of discrimination. Plaintiff's allegations are,
for the most part, non-specific and conclusory. The dishwashing
comment does not approach a demonstration of a policy or custom,
nor do the allegations about Terrett and Dunn suffice. Plaintiff
has not, as required, "come forward with specific evidence
demonstrating the existence of a genuine dispute of material
fact" as to whether MTA had a policy or custom of
discrimination. Great Am. Ins. Co., 607 F.3d at 292. Therefore,
Kellman is unable to state claims against MTA or McConville in
his official capacity under §§ 1981 or 1983, and Defendants'
Motion for Summary Judgment on these claims is GRANTED.

G. Claims Against McConville in His Individual Capacity Under 42 U.S.C. §§ 1981 and 1983

Kellman also asserts claims under §§ 1981 and 1983 against Defendant McConville in his individual capacity.[22] To make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action . . . . [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." Patterson, 375 F.3d at 229 (citation omitted). Similarly, a plaintiff must establish an individual defendant's personal involvement in the claimed violation to find him liable in his individual capacity under § 1983. Id. "A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others." Rolon v. Ward, 345 F. App'x 608, 611 (2d Cir. 2009) (citing Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003)).

Plaintiff alleges that McConville was aware of the denials of Plaintiff's training requests, signed off on promotion orders

---

[22] Although the Amended Complaint asserted a claim against Culhane (Am. Compl. ¶ 19), Kellman abandoned this claim when she failed to mention Culhane in opposition to Defendants' discussion of her claim against him. (Compare Defs.' Mem. 22-24 with Pl.'s Opp'n 22-24); see also supra n.7 (citing cases).

and discipline, took no steps to investigate Plaintiff's OCR Complaint, and made the aforementioned dishwashing comment. (Pl.'s Opp'n 23-24.) The dishwashing comment, on its own, is not an adverse action, and accordingly, cannot subject McConville to individual liability under §§ 1981 and 1983. See Conklin v. Cnty. of Suffolk, 859 F. Supp. 2d 415, 440 (E.D.N.Y. 2012) ("These threats . . . are insufficient to constitute an adverse employment action and thus are insufficient to demonstrate [defendant]'s personal involvement."). Plaintiff's other general allegations are insufficient to raise an issue of material fact regarding McConville's individual liability. Kellman has failed to demonstrate that McConville was aware that "constitutional violations [were] occurring." Patterson, 375 F.3d at 229. Accordingly, Defendants' Motion for Summary Judgment is GRANTED with regard to Plaintiff's §§ 1981 and 1983 claims against McConville in his individual capacity except for those related to McConville's alleged involvement in sustaining a hostile work environment, on which the Court reserves judgment.[23]

---

[23] Because the Court reserves judgment on Plaintiff's hostile work environment claims, the Court also reserves judgment as to Plaintiff's § 1981 and § 1983 hostile work environment claims brought against McConville in his individual capacity, and as to Plaintiff's NYSHRL and NYCHRL aiding-and-abetting claims regarding hostile work environment brought against McConville and Culhane in their individual capacities.

H. **Claims Against Individual Defendants in Their Individual Capacities Under the NYSHRL and NYCHRL**

Plaintiff asserts that Culhane and McConville should be held individually liable under the NYSHRL and NYCHRL as aiders and abettors. Under the NYSHRL and NYCHRL, it is unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this [provision], or to attempt to do so." N.Y. Exec. Law § 296(6); Admin. Code N.Y.C. § 8-107(6). Actual participation in conduct giving rise to a discrimination claim may support liability under both statutes. See <u>Malena v. Victoria's Secret Direct, LLC</u>, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012). Liability "may extend to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct." <u>Morgan v. N.Y. State Att'y Gen.'s Office</u>, No. 11 Civ. 9389, 2013 WL 491525, at *13 (S.D.N.Y. Feb. 8, 2013). However, "aiding and abetting 'is only a viable theory where an underlying violation has taken place.'" <u>Petrisch v. HSBC Bank USA, Inc.</u>, No. 07 Civ. 3303, 2013 WL 1316712, at *21 (E.D.N.Y. Mar. 28, 2013) (citation omitted). Finally, under both statutes, "'an individual may not be held liable merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating' that law." <u>Malena</u>, 886 F. Supp. 2d at 367-68 (citation and alterations omitted).

Plaintiff alleges generally that McConville was aware of and approved MTA's discriminatory promotion and training decisions and that Culhane engaged in discriminatory practices and failed to address complaints of discrimination. (Pl.'s Opp'n 25.) These allegations fail to raise an issue of material fact as to whether McConville or Culhane participated in the underlying discrimination discussed <u>supra</u>, even under the broad definition of participation applied to supervisors. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's NYSHRL and NYCHRL aiding-and-abetting claims, except for those related to the creation and maintenance of a hostile work environment, on which the Court reserves judgment.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part, DENIED in part, and decision is reserved in part, as follows:

(1) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's disparate treatment claims brought under Title VII and the NYSHRL; Plaintiff's NYCHRL race- and sex-based disparate treatment claims concerning the denial of Executive Protection Training, Land Transportation Antiterrorism Training, Plainclothes Training, and Plaintiff's applications for

promotion; and Plaintiff's NYCHRL sex-based disparate treatment
claim regarding the denial of ICS Training;

(2) Defendants' Motion for Summary Judgment is DENIED as to
Plaintiff's NYCHRL race-based disparate treatment claim
concerning the denial of ICS Training;

(3) Defendants' Motion for Summary Judgment is GRANTED as
to Plaintiff's Title VII, NYSHRL, and NYCHRL retaliation claims
concerning the issuance of LOIs, the investigation into the
missing May 2006 Activity Report and the related Notice of
Intent to Discipline, and the denial of training;

(4) Defendants' Motion for Summary Judgment is DENIED as to
Plaintiff's Title VII, NYSHRL, and NYCHRL retaliation claims
concerning the threat to transfer Plaintiff to the
Communications Unit, the Delaware State Police incident, and the
related withdrawal of Plaintiff's vacation day;

(5) Defendants' Motion for Summary Judgment is GRANTED as
to Plaintiff's pattern or practice claims brought under Title
VII, the NYSHRL, the NYCHRL, § 1981, and § 1983;

(6) Defendants' Motion for Summary Judgment is GRANTED as
to Plaintiff's § 1981 and § 1983 claims brought against MTA and
the individual Defendants in their official capacities;

(7) Defendants' Motion for Summary Judgment is GRANTED as
to Plaintiff's § 1981, § 1983, NYSHRL, and NYCHRL claims brought

against Culhane and McConville in their individual capacities,

other than Plaintiff's hostile work environment claims; and

(8) Decision is reserved with respect to Plaintiff's

hostile work environment claims brought against MTA under Title

VII, the NYSHRL, and the NYCHRL, and brought against Culhane and

McConville in their individual capacities under § 1981, § 1983,

the NYSHRL, and the NYCHRL.


SO ORDERED.

Dated: March 26, 2014
       New York, New York

_Deborah a. Batts_
       Deborah A. Batts
United States District Judge