UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
MARILYN Y. ARMSTRONG,

                    Plaintiff,

                                        07 Civ. 3561 (DAB)
        v.                              OPINION

METROPOLITAN TRANSPORTATION AUTHORITY,
ELLIOT SANDER, WILIAM MORANGE, KEVIN
McCONVILLE, and TERRANCE CULHANE,

                    Defendants.
---------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Plaintiff Marilyn Y. Armstrong ("Plaintiff" or

"Armstrong"), an African-American female, together with eight

African-American plaintiffs and one Hispanic plaintiff, all of

whom are current or former employees of the Metropolitan

Transportation Authority ("MTA") Police Department ("MTA PD"),

commenced this action against the MTA and four MTA executive

officers (collectively, "Defendants"), alleging violations of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et

seq., the New York State Human Rights Law ("NYSHRL"), the New

York City Human Rights Law ("NYCHRL"), and 42 U.S.C. §§ 1981 and

1983. Plaintiff maintains that Defendants discriminated against

her on the basis of her race and sex by denying her transfers,

training, and overtime pay, subjecting her to a hostile work

environment, and engaging in a pattern or practice of

discrimination, and retaliated against her for complaining to

her superiors, the MTA Office of Civil Rights ("OCR"), and the New York State Division of Human Rights ("SDHR") about alleged discrimination. Defendants now move pursuant to Fed. R. Civ. P. 56 for Summary Judgment on each of Plaintiff's claims.[1]

For the reasons set forth herein, Defendants' Motion for Summary Judgment is granted in part, denied in part, and the Court reserves decision in part.

## I.    FACTUAL BACKGROUND

A. The Parties

Defendant MTA is a New York State public benefit corporation that provides public transportation services to the Greater New York City area. Defendant Elliot Sander served as the Executive Director and Chief Executive Officer of MTA from January 1, 2007 to May 7, 2009. Defendant William Morange was MTA Director of Security from July 2003 to December 2010. Defendant Kevin McConville was the Chief of MTA PD from October 2005 to January 2008. Defendant Terrance Culhane was an Assistant Deputy Chief of MTA PD from 2004 to July 2010.

---

[1] In a Scheduling Order dated September 24, 2010, the Court allowed separate Motions for Summary Judgment to be submitted for each individual Plaintiff in this action. This Memorandum and Order addresses only the Motion for Summary Judgment filed with respect to the claims instituted by Plaintiff Marilyn Y. Armstrong.

Plaintiff Marilyn Y. Armstrong joined the Long Island Railroad Police Department ("LIRR PD") as a patrol officer in 1990. (Pl.'s 56.1 Stmt. ¶ A.) In 1997, the New York State Legislature created MTA, and on January 1, 1998, all employees of the LIRR PD, including Plaintiff, were transferred to MTA PD. (Defs.' 56.1 Stmt. ¶ 7.)

B. Plaintiff's Employment with MTA PD

In October 2000, Plaintiff was promoted to Detective and assigned to the Applicant Investigations Unit ("AIU"). (Pl.'s 56.1 Stmt. ¶¶ F-G.) In 2001, Plaintiff was transferred to the Detective Division in the Eastern Region, where she reported to Detective Sergeants Peter Cummo and Kim Riley and allegedly experienced race- and sex-based harassment every day. (Id. ¶¶ H-I.) For instance, she alleges that Riley told others that Plaintiff's reports were written in Ebonics and that both Riley and Cummo refused to speak to her, placed her in a small office with old equipment, and discouraged other detectives from working with her. (Id. ¶¶ L-M, Q-R.) In addition, Cummo allegedly treated Plaintiff differently than Caucasian detectives by creating a personal disciplinary file on Armstrong and requiring her to call him twice a day so that he could confirm that she was not arriving late or leaving early. (Id. ¶¶ DD-EE.) Plaintiff complained about Riley's discriminatory

behavior, particularly her Ebonics comment, to Police Benevolent Association ("PBA") Vice President Vincent Provenzano in July 2002 and to Lieutenant Timothy Harmon in August 2002. (Id. ¶¶ AA-BB.) Harmon subsequently met with Riley and advised her to "stop any gossiping if she has been doing so." (Jeremias Decl. Ex. HH, at P00299.) Three weeks later, Armstrong was placed on the evening tour without a partner, which prevented her from conducting overtime. (Pl.'s 56.1 Stmt. ¶ CC.) In November 2002, Plaintiff complained to then-Captain Robert Terrett about Cummo and Riley's alleged discrimination and asked if she could transfer into a Unit not supervised by them, but Terrett took no action. (Id. ¶¶ FF-GG.) Plaintiff alleges that Terrett's behavior was only one example of Defendants' longstanding failure to address minorities' complaints of race discrimination. (Id. ¶¶ PPPP-HHHHH.)

From November 2002 through May 2003, Plaintiff took an approved medical leave of absence, during which she had non-elective surgery and, after a subsequent car accident, recovered from her injuries. (Id. ¶ HH.) At 5:00 P.M. on May 26, 2003, two MTA PD members went to Plaintiff's house to perform a routine sick leave investigation and, when she did not respond to the doorbell, called her phone. (Fuchs Decl. Ex. 25.) The MTA PD members informed their superiors that Armstrong was not at home and that at 7:45 P.M. a black female had run into Armstrong's

4

backyard. (Fuchs Reply Decl. Ex. 1, at D00003417-18.) Armstrong
answered the door at 8:05 P.M. (Id. at D00003418.) During the
ensuing investigation regarding Plaintiff's unavailability,
Plaintiff alleged that she did not answer the door or the phone
before 8:05 P.M. because she was asleep, on heavy medication,
and had taken the phone off the hook. (Fuchs Decl. Ex. 25, at
D00008778.) Plaintiff's allegations, and not those of the two
MTA PD members, were the basis of MTA's determination that
Plaintiff was "unavailable" for the sick leave investigation.
(Fuchs Decl. Ex. 25; Fuchs Reply Decl. Ex. 1, at D00003417.) As
a result of that determination, Plaintiff received a Command
Discipline stating that she would be suspended for two days
without pay. (Fuchs Decl. Ex. 25.) However, she declined to
accept the discipline pursuant to union procedures, and MTA
never required her to serve the discipline, allegedly because of
ongoing negotiations with the union about sick leave issues
affecting multiple MTA PD members. (Fuchs Decl. Ex. 14 ¶ 6;
Fuchs Decl. Ex. 25.)

When Plaintiff returned to work on May 30, 2003, she was
assigned to District 4 – Penn Station, where she was supervised
by Cummo. (Pl.'s 56.1 Stmt. ¶¶ LL-MM; Fuchs Decl. Ex. 20, at
D00004066.) In January 2004, Armstrong was transferred to
District 3 – Jamaica, where Cummo again supervised her. (Pl.'s
56.1 Stmt. ¶ VV.) Cummo allegedly continued to assign Plaintiff

low-overtime cases, avoided direct contact with her, and overly scrutinized her case reports. (Id. ¶¶ AAA-BBB.) Plaintiff was transferred on March 31, 2004 to District 5 – Grand Central, where Cummo was no longer her supervisor. (Fuchs Decl. Ex. 13.) In mid-April 2004, she took a leave of absence to seek psychiatric treatment for stress related to the alleged workplace harassment. (Pl.'s 56.1 Stmt. ¶ CCC.)

On April 2, 2004, Plaintiff filed a Complaint with the OCR. (Jeremias Decl. Ex. F, at P00370.) When she returned to work in May 2004, she allegedly continued to be subjected to harassment. (Pl.'s 56.1 Stmt. ¶ EEE.) On June 21, 2004, Plaintiff filed a Complaint with the SDHR. (Id. ¶ FFF.) The OCR informed Plaintiff on July 16, 2004 that it was administratively closing the investigation of her OCR Complaint because she had filed an external Complaint with the Equal Employment Opportunity Commission ("EEOC"). (Jeremias Decl. Ex. I.)

In August 2005, Armstrong was transferred to AIU, where she reported to Detective Sergeant Karen Taylor and Chief John D'Agostino. (Pl.'s 56.1 Stmt. ¶ UUU.) Plaintiff alleges that Taylor engaged in discrimination by, for example, overly scrutinizing her work and having a confrontational and hostile attitude toward her. (Id. ¶¶ VVV-WWW.) Plaintiff also witnessed on a regular basis Taylor's allegedly hostile behavior toward co-plaintiff Marshall Mazyck. (Id. ¶ XXX.)

On May 2, 2006, the SDHR issued a determination that found probable cause to believe MTA had discriminated against Armstrong on the bases of race and sex. (Jeremias Decl. Ex. H.) At a June 16, 2006 AIU department meeting, co-plaintiffs Mazyck and Lillian Alvarado complained to D'Agostino about Taylor's treatment of them and Armstrong. (Armstrong Decl. ¶ 24; Jeremias Decl. Ex. N.) On June 26, 2006, Taylor allegedly barged into Plaintiff's office and berated her about vacation scheduling and interviews. (Armstrong Decl. ¶ 24.) After Taylor left, Armstrong closed her office door, allegedly in accordance with AIU policy; Taylor subsequently opened Armstrong's door and screamed at her for closing it. (Id.) On July 11, 2006, Plaintiff was involuntarily transferred from AIU to the Operation Support Unit, effective July 13, 2006. (Pl.'s 56.1 Stmt. ¶ KKKK; Jeremias Decl. Ex. PP.) According to Taylor, MTA was reducing the size of AIU, and when no one volunteered to transfer out of the Unit, AIU involuntarily transferred Plaintiff because she was the most junior detective. (Taylor Dep. 110:13-111:7.) In one of Plaintiff's SDHR Complaints, however, she stated that Alvarado volunteered to transfer provided she could begin her tour at 7:00 A.M., but a supervisor from the Operation Support Unit stated that she could not start her tour that early. (Jeremias Decl. Ex. PPP, at P00464.)

Plaintiff filed a second SDHR charge on October 10, 2006 and filed the instant Complaint with the Court on May 4, 2007. (Pl.'s 56.1 Stmt. ¶¶ LLLL-MMMM.) In July 2007, Assistant Deputy Chief Stephen Conner informed Armstrong that she would not be transferred back to AIU because MTA had decided that police officers would be assigned to AIU instead of detectives. (Jeremias Decl. Ex. RRR, at P00547.) Conner informed Plaintiff that she could transfer to the Detective Division if she wished, but Plaintiff declined the offer due to the allegedly hostile work environment in the Detective Division. (Id. at P00547-48.) Two weeks later, Chief McConville wrote to Plaintiff, "If your reference [to a hostile work environment] concerns allegations you made in 2004 about your employment in the Detective Division, MTA investigated those allegations at the time and found they had no merit." (Jeremias Decl. Ex. RRR.)

C. Plaintiff's September 2003 Application for Transfer to ICTF

On September 2, 2003, Defendants published a Personnel Order requesting abstracts for assignment to the Interagency Counterterrorism Task Force ("ICTF"). (Jeremias Decl. Ex. CCC.) Plaintiff applied on September 12, 2003. (Pl.'s 56.1 Stmt. ¶ OO.) In October 2003, then-Lieutenant Conner asked Ernest Pucillo, ICTF's Commanding Officer at the time, to consider Plaintiff's application seriously; Conner told Pucillo that he

8

thought transferring to ICTF would be a "good move" for
Armstrong because she "was having some issues in the detective
division and wanted to get a different assignment." (Fuchs Decl.
Ex. 32 ¶ 5; Pucillo Dep. 71:12-72:5.) Pucillo did not ask Conner
to describe Plaintiff's "issues." (Pucillo Dep. 71:25-72:10.)
Later that month, Plaintiff was interviewed for the ICTF
position; male Detectives Frederick Doscher (Caucasian), Daniel
Ojeda (race disputed),[2] and Gordon Urquhart (African-American)
also received interviews. (Pl.'s 56.1 Stmt. ¶ OO; Pucillo Dep.
72:9-10.) Defendants denied Plaintiff and Doscher's applications
and granted Ojeda and Urquhart's applications in November 2003.
(Fuchs Decl. Exs. 27-28.)

       According to an affidavit by Pucillo dated June 20, 2006
and submitted to the SDHR, "Detective Armstrong's attendance
record as compared to the successful candidates and my belief
that Detective Armstrong was still not a self-starter and most
importantly did not have a desire to engage in a career in
counterterrorism resulted in my decision to deny her application
for the ICTF assignment." (Fuchs Decl. Ex. 32 ¶ 8.) During
Pucillo's December 18, 2008 deposition, however, he stated that
MTA used a non-determinative point system to assess candidates,
and points were awarded based on the completeness of candidates'

---

[2] Plaintiff alleges that Ojeda is white and represents himself as
white (Urquhart Dep. 192:15-18), but Ojeda affirms that he is
Hispanic and identifies himself as such (Ojeda Decl. ¶ 2).

abstracts, their disciplinary record, responses to interview questions, appearance and demeanor, and sick time history. (Pucillo Dep. 68:25-70:18, 72:23-25.) The notes from Armstrong's interview indicate that points were also awarded based on time on the job and experience. (Fuchs Reply Decl. Ex. 8.)

The ICTF abstract required candidates to record the number of sick leave days and events they had taken in 2002 and up to that point in 2003. (Jeremias Decl. Ex. N, at D00024299.) Plaintiff recorded one sick leave event consisting of thirteen days in 2002 and one sick leave event consisting of 149 days in 2003,[3] and Urquhart reported two sick leave events consisting of six days in 2002 and one sick leave event consisting of ten days in 2003. (Fuchs Decl. Ex. 17, at D00025673; Jeremias Decl. Ex. N, at D00024299.) Ojeda did not submit an up-to-date abstract, and accordingly, his submitted abstract did not record his 2002 and 2003 sick leave experience. (Fuchs Decl. Ex. 18, at D00024284, D00024286.) Sick leave records indicate that Ojeda had no sick leave events in 2002 and one sick leave event consisting of five days in the first quarter of 2003, Urquhart had two sick leave events consisting of six days in 2002 and one sick leave event consisting of four days in the first quarter of

---

[3]   If MTA PD's attendance records are accurate, Plaintiff's abstract dramatically overstated the number of sick days she took in 2003 and understated the number of sick days she took in 2002. (Compare Jeremias Decl. Ex. N, at D00024299 with Fuchs Decl. Ex. 20, at D00004065-66.)

2003, and Armstrong had four sick leave events consisting of thirty-six days in 2002, one sick leave event consisting of sixty-four days in the first quarter of 2003, and two sick leave events consisting of 108 days at the time her application was reviewed in 2003. (Fuchs Decl. Ex. 20, at D00004065-66; Fuchs Decl. Ex. 21, at D00025686, D00025700, D00025706.)

Of Plaintiff's absences, her approved medical leave for surgery and recovery from a car accident accounted for one sick event consisting of 137 days from November 14, 2002 through May 30, 2003. (Pl.'s 56.1 Stmt. ¶ HH; Fuchs Decl. Ex. 20, at D00004065-66.) When Pucillo reviewed Plaintiff's abstract during his deposition, he noted that her absences appeared to be due to a motor vehicle accident; in response to questioning as to whether MTA would hold absences resulting from a car accident against a candidate, Pucillo responded, "Oh, no, absolutely not, no." (Pucillo Dep. 230:8-231:7; see id. 67:24-68:3.) This testimony contradicted Pucillo's earlier affidavit, in which he stated that "when we looked at an applicant's attendance record, we did not discern why he or she may have been out sick." (Fuchs Decl. Ex. 32 ¶ 12.) Notes from Plaintiff's interview indicate that she received a score of zero for her attendance record. (Fuchs Reply Decl. Ex. 8, at D00024296.) The SDHR found that Defendants' "claims" that Armstrong "had a poor attendance

record were used as false reasons to deny her lateral transfers." (Jeremias Decl. Ex. H, at P00182.)

Pucillo's affidavit also stated that he denied Armstrong's application because of his "belief" that she was "not a self-starter." (Fuchs Decl. Ex. 32 ¶ 8.) In his subsequent deposition, however, Pucillo stated that he "didn't have an opinion that she was not a self-starter at the time" he denied Plaintiff's application, and when asked whether he had found Plaintiff to be "quite acceptable" when he had worked with her, he stated, "Yes, I had." (Pucillo Dep. 223:7-14.)

The "most important[]" reason, according to Pucillo's affidavit, that he denied Plaintiff's application was she "did not have a desire to engage in a career in counterterrorism." (Fuchs Decl. Ex. 32 ¶ 8; see id. ¶ 5.) Pucillo based this assessment on his October 2003 conversation with Conner. (Id. ¶ 5; Pucillo Dep. 75:9-16.) No contemporaneous evidence suggests that Plaintiff's interviewers asked her why she wanted to transfer to ICTF or that Plaintiff's level of interest in ICTF and counterterrorism factored into Defendants' assessment of her. (See Fuchs Reply Decl. Ex. 8.)

Plaintiff argues that she was more qualified than Ojeda, particularly in the areas emphasized in Defendants' grading system. (Pl.'s 56.1 Stmt. ¶ RR.) Ojeda was hired two years after Plaintiff and had less overall experience. (Id.) Whereas

Plaintiff's experience immediately before applying involved
conducting case investigations comparable to those conducted in
ICTF, Ojeda had spent the two prior years in AIU conducting
background investigations on MTA applicants. (Id. ¶¶ G, RR.)
Defendants note that Ojeda's interview performance score was two
points higher than Plaintiff's but fail to mention that
Plaintiff's overall score of 66 was one point higher than
Ojeda's. (Defs.' Resp. Pl.'s 56.1 Stmt. ¶ RR; Fuchs Reply Decl.
Exs. 3, 8.) Defendants also note that whereas Plaintiff had no
counterterrorism experience, Ojeda had served in the U.S. Marine
Corps 2nd Surveillance Reconnaissance and Intelligence Group and
had completed a Terrorism Counteraction course while in the
Marine Corps. (Defs.' Resp. Pl.'s 56.1 Stmt. ¶ RR.) Plaintiff
does not argue she was more qualified than Urquhart and instead
notes that Urquhart was a former member of ICTF's predecessor
unit, the Joint Infrastructure Task Force ("JITF"); she also
alleges that Urquhart was the only JITF member required to
interview for an ICTF position, a claim Defendants dispute.
(Pl.'s 56.1 Stmt. ¶ PP; Defs.' Resp. Pl.'s 56.1 Stmt. ¶ PP.)


   D. Plaintiff's January 2004 Application for Transfer to AIU
      Plaintiff applied for a position in AIU in January 2004.
(Pl.'s 56.1 Stmt. ¶ WW.) Plaintiff and Detective William Burke,

a Caucasian male, received interviews, and Defendants chose Burke for the position. (Id. ¶ YY.)

Plaintiff argues she was more qualified for the position because she performed well in her interview and had a year of prior experience in AIU; she alleges that Burke had only a few months of experience in AIU, but the evidence she cites does not support that allegation. (Id. (citing Jeremias Decl. Ex. KK).) She also points to a letter written in May 2004 by her former supervisor in AIU, which stated that Armstrong had "all the qualifications a good Applicant Investigator needs" and that he had tried to get her assigned to AIU permanently in the past. (Jeremias Decl. Ex. C.) In addition, Mazyck advocated for Plaintiff to be transferred to AIU, but Assistant Deputy Chief Kathleen Finneran allegedly told him that she would transfer him out of AIU if he continued to lobby for Plaintiff's transfer. (Jeremias Decl. Ex. H, at P00189; Jeremias Decl. Ex. S ¶ 45.) The recommendation attached to Plaintiff's abstract stated that her work had not displayed strong leadership skills, and Burke's recommendation had no negative remarks. (Jeremias Decl. Ex. KK, at P00388; Jeremias Decl. Ex. HHH, at D00012681.)

Finneran was responsible for denying Plaintiff's application. (Fuchs Decl. Ex. 14 ¶ 8.) Finneran had previously questioned Plaintiff regarding the May 26, 2003 sick leave incident and did not believe Plaintiff's account of the

incident. (Id. ¶ 5.) Plaintiff's alleged lack of credibility was one purported basis for Finneran's denial of her application. (Id. ¶ 8.) In addition, Finneran allegedly sought to assign a detective familiar with the Northern Region because the two detectives already assigned to AIU were both from the Eastern Region. (Id.) Burke was from the Northern Region, while Plaintiff's experience was primarily in the Eastern Region. (Id.) Neither the Personnel Order nor the interview notes reflect a preference for a detective from a particular region. (Jeremias Decl. Ex. R; Jeremias Decl. Ex. HHH, at D00012683.)

E. Plaintiff's March 2004 Request for Transfer to ICTF or AIU

During a March 25, 2004 meeting with Conner, Plaintiff requested that she be transferred to ICTF or AIU. (Conner Dep. 59:17-22; Fuchs Decl. Ex. 12, at D00008879-80.) Plaintiff alleges that at this meeting, she complained to Conner that Cummo was discriminating against her; Defendants allege that Plaintiff did not mention her discrimination claims to Conner until the following day. (Armstrong Decl. ¶ 18; Armstrong Dep. 174:7-9, 175:19-176:5; Fuchs Decl. Ex. 12, at D00008879-81; Fuchs Decl. Ex. 13, at D00012593.) At some point on March 25, 2004, Conner asked Pucillo if he would be willing to accept Armstrong in ICTF. (Conner Dep. 60:5-61:24; Fuchs Decl. Ex. 12, at D00008881; Pucillo Reply Decl. ¶ 3.) Conner allegedly told

Pucillo that Armstrong had been having difficulty with sergeants
in the Eastern Region but did not discuss Armstrong's
qualifications. (Conner Dep. 61:14-23.) Pucillo told Conner that
he had already decided to transfer another detective, Adam
Jutze, to ICTF, and he therefore could not accept Armstrong into
the unit. (Fuchs Decl. Ex. 12, at D00008881; Pucillo Reply Decl.
¶ 3.) Also on March 25, 2004, Conner contacted then-Chief of
Police Thomas Lawless, who told Conner that because AIU had
"just filled their one and only position," Armstrong could not
transfer to AIU at that time. (Fuchs Decl. Ex. 12, at
D00008881.) On March 26, 2004, Plaintiff reiterated her request
to transfer to AIU or ICTF in an email to Conner. (Fuchs Decl.
Ex. 13, at D00012593.) That same day, MTA issued a Personnel
Order announcing the transfer of Jutze, a Caucasian man, to
ICTF. (Jeremias Decl. Ex. P, at D00013044.) Pucillo affirmed
that the Order "had been prepared and processed days before it
was issued." (Pucillo Reply Decl. ¶ 5.) On March 29, 2004,
Conner transferred Plaintiff to District 5 - Grand Central,
effective March 31, 2004. (Fuchs Decl. Ex. 13, at D00003508.)

Jutze was transferred to ICTF without going through the
typical interview and selection process, allegedly because ICTF
had an immediate need for a detective and did not want to
commence a time-consuming interview process. (Pucillo Reply
Decl. ¶ 4.) When Pucillo was asked during his deposition why he

chose not to consider those candidates who had unsuccessfully submitted abstracts in September 2003, Pucillo responded, "Well, normally we would look at those. And [Jutze] may have been an additional candidate." (Pucillo Dep. 84:21-85:2.) However, Pucillo chose not to consider Armstrong for the March 2004 vacancy, even though she had submitted an abstract in September 2003. (Pucillo Reply Decl. ¶ 6.)

On June 17, 2004, a Personnel Order addressed to police officers requested abstracts from those police officers seeking promotion to Detective; the Order stated that selected candidates would be assigned to ICTF. (Fuchs Decl. Ex. 33.) Plaintiff does not allege that she again requested transfer to ICTF at this time. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 28R.) On July 14, 2004, MTA issued a Personnel Order listing the promotion of four Caucasian men and one African-American woman from Police Officer to Detective. (Fuchs Decl. Ex. 34, at D00007382; see Fuchs Decl. Ex. 30.) On July 21, 2004, MTA issued a Personnel Order stating that the five new detectives had been assigned to ICTF. (Jeremias Decl. Ex. Q, at D00007238.)

F. Alleged Denial of Overtime Pay

Armstrong alleges that Detectives Cummo and Riley denied her significant overtime by assigning high-overtime cases and investigations to Caucasian male detectives. (Pl.'s 56.1 Stmt. ¶

17

HHH.) Overtime for detectives is associated with the cases and investigations to which their supervisors assign them. (Id. ¶ III.) In 2003, more than half of Armstrong's cases were arrest enhancement cases. (Id.) While assigned to Jamaica in 2004, seventeen out of Armstrong's twenty-four cases were lost property and arrest enhancement cases. (Id. ¶ KKK.) According to Riley, lost property and arrest enhancement cases do not generate much overtime. (Riley Dep. 74:19-24.)

In 2003, Armstrong's overtime hours were third lowest of the eleven detectives assigned to her location. (Pl.'s 56.1 Stmt. ¶ CCC; Jeremias Decl. Ex. CC.) She worked more overtime than two Caucasian men and less overtime than six Caucasian men, one African-American man, and one Hispanic man. (Jeremias Decl. Ex. CC.) Plaintiff was on medical leave for the first five months of 2003. (Fuchs Decl. Ex. 20, at D00004066.) Her 901 hours of sick leave were far greater than the amount of sick leave taken by any of the detectives to whom she compares herself, except for Kenneth Bifarelli, Caucasian, who took 2,120 sick hours and earned no overtime. (Jeremias Decl. Ex. CC.)

In 2004, Plaintiff worked the least overtime of the ten detectives assigned to her district, including six Caucasian men, two African-American men, and one Hispanic man. (Pl.'s 56.1 Stmt. ¶ KKK; Jeremias Decl. Ex. DD.) She also compares herself to detectives assigned to the "Tracks" location; of those ten

detectives, five Caucasian men, three Hispanic men, and one
Hispanic woman worked more overtime than Plaintiff, and one
Caucasian man worked less overtime than Plaintiff. (Jeremias
Decl. Ex. DD.) Plaintiff also compares herself to all detectives
in the Detective Division (Pl.'s 56.1 Stmt. ¶ LLL); she worked
the second-least overtime of the twenty-eight detectives in the
Detective Division, less than seventeen Caucasian men, three
African-American men, four Hispanic men, and two Hispanic women,
and more than one Caucasian man.[4] (Jeremias Decl. Ex. DD.)
Plaintiff was on medical leave from April 12, 2004 to May 26,
2004, and the twenty-six detectives who worked more overtime
than she did took significantly less sick time. (Fuchs Decl. Ex.
20, at D00004067; Jeremias Decl. Ex. DD.) Moreover, Cummo and
Riley were no longer Plaintiff's supervisors as of March 31,
2004. (Fuchs Decl. Ex. 13.)

　　Plaintiff also alleges that she was denied overtime during
her assignment to AIU. (Pl.'s 56.1 Stmt. ¶¶ DDDD-GGGG.) Taylor
instituted a cap on the amount of overtime hours AIU detectives
were permitted to work. (Id. ¶ DDDD.) Plaintiff alleges that
Taylor supervised the cap in a discriminatory manner by

---

[4] Plaintiff states that the man who worked less overtime than she
did was William Burke. (Pl.'s 56.1 Stmt. ¶ LLL; Jeremias Decl.
Ex. DD.) Although Burke worked less overtime than Plaintiff, he
was not a member of the Detective Division, and it appears that
Plaintiff is confusing him with Mark Landro, the one detective
in the Detective Division who worked less overtime than she did.
(Pl.'s 56.1 Stmt. ¶ YY; Jeremias Decl. Ex. DD.)

permitting Burke and Detective Benjamin Rosario, a Hispanic man, to exceed the cap and denying the same permission to Plaintiff, Alvarado, and Mazyck. (Id. ¶¶ DDDD-EEEE, GGGG.) Armstrong never asked Taylor if she could work additional overtime hours above the cap, allegedly because she witnessed Taylor deny Mazyck's requests to exceed the overtime cap and because of Taylor's hostile and confrontational manner. (Armstrong Dep. 329:9-331:9, 333:8-16.) Nothing in the record suggests that Burke and Rosario were permitted to exceed the cap without requesting permission to exceed it. (See id. 338:11-16.) Plaintiff cites to one incident in which Burke and Rosario were permitted to work 3.5 hours of overtime setting up for a training, but the record does not make clear whether they asked to set up the training. (Pl.'s 56.1 Stmt. ¶ GGGG.) Plaintiff also cites to an incident in which Taylor denied Mazyck's request to go to Maryland to do a field investigation. (Armstrong Dep. 296:9-12.) In contrast, Taylor permitted Burke and Rosario to travel to Maryland and incur overtime for investigations. (Pl.'s 56.1 Stmt. ¶ FFFF.)

The report of Plaintiff's retained expert, Dr. Mark Killingsworth, states that African-American detectives in the Eastern Region worked fewer overtime hours on average than Caucasian detectives in the Eastern Region in 2004, 2005, 2006, and 2007. (Pl.'s 56.1 Stmt. ¶ MMM; Jeremias Decl. Ex. OOO tbl. 3.) Defendants challenge the validity of these statistics and

note that Plaintiff was not assigned to the Eastern Region after March 2004. (Defs.' Resp. Pl.'s 56.1 Stmt. ¶ MMM.)

### G. Alleged Denial of Training

Plaintiff alleges that she was denied Executive Protection Training when she was assigned to Grand Central Terminal from March 31, 2004 through August 2, 2005 and when she requested it from her AIU supervisors in late 2005. (Pl.'s 56.1 Stmt. ¶¶ RRR, BBBB; Fuchs Decl. Ex. 13; Jeremias Decl. Ex. SSS.) She points to eight MTA PD members who did receive Executive Protection Training: Lieutenant Joseph Martelli, Detective Sergeant James Flanagan, Sergeants Thomas Farney and Lawrence Cudia, and Detectives Burke, Rosario, Michael Alfalla, and Leonard Pomposello. (Pl.'s 56.1 Stmt. ¶¶ RRR-SSS.) None of these individuals received Executive Protection Training during the March 2004-July 2006 time period when Plaintiff was assigned to Grand Central and AIU, except for Cudia. (Fuchs Decl. Ex. 13; Fuchs Decl. Ex. 39 ¶ 2; Jeremias Decl. Exs. U, PP, SSS.) Cudia received the Training on April 19, 2004, when Plaintiff was technically assigned to Grand Central but was in the second week of a six-week medical leave of absence. (Fuchs Decl. Ex. 20, at D00004067; Jeremias Decl. Ex. U, at D00007828.)

Plaintiff also alleges that D'Agostino and Taylor refused to assign her to Applicant Investigative Training ("AIU

Training") on the bases of her race and sex. (Pl.'s 56.1 Stmt. ¶ CCCC.) In 2006, Taylor offered Plaintiff the opportunity to attend AIU Training. (Id.) Plaintiff alleges that she accepted Taylor's offer but never received the Training. (Armstrong Dep. 384:14-15.)[5] Subsequently, Taylor, a Caucasian woman, attended an AIU Training offered in January 2006, as did Rosario. (Id.; Fuchs Decl. Ex. 11, at D00008634.)

## II. DISCUSSION

A. Legal Standard for Summary Judgment

A court should grant summary judgment when there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). Genuine issues of material fact cannot be created by conclusory allegations. Victor v. Milicevic, 361 F. App'x 212, 214 (2d Cir. 2010). Summary judgment is appropriate only when,

---

[5] In her Reply Declaration, Taylor stated that Armstrong told her she did not want to attend the Training. (Taylor Reply Decl. ¶ 6.) "[I]t is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden," but "a court may choose to admit such evidence where the opposing party will suffer no prejudice." Dixon v. NBCUniversal Media, LLC, 947 F. Supp. 2d 390, 396 (S.D.N.Y. 2013) (citation omitted). The information in Taylor's Reply Declaration was available to Defendants when they moved for summary judgment (see, e.g., Armstrong Dep. 168:4-6), and its introduction would be prejudicial to Plaintiff. Accordingly, the Court will not consider Taylor's Reply Declaration.

after drawing all reasonable inferences in favor of a non-movant, no reasonable juror could find in favor of that party. Melendez v. Mitchell, 394 F. App'x 739, 740 (2d Cir. 2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. (citation omitted). The non-movant may not rely upon speculation or conjecture to overcome a motion for summary judgment. Burgess v. Fairport Cent. Sch. Dist., 371 F. App'x 140, 141 (2d Cir. 2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. Id.

B. Disparate Treatment Based on Race and Sex

1. Title VII and NYSHRL Claims

Courts in this Circuit analyze Title VII and NYSHRL claims of employment discrimination according to the three-stage, burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Simmons v. Akin Gump Strauss Hauer & Feld, LLP, 508 F. App'x 10, 12 (2d Cir. 2013). Under McDonnell Douglas, a plaintiff bears the initial, de minimis burden of establishing a prima facie case of discrimination. Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). To make out a prima facie case, a plaintiff must demonstrate, through direct or circumstantial evidence, that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered from an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). A plaintiff may raise such an inference by showing that his employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside of his protected group. Ruiz v. Cnty. of Rockland, 609 F.3d 486, 493 (2d Cir. 2010).

A plaintiff who makes out a prima facie case establishes a presumption of discrimination, at which point the burden of production shifts to the defendant to articulate a "legitimate,

non-discriminatory reason" for the challenged conduct. <u>Woodman v.</u>
<u>WWOR-TV, Inc.</u>, 411 F.3d 69, 76 (2d Cir. 2005) (citation omitted).
If the defendant produces such a reason, the plaintiff must then,
without the benefit of the presumption of discrimination, "raise[]
sufficient evidence upon which a reasonable jury could conclude by
a preponderance of the evidence that the [adverse employment
action] was based, at least in part," on discrimination. <u>Holcomb</u>,
521 F.3d at 141. Typically, plaintiffs who lack direct evidence of
discrimination argue that the employer's stated reason for the
challenged conduct is pretextual. <u>Id.</u> "[I]n many cases, a showing
of pretext, when combined with a prima facie case of
discrimination, will be enough to permit a rational finder of fact
to decide that the decision was motivated by an improper motive."
<u>Id.</u> However, a showing of pretext is not required. <u>Id.</u> at 141-42.
Instead, a plaintiff "alleging that an employment decision was
motivated both by legitimate and illegitimate reasons may
establish that the impermissible factor was a motivating factor,
without proving that the employer's proffered explanation was not
some part of the employer's motivation." <u>Id.</u> at 142.

Title VII's statute of limitations bars claims based on
events occurring more than 300 days prior to filing a charge of
discrimination with a state or local employment agency. 42
U.S.C. § 2000e-5(e)(1). Plaintiff filed an administrative
Complaint with the SDHR on June 21, 2004. (Fuchs Decl. Ex. 2.)

Accordingly, only those incidents that occurred on or after
August 26, 2003 are actionable under Title VII. <u>Patterson v.
Cnty. of Oneida</u>, 375 F.3d 206, 220 (2d Cir. 2004) (noting that
Title VII precludes recovery for discrete discriminatory acts
that occurred outside the statutory time period even if other
acts occurred within the time period). Discrimination claims
under the NYSHRL are subject to a three-year statute of
limitations. <u>Lange v. Town of Monroe</u>, 213 F. Supp. 2d 411, 418
(S.D.N.Y. 2002). As this action was brought on May 4, 2007, only
those incidents occurring on or after May 4, 2004 are actionable
under the NYSHRL. Nonetheless, earlier incidents may be cited as
background evidence in support of a timely Title VII or NYSHRL
claim. <u>Anderson v. Nassau Cnty. Dep't of Corr.</u>, 558 F. Supp. 2d
283, 299 (E.D.N.Y. 2008).

   Armstrong alleges that MTA violated Title VII and the
NYSHRL by denying her transfers, training, and overtime pay on
the bases of her race and sex.[6] Plaintiff's first disparate

---

[6] Although Plaintiff's Amended Complaint alleges that Defendants
engaged in discrimination by failing to promote her to Detective
until 2000, denying her Sex Crimes and Child Abuse and Homicide
Investigation trainings, and not offering her training after she
joined the Operation Support Unit (Am. Compl. ¶¶ 72, 80, 85),
the Court deems Plaintiff to have abandoned these claims.
Defendants' moving memorandum specifically addresses these
claims (Defs.' Rev. Mem. Law Supp. Summ. J. 3 & n.5, 7, 10-11),
and Plaintiff's opposition papers fail to address Defendants'
arguments. "[A]rguments not made in opposition to a motion for
summary judgment are deemed abandoned." <u>Plahutnik v. Daikin Am.,
Inc.</u>, No. 10 Civ. 1071, 2012 WL 6108236, at *5 (S.D.N.Y. Dec. 6,

treatment allegation, the November 2003 denial of her September 2003 application to transfer to ICTF, falls outside the NYSHRL's statute of limitations because it was a discrete act occurring before May 4, 2004. However, the November 2003 transfer denial falls within Title VII's statute of limitations, and Plaintiff has established a prima facie case of discrimination with regard to the incident. Defendants do not dispute that Plaintiff has met the first three prima facie elements. (Defs.' Mem. Law Supp. Mot. Summ. J. ("Defs.' Mem.") 4-5.) Plaintiff has also met the fourth element because a reasonable jury could find the circumstances of the transfer denial to give rise to an inference of discrimination. "An inference of discrimination can be established if the Plaintiff shows that the position sought went to a person outside her protected class." Collins v. Cohen Pontani Lieberman & Pavane, No. 04 Civ. 8983, 2008 WL 2971668, at *12 (S.D.N.Y. July 31, 2008) (citation and alterations omitted); Regis v. Metro. Jewish Geriatric Ctr., No. 97 Civ. 0906, 2000 WL 264336, at *10 (E.D.N.Y. Jan. 11, 2000) ("In order to state a prima facie case of discrimination concerning a failure to transfer, [Plaintiff] would have to show that a

---

2012); see Jain v. McGraw-Hill Cos., Inc., 827 F. Supp. 2d 272, 280 (S.D.N.Y. 2011) (holding that plaintiff abandoned six claims when her opposition papers failed to respond to defendants' arguments on those claims); Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011) ("Plaintiff did not address this argument in his opposition papers, which operates as an abandonment of the argument.").

position . . . that she wanted was . . . filled by a person who was not in her protected class . . . .”). Here, the ICTF position Armstrong formally applied for went to Ojeda, who was not a woman and not African-American. (Pl.'s 56.1 Stmt. ¶¶ OO, RR; Defs.' Resp. Pl.'s 56.1 Stmt. ¶ OO.) Plaintiff has adduced enough evidence to support a finding that she and Ojeda were "similarly situated in all material respects." <u>Matusick v. Erie Cnty. Water Auth.</u>, Nos. 11-1234, 11-1618, 2014 WL 700718, at *17 (2d Cir. Feb. 25, 2014). Plaintiff and Ojeda were both qualified for the transfer and Plaintiff had greater or comparable seniority. <u>See</u> <u>Mandell v. Cnty. of Suffolk</u>, 316 F.3d 368, 379 (2d Cir. 2003); (Jeremias Decl. Exs. N, CCC; Fuchs Decl. Ex. 18).

Defendants state two legitimate, nondiscriminatory reasons for transferring Ojeda instead of Plaintiff: Armstrong's "sole motivation for her ICTF application was to escape conflicts with her supervisors[], not any interest in counterterrorism," and she "had poor attendance in the year prior to her application." (Defs.' Mem. 5.) Plaintiff has raised genuine issues of material fact as to whether both reasons are pretextual. Although Pucillo avowed that the "most important" reason he denied Plaintiff's application was her lack of interest in counterterrorism, the evidence suggests that the interviewers did not ask Armstrong or Ojeda about their interest in counterterrorism or why they

sought to transfer to ICTF, and the abstract form did not ask candidates to describe their interest in ICTF. (Fuchs Decl. Ex. 32 ¶ 8; Fuchs Reply Decl. Exs. 3, 8; Jeremias Decl. Ex. CCC.)[7] Pucillo's only stated reason for believing that Plaintiff had no interest in counterterrorism was his conversation with Conner, who allegedly told him that Plaintiff sought to transfer because of her strained relationship with Cummo and Riley. (Fuchs Decl. Ex. 32 ¶ 5; Pucillo Dep. 71:15-72:5, 75:9-16, 225:6-226:15.) Pucillo admits, however, that he chose not to ask Conner any further questions about Plaintiff, such as whether Conner believed she was interested in counterterrorism. (Pucillo Dep. 71:25-72:10.) The lack of contemporaneous evidence that Pucillo cared about the candidates' interest in counterterrorism belies Pucillo's claim that Armstrong's alleged lack of interest was the "most important" reason he chose Ojeda for the position. (Fuchs Decl. Ex. 32 ¶ 8.)

The record also contains evidence that Plaintiff's "poor attendance in the year prior to her application" was not Pucillo's reason for denying her application. (Defs.' Mem. 5.)

---

[7] Notes from Armstrong and Ojeda's interviews were submitted on reply. "A district court enjoys broad discretion . . . to rely on evidence submitted with the reply papers." Dixon, 947 F. Supp. 2d at 396 (citation omitted); see also supra n.5. The interview notes submitted here, rather than prejudicing Plaintiff, support her argument by indicating that the candidates were not asked about their interest in counterterrorism or why they sought to transfer to ICTF. Accordingly, the Court will consider the interview notes.

Assuming "the year prior to" Armstrong's application consists of September 2002 to September 2003, 137 of Plaintiff's 140 sick days during that period comprised one medical leave of absence approved by MTA. (Pl.'s 56.1 Stmt. ¶ HH; Fuchs Decl. Ex. 21, at D00004065-66.) The medical leave was approved for non-elective surgery and recovery from a subsequent car accident. (Pl.'s 56.1 Stmt. ¶ HH.) Pucillo testified that he would "absolutely not" "hold against" a candidate a medical leave taken to recover from a car accident.[8] (Pucillo Dep. 231:4-7.) Taking Pucillo at his word, Defendants' argument about Plaintiff's "poor attendance" in the year prior to her application must refer to the two sick days Plaintiff took in September 2002 and the one sick day Plaintiff took in June 2003. (Fuchs Decl. Ex. 21, at D00004065-66.) Both Ojeda and Urquhart took more than three sick days during that year-long period; indeed, Ojeda took five days and Urquhart took four days in only the first quarter of 2003. (Fuchs Decl. Ex. 20, at D00025700, D00025706.) Accordingly, either Defendants' stated attendance rationale is false, or Pucillo testified falsely during his deposition and MTA is admitting it took an adverse employment action against an employee because she went on an approved medical leave.

---

[8] Indeed, had Defendants denied Plaintiff's ICTF application because of her prior medical leave, they might have violated the Americans with Disabilities Act. See 42 U.S.C. § 12112 et seq.

"[E]vidence satisfying the minimal McDonnell Douglas prima facie case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of discrimination." James v. N.Y. Racing Ass'n, 233 F.3d 149, 156-57 (2d Cir. 2000). "[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove--particularly discrimination." Id. at 157. "The relevant factors identified by the Supreme Court 'include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case.'" Id. at 156 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148-49 (2000)) (alterations omitted).

Here, Plaintiff's prima facie case is of adequate strength and her evidence that Defendants' rationales are pretextual is quite strong. Defendants argue that their selection of Urquhart weighs against an inference of race discrimination. (Defs.' Mem. 4-5.) But a reasonable juror could just as easily find that the way in which Urquhart was selected supports an inference of discrimination. Pucillo testified that individuals who had been part of JITF prior to its dissolution were not required to submit an abstract or formally interview for an ICTF position;

instead, former JITF members were asked whether they wanted to join ICTF, and if they did, they were assigned to ICTF. (Pucillo Dep. 57:23-58:25.) Urquhart was a former JITF member, but he had to go through the same formal application and interview process as Armstrong and Ojeda, neither of whom were JITF members. (Pl.'s 56.1 Stmt. ¶ PP; Fuchs Decl. Ex. 17.) Urquhart testified that after undergoing this process, Pucillo told him he would not be assigned to ICTF because he did not "pass" the interview; allegedly, Urquhart was only assigned to ICTF after he complained to a PBA representative about the denial of his ICTF application and threatened to file a discrimination lawsuit. (Urquhart Dep. 31:9-16, 33:14-34:11, 35:21-36:14.) Defendants argue that John Uebel, a Caucasian member of JITF, formally applied to ICTF and had his application denied; however, Uebel, a police officer, was not similarly situated to Urquhart, a detective. (Defs.' Resp. Pl.'s 56.1 Stmt. ¶ PP.) Here, the evidence of race- and sex-based discrimination raised in Armstrong's prima facie case, in combination with the evidence of race discrimination raised by the circumstances surrounding Urquhart's appointment to ICTF and the strong evidence that both of Defendants' stated rationales for denying Armstrong's application are false, could convince a reasonable juror that Defendants denied Armstrong's application on the bases of her race and sex. See Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847

(2d Cir. 2013) (holding that plaintiff's prima facie case plus evidence of pretext sufficed to permit reasonable juror to infer that retaliation was but-for cause of adverse action). Accordingly, summary judgment is inappropriate on this claim.

Plaintiff next alleges that she was denied admission to AIU in January 2004 on the bases of her race and sex.[9] Assuming arguendo that Plaintiff has established a prima facie case of discrimination, Defendants have set forth two legitimate, nondiscriminatory rationales for the denial: Finneran wanted to appoint a detective from the Northern Region, and Finneran believed that Armstrong lacked credibility because of the May 2003 sick leave incident. (Defs.' Mem. 6.) Plaintiff has raised an issue of material fact, albeit a weak one, as to whether these rationales are false. No evidence contemporaneous to the application process indicates whether Finneran sought regional diversity among AIU detectives, other than the fact that the abstract form asked applicants to state their current assignment region. (See Jeremias Decl. Exs. R, KK, HHH.) Moreover, Finneran did not mention her preference for Northern Region detectives during her deposition; Finneran did state, however, that the May 2003 sick leave incident was only "part of [the] reason" Plaintiff's application was denied, and Plaintiff's counsel

---

[9] As with Plaintiff's claim regarding the November 2003 denial of her ICTF application, this claim falls outside the NYSHRL's statute of limitations.

apparently did not press Finneran on the other reasons for the denial. (Finneran Dep. 246:3-13.)

As for the credibility rationale, MTA PD's Internal Affairs Bureau ("IAB") Report, which Finneran approved, did not find that Plaintiff had lied about being at home when the sick leave investigation occurred. (Fuchs Reply Decl. Ex. 1, at D00003417-19.)[10] Instead, the IAB based its finding that Plaintiff was unavailable for the sick leave investigation on her failure to answer her door or telephone and her admission that she had taken medication and left the telephone off the hook to sleep. (Id. at D00003417-18.) However, the IAB Report described events that might have convinced Finneran that Armstrong was lying about being at home during the sick leave investigation; moreover, the IAB investigators did not affirmatively find that Plaintiff was at home at the time of the investigation, and nothing in the record suggests that Finneran believed Plaintiff's admission was truthful. (See id. at D00003417-19.) Armstrong also argues against Defendants' credibility rationale by pointing to her former AIU supervisor's statement that she had "strong morals and her integrity is beyond reproach." (Jeremias Decl. Ex. C.)

---

[10] Because the IAB Final Report, rather than prejudicing Plaintiff, supports her argument that Defendants' credibility rationale is pretextual, the Court will consider it here. See supra nn.5 & 7 (citing case law).

Even taking into account the evidence of pretext, no reasonable juror could find that the denial of Plaintiff's AIU application was based, even in part, on her race or sex. See Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he issue as to the sufficiency of the evidence is whether the record as a whole, including whatever reasonable inference the jury could draw from the proffer of a false reason for the discharge, permitted the required ultimate finding of discrimination."). Plaintiff's prima facie case is no more than adequate, and her evidence of pretext raises only a weak issue of fact. Although Plaintiff argues that she was more qualified than Burke, she rests this argument on an allegation that Burke had worked in AIU for a shorter period of time than Plaintiff, an allegation not supported by the evidence to which she cites. (Pl.'s 56.1 Stmt. ¶ YY (citing Jeremias Decl. Ex. KK).) Plaintiff also notes that after the selection process, her former AIU supervisor, Darryl Jenkins, wrote a very positive recommendation letter; however, Jenkins had retired from MTA PD in 2002, prior to the 2004 selection process. (Fuchs Decl. Ex. 30; Jeremias Decl. Ex. C.) Moreover, MTA could have found Burke to be more qualified for the position given his clearly stronger supervisor recommendation. (Compare Jeremias Decl. Ex. KK, at P00388 with Jeremias Decl. Ex. HHH, at D00012681.) Plaintiff also points to Mazyck's allegation that Finneran told him she

35

would transfer him out of AIU if he continued to advocate for Armstrong's transfer. (Jeremias Decl. Ex. H, at P00189; Jeremias Decl. Ex. S ¶ 45.) Such a statement by Finneran might indicate that she disliked Armstrong but does not on its own reveal race or sex discrimination.

Next, Plaintiff alleges that the March 2004 denial of her request to transfer to ICTF was based on her race and sex. This incident falls outside the NYSHRL's statute of limitations but falls within Title VII's statute of limitations, and Plaintiff has established a prima facie case of discrimination. Defendants do not contest that Plaintiff has met the first three elements of her prima facie case. (Defs.' Mem. 4-5.) Instead, they argue the denial did not occur under circumstances giving rise to an inference of discrimination. (Id.)

"[A] departure from established procedures may provide support for an inference of discrimination in some contexts." Tucker v. New York City, No. 05 Civ. 2804, 2008 WL 4450271, at *5 (S.D.N.Y. Sept. 30, 2008) (citation omitted); see also Nurse v. Lutheran Med. Ctr., 854 F. Supp. 2d 300, 317 (E.D.N.Y. 2012) ("It is well settled that 'departures from procedural regularity can create an inference of discriminatory intent, sufficient to establish a prima facie case' of employment discrimination.") (citation and alterations omitted). Here, according to Pucillo, the denial of Plaintiff's March 2004 request was the direct

result of a procedural irregularity. In his Reply Declaration,
Pucillo affirmed that he refused to transfer Plaintiff to ICTF
in March 2004 because "ICTF supervisors had already selected
another Detective to assign to ICTF, Adam Jutze." (Pucillo Reply
Decl. ¶ 3.)[11] When asked, in his deposition, why he didn't "go
back to the abstracts that [he] had for September '03 as a means
of selecting another individual from those abstracts," Pucillo
responded, "Well, normally we would look at those. And [Jutze]
may have been an additional candidate." (Pucillo Dep. 84:21-
85:2.) Armstrong, as discussed above, submitted an abstract in
September 2003. (Pl.'s 56.1 Stmt. ¶ OO.) However, Pucillo
admitted in his Reply Declaration that "Jutze and Armstrong were
never compared with each other, and were never considered for
assignment to ICTF at the same time." (Pucillo Reply Decl. ¶ 6.)
In sum, when Pucillo, faced with the need to assign a detective
to ICTF, chose not to review Plaintiff's September 2003 abstract
and instead assigned a Caucasian male detective who had not
applied to ICTF in September 2003, he departed from the
"normal[]" ICTF assignment procedures.[12] (Pucillo Decl. ¶¶ 3-4,

---

[11] Because Pucillo's Reply Declaration, rather than prejudicing
Plaintiff, supports her prima facie case, the Court will
consider it here. See supra nn.5 & 7 (citing case law).
[12] Pucillo's description of ICTF's transfer procedures differs
from McConville's testimony that when MTA sought to fill
vacancies, its practice was to begin a fresh application process
and solicit new applications for transfer. (See McConville Dep.
309:18-25.) MTA's custom and practice for filling vacancies is a

6; Pucillo Dep. 84:21-85:2.) This evidence of procedural irregularity suffices to create an inference of discrimination, and accordingly, Plaintiff has met her burden of establishing a prima facie case of discrimination.

Defendants argue that Plaintiff's request for assignment to ICTF in March 2004 was denied for the same legitimate, nondiscriminatory reasons as her September 2003 application: Armstrong applied because she wanted to escape supervisor conflicts and not because she was interested in counterterrorism, and her attendance in the prior year was poor. (Defs.' Mem. 4-5.)[13] Much of the evidence referenced supra in the Court's discussion of Plaintiff's September 2003 application supports a finding that these rationales are pretextual. The clearest evidence that these rationales are false, however, is Pucillo's affirmation that Armstrong was not even considered for assignment to ICTF in March 2004 and that her request was denied

---

disputed issue of material fact. However, even if McConville's testimony accurately describes ICTF's customary procedures, Pucillo's decision to assign Jutze without soliciting new applications for transfer departed from those procedures.
[13] It is not clear whether Defendants intended these legitimate, nondiscriminatory reasons to apply to the March 2004 denial or only to the November 2003 denial. If the latter, then Defendants have not met their burden under the second step of the McDonnell Douglas test, and summary judgment is inappropriate. See, e.g., Castro v. Mitchell, No. 09 Civ. 3754, 2011 WL 10901797, at *7 (S.D.N.Y. Aug. 25, 2011) (denying defendants' motion for summary judgment because plaintiff had established prima facie case of discrimination and defendant had not offered legitimate, nondiscriminatory rationale for adverse action).

because ICTF supervisors had already selected Jutze. (Pucillo Reply Decl. ¶¶ 3, 6.)

If there were no issue of material fact as to whether Pucillo's new rationale regarding Jutze was pretextual, summary judgment might still be warranted. However, the five assignments to ICTF in July 2004 support a finding that Jutze's transfer was not the real reason Pucillo denied Plaintiff's request. The only plausible reason Jutze's selection would preclude Armstrong from even being considered for transfer to ICTF is if ICTF did not need or have room for a second newly assigned detective. Two and a half months after the denial of Plaintiff's request, however, there was a great enough need for detectives in ICTF that MTA initiated a new application process, which resulted in the assignment of five additional detectives. (Fuchs Decl. Ex. 33; Jeremias Decl. Ex. Q, at D00007238.) Nothing in the record indicates that between late March 2004 and July 2004, five detectives left ICTF or ICTF experienced an enormous increase in workload. Thus, there appears to be no logical, nondiscriminatory reason why Jutze's transfer to ICTF would have precluded Pucillo from considering the merits of Armstrong's candidacy in March 2004.

This evidence of pretext is strengthened by the evidence that MTA chose not to offer Plaintiff the opportunity to participate in the June 2004 application cycle and instead

addressed the June 2004 Personnel Order only to police officers. (Fuchs Decl. Ex. 33.) Moreover, the evidence that ICTF departed from its regular procedures when it selected Jutze for a vacancy without considering Armstrong's September 2003 abstract further supports an inference of pretext. See Stern v. Trs. of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997) (noting that evidence of procedural irregularity supported inference of pretext); Norris v. Metro-N. Commuter R.R. Co., 522 F. Supp. 2d 402, 409 (D. Conn. 2007) (holding that procedural irregularity created issue of material fact as to pretext and discriminatory intent).

As with Plaintiff's claim regarding the denial of her September 2003 ICTF abstract, Plaintiff's prima facie case regarding the March 2004 denial is of adequate strength and her evidence that the rationales in Defendants' moving Memorandum and Pucillo's Reply Declaration are pretextual is very strong. Defendants claim that their assignment of Keyla Hammam, an African-American woman, to ICTF in July 2004 requires the Court to grant summary judgment on Plaintiff's claim. (Defs.' Mem. 4-5.) However, "discrimination against one employee cannot be cured, or disproven, solely by favorable, or equitable, treatment of other employees of the same race or sex." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). Although the assignment of Hammam weighs against a finding of discrimination, the fact that five of the six detectives assigned to ICTF

between March 2004 and July 2004 were Caucasian men weighs strongly in favor of a finding of discrimination. (Fuchs Decl. Ex. 30; Jeremias Decl. Ex. P, at D00013044; Jeremias Decl. Ex. Q, at D00007238.) Here, Plaintiff's prima facie case, the evidence of procedural irregularities in Jutze's assignment to ICTF, the strong evidence of pretext, and the fact that five of the six detectives assigned to ICTF in a four-month period were Caucasian men could convince a reasonable juror that Defendants denied Armstrong's request on the bases of her race and sex.

Next, Plaintiff alleges that she was denied Executive Protection Training when she was assigned to Grand Central Terminal from March 31, 2004 through August 2, 2005 and when she requested it from her AIU supervisors in late 2005. The circumstances of these denials do not raise an inference of discrimination. Plaintiff points as comparators to eight Caucasian[14] men who received Executive Protection Training. (Pl.'s 56.1 Stmt. ¶¶ RRR-SSS.) However, none of these men received Executive Protection Training during the March 31, 2004 through July 13, 2006 time period when Plaintiff was assigned to Grand Central and AIU, except for a sergeant who received the Training while Plaintiff was taking a six-week medical leave of

---

[14] The Parties dispute whether Detective Michael Alfalla is Hispanic or non-Hispanic Caucasian. (Pl.'s 56.1 Stmt. ¶ SSS; Defs.' Resp. Pl.'s 56.1 Stmt. ¶ SSS.) For the purposes of this Memorandum and Order only, the Court assumes arguendo that Alfalla identifies as non-Hispanic Caucasian.

absence. (Fuchs Decl. Ex. 13; Fuchs Decl. Ex. 20, at D00004067;
Fuchs Decl. Ex. 39 ¶ 2; Jeremias Decl. Exs. U, PP, SSS.)
Moreover, according to the records presented by the Parties on
this Motion, four of the thirteen MTA PD members assigned to
Executive Protection Training were African-American and two were
women. (Fuchs Decl. Exs. 30, 40; Jeremias Decl. Ex. U; Urquhart
Dep. 176:4-8.) The record does not contain evidence from which a
reasonable juror could infer that Plaintiff was denied Executive
Protection Training because of her race or sex.

Plaintiff's claim regarding the denial of AIU Training in
2006 also fails. The "denial of professional training
opportunities may constitute an adverse employment action, but
only where an employee can show 'material harm' from the denial,
'such as a failure to promote or a loss of career advancement
opportunities.'" Trachtenberg v. Dep't of Educ. of N.Y.C., 937
F. Supp. 2d 460, 468 (S.D.N.Y. 2013) (citation omitted). Here,
Plaintiff has not raised an issue of fact as to whether she
suffered material harm. Nothing in the record suggests that the
denial of AIU Training affected Plaintiff's career advancement
or caused any other material harm. (See, e.g., Armstrong Decl. ¶
22.) Indeed, Plaintiff's Opposition brief does not cite to a
single piece of evidence in support of her argument that the
denial was adverse. (Pl.'s Mem. Law Opp'n Defs.' Mot. Summ. J.
("Pl.'s Opp'n") 15.)

Next, Plaintiff alleges that she was denied overtime opportunities when she was supervised by Cummo and Riley in the Detective Division. (Id. 16.) Because Plaintiff transferred away from Cummo and Riley's supervision on March 31, 2004, only conduct occurring between August 26, 2003 and March 31, 2004 is relevant to this Title VII claim.[15] (Fuchs Decl. Ex. 13.) The evidence does not show that the alleged denial of overtime occurred under circumstances raising an inference of discrimination. Plaintiff does not point to specific overtime opportunities given to Caucasian or male detectives and instead places great emphasis on overtime records that identify the total overtime each MTA member earned in 2003 and 2004. These overtime records have very little utility for her claim. Armstrong's overtime earnings in 2003 were, of course, affected dramatically by her five-month medical leave; none of the comparators who earned more overtime than Plaintiff took even close to that amount of sick leave. (Fuchs Decl. Ex. 20, at D00004066; Jeremias Decl. Ex. CC.) Likewise, her 2004 overtime earnings were affected by her six-week medical leave, an amount of sick leave significantly greater than that taken by those detectives who earned more overtime than Plaintiff; in addition, only the first three months of 2004 are relevant to Plaintiff's

---

[15] The claim falls outside the NYSHRL's statute of limitations, as it occurred before May 4, 2004.

claim. (Fuchs Decl. Ex. 13; Fuchs Decl. Ex. 20, at D00004067;
Jeremias Decl. Ex. DD.) The annual overtime earnings of
Plaintiff and her comparators, in the context of the remainder
of the record, do not raise an inference of discrimination.

Plaintiff also fails to establish that the alleged denial
of overtime when she was assigned to AIU occurred under
circumstances giving rise to an inference of discrimination.
Plaintiff admitted she never asked Taylor if she could work
additional overtime hours above the overtime cap. (Armstrong
Dep. 329:9-331:9.) She does not cite to any evidence that Burke
and Rosario, without requesting permission to exceed the
overtime cap, were permitted to exceed it. (See Armstrong Dep.
338:11-16.) Indeed, the only specific incident cited to
demonstrate that Taylor denied Armstrong overtime opportunities
is Taylor's permitting Burke and Rosario to earn 3.5 hours of
overtime for setting up a Training without offering the
opportunity to Armstrong. (Pl.'s 56.1 Stmt. ¶ GGGG.) All other
evidence cited by Plaintiff concerns Taylor's treatment of
Alvarado and Mazyck, whose claims regarding overtime this Court
has dismissed.[16] See Mazyck v. Metro Transp. Auth., 893 F. Supp.
2d 574, 589 (S.D.N.Y. 2012); Alvarado v. Metro. Transp. Auth.,

---

[16] Plaintiff's 56.1 Statement repeatedly and disingenuously
states that she herself was "denied overtime," when in fact, the
evidence cited only discusses Alvarado and Mazyck. (See Pl.'s
56.1 Stmt. ¶¶ EEEE-FFFF.)

No. 07 Civ. 3561, 2012 WL 1132143, at *9-10 (S.D.N.Y. Mar. 30, 2012). The sparse evidence Plaintiff cites is insufficient to raise an issue of material fact on Plaintiff's overtime claim.

Accordingly, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's NYSHRL disparate treatment claims and as to Plaintiff's Title VII claims regarding the denial of her January 2004 application to transfer to AIU, the denial of training, and the denial of overtime opportunities. However, Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's Title VII disparate treatment claims regarding the denials of Plaintiff's September 2003 application and March 2004 request to transfer to ICTF.


   2. NYCHRL Claims

   The NYCHRL "'explicitly requires an independent liberal construction analysis in all circumstances,' an analysis that 'must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's uniquely broad and remedial purposes, which go beyond those of counterpart state or federal civil rights laws.'" Bennett v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 34 (N.Y. App. Div. 2011) (citation omitted); see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) ("[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law

claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'") (citation omitted).

> For an NYCHRL claim to survive a summary judgment motion,
>
> the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that "discrimination play[ed] no role" in its actions.

Id. at 110 n.8 (citation omitted). "[S]ummary judgment dismissing a claim under the NYCHRL should be granted only if 'no jury could find defendant liable under any of the evidentiary routes--McDonnell Douglas, mixed motive, direct evidence, or some combination thereof.'" Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 113 (N.Y. App. Div. 2012) (citation omitted). However, these evidentiary routes are not applied to Title VII and NYCHRL claims in identical ways. For instance, "to make out the third prong of a prima facie case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." Williams v. Regus Mgmt. Grp., LLC, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011); see also Lytle v. JPMorgan Chase, No. 08 Civ. 9503, 2012 WL 393008, at *19 (S.D.N.Y. Feb. 8, 2012) (NYCHRL plaintiff "does not need to

demonstrate that he was subject to a materially adverse employment action."), adopted by 2012 WL 1079964 (S.D.N.Y. Mar 30, 2012), aff'd by 518 F. App'x 49 (2d Cir. 2013).

Armstrong's disparate treatment claims regarding the November 2003, January 2004, and March 2004 denials of her applications for transfer and the denial of overtime opportunities during the period she worked under Cummo and Riley in the Detective Division fall outside the NYCHRL's three-year statute of limitations, because they were discrete acts occurring prior to May 4, 2004. N.Y. City Admin. Code § 8-502(d). Plaintiff has not raised an issue of material fact as to whether MTA's alleged denials of training and, during her time at AIU, overtime opportunities were "caused at least in part by discriminatory . . . motives." Mihalik, 715 F.3d at 113. The evidence discussed supra Part II.B.1 and in the remainder of the record does not meet Plaintiff's burden to show that the alleged denials of Executive Protection Training and overtime were based in part on discrimination. Moreover, although the denial of AIU Training was adverse under the NYCHRL standard,[17] no reasonable

---

[17] The denial of AIU Training is "more than trivial, insubstantial, or petty." Jeune v. City of New York, No. 11 Civ. 7424, 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014) (citation omitted). Employee trainings provide important educational and vocational benefits, and losing access to training is not a trivial matter. The fact that the denial of AIU Training did not lead to promotion rejections does not bar Plaintiff's NYCHRL claim, even though the denial is not adverse under Title VII.

juror could find the denial to have been based in part on race or sex discrimination. Plaintiff does not dispute that after she left AIU in July 2006, there was no reason for MTA to assign her to AIU Training. (Pl.'s Opp'n 15-16.) Instead, she focuses on Taylor's failure to follow through on her offer to assign her to the January 2006 AIU Training. (Id.) Plaintiff admitted, however, that Taylor made her offer even though Plaintiff had not requested the Training. (Armstrong Dep. 303:7-9, 344:9-17.)[18]

---

See Williams, 836 F. Supp. 2d at 175-76 (holding that ignoring plaintiff's opinion and communicating with him differently than Caucasian employees was adverse under NYCHRL even though it was probably not adverse under Title VII); see also Forgione v. City of New York, No. 11 Civ. 5248, 2012 WL 4049832, at *5-6 (E.D.N.Y. Sept. 13, 2012) (holding that defendants' referral of plaintiff for psychological evaluation, while not materially adverse under NYSHRL, was not "merely trivial" under NYCHRL); Sotomayor v. City of New York, 862 F. Supp. 2d 226, 255, 257-58 (E.D.N.Y. 2012) (holding that negative observations, evaluations, and letters to file that did not trigger negative consequences for plaintiff's employment were not adverse under Title VII or NYSHRL but were adverse under NYCHRL).

[18] Plaintiff's Declaration, in which she stated, "I also requested AIU Training," conflicts with her deposition testimony. (Compare Armstrong Dep. 303:7-9, 344:9-17 with Armstrong Decl. ¶ 22.) The Declaration does not provide any details about when this "request" occurred, to whom it was made, or the form in which it occurred. In addition, Plaintiff's Opposition brief, 56.1 Statement, and Response to Defendants' 56.1 Statement concede that Plaintiff did not request AIU Training. (Pl.'s 56.1 Stmt. ¶ CCCC ("Taylor asked Armstrong, as well as Mazyck, if they were interested in attending the course."); compare Defs.' 56.1 Stmt. ¶ 34 ("Armstrong never requested Applicant Investigations Training.") with Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 34R; compare Defs.' Mem. 9 ("[Plaintiff] alleges . . . that she did not request this training.") with Pl.'s Opp'n 15-16.) Accordingly, the Court does not find Plaintiff's Declaration to raise a genuine issue of material fact as to whether she requested AIU Training.

The fact that Taylor's initial offer was unprompted and of her own accord weighs strongly against a finding that she failed to act on her promise because of Plaintiff's race or sex. The remainder of the record does not contain sufficient evidence for a reasonable juror to find that the Training denial was based even in part on discrimination.

Accordingly, Defendants' Motion for Summary Judgment on Armstrong's NYCHRL claims is GRANTED.


C. Hostile Work Environment Claims

1. Title VII and NYSHRL Claims

"In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (citation omitted). "A hostile working environment is shown when the incidents of harassment occur either in concert or with regularity that can reasonably be termed pervasive." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 724 (2d Cir. 2010) (citation omitted). It "can also be established through evidence of a single incident of harassment that is 'extraordinarily severe.'" Id. (citations omitted). "A work

environment will be considered hostile if a reasonable person
would have found it to be so and if the plaintiff subjectively
so perceived it." Brennan v. Metro. Opera Ass'n, 192 F.3d 310,
318 (2d Cir. 1999). Whether a reasonable person would find a
given work environment hostile depends on the "totality of the
circumstances," consideration of which includes: (1) frequency
of the conduct, (2) severity of the conduct, (3) whether the
conduct is physically threatening or humiliating, or a mere
offensive utterance, and (4) whether the conduct unreasonably
interferes with the employee's work performance. Harris v.
Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Plaintiff bases her hostile work environment claims on
various allegations. Armstrong cites to, inter alia, alleged
incidents in which supervisors stated she wrote her reports in
Ebonics, refused to communicate with her directly, discouraged
other detectives from working with her, declined to give her a
partner, screamed at her for closing her door, overly
scrutinized her work and whereabouts, failed to give her an
identification card for six months, and had a hostile and
aggressive attitude in their communications with her. (Pl.'s
56.1 Stmt. ¶¶ L-M, Q-R, BB-EE, AAA-BBB, EEE, VVV-WWW; Armstrong
Decl. ¶ 24.) She also relies on her belief that Defendants
denied her transfers, training, and overtime on the bases of her
race and sex, her personal awareness of hostility directed at

other African-American and female MTA members, and her allegation that co-plaintiffs and Caucasian members perceived MTA PD as racially hostile. (Pl.'s Opp'n 2-7.) The hostile work environment allegedly caused her to seek psychiatric treatment. (Pl.'s 56.1 Stmt. ¶ CCC.)

With hostile work environment claims, "the crucial inquiry focuses on the nature of the workplace environment as a whole, [so] a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those instances to support her claim." Cruz, 202 F.3d at 570. It is not necessary that "offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class" for those remarks to support a plaintiff's claim. Id. Even if Plaintiff herself "were not present or were not the target of some of [the] racial remarks, a jury plausibly could find that [the] persistently offensive conduct created an overall 'hostile or abusive environment,' which exacerbated the effect of the harassment [Plaintiff] experienced individually." Id. at 571 (citation omitted). Defendants have therefore failed to establish that there is no dispute as to any material facts, even assuming they are correct in asserting that, on their own, the comments and actions directed at Plaintiff would be insufficient to make out a hostile work environment claim.

Accordingly, the Court reserves decision on Defendants'
Motion for Summary Judgment on Armstrong's federal and state
hostile work environment claims until after considering fully
the Motion for Summary Judgment against Plaintiff Bryan Henry.


### 2. NYCHRL Claim

NYCHRL claims must be reviewed "separately and
independently from any federal and state law claims." <u>Mihalik</u>,
715 F.3d at 109. For the purpose of judicial efficiency, the
Court reserves decision on Defendants' Motion for Summary
Judgment on Plaintiff's NYCHRL hostile work environment claim
until it considers Armstrong's state and federal hostile work
environment claims in light of fellow Plaintiffs' allegations.


## D. Retaliation Claims

### 1. Title VII and NYSHRL Claims

Plaintiff alleges that she suffered unlawful retaliation
for complaining to her superiors about discrimination and filing
her OCR and SDHR Complaints. She claims that MTA retaliated
against her for complaining to superiors by denying her requests
to transfer to ICTF and AIU and that MTA retaliated against her

for those complaints and for filing her OCR and SDHR Complaints by transferring her from AIU to the Operation Support Unit.[19]

"Federal and state law retaliation claims are reviewed under the burden-shifting approach of McDonnell Douglas." Kwan, 737 F.3d at 843. "Under the first step of the McDonnell Douglas framework, the plaintiff must establish a prima facie case of retaliation by showing 1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" Id. at 844 (citation omitted). "[I]f the plaintiff meets this burden, the defendant employer must then articulate a legitimate, non-discriminatory reason for its adverse employment action." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 n.6 (2d Cir. 2011). The Supreme Court has recently held that if the employer does so, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer" for his or her Title VII claim to survive. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013).

---

[19] Although Plaintiff's Amended Complaint alleges that Defendants retaliated against her by denying her training, overtime, and a transfer to AIU in 2007 (Am. Compl. ¶¶ 71, 79, 84), the Court deems Plaintiff to have abandoned these claims. Defendants' moving Memorandum specifically addresses these claims (Defs.' Mem. 17-19, 21.), and Plaintiff's opposition papers fail to address Defendants' arguments. See supra n.6 (citing cases).

Although it is not yet clear whether the "but-for" standard applies to NYSHRL claims or whether Plaintiff need only "demonstrate that a retaliatory motive was 'a substantial or motivating factor behind the adverse action,'" see Kwan, 737 F.3d at 846 n.5, 847 n.7 (citation and alteration omitted), the Court need not address which standard applies because on this record, the distinction does not alter the Court's conclusions.

Plaintiff first argues that Defendants denied her March 2004 request to transfer to ICTF in retaliation for complaining to Conner about Cummo's alleged discrimination against her.[20] As before, this claim is not actionable under the NYSHRL because it falls outside the statute of limitations, but it is actionable under Title VII. Defendants do not contest that Plaintiff has met the first and third elements of her prima facie case (Defs.' Reply Mem. Law Supp. Mot. Summ. J. ("Defs.' Reply") 8), and Plaintiff satisfies the remaining elements. Although it is not clear whether Pucillo was aware that Armstrong had complained of discrimination, "a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge

---

[20] In her Opposition brief, Plaintiff states that the retaliatory act was the November 2003 ICTF transfer denial. (Pl.'s Opp'n 19.) However, the substance of the paragraph makes clear that Plaintiff's claim is about the March 2004 ICTF transfer denial. (See id. ("[A] few days later Pucillo transferred Jutze . . . .".) Defendants, recognizing that Plaintiff may have made a typographical error, respond in their Reply brief to Plaintiff's arguments regarding the March 2004 denial. (Defs.' Reply 8 & n.23.)

prong of the prima facie case." <u>Kwan</u>, 737 F.3d at 844 (quoting
<u>Gordon v. N.Y.C. Bd. of Educ.</u>, 232 F.3d 111, 116 (2d Cir.
2000)). Courts have found general corporate knowledge to arise
when a supervisor, corporate officer, or employee whose job is
to investigate and resolve discrimination complaints becomes
aware of the protected activity. <u>See</u> <u>Patane v. Clark</u>, 508 F.3d
106, 115 (2d Cir. 2007) (finding that plaintiff's complaints to
"employee whose job it was to investigate and resolve such
complaints" satisfied knowledge requirement); <u>Reed v. A.W.</u>
<u>Lawrence & Co., Inc.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996) (finding
knowledge prong satisfied where officer of company was aware of
complaints); <u>Murray v. Visiting Nurse Servs. of N.Y.</u>, 528 F.
Supp. 2d 257, 270 (S.D.N.Y. 2007) (Plaintiff's "two complaints
to his supervisor . . . clearly satisfy the 'knowledge
requirement' of the . . . <u>prima facie</u> standard."). Here, the
fact that Conner, then the Commanding Officer responsible for
the Detective Division, was aware of Plaintiff's discrimination
complaint suffices to meet the knowledge prong of Plaintiff's
<u>prima facie</u> case. (Decl. of Stephen Conner Supp. Defs.' Mot.
Summ. J. Against Blake Willett ¶ 4; Fuchs Decl. Ex. 12, at
D00008878.)

Plaintiff has also satisfied the causal connection prong.
Defendants argue that Pucillo's alleged lack of awareness of
Plaintiff's complaint shows that there was no causal connection.

(Defs.' Reply 8.) However, "[a] jury can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, . . . so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge." Gordon, 232 F.3d at 117. Indeed, causation can be established merely "by showing that the protected activity was closely followed in time by the adverse employment action." Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) (citation omitted). Here, there is a material issue of fact as to whether Plaintiff first complained to Conner about Cummo's alleged discrimination during the March 25, 2004 meeting, before Conner spoke to Pucillo, or in an email on March 26, 2004, after Conner spoke to Pucillo. (Armstrong Decl. ¶ 18; Armstrong Dep. 174:7-9, 175:19-176:5; Fuchs Decl. Ex. 12, at D00008879-81; Fuchs Decl. Ex. 13, at D00012593.) Assuming, as the Court must at this stage, that Armstrong complained about discrimination at the March 25 meeting, Pucillo denied her transfer request the very same day that she made her complaint. Such close temporal proximity between the protected activity and adverse action is plainly adequate to establish causation.

As discussed supra Part II.B.1, there is strong evidence that the legitimate, nondiscriminatory reasons for denying

Plaintiff's request laid out in Defendants' memoranda and
Pucillo's Reply Declaration are false. The evidence that the
denial of Plaintiff's transfer request resulted from a
procedural irregularity further supports an inference of a
retaliatory motivation for the denial. See, e.g., Eldaghar v.
City of N.Y. Dep't of Citywide Admin. Servs., No. 02 Civ. 9151,
2008 WL 2971467, at *12-13 (S.D.N.Y. July 31, 2008) (finding
evidence of procedural irregularities to raise "genuine issues
of material fact regarding . . . retaliatory motivation"). The
evidence of close temporal proximity, pretext, and procedural
irregularity is sufficient for a reasonable jury to find that
retaliation was a but-for cause of the denial of Plaintiff's
March 2004 request to transfer to ICTF. See Kwan, 737 F.3d at
847 (holding that a reasonable jury could infer from evidence of
pretext and temporal proximity that plaintiff's protected
activity was a but-for cause of defendant's adverse action).

Next, Plaintiff alleges that Defendants denied her January
2004 application to transfer to AIU in retaliation for her
complaints of discrimination.[21] Plaintiff's Opposition brief does
not specify the complaints she believes precipitated the January
2004 denial, and only one of the sources she cites in her brief
mentions a complaint of race- or sex-based discrimination made

---

[21] As discussed earlier, Plaintiff's NYSHRL claim based on these
facts fails pursuant to that law's statute of limitations.

by Plaintiff. (Pl.'s Opp'n 19.) Namely, in July 2002 and August 2002, Plaintiff complained to Provenzano and Harmon about Riley's allegedly discriminatory behavior, including Riley's alleged statement that Plaintiff wrote her reports in Ebonics; Finneran was aware of at least one of these complaints. (Pl.'s 56.1 Stmt. ¶¶ AA-BB; Finneran Dep. 228:5-22.)

Plaintiff has failed to establish a prima facie case of retaliation because no juror could find a causal connection between the complaints Plaintiff made in the summer of 2002 and the January 2004 denial of her AIU application. The temporal gap of 1.5 years between Plaintiff's complaints and the transfer denial is unable to support an inference of causation that could defeat summary judgment. See Garrett v. Garden City Hotel, Inc., No. 05 Civ. 962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("[D]istrict courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.") (collecting cases); Cunningham v. Consol. Edison, Inc., No. 03 Civ. 3522, 2006 WL 842914, at *19 (E.D.N.Y Mar. 28, 2006) ("[A] passage of two months between the protected activity and the adverse employment action seems to be the dividing line.") (collecting cases). The remainder of the record does not provide sufficient evidence of causation.

Even assuming *arguendo* that Plaintiff had established a *prima facie* case of retaliation, Defendants have set forth two legitimate, nondiscriminatory rationales for the transfer denial: Finneran chose Burke because he was from the Northern Region and because she believed Armstrong lacked credibility. As described *supra* Part II.B.1, Plaintiff has raised a weak issue of material fact as to whether both rationales are pretextual. This weak evidence of pretext, however, even in combination with Mazyck's allegation that Finneran threatened to transfer him if he advocated for Armstrong's assignment to AIU, could not convince a reasonable juror that retaliation was a but-for cause of the transfer denial. (*See* Jeremias Decl. Ex. H, at P00189; Jeremias Decl. Ex. S ¶ 45.)

Next, Plaintiff claims that retaliation was a but-for cause of the March 2004 denial of her request to transfer to AIU.[22] Plaintiff has established a *prima facie* case of retaliation on this claim. Defendants argue that there is no causal connection between her complaint to Conner and the denial of her request. However, Plaintiff has raised an issue of material fact as to whether she complained of race and sex discrimination to Conner on March 25, 2004, prior to the March 25, 2004 conversation between Conner and Lawless during which Lawless denied

---

[22] This claim falls outside the NYSHRL's statute of limitations but is actionable under Title VII.

Plaintiff's request. (Armstrong Decl. ¶ 18; Armstrong Dep.
174:7-9, 175:19-176:5; Fuchs Decl. Ex. 12, at D00008881.) The
close temporal proximity between Plaintiff's complaint and the
alleged adverse action suffices to establish causation.

Defendants, however, have produced evidence of a
legitimate, nonretaliatory reason for the denial of Plaintiff's
transfer request: Chief Lawless told Conner that AIU had
recently filled its only available position, and accordingly,
Plaintiff could not be transferred there. (Fuchs Decl. Ex. 12,
at D00008881.) Plaintiff has not raised an issue of material
fact as to whether this rationale is pretextual. She does not
cite to evidence that another detective was transferred to AIU
between March 2004 and August 2005, when she herself was
transferred to AIU. (See Pl.'s 56.1 Stmt. ¶ UUU.) Plaintiff
points to Finneran's knowledge of Plaintiff's Summer 2002
complaints of race discrimination and the evidence that her
rationales for denying Plaintiff's January 2004 application may
have been pretextual. This evidence, however, is not probative
of Lawless's reasons for denying Plaintiff's March 2004 request,
nor does it or the remainder of the record permit a reasonable
juror to find that retaliation was a but-for cause of the March
2004 denial.

Next, Plaintiff argues that Defendants transferred her from
AIU to the Operation Support Unit in July 2006 in retaliation

for filing her OCR and SDHR Complaints.[23] Assuming <u>arguendo</u> that
Plaintiff has established a <u>prima facie</u> case of retaliation,
Defendants have set forth a legitimate, nondiscriminatory reason
for the transfer. In July 2006, AIU started a downsizing process
due to a decreased workload; Taylor sought volunteers, and when
there were none, AIU decided to transfer the most junior
detective in AIU, Armstrong. (Defs.' Mem. 17.) Plaintiff does
not contest MTA's need to downsize AIU or Plaintiff's junior
status in AIU. (Pl.'s Opp'n 20-21.) Instead, she takes issue
with Defendants' claim that no one volunteered to transfer to
the Operation Support Unit and cites evidence that Alvarado
volunteered to transfer. (<u>Id.</u> 20 n.57.) According to the
Complaint of retaliation that Plaintiff filed with the SDHR the
day after she was transferred, Alvarado volunteered to transfer
provided she could begin her tour at 7:00 A.M.; a supervisor
from the Operation Support Unit came to the meeting and told
Alvarado that she could not begin her tour before 8:00 A.M.
(Jeremias Decl. Ex. PPP, at P00464.) Plaintiff's admission that
Alvarado was not willing to volunteer if a particular condition
was not met, and her further statement that Defendants were not

---

[23] Plaintiff's Opposition brief also claims that she "stated in
an open meeting with Taylor and D'Agostino that she felt
discriminated against at the AIU." However, Plaintiff admitted
in her Declaration that only Alvarado and Mazyck complained
about discrimination at that meeting. (Armstrong Decl. ¶ 24.)
Alvarado and Mazyck's complaints do not constitute protected
activity by Armstrong.

willing to meet that condition, makes clear that Alvarado did not volunteer for the Operation Support Unit position. Accordingly, Plaintiff has failed to raise an issue of material fact as to whether Defendants' rationales are pretextual.

Nor does the record contain evidence from which a reasonable juror could find that retaliation was a but-for cause of Plaintiff's involuntary transfer. Later in 2006, Defendants transferred the two next most junior detectives in AIU, including Rosario, who had not filed an SDHR complaint. (Fuchs Decl. Ex. 39 ¶ 5.) Mazyck, who filed an SDHR complaint in June 2006, was never involuntarily transferred from AIU. (Jeremias Decl. Exs. S, UUU.) The fact that Plaintiff was transferred two months after the SDHR made a "probable cause" determination on her claim and one month after a meeting in which two other detectives complained of discrimination is relevant to Plaintiff's retaliation claim, but it is insufficient on its own to support a finding of retaliation. (Pl.'s 56.1 Stmt. ¶¶ HHHH, KKKK; Armstrong Decl. ¶ 24.)

Accordingly, Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's Title VII retaliation claim regarding her March 2004 request for transfer to ICTF. However, Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's Title VII claims regarding her requests for transfer

to AIU and her involuntary transfer out of AIU, and as to all of
Plaintiff's NYSHRL claims.

2. NYCHRL Claims

"[T]o prevail on a retaliation claim under the NYCHRL, the
plaintiff must show that she took an action opposing her
employer's discrimination, and that, as a result, the employer
engaged in conduct that was reasonably likely to deter a person
from engaging in such action." Mihalik, 715 F.3d at 112
(citations omitted). "[A] defendant is not liable if the
plaintiff fails to prove the conduct is caused at least in part
by . . . retaliatory motives, or if the defendant proves the
conduct was nothing more than 'petty slights or trivial
inconveniences.'" Id. at 113 (citations omitted).

Armstrong's claims regarding the January 2004 and March
2004 denials of her requests for transfer to ICTF and AIU fall
outside the NYCHRL's three-year statute of limitations because
they were discrete acts occurring prior to May 4, 2004. Even
after taking into account the NYCHRL's "uniquely broad and
remedial purposes," no jury could find, based on the submitted
evidence, that Plaintiff's transfer out of AIU in July 2006 was
caused even in part by retaliatory motives. See id. at 115 n.12
(citation omitted). Accordingly, Defendants' Motion for Summary
Judgment on Plaintiff's NYCHRL retaliation claims is GRANTED.

E. Pattern or Practice of Discrimination Claims

Plaintiff maintains that Defendants' conduct towards racial minorities in MTA PD amounted to a pattern or practice of discrimination. (Pl.'s Opp'n 21.) Although Title VII initially envisioned that the government would pursue pattern or practice claims, 42 U.S.C. § 2000e-6, courts have unequivocally granted private individuals the right to vindicate those claims. See Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876 n.9 (1984). However, "no such pattern-or-practice theory of liability is available to the private non-class plaintiffs in this case." Chin v. Port Auth. of N.Y. & N.J. Inc., 685 F.3d 135, 146 (2d Cir. 2012); see United States v. City of New York, 631 F. Supp. 2d 419, 427 (S.D.N.Y. 2009) ("[I]ndividuals cannot maintain a private, non-class, pattern-or-practice claim.).

Here, Armstrong and her fellow plaintiffs have not brought their claims as a class action, and thus cannot assert pattern or practice claims of discrimination. Defendants' Motion for Summary Judgment on these claims is hereby GRANTED.

F. Claims Against MTA and Individual Defendants in their Official Capacities Under 42 U.S.C. §§ 1981 and 1983

Plaintiff alleges that MTA is liable under 42 U.S.C. §§ 1981 and 1983 for engaging in discriminatory conduct by

subjecting her to disparate treatment, a hostile work
environment, retaliation, and a pattern and practice of
discrimination. Plaintiff also asserts claims under §§ 1981 and
1983 against individual Defendants Morange, McConville, and
Culhane in their official capacities.[24] Plaintiff alleges that
Defendants' actions deprived her of "rights, privileges and
immunities secured by the United States Constitution and laws
and [§ 1983]." (Am. Compl. ¶ 216.)

Section 1981 "outlaws discrimination with respect to the
enjoyment of benefits, privileges, terms, and conditions of a
contractual relationship, such as employment." Patterson, 375
F.3d at 224. Section 1983 provides for an action at law against
a "person who, under color of any statute, ordinance,
regulation, custom, or usage of any State . . . subjects or
causes to be subjected, any citizen of the United States . . .
to the deprivation of any rights, privileges, or immunities
secured by the Constitution and law." 42 U.S.C. § 1983. "Section
1983 'is not itself a source of substantive rights'"; instead,
it "merely provides 'a method for vindicating federal rights
elsewhere conferred,' such as those conferred by § 1981."
Patterson, 375 F.3d at 225 (quoting Baker v. McCollan, 443 U.S.

---

[24] Although the Amended Complaint also asserted claims against
Sander (Am. Compl. ¶¶ 16), Armstrong abandoned these claims when
she failed to mention Sander in opposition to Defendants'
discussion of him. (Compare Defs.' Mem. 22-24 with Pl.'s Opp'n
21-24); see supra n.6 (citing cases).

137, 144 n.3 (1979)). Indeed, "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units . . . ." Id. (quoting Jett v. Dall. Indep. Sch. Dist., 491 U.S. 701, 733 (1989)). Although a § 1983 action may not be brought to vindicate rights conferred only by a statute that contains its own enforcement structure, such as Title VII, id., a Title VII plaintiff may bring a concurrent § 1983 claim "if some law other than Title VII is the source of the right alleged to have been denied." Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993); see also Patterson, 375 F.3d at 225 ("'A Title VII plaintiff is not precluded from bringing a concurrent § 1983 cause of action' . . . 'so long as the § 1983 claim is based on a distinct violation of a constitutional right.'") (citation omitted). Here, the sources of Plaintiff's § 1983 claim are 42 U.S.C. § 1981 and the U.S. Constitution. (Am. Compl. ¶ 216); see also Reed v. Conn. Dep't of Transp., 161 F. Supp. 2d 73, 85 (D. Conn. 2001) (noting that the source of plaintiff's § 1983 claim was § 1981).

"[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality - or an individual sued in his official capacity - the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." Patterson, 375 F.3d at 226 (citations omitted). The

policy or custom need not be an express rule or regulation; it is sufficient for a plaintiff to show that the discriminatory conduct is so "persistent and widespread . . . so permanent and well settled as to constitute a custom or usage with the force of law." Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992). Additionally, "a plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional." Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001).

In support of her claim that MTA had a custom or policy of discrimination, Armstrong claims that Defendants took no affirmative steps in response to the complaints of discrimination they received and ignored or acquiesced in retaliation. In particular, she argues that McConville endorsed discrimination against Plaintiff in July 2007 when, in response to Plaintiff's email stating that she did not want to return to the Detective Division because she did not want to reenter a hostile work environment, he stated, "If your reference [to a hostile work environment] concerns allegations you made in 2004 about your employment in the Detective Division, MTA investigated those allegations at the time and found they had no merit"; in fact, MTA had administratively closed its investigation of Armstrong's 2004 OCR Complaint without determining the merits of her claims, in line with its policy of

closing OCR investigations when complainants submitted their claims to the EEOC. (Jeremias Decl. Exs. I, RRR.) Plaintiff also claims that Conner, Harmon, Terrett, and the OCR did not adequately reprimand Riley or Cummo or expediently remove Plaintiff from their supervision. Finally, Plaintiff alleges that not all MTA supervisors were well trained in the MTA's EEO policy and that Conner, Terrett, and D'Agostino did not advise her to file a complaint with the OCR. (Pl.'s Opp'n 22-24.)

These claims do not sufficiently allege a policy or practice of discrimination. McConville's incorrect statement regarding Plaintiff's 2004 OCR Complaint hardly indicates his or MTA's endorsement of discrimination. McConville was not Chief of Police when Armstrong was in the Detective Division (Jeremias Decl. Ex. A, at 5), and MTA's policy of administratively closing OCR complaints submitted to the EEOC is not discriminatory. United States v. N.Y.C. Trans. Auth., 97 F.3d 672, 677 (2d Cir. 1996). The fact that Conner took immediate action to transfer Plaintiff away from Cummo's supervision within days of her first complaint to him about Cummo's alleged discrimination belies any claim that Conner did not act expediently to remove Plaintiff. In contrast, reading the facts in Plaintiff's favor, Harmon and Terrett's lack of action in 2002 in response to Plaintiff's complaints about Riley and Cummo is troubling. However, these two individuals' behavior, five years before the initiation of

the instant lawsuit, are insufficient to show a general policy
or practice of discrimination in MTA PD. Nor do Plaintiff's
mostly-generalized allegations about a lack of training suffice
to show a policy or practice. Plaintiff has not, as required,
"come forward with specific evidence demonstrating the existence
of a genuine dispute of material fact" as to whether MTA had a
policy or custom of discrimination. Great Am. Ins. Co., 607 F.3d
at 292. Therefore, Armstrong is unable to state claims against
MTA or the individual Defendants in their official capacities
under §§ 1981 or 1983, and Defendants' Motion for Summary
Judgment on these claims is GRANTED.

    G. Claims Against Individual Defendants in Their Individual
       Capacities Under 42 U.S.C. §§ 1981 and 1983

    Armstrong also asserts claims under §§ 1981 and 1983
against Defendants McConville and Culhane in their individual
capacities. To make out a claim for individual liability under
§ 1981, "a plaintiff must demonstrate some affirmative link to
causally connect the actor with the discriminatory action . . .
. [P]ersonal liability under section 1981 must be predicated on
the actor's personal involvement." Patterson, 375 F.3d at 229
(citation omitted). Similarly, a plaintiff must establish an
individual defendant's personal involvement in the claimed
violation to find him liable in his individual capacity under

§ 1983. Id. "A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others." Rolon v. Ward, 345 F. App'x 608, 611 (2d Cir. 2009) (citing Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003)).

Plaintiff alleges that McConville had policy-making authority, took no affirmative steps with regard to complaints of discrimination, and told Plaintiff that MTA had determined that her Complaint to OCR had no merit. She alleges that Culhane had decision-making authority and engaged or acquiesced in widespread discriminatory conduct throughout his career. (Pl.'s Opp'n 24; see id. 23.) McConville's incorrect statement that OCR had made a merits determination on Plaintiff's 2004 Complaint does not have any bearing on whether McConville was personally involved in the conduct that Plaintiff's 2004 Complaint was challenging; indeed, nothing in the record suggests that McConville was aware of the challenged conduct in 2004, when he was not yet Chief. Plaintiff's other general allegations are insufficient to raise an issue of material fact regarding McConville and Culhane's individual liability. Armstrong has failed to demonstrate that McConville and Culhane were aware that "constitutional violations [were] occurring." Patterson,

375 F.3d at 229. Accordingly, Defendants' Motion for Summary Judgment is GRANTED with regard to Plaintiff's §§ 1981 and 1983 claims against the individual Defendants in their individual capacities, except for those related to McConville and Culhane's alleged involvement in sustaining a hostile work environment, on which the Court reserves judgment.[25]

H. Claims Against Individual Defendants in Their Individual Capacities Under the NYSHRL and NYCHRL

Plaintiff asserts that McConville and Culhane should be held individually liable under the NYSHRL and NYCHRL as aiders and abettors. Under the NYSHRL and NYCHRL, it is unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this [provision], or to attempt to do so." N.Y. Exec. Law § 296(6); Admin. Code N.Y.C. § 8-107(6). Actual participation in conduct giving rise to a discrimination claim may support liability under both statutes. See Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012). Liability "may extend to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged

---

[25] Because the Court reserves judgment on Plaintiff's hostile work environment claims, the Court also reserves judgment as to Plaintiff's § 1981, § 1983, NYSHRL, and NYCHRL hostile work environment claims brought against McConville and Culhane in their individual capacities.

discriminatory conduct." Morgan v. N.Y. State Att'y Gen.'s Office, No. 11 Civ. 9389, 2013 WL 491525, at *13 (S.D.N.Y. Feb. 8, 2013). However, "aiding and abetting 'is only a viable theory where an underlying violation has taken place.'" Petrisch v. HSBC Bank USA, Inc., No. 07 Civ. 3303, 2013 WL 1316712, at *21 (E.D.N.Y. Mar. 28, 2013) (citation omitted). Finally, under both statutes, "'an individual may not be held liable merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating' that law." Malena, 886 F. Supp. 2d at 367-68 (citation and alterations omitted).

As discussed supra, Plaintiff has not raised genuine issues of material fact regarding whether any underlying violations of the NYSHRL and NYCHRL took place within those statutes' three-year limitations period. Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's NYSHRL and NYCHRL aiding-and-abetting claims, except for those related to the creation and maintenance of a hostile work environment, on which the Court reserves judgment.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part, DENIED in part, and decision is reserved in part, as follows:

(1) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's disparate treatment claims brought under the NYSHRL and the NYCHRL and as to Plaintiff's Title VII disparate treatment claims regarding the denial of training, overtime opportunities, and her January 2004 application to transfer to AIU;

(2) Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's Title VII disparate treatment claims regarding the denials of Plaintiff's September 2003 application and March 2004 request to transfer to ICTF;

(3) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's retaliation claims brought under the NYSHRL and the NYCHRL and as to Plaintiff's Title VII retaliation claims regarding her January 2004 application and March 2004 request to transfer to AIU and her July 2006 involuntary transfer out of AIU;

(4) Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's Title VII retaliation claim concerning the denial of her March 2004 request to transfer to ICTF;

(5) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's pattern or practice claims brought under Title VII, the NYSHRL, the NYCHRL, § 1981, and § 1983;

(6) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's § 1981 and § 1983 claims brought against MTA and the individual Defendants in their official capacities;

(7) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's § 1981, § 1983, NYSHRL, and NYCHRL claims brought against McConville and Culhane in their individual capacities, other than Plaintiff's hostile work environment claims; and

(8) Decision is reserved with respect to Plaintiff's hostile work environment claims brought against MTA under Title VII, the NYSHRL, and the NYCHRL, and brought against McConville and Culhane in their individual capacities under § 1981, § 1983, the NYSHRL, and the NYCHRL.


SO ORDERED.

Dated:
          New York, New York
          August 28, 2014



                              _Deborah a. Batts_
                              Deborah A. Batts
                         United States District Judge