```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
BRYAN HENRY,

                    Plaintiff,

                                          07 Civ. 3561 (DAB)
        v.                                OPINION

METROPOLITAN TRANSPORTATION AUTHORITY,
ELLIOT SANDER, WILIAM MORANGE, KEVIN
McCONVILLE, and TERRANCE CULHANE,

                    Defendants.
---------------------------------------X
```

DEBORAH A. BATTS, United States District Judge.

Plaintiff Bryan Henry ("Plaintiff" or "Henry"), an African-American male, together with eight African-American plaintiffs and one Hispanic plaintiff, all of whom are current or former employees of the Metropolitan Transportation Authority ("MTA") Police Department ("MTA PD"), commenced this action against the MTA and four MTA executive officers (collectively, "Defendants"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), and 42 U.S.C. §§ 1981 and 1983. Plaintiff maintains that Defendants discriminated against him on the basis of his race by denying him promotions, subjecting him to a hostile work environment, and engaging in a pattern or practice of discrimination, and retaliated against him for complaining to his superiors, the New York State Division of Human Rights

("SDHR"), and the Police Benevolent Association ("PBA") about alleged discrimination. Defendants now move pursuant to Fed. R. Civ. P. 56 for Summary Judgment on each of Plaintiff's claims.[1]

For the reasons set forth herein, Defendants' Motion for Summary Judgment is granted in part, denied in part, and the Court reserves decision in part.


I.   FACTUAL BACKGROUND

A. The Parties

Defendant MTA is a New York State public benefit corporation that provides public transportation services to the Greater New York City area. Defendant Elliot Sander served as the Executive Director and Chief Executive Officer of MTA from January 1, 2007 to May 7, 2009. Defendant William Morange was MTA Director of Security from July 2003 to December 2010. Defendant Kevin McConville was the Chief of MTA PD from October 2005 to January 2008. Defendant Terrance Culhane was an Assistant Deputy Chief of MTA PD from 2004 to July 2010.

---

[1] In a Scheduling Order dated September 24, 2010, the Court allowed separate Motions for Summary Judgment to be submitted for each individual Plaintiff in this action. This Memorandum and Order addresses only the Motion for Summary Judgment filed with respect to the claims instituted by Plaintiff Bryan Henry.

Plaintiff Bryan Henry joined the Metro North Railroad Police Department ("MNR PD") in 1985. (Pl.'s 56.1 Stmt.[2] ¶ A.) In 1997, the New York State Legislature created MTA PD, and on January 1, 1998, all employees of MNR PD, including Plaintiff, were transferred to MTA PD. (Defs.' 56.1 Stmt. ¶ 8.)

### B. Plaintiff's Employment with MNR PD

Henry alleges he was discriminated against and subjected to racially derogatory remarks from early on in his career. For example, Defendant McConville, then a Detective, allegedly stated, in front of Henry and a group of Caucasian officers, that he was going to go to Henry's house and "fuck" Henry's wife, who was Caucasian. (Pl.'s 56.1 Stmt. ¶ B.) On another occasion, when Plaintiff requested back-up support, his supervisor allegedly denied the request and accused him of being afraid of guns and white people. (Id. ¶ C.) Throughout his time as a police officer, Plaintiff alleges he was isolated and ignored. (Id. ¶¶ C-D.)

---

[2] Pursuant to the Court's Order of July 9, 2012 and subsequent correspondence with the Parties, the Court relies on Plaintiff's Corrected Responses to Defendants' Rule 56.1 Statement and Counter-Statement of Material Facts in Dispute (emphasis added), Dkt. No. 294, and not on Plaintiff's Responses to Defendants' Rule 56.1 Statement and Counter-Statement of Material Facts in Dispute, located at Dkt. No. 320.

In 1987, Henry passed the Sergeant's examination. (Id. ¶ E.) Defendants allegedly attempted to promote a Caucasian officer who was below Plaintiff on the promotional list without promoting Henry; Henry was allegedly only promoted when he complained to labor relations. (Id.) During his time as Sergeant, Henry allegedly learned that other MNR PD members had stated that "the niggers are taking over the Department," discovered that someone had written "Uncle Tom" on a picture of him, listened to a tape-recorded conversation of two MNR PD members using the words "nigger" and "spic," and was referred to as "boy" and "son" by Caucasian officers, sometimes in a Southern drawl. (Henry Decl. ¶ 6; Pl.'s 56.1 Stmt. ¶¶ F-H.) In 1988, Henry learned through the media about a video recording of a Caucasian MNR PD member asking an African-American homeless man, "When did you notice you turned black?" and "Did you find yourself eating a lot of watermelon, tap dancing, and shining shoes?" (Jeremias Decl. Ex. A; Pl.'s 56.1 Stmt. ¶ J.) MNR PD members also allegedly vandalized Henry's car and punched him without provocation. (Pl.'s 56.1 Stmt. ¶ H.)

MNR PD transferred Henry to Grand Central Terminal ("GCT") in 1989. (Id. ¶ I.) Allegedly, he was isolated in a one-man unit and not provided with an office, back-up support, or safety training, and other MNR PD members referred to him as "Skell

**4**

Master" and "Uncle Tom." (Id. ¶ K.) Henry was promoted to Lieutenant in 1991 and to Captain in 1995. (Id. ¶¶ L, N.)


### C. Plaintiff's Employment with MTA PD

Plaintiff transferred to MTA PD in 1998, and between 1998 and 2004 worked in a variety of locations and units. (Henry Decl. ¶¶ 11, 13, 19.) During this time, his supervisors allegedly continued to subject him to race-based harassment by screaming at him, loading and unloading their handguns in his office, ignoring him, admonishing him, taking away his vehicle, assigning him to guard the bathrooms, and requiring him to travel to attend one-on-one meetings where nothing of substance was discussed. (Pl.'s 56.1 Stmt. ¶¶ P-S.)

In June 2003, in the midst of a labor dispute, Plaintiff, Captain Thomas Dunn, and Inspectors Kevin Hoban and Stephen McCabe voluntarily reduced their rank to Lieutenant in order to receive better compensation. (Dunn Dep. 13:10-12; Pl.'s 56.1 Stmt. ¶ DD.) Captain Robert Terrett had voluntarily reduced his rank to Lieutenant earlier in 2003. (Henry Decl. ¶ 18; Pl.'s 56.1 Stmt. ¶ FF.) Although Plaintiff believed that MTA would re-promote him and the others who had voluntarily reduced rank to their prior ranks, at the time of his reduction in rank, he was aware that MTA had not agreed to re-promote him. (Henry Decl. ¶ 18; Henry Dep. 155:24-156:5, 317:3-7.) Sometime between 2004 and

2005, he alleges that he overheard command staff stating that Chief of Police Thomas Lawless had told McConville that anyone who had voluntarily reduced rank would be promoted to his former rank. (Henry Dep. 317:8-318:4.)

In 2004, Henry began working in GCT under the supervision of Dunn and Terrett, who had been promoted to Inspector and Deputy Inspector, respectively. (Henry Decl. ¶ 20.) Plaintiff alleges that Dunn and Terrett treated him differently than Caucasian officers by threatening him with discipline, blaming him without cause, verbally harassing him, ordering him to perform conflicting tasks at the same time, and requiring him to do unnecessary or demeaning tasks. (Pl.'s 56.1 Stmt. ¶¶ RR-XX.)

On November 1, 2004, Henry emailed Terrett a list of security issues that he wanted added to the agenda of the next GCT staff meeting, including the potential threat posed by employees working for GCT vendors. (Jeremias Decl. Ex. PP.) Terrett directed Henry to add the issues to the agenda and to coordinate with the Interagency Counterterrorism Task Force ("ICTF") regarding employee checks for vendors in GCT. (Jeremias Decl. Ex. H, at D00005334.) He also instructed Henry that "issues related to security or topics that could be considered critical of the command should be brought to the attention of the district commanders prior to documenting them in email format" and that "the consistent forwarding of perceived

problems with no solutions or actions to correct such issues was in effect, 'managing up' the chain of command." (Id.)

On December 7, 2004, Henry emailed Terrett and Dunn a list of suggestions, including "Diversity/Sensitivity Training . . . [to] help to reduce various social tensions plaguing the District." (Defs.' 56.1 Stmt. ¶ 27; Fuchs Decl. Ex. 16, at D00005356-57.) Terrett responded on December 9, 2004 by instructing Henry, inter alia, to "[c]ontact EEOC and determine what sensitivity training programs are offered and report back to me" and to "[i]n the future, . . . forward all recommendations, and or issues, through the chain of command." (Fuchs Decl. Ex. 16, at D00005356.)

On December 12, 2004, Henry sent Terrett a lengthy email response alleging that he had faced "various forms of racism, vicious hostility and discrimination" during his time with MTA PD, criticizing the "threatening, punitive and hostile tone" of Terrett's email, and accusing Terrett of harassment. (Fuchs Decl. Ex. 17, at D00005361-63.) He ended the email by writing, "I suppose you'll (They'll) find room for a few more knives in dozens of knives already imbedded in my back. Do what you have to do!!!" (Id. at D00005363.)

As Henry passed Terrett's office door on the morning of December 13, 2004, he said to Terrett, "It's better to go out in a burst of glory. Today is a good day to die." (Pl.'s 56.1 Stmt.

¶ BBB.) Plaintiff affirms he was quoting Star Trek, and that he, Terrett, and others in the command quoted movie or television lines to each other almost every day. (Henry Decl. ¶ 21; Henry Dep. 209:17-211:1, 219:3-8.) Terrett affirms that he never shared movie quotes with Henry. (Terrett Dep. 211:13-18.) Although Terrett was initially unconcerned by Henry's remark, when he read his December 12 email a few minutes later, the email "combined with [Henry's] behavior at the front of [Terrett's] door raised [his] concern." (Id. 210:6-13.) Terrett told Dunn about Henry's statements and email shortly afterwards, and Dunn found the email to be insubordinate. (Dunn Dep. 94:6-95:11; Fuchs Reply Decl. Ex. 6, at D00023289; Terrett Dep. 211:19-25.) At a 5:00 P.M. meeting between Dunn, Lawless, and McConville on December 14, 2004, Lawless stated he was concerned for Henry's safety and instructed Dunn and McConville to go to Henry's house, put Henry on modified duty, and remove his weapons, shield, and MTA I.D.; Dunn, McConville, and PBA representative John See carried out Lawless's instruction at 9:00 P.M. that night. (Dunn Dep. 90:4-8; Fuchs Decl. Ex. 19; Pl.'s 56.1 Stmt. ¶¶ EEE-FFF.) Henry remained on modified duty until he was cleared by an MTA psychologist to return to full duty two weeks later. (Pl.'s 56.1 Stmt. ¶ FFF.) On January 18, 2005, Dunn counseled Henry on the "insubordinate" nature of his email. (Dunn Dep. 112:5-8, 117:4-7.)

On July 24, 2005, Henry emailed then-Director of Security Morange concerning MTA's fiber optic network. (Pl.'s 56.1 Stmt. ¶ GGG.) After Morange told McConville that the email should have gone through the chain of command, Dunn counseled Henry for going outside of the chain of command. (Dunn Decl. ¶ 5 & Ex. A; Morange Dep. 132:4-13.)

Between August 2, 2005 and August 15, 2005, Henry sent a series of emails containing photographs of potential security issues in GCT to Gary Schulze, a civilian employee of MTA assigned to ICTF (Fuchs Decl. Ex. 23; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 33R); in one of the emails, Henry forwarded the email he had sent to Morange in July, and added, "This was my last attempt to send any suggestion to anyone in the upper levels of the department. Inspector Dunn and chief McLaughlin blasted me for sending it — after this I really don't care any more." (Fuchs Decl. Ex. 23, at D00023389.) The facts surrounding these emails are in dispute. Plaintiff alleges that he sent the emails after he learned that he and Schulze were being assigned to a Security Committee and in response to Schulze's request that Henry email him about security issues they had discussed. (Henry Decl. ¶ 22.) Schulze says that he did not make any such request (Schulze Dep. 93:1-9), and Defendants provide evidence that Henry sent the emails before he and Schulze were assigned to the Security Committee. (Defs.' 56.1 Stmt. ¶¶ 34, 36; see Schulze

Dep. 96:8-14.) Dunn affirms that he advised Henry he would be assigned to the Security Committee on September 9 or September 10, 2005. (Dunn Decl. ¶ 8.) New members of the Security Committee received official notification of the Committee's creation on September 27, 2005. (Fuchs Decl. Ex. 22.)

During a September 9, 2005 meeting between Dunn and Schulze, Schulze allegedly learned that Dunn and Terrett "had seen the pictures" Henry had emailed Schulze and were "upset that [Henry] had gone around the chain of command." (Defs.' 56.1 Stmt. ¶ 38; Schulze Dep. 93:18-19, 95:5-6.) Although Dunn's notes from the meeting show that he and Schulze discussed "info forwarded to ICTF by Lt. Henry last year" (Jeremias Decl. Ex. D), in his Declaration, Dunn affirms that he did not learn about Schulze's "receipt of emails from Henry" during the September 9, 2005 meeting. (Dunn Decl. ¶ 8.) On September 10, 2005, Henry sent Dunn an email attaching the nineteen emails he had sent to Schulze in August. (Id.) Dunn alleges that he did not open the nineteen attached emails at that time but, on the basis of the primary email, instructed Henry not to violate the chain of command. (Id.; Fuchs Decl. Ex. 21, at D00005336.)

On October 13, 2005, Dunn allegedly asked Henry if he wanted to hit him. (Henry Decl. ¶ 17; Pl.'s 56.1 Stmt. ¶ MMM.) Henry stated that he did not want to hit Dunn and that he was going to MTA's Employee Assistance Program ("EAP") because he

10

was "having a bad day." (Pl.'s 56.1 Stmt. ¶ MMM.) When Dunn
followed Henry to EAP and allegedly asked Henry if he was okay,
Henry responded, "I'm tired of being treated like shit."
(Jeremias Decl. Ex. D, at D00023198-99; Pl.'s 56.1 Stmt. ¶ MMM.)
After leaving, Dunn met with McConville and expressed his
concern for Henry's safety and the safety of others "in the
event [Henry] became stressed out and lost control" and
recommended that Henry be prohibited from returning to work
until he was medically cleared to return. (Jeremias Decl. Ex.
OO, at D00039287-88; see Jeremias Decl. Ex. D, at D00023199.)
McConville responded, "[W]e need documentation in order to do
something" and stated that Henry's December 2004 emails and
comments were insufficient. (Jeremias Decl. Ex. OO, at
D00039287.) Shortly after this conversation, Henry returned from
EAP and, after telling Dunn "'I'm okay now,'" "said something
about being 'a Negro in a white mans [sic] world or white mans
[sic] job.'" (Id. at D00039288; Pl.'s 56.1 Stmt. ¶ MMM.) On the
morning of October 14, 2005, Dunn and Terrett again told
McConville that they were concerned about Henry, and McConville
reiterated that "unless we had something specific, we could not
do anything and that we cannot bring up old incidents that he
was already cleared on." (Jeremias Decl. Ex. OO, at D00039289.)
At 12:30 P.M., an EAP employee told Dunn and Terrett that Henry
was not dangerous. (Id. at D00039290.)

On October 14, 2005, Dunn forwarded to McConville Henry's September 10, 2005 email, in which Henry had attached his emails to Schulze. (Fuchs Decl. Ex. 23, at D00036564.) Dunn asked McConville to "take the time to open each attached e-mail and see what the Lt has sent to Gary – without our knowledge until I mentioned it to Bryan when I informed him I will be assigning him to assist with the new GCT Security Committee." (Id.) He alleges that only on October 17, 2005 did he learn that Henry's emails to Schulze contained "sensitive" information. (Dunn Decl. ¶ 10; Jeremias Decl. Ex. H, at D00005336-37.) Dunn alleges that only after an October 19, 2005 counseling session with Henry did he notice that Henry had forwarded Schulze the July 24, 2005 email to Morange; Dunn believed Henry's accompanying statement that he was sending the email even after being "blasted" by Dunn indicated his "willful insubordination." (Dunn Decl. ¶¶ 11-12.)

On October 25, 2005, Terrett recommended to Dunn that Henry be charged a Command Discipline and assessed a forty-hour suspension. (Defs.' 56.1 Stmt. ¶ 40; Dunn Decl. Ex. D.) Dunn subsequently filed a formal Command Discipline Report, which Henry received and signed on October 26, 2005. (Dunn Decl. ¶ 14; Fuchs Decl. Ex. 25.) The Report stated that on August 2, 2005, Henry "sen[t] an e-mail containing security sensitive information about Grand Central Terminal to a civilian employee of the M.T.A. without permission or authority. . . . Henry's

conduct violated the Department's Chain of Command and was prejudicial to the good order and efficiency of this District. Lieutenant Henry had been previously counseled on three separate occasions related to this type of behavior and has received instruction prohibiting this conduct." (Fuchs Decl. Ex. 25, at D00005183.) Dunn found that Henry had violated the Department Manual's prohibitions on "engag[ing] in conduct prejudicial to good order, efficiency, or discipline" and on disseminating confidential Department information without proper authorization. (Fuchs Decl. Ex. 25.) Henry declined to accept the Command Discipline and instead chose to grieve the discipline pursuant to the MTA Collective Bargaining Agreement. (Defs.' 56.1 Stmt. ¶ 41.) On May 3, 2006, following negotiation with the PBA, McConville issued Henry a Letter of Instruction ("LOI") for his August 2005 emails to Schulze. (Fuchs Decl. Ex. 27; Pl.'s 56.1 Stmt. ¶¶ OOO-PPP.)

On July 11, 2006, Henry filed a Complaint alleging race discrimination with the SDHR. (Jeremias Decl. Ex. N; Pl.'s 56.1 Stmt. ¶ RRR.) On March 29, 2007, Henry submitted a ten-page complaint to the PBA alleging a race- and retaliation-based hostile work environment and requesting that he be transferred out of Dunn's command. (Jeremias Decl. Ex. Q.) PBA Vice President Vincent Provenzano forwarded Henry's PBA Complaint to McConville on April 3, 2007 and asked that Henry be transferred

away from Dunn's supervision. (Id. at PBA309.) McConville forwarded the Complaint to Assistant Deputy Chief John D'Agostino, who oversaw MTA PD's Internal Affairs Bureau ("IAB"). (Pl.'s 56.1 Stmt. ¶ YYY.) Although D'Agostino stated that a full investigation of Henry's allegations would be conducted (Jeremias Decl. Ex. R), it is unclear whether IAB conducted an investigation. (Compare D'Agostino Dep. 201:10-12 with Fuchs Reply Decl. Ex. 11.) OCR closed its separate investigation of Henry's Complaint on May 14, 2007 because the complaint was "being investigated by MTA PD" and Henry "declined to speak to OCR, on advice of counsel." (Fuchs Reply Decl. Ex. 11, at D00013431.)

Dunn's notes reflect that on April 16, 2007, he received emails from Henry and learned from an MTA PD member that Henry was not currently at work; Dunn wrote, "will ck [sic] if he is getting e-mails @ home." (Jeremias Decl. Ex. D, at D00023264.) On April 18, 2007, Dunn emailed Assistant Deputy Chief Kimberly Rehbein, "I have just learned that Lt Henry does in fact have department e-mail access at home. Due to past complaints related to represented members accessing e-mails at home, I must request that Lt Henry's home access be terminated." (Jeremias Decl. Ex. TT.) Dunn alleges that he took this action because "[h]ome should be for home" and states that he told all the lieutenants

14

working for him that "they shouldn't have email access at home." (Dunn Dep. 377:10-13.)

Also in April 2007, Deputy Inspector Sean Montgomery asked McConville to assign Henry to Montgomery's Directed Patrol initiative. (Montgomery Dep. 122:21-22; Pl.'s 56.1 Stmt. ¶ UUU.) McConville allegedly told Montgomery that he needed to talk to the Legal Department first and asked Montgomery whether he was sure he wanted Henry. (Montgomery Dep. 122:11-16.) When Montgomery asked whether there was something he should be aware of about Henry, McConville allegedly responded, "Yes. He is crazy." (Id. 122:17-19.) In May 2007, after PBA representatives advocated for Henry's transfer, Henry was assigned to work under Montgomery. (Pl.'s 56.1 Stmt. ¶ UUU.)

In September 2007, after Montgomery was promoted and replaced by Beahan, Henry asked to be transferred back to GCT because he did not enjoy working with Beahan. (Henry Dep. 488:18-489:11; Defs.' 56.1 Stmt. ¶ 64.) At GCT, Henry was supervised by Terrett; he alleges that Terrett used a hostile tone with him, ordered him to stay out of the office, and required him to do work typically assigned to sergeants. (Henry Decl. ¶ 33; Pl.'s 56.1 Stmt. ¶ MMMM.) In October 2008, Henry suffered a stroke and took disability leave. (Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 14R.) He retired from MTA PD in March 2009, allegedly because he and his psychologist believed workplace

harassment was having a negative impact on his health. (Pl.'s 56.1 Stmt. ¶ NNNN; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 14R.)

D. Denial of Promotions

In April 2002, MTA published a Directive listing nine Caucasian and two African-American captains, including Henry, who would be interviewed for promotion to Inspector. (Jeremias Decl. Ex. AA; Pl.'s 56.1 Stmt. ¶ V.) Plaintiff alleges he never received an interview, a claim denied by Defendants. (Pl.'s 56.1 Stmt. ¶ X; Defs.' Resp. Pl.'s 56.1 Stmt. ¶ X.) As of March 2004, everyone on the April 2002 Directive had been promoted above Captain other than Henry and two Caucasian members who had retired. (Pl.'s 56.1 Stmt. ¶ CC.)  Also in March 2004, MTA promoted Stephen Conner from Lieutenant to Inspector and Defendant Culhane from Captain to Assistant Deputy Chief. (Fuchs Decl. Ex. 14.) Neither had been listed on the April 2002 Directive or submitted abstracts for these promotions. (Conner Dep. 23:5-7; Culhane Dep. 38:21-25, 44:13-19.)

On June 8, 2004, after MTA had improved the compensation issues that led to Dunn, Henry, Hoban, and McCabe's June 2003 voluntary reduction in rank, MTA issued two Personnel Orders. (Dunn Dep. 14:22-15:7; Fuchs Decl. Ex. 11, at D00010083-84.) A Personnel Order addressed to "All Lieutenants" requested abstracts for promotion to Captain and an Order addressed to

"All Captains and Lieutenants" requested abstracts for promotion to Inspector. (Fuchs Decl. Ex. 11, at D00010083-84.) On June 16, 2004, MTA issued another Personnel Order addressed to "All Captains & Lieutenants" requesting abstracts for promotion to Deputy Inspector. (Id. at D00010080.) Henry alleges that he was not aware of these Personnel Orders. (Henry Dep. 319:10-320:21.)

The following individuals submitted abstracts in response to the Orders by the Orders' June 23, 2004 deadline: Dunn applied for promotion to Captain, Deputy Inspector, and Inspector; then-Captain Montgomery applied for promotion to Deputy Inspector and Inspector; Lieutenant James McKenna applied for promotion to Captain and Inspector; and Lieutenants Kevin King, Joseph Martelli, and Terrett applied for promotion to Inspector. (Fuchs Decl. Exs. 11-12; Fuchs Reply Decl. Exs. 2-3; Jeremias Decl. Ex. T, at D00040954.) Defense counsel affirms that the June 2004 abstracts of Lieutenants Neil Boyle, Kevin Kieran, and Douglas Peterson "remain unaccounted for" and that Plaintiff did not ask Defendants for information or documents regarding these three lieutenants' promotions prior to submitting his Opposition materials. (Fuchs Reply Decl. ¶¶ 3-4.) Henry did not submit an abstract. (Defs.' 56.1 Stmt. ¶ 22; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 22R.)

Describing the application process in a 2006 submission to the SDHR, MTA stated, "When it appeared that there had not been

17

a large response to the Personnel Order [requesting abstracts
for promotion to Captain], Chief Lawless asked his immediate
subordinates to contact the lieutenants who had not filed
abstracts and to ask them if they would do so. In response to
this request, . . . McConville spoke to Henry. . . . Henry never
submitted an application . . . ." (Jeremias Decl. Ex. O, at
P02390.) However, both Henry and McConville affirm that
McConville never asked Henry to submit an abstract, and
McConville further claims that he had no involvement in the June
2004 promotion process and never contacted any MTA PD members to
suggest they submit abstracts. (Henry Dep. 330:24-332:6;
McConville Dep. 215:8-216:11.)

 On July 14, 2004, MTA published a Personnel Order
promoting, <u>inter alios</u>, Dunn and King to Inspector, Montgomery
and Terrett to Deputy Inspector, and Boyle, Kieran, Martelli,
McKenna, and Peterson to Captain. (Ontell Decl. Ex. B, at
D00007380.) Lawless, prior to the publication of the Order, had
one-on-one conversations with Dunn and Terrett during which he
informed them they would be promoted. (Dunn Dep. 18:19-19:1;
Terrett Dep. 34:22-35:16.) Hoban and McCabe, who also reduced
rank with Henry, were not promoted above Lieutenant.[3] (Defs.'
Resp. Pl.'s 56.1 Stmt. ¶ OO.)

---

[3] Plaintiff states that "Hoban was also offered a promotion, but
turned it down." (Pl.'s 56.1 Stmt. ¶ II.) However, the only

On February 22, 2005, MTA issued a Personnel Order requesting abstracts from lieutenants seeking promotion to Captain. (Jeremias Decl. Ex. F.) Henry was aware of the Personnel Order but chose not to apply "because [he] felt that . . . [he] would probably be refused." (Henry Dep. 320:21-24.) In May 2005, Lieutenants Gary Beahan and Timothy Denmark, who had submitted abstracts, were promoted to Captain. (Fuchs Reply Decl. Ex. 4; Ontell Decl. Ex. B, at D00007378.)

On February 14, 2007, MTA issued an Interim Order requesting abstracts from lieutenants seeking promotion to Captain. (Jeremias Decl. Ex. P.) The Order required candidates to "secure the endorsement of their immediate Supervisor and Commanding Officer." (Id.) Henry submitted an abstract for Captain on February 23, 2007. (Jeremias Decl. Ex. S, at D00007555.) On March 5, 2007, Dunn submitted a Supervisory Recommendation in which he refused to endorse Henry's candidacy, and Assistant Deputy Chief McLaughlin agreed with Dunn's

---

support cited for that allegation is Henry's testimony that Hoban was offered a promotion. (Id. (citing Henry Dep. 325:18-23).) Shortly after giving this testimony, Henry admitted that he had no personal knowledge of whether Hoban had been offered a promotion. (Henry Dep. 326:3-20.) Because nothing else in the record supports a finding that Plaintiff has personal knowledge that Hoban was offered a promotion, his testimony that Hoban was offered the promotion is inadmissible. See Fed. Rule Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

assessment. (Id. at D00007556-58.) In his Supervisory
Recommendation, Dunn wrote that Henry "has consistently shown a
pattern of 'managing up' in that he does not resolve issues
without frequently consulting or questioning superiors" and
that, because he had "repeatedly violat[ed] the chain of
command," Henry had been charged with a Notice of Intent to
Discipline that was subsequently reduced to an LOI. (Id. at
D00007556-57.) Moreover, Dunn wrote that in December 2004 Henry
had sent an "insubordinate e-mail" that "detailed perceived
injustices," and subsequently "was disqualified from duty based
on his comments and irrational behavior." (Id. at D00007557.)

On April 9, 2007, Dunn discussed Henry's March 29, 2007 PBA
Complaint with D'Agostino and McConville, and the next day Dunn
asked for a copy of the PBA Complaint. (Jeremias Decl. Ex. SS.)
On April 19, 2007, Chief Kathleen Finneran forwarded a list of
candidates for promotion to Detective and Captain that
characterized candidates as "qualified" or "not qualified";
Henry was listed as "qualified," which signified that his
abstract "met the requirements" for becoming Captain. (Finneran
Dep. 113:18-24; Jeremias Decl. Ex. GG.) On April 20, 2007,
D'Agostino gave Dunn a copy of Henry's PBA Complaint. (Jeremias
Decl. Ex. D, at D00023267.) That same day, Dunn emailed
Finneran, stating, "If the 'Not Qualified' section indication
'NO-CO' means the CO did not endorse the candidate, the

indication for Lt Henry is not correct – he was not endorsed by the CO and Regional Chief." (Jeremias Decl. Ex. HH.) McConville also allegedly told Finneran that he "pulled [Henry's] abstract" and that Henry "was not going to be interviewed." (Finneran Dep. 108:6-17.) McConville alleges that after he learned Henry was disappointed that he hadn't been interviewed, he instructed Finneran to conduct an independent review of the promotion process to ensure that the promotion denial had not been discriminatory or retaliatory. (Defs.' Resp. Pl.'s 56.1 Stmt. ¶ AAAA; McConville Dep. 227:10-228:9.) Although Finneran does not recall speaking to McConville about Henry after the conversation in which he told her he had pulled Henry's abstract (Pl.'s 56.1 Stmt. ¶ AAAA n.44.), Dunn's notes reflect that Finneran met with him and McLaughlin on May 23, 2007 to discuss their decision not to endorse Henry. (Defs.' Resp. Pl.'s 56.1 Stmt. ¶ CCCC; Dunn Decl. ¶ K.) Finneran allegedly told McConville she had met with Dunn and McLaughlin and had concluded their reasons for not endorsing Henry were "proper." (Pl.'s 56.1 Stmt. ¶ CCCC.)

In August 2007, Defendants promoted John Fitzpatrick, a Caucasian, to Captain. (Id. ¶ FFFF; Defs.' Resp. Pl.'s 56.1 Stmt. ¶ FFFF.) Fitzpatrick had received the endorsement of his commanding officer and had received an interview for promotion to Captain. (Jeremias Decl. Ex. JJ, at D00038122.) Plaintiff points out that in August 2004, Fitzpatrick had received a

Command Discipline for arresting and transporting a prisoner while off-duty without notifying the Communications Unit or promptly notifying his Unit Commander. (Jeremias Decl. Ex. U; Pl.'s 56.1 Stmt. ¶ GGGG.) He had also received an LOI for tampering with a personal photograph of Finneran's. (Pl.'s 56.1 Stmt. ¶ HHHH.) Plaintiff also argues that Defendants promoted Caucasian members in disproportionately greater numbers and at a faster pace than African-American members. (Id. ¶ QQ.)

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

A court should grant summary judgment when there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). Genuine issues of material fact cannot be created by conclusory allegations. Victor v. Milicevic, 361 F. App'x 212, 214 (2d Cir. 2010). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable juror could find in favor of that party. Melendez v. Mitchell, 394 F. App'x 739, 740 (2d Cir. 2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be

evidence on which the jury could <u>reasonably</u> find for the plaintiff." <u>Id.</u> (citation omitted). The non-movant may not rely upon speculation or conjecture to overcome a motion for summary judgment. <u>Burgess v. Fairport Cent. Sch. Dist.</u>, 371 F. App'x 140, 141 (2d Cir. 2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." <u>FDIC v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. <u>Id.</u>

   B. Disparate Treatment Based on Race

      1. The Pleadings

      In his opposition brief, Henry alleges that in June 2003, December 2003, March 2004, and May 2005, Defendants denied him promotions on the basis of his race. (Pl.'s Am. Mem. Law Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n") 3-8.) Defendants argue that these are new claims not alleged in Plaintiff's Amended Complaint. (Defs.' Rev. Reply Mem. Law Supp. Mot. Summ. J. ("Defs.' Reply") 1, 2 n.8.)

"A party generally may not 'assert a cause of action for the first time in response to a summary judgment motion.'" LeBlanc v. United Parcel Serv., No. 11 Civ. 6983, 2014 WL 1407706, at *17 (S.D.N.Y. Apr. 11, 2014) (quoting Greenidge v. Allstate Ins. Co., 312 F. Supp. 2d 430, 436–37 (S.D.N.Y. 2004), aff'd, 446 F.3d 356, 361 (2d Cir. 2006)); see Malmsteen v. Universal Music Grp., Inc., 940 F. Supp. 2d 123, 135 (S.D.N.Y. 2013) ("Because [Plaintiff] failed to include this claim in his Amended Complaint, instead raising it for the first time in opposition to summary judgment, it is waived.") Under Fed. R. Civ. P. 15(b), however, "a district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice." Cruz v. Coach Stores, Inc., 202 F.3d 560, 569 (2d Cir. 2000). "Claims that are entirely new--that is, claims based [on] new facts and new legal theories with no relation to the previously pled claims--are commonly rejected at the summary judgment stage due to the prejudice to the defendant, who may not have had fair notice of the claim and consequently may not have had an adequate opportunity for discovery." Coudert v. Janney Montgomery Scott, LLC, No. 3:03 Civ. 324, 2005 WL 1563325, at *2 (D. Conn. July 1, 2005); see also Lyman v. CSX Transp., Inc., 364 F. App'x 699, 701-02 (2d Cir. 2010) (holding district court did not abuse discretion in refusing to consider new claims where complaint did not put

defendant on notice of said claims). In contrast, "claims that
are related to or are mere variations of previously pleaded
claims--that is, claims based on the same nucleus of operative
facts and similar legal theories as the original claims--may be
raised on a motion for summary judgment where the defendant was
clearly on notice from the complaint and was not unfairly
prejudiced." Coudert, 2005 WL 1563325, at *3; see also Ragusa v.
Malverne Union Free Sch. Dist., 381 F. App'x 85, 89-90 (2d Cir.
2010) (holding district court should have considered retaliation
claim where complaint "was sufficient to place defendants on
notice that [plaintiff] intended to pursue" said claim).

     The Amended Complaint fails to put Defendants on notice of
Plaintiff's new claims that he was illegally denied promotions
in June 2003, December 2003, March 2004, and May 2005. It refers
to two instances of discriminatory promotion decisions: the
promotions of Dunn and Terrett and alleged offer of promotion to
Hoban in 2004, and MTA's refusal in 2007 to interview Henry for
Captain. (Am. Compl. ¶ 136 ("Around the beginning of 2004, three
of the Caucasian Captains and Inspectors . . . who had
voluntarily stepped down with HENRY were privately approached to
be re-promoted."); id. ¶¶ 136, 141.) The Amended Complaint's
statement that "the MTA has denied [Henry] promotion" (Am.
Compl. ¶ 133) is too general to put Defendants on notice of
Plaintiff's additional promotion-related claims, which are based

on facts not alleged in the Amended Complaint. See Lyman, 364 F.
App'x at 701-02 (where complaint made specific workplace safety
negligence claims, the additional "general complaint that the
'defendant . . . negligently . . . failed to provide plaintiff
with a reasonably safe place to work' [was] insufficient to put
defendant on notice" of new workplace safety negligence claims
not specified in complaint). Defendants did not move for summary
judgment on these new claims and would be prejudiced were the
Court to consider them. (See generally Defs.' Rev. Mem. Law
Supp. Mot. Summ. J. ("Defs.' Mem.").) Accordingly, the Court
finds that Plaintiff's claims regarding alleged promotion
denials in June 2003, December 2003, March 2004, and May 2005
are untimely and waived.


     2. Title VII and NYSHRL Claims

     Courts in this Circuit analyze Title VII and NYSHRL claims
of employment discrimination according to the three-stage,
burden-shifting framework set forth in McDonnell Douglas Corp.
v. Green, 411 U.S. 792 (1973). Simmons v. Akin Gump Strauss
Hauer & Feld, LLP, 508 F. App'x 10, 12 (2d Cir. 2013). Under
McDonnell Douglas, a plaintiff bears the initial, de minimis
burden of establishing a prima facie case of discrimination.
Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). To
make out a prima facie case, a plaintiff must demonstrate,

through direct or circumstantial evidence, that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered from an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). A plaintiff may raise such an inference by showing that his employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside of his protected group. Ruiz v. Cnty. of Rockland, 609 F.3d 486, 493 (2d Cir. 2010).

A plaintiff who makes out a prima facie case establishes a presumption of discrimination, at which point the burden of production shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the challenged conduct. Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (citation omitted). If the defendant produces such a reason, the plaintiff must then, without the benefit of the presumption of discrimination, "raise[] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the [adverse employment action] was based, at least in part," on discrimination. Holcomb, 521 F.3d at 141. "Plaintiff can show that Defendant's non-discriminatory rationale is pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence.'" Delville v. Firmenich Inc., 920 F. Supp. 2d 446, 462 (S.D.N.Y. 2013) (citation omitted); see Weiss v. JPMorgan Chase & Co., 332 F. App'x 659, 661 (2d Cir. 2009) (same). "[I]n many cases, a showing of pretext, when combined with a prima facie case of discrimination, will be enough to permit a rational finder of fact to decide that the decision was motivated by an improper motive." Holcomb, 521 F.3d at 141. However, a showing of pretext is not required. Id. at 141-42. Instead, a plaintiff "alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation." Id. at 142.

Title VII's statute of limitations bars claims based on events occurring more than 300 days prior to filing a charge of discrimination with a state or local employment agency. 42 U.S.C. § 2000e-5(e)(1). Plaintiff filed an administrative Complaint with the SDHR on July 11, 2006. (Fuchs Decl. Ex. 3.) Accordingly, only those incidents that occurred on or after September 14, 2005 are actionable under Title VII. Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004) (noting that Title VII precludes recovery for discrete discriminatory acts that occurred outside the statutory time period even if other acts occurred within the time period). Discrimination claims

under the NYSHRL are subject to a three-year statute of limitations. Lange v. Town of Monroe, 213 F. Supp. 2d 411, 418 (S.D.N.Y. 2002). As this action was brought on May 4, 2007, only those incidents occurring on or after May 4, 2004 are actionable under the NYSHRL. Nonetheless, earlier incidents may be cited as background evidence in support of a timely Title VII or NYSHRL claim. Anderson v. Nassau Cnty. Dep't of Corr., 558 F. Supp. 2d 283, 299 (E.D.N.Y. 2008).

Henry alleges that MTA violated Title VII and the NYSHRL by denying him promotions on the basis of his race.[4] First, Plaintiff argues that Defendants discriminated against him by

---

[4] Although Plaintiff's Amended Complaint alleges that Defendants brought Henry up on disciplinary charges and issued the May 2006 LOI on the basis of his race (Am. Compl. ¶ 137), the Court deems Plaintiff to have abandoned any claim that the disciplinary charges and LOI constitute a discrete instance of race-based disparate treatment by MTA. Defendants' moving memorandum specifically addresses these claims, but Plaintiff's Opposition brief fails to mention them in any way. (Defs.' Mem. 8-11.) "[A]rguments not made in opposition to a motion for summary judgment are deemed abandoned." Plahutnik v. Daikin Am., Inc., No. 10 Civ. 1071, 2012 WL 6108236, at *5 (S.D.N.Y. Dec. 6, 2012) (finding plaintiff to have abandoned promotion claim because he "ha[d] not argued his failure-to-promote claim in his brief"); see Robinson v. Roosevelt Union Free Sch. Dist., No. 10 Civ. 834, 2012 WL 1980410, at *6 (E.D.N.Y. May 31, 2012) ("[T]he Court considers this claim abandoned because plaintiff has failed to address it in her opposition brief."); Gaston v. City of New York, 851 F. Supp. 2d 780, 796 (S.D.N.Y. 2012) (dismissing claims as abandoned where "Defendants moved for summary judgment on those claims, but [plaintiff] failed to respond or even mention these claims in his opposition brief to defendants' summary judgment motion") (citation omitted).

failing to promote him to Captain, Deputy Inspector, or Inspector when they promoted others to those positions in July 2004. Plaintiff fails to establish a prima facie case of discrimination because he did not apply for the position and has not demonstrated that he was legally excused from applying.

To establish a prima facie case, a plaintiff must show that "she applied for an available position for which she was qualified." Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 n.6 (1981)). Burdine "require[s] a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." Id. However, "Burdine is subject to modification where the facts of a particular case make an allegation of a specific application a quixotic requirement." Id. The "quixotic requirement" exception "is narrow and does not pertain simply because an employee asserts that an 'aura of dis-crimination' in the workplace somehow discouraged her from filing a formal application." Petrosino v. Bell Atl., 385 F.3d 210, 227 (2d Cir. 2004) (quoting Brown, 163 F.3d at 710). "Rather, to be excused from the specific application requirement, an employee must demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no

knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." Id.

Here, Henry did not submit an abstract in response to the June 8, 2004 and June 16, 2004 Personnel Orders requesting applications for promotion to Captain, Deputy Inspector, and Inspector. (Defs.' 56.1 Stmt. ¶ 22; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 22R; Fuchs Decl. Ex. 11.) Moreover, Plaintiff does not contest that MTA PD posted the Personnel Orders listing the open positions, and that the Personnel Orders were addressed to "All Lieutenants." (Defs.' 56.1 Stmt. ¶ 22; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 22R; Fuchs Decl. Ex. 11.) Accordingly, Plaintiff has failed to establish that he met or was excused from the application requirement. Petrosino, 385 F.3d at 227.

Plaintiff argues that he should be excused from the application requirement because he "was still awaiting a promotion based on the fact that he was the only remaining candidate left on the 2002 Inspector promotion list and believed that he would be reinstated to his position at the resolution of the labor dispute." (Pl.'s Opp'n 6-7.) He does not allege that MTA officially stated that he would be promoted or reinstated without needing to formally apply. Even assuming Henry believed he would be promoted without submitting an abstract, the Personnel Orders provided notice that all lieutenants seeking

promotion to Captain, Deputy Inspector, or Inspector needed to submit an abstract by June 23, 2004. (Fuchs Decl. Ex. 11.)

Henry also alleges that he should be excused from applying because from 2002 through the July 2004 promotions, MTA promoted Caucasian individuals who had not submitted abstracts to command staff positions. (Pl.'s Opp'n 7.) The procedures for promotion prior to June 2004 are irrelevant here, where the June 2004 Personnel Orders provided notice of the new formal application requirements. As for the July 2004 promotions, Plaintiff fails to cite to evidence in the record from which a jury could find that any of the nine people promoted to Captain, Deputy Inspector, or Inspector in July 2004 failed to submit abstracts. The record contains six of the promoted individuals' June 2004 abstracts. (Fuchs Decl. Ex. 12; Fuchs Reply Decl. Exs. 2-3; Ontell Decl. Ex. B, at D00007380.)[5] Plaintiff never asked Defendants for any information or documentation regarding the promotion of the remaining three individuals (Fuchs Reply Decl. ¶ 3), nor were Defendants required to provide such information

---

[5] "[R]eply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party." Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G., 215 F.3d 219, 226-27 (2d Cir. 2000) (citation omitted). Jonathan Jeremias's Declaration in Opposition and Plaintiff's Opposition brief allege that during discovery, Defendants did not produce abstracts for several individuals promoted in 2004. (Pl.'s Opp'n 7; Jeremias Decl. ¶ 89.) The Court will consider the exhibits and declaration Defendants have submitted on reply addressing this new material issue.

or documentation under the Federal or Local Rules of Civil Procedure. Plaintiff, after failing to request these materials during discovery, cannot now point to their absence as evidence that the three individuals did not submit abstracts. Plaintiff also points to MTA's SDHR submission, which states, "When it appeared that there had not been a large response to the Personnel Order," Lawless directed his immediate subordinates to contact lieutenants who had not applied and to ask them to do so; according to MTA's SDHR submission, McConville subsequently asked Henry to apply. (Pl.'s Opp'n 7 n.13; Jeremias Decl. Ex. O, at P02390.) MTA's submission is belied by the remainder of the record, which indicates that Lawless did not direct his subordinates to encourage lieutenants to apply and that McConville did not ask Henry or anyone else to submit an abstract. (Pl.'s 56.1 Stmt. ¶ KK; see also Fuchs Decl. Ex. 12; Fuchs Reply Decl. Exs. 2-3 (showing that at least six promoted individuals submitted abstracts by deadline specified in Personnel Orders).) No reasonable juror could find from the evidence in the record that MTA promoted individuals who did not submit abstracts by the deadline specified in the Personnel Orders. Accordingly, Plaintiff has not demonstrated that his failure to submit an application should be excused by the Court, and he has not met his burden to establish a prima facie case.

Next, Plaintiff alleges that MTA denied his February 2007 application for promotion to Captain on the basis of his race. Defendants do not dispute that Plaintiff has established a <u>prima facie</u> case of discrimination and instead argue that the promotion denial rested on legitimate, nondiscriminatory reasons. Namely, Henry was not promoted because Dunn did not endorse his candidacy, and Dunn's refusal to endorse was based on Henry's history of strange and erratic behavior and his history of poor work performance, including breaking the chain of command, sending sensitive information to a civilian employee, and "managing up." (Defs.' Mem. 5-7.)

"Because [MTA] has produced evidence that it acted for a non-discriminatory reason, [Henry] may no longer rely on the presumption of discrimination raised by the prima facie case." <u>Holcomb</u>, 521 F.3d at 141. "[W]ithout the aid of the presumption," Henry has failed to "raise[] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that the decision" not to promote him was based, at least in part, on his race. <u>Id.</u> Although Henry has raised some evidence that the MTA's "sending sensitive information" sub-rationale is false (<u>see</u> Defs.' 56.1 Stmt. ¶ 38; Dunn Decl. ¶ 14; Fuchs Decl. Ex. 21, at D00005336; Fuchs Decl. Ex. 25; Jeremias Decl. Ex. D, at D00023199; Jeremias Decl. Ex. OO, at D00039287-89; Pl.'s 56.1 Stmt. ¶ MMM; Schulze Dep. 93:18-19,

95:5-6, 98:8-14), the record could not permit a reasonable juror to find that "discrimination was the real reason" for the promotion denial. Jeune v. City of New York, No. 11 Civ. 7424, 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). Plaintiff does not raise evidence that he was more qualified than Fitzpatrick, nor does he show that Fitzpatrick, who was endorsed by his Commanding Officer, had the work performance or behavioral issues listed in Dunn's Recommendation and at least somewhat supported in the record. (Dunn Decl. ¶¶ 5, 8, 25 & Ex. A; Dunn Dep. 83:16-20, 89:21-90:12, 90:4-8, 100:15-102:1, 342:1-25; Fuchs Decl. Ex. 16, at D00005356; Fuchs Decl. Ex. 25; Jeremias Decl. Ex. D, at D00023199; Jeremias Decl. Ex. H, at D00005334-36; Jeremias Decl. Ex. S, at D00007556-57; Jeremias Decl. Ex. OO, at D00039287-89; Pl.'s 56.1 Stmt. ¶¶ FFFF-HHHH; Terrett Dep. 210:10-13, 216:21-24.) The record, including Plaintiff's statistical evidence of race-related disparities in advancement in rank (Pl.'s 56.1 Stmt. ¶¶ QQ, JJJJ-KKKK), cannot sustain a finding that the promotion denial was racially discriminatory.

Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's Title VII and NYSHRL disparate treatment claims is GRANTED.

35

### 3. NYCHRL Claims

The NYCHRL "'explicitly requires an independent liberal construction analysis in all circumstances,' an analysis that 'must be targeted to understanding and fulfilling what the statute characterizes as the City HRL's uniquely broad and remedial purposes, which go beyond those of counterpart state or federal civil rights laws.'" <u>Bennett v. Health Mgmt. Sys., Inc.</u>, 92 A.D.3d 29, 34 (N.Y. App. Div. 2011) (citation omitted); <u>see also</u> <u>Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, 109 (2d Cir. 2013) ("[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible.'") (citation omitted).

> For an NYCHRL claim to survive a summary judgment motion,
>
> the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that "discrimination play[ed] <u>no</u> role" in its actions.

<u>Mihalik</u>, 715 F.3d at 110 n.8 (citation omitted). "[S]ummary judgment dismissing a claim under the NYCHRL should be granted only if 'no jury could find defendant liable under any of the evidentiary routes--<u>McDonnell Douglas</u>, mixed motive, direct

evidence, or some combination thereof.'" Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 113 (N.Y. App. Div. 2012) (citation omitted). However, these evidentiary routes are not applied to Title VII and NYCHRL claims in identical ways. For instance, "to make out the third prong of a prima facie case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." Williams v. Regus Mgmt. Grp., LLC, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011); see also Lytle v. JPMorgan Chase, No. 08 Civ. 9503, 2012 WL 393008, at *19 (S.D.N.Y. Feb. 8, 2012) (NYCHRL plaintiff "does not need to demonstrate that he was subject to a materially adverse employment action."), adopted by 2012 WL 1079964 (S.D.N.Y. Mar 30, 2012), aff'd by 518 F. App'x 49 (2d Cir. 2013).

Plaintiff has not raised an issue of material fact as to whether he was not promoted in July 2004 and August 2007 at least in part for discriminatory reasons.[6] As for his July 2004 promotion claim, Henry has not shown that MTA treated him "less well" than anyone else; he did not apply for a promotion, and he does not point to record evidence showing that any individuals promoted in July 2004 failed to submit formal applications.

---

[6] Because a three-year statute of limitations applies to NYCHRL claims, only those incidents occurring on or after May 4, 2004 are actionable here. N.Y. City Admin. Code § 8-502(d); see Odom v. Doar, 497 F. App'x 88, 89 (2d Cir. 2012).

<u>Mihalik</u>, 715 F.3d at 110 n.8. The evidence discussed <u>supra</u> Part II.B.2 and contained in the record does not meet Plaintiff's burden to show that the 2007 promotion denial was motivated at least in part by discrimination.

Accordingly, Defendants' Motion for Summary Judgment on Henry's NYCHRL disparate treatment claims is GRANTED.


C. Hostile Work Environment Claims

1. Title VII and NYSHRL Claims

"In order to survive summary judgment on a claim of hostile work environment harassment, a plaintiff must produce evidence that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.'" <u>Cruz</u>, 202 F.3d at 570 (citation omitted). "A hostile working environment is shown when the incidents of harassment occur either in concert or with regularity that can reasonably be termed pervasive." <u>Fincher v. Depository Trust & Clearing Corp.</u>, 604 F.3d 712, 724 (2d Cir. 2010) (citation omitted). It "can also be established through evidence of a single incident of harassment that is 'extraordinarily severe.'" <u>Id.</u> (citations omitted). "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." <u>Brennan v.</u>

Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999). Whether a reasonable person would find a given work environment hostile depends on the "totality of the circumstances," consideration of which includes: (1) frequency of the conduct, (2) severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

Plaintiff bases his hostile work environment claims on various allegations. Henry cites to, inter alia, allegations that MTA members referred to him as "Uncle Tom," "Skell Master," "boy," and "son"; threatened to "fuck" his Caucasian wife; vandalized his car; and denied his request for backup while stating that he was afraid of guns and white people. (Pl.'s 56.1 Stmt. ¶¶ B-D, F-H, K.) He also alleges that superiors gave him menial and gratuitous job assignments; screamed at him; slammed doors; took away his vehicle; treated him with hostility; called him "irrational" and "crazy"; threatened him with unfounded discipline; punished him with counseling sessions, memos to file, and the LOI; assigned him to locations far from his home; and isolated him. (Pl.'s 56.1 Stmt. ¶¶ E, K, P-S, RR-XX, MMMM.) He also relies on his personal awareness of hostility directed at other African-American members and his allegation that co-

plaintiffs and Caucasian members perceived MTA PD as racially hostile. (Pl.'s Opp'n 15-16.) The hostile work environment allegedly had a negative impact on Henry's health. (Pl.'s 56.1 Stmt. ¶ NNNN; Pl.'s Resp. Defs.' 56.1 Stmt. ¶ 14R.)

With hostile work environment claims, "the crucial inquiry focuses on the nature of the workplace environment as a whole, [so] a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those instances to support her claim." Cruz, 202 F.3d at 570. It is not necessary that "offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class" for those remarks to support a plaintiff's claim. Id. Even if Plaintiff himself "were not present or were not the target of some of [the] racial remarks, a jury plausibly could find that [the] persistently offensive conduct created an overall 'hostile or abusive environment,' which exacerbated the effect of the harassment [Plaintiff] experienced individually." Id. at 571 (citation omitted). Without considering instances of hostility alleged by Henry's co-plaintiffs, the Court cannot determine whether there is a dispute as to any material facts, even assuming Defendants are correct in asserting that, on their own, the comments and actions directed at Henry would be insufficient to make out a hostile work environment claim.

Accordingly, the Court reserves decision on Defendants'
Motion for Summary Judgment on Henry's federal and state hostile
work environment claims until after considering them in
conjunction with the instances of hostility alleged by Henry's
co-plaintiffs Davis, Willett, Mazyck, Moore, Kellman and
Armstrong.

### 2. NYCHRL Claim

NYCHRL claims must be reviewed "separately and
independently from any federal and state law claims." <u>Mihalik</u>,
715 F.3d at 109. For the purpose of judicial efficiency, the
Court reserves decision on Defendants' Motion for Summary
Judgment on Plaintiff's NYCHRL hostile work environment claim
until it considers his state and federal hostile work
environment claims in light of fellow Plaintiffs' allegations.

### D. Retaliation Claims

#### 1. The Pleadings

Henry alleges in his opposition brief that, in retaliation
for his December 2004 email, MTA created a retaliatory hostile
work environment in December 2004 and January 2005 by removing
Henry's firearm, assigning him to light duty, humiliating him,
and putting a counseling memorandum in his file, and by
thereafter portraying him as crazy in a series of memoranda.

(Pl.'s Opp'n 17-18.) He also alleges that MTA issued the May 2006 LOI in retaliation for his October 2005 comment to Dunn that he was "a Negro in a white mans [sic] world or white mans [sic] job." (Pl.'s Opp'n 18-20.) Defendants argue that the Court should not consider these claims because they were not alleged in Plaintiff's Amended Complaint. (Defs.' Reply 6-7.)

The Amended Complaint does not include these claims, and no language within the Amended Complaint provides notice of them. The Amended Complaint first alleges generally that Henry "complained about the discriminatory treatment" by, inter alia, "speaking to supervisors." (Am. Compl. ¶ 133.) Later, it states, "HENRY's supervisors have discriminated against and subjected him to a hostile work environment. In 2005, they brought HENRY up on fabricated disciplinary charges and issued a letter of instruction." (Am. Compl. ¶ 137.) In paragraph 140, the Amended Complaint states that "[i]n 2006," Henry made internal complaints and complained to the SDHR, and alleges that "[a]s a result of his internal and external complaints, HENRY has been retaliated against" (Am. Compl. ¶ 140); in that paragraph and the following two, Plaintiff provides examples of alleged retaliation that occurred in 2006 and 2007, but does not mention the May 2006 LOI. (Am. Compl. ¶¶ 140-42.) The Amended Complaint never suggests that the LOI was issued in retaliation for a complaint of discrimination and does not mention Henry's

December 2004 email or his October 2005 comment to Dunn. Nor does the Amended Complaint state that in December 2004 or in January 2005 MTA created a retaliatory hostile work environment, removed Henry's firearm, assigned him to light duty, humiliated him, put a counseling memorandum in his file, or that thereafter a series of memoranda were written portraying Henry as crazy.[7] Defendants did not move for summary judgment on Plaintiff's new claims of retaliation, and they would be prejudiced if the Court considered them here. Accordingly, the Court finds that Plaintiff's new claims that MTA created a retaliatory hostile work environment in retaliation for Henry's December 2004 email or issued the LOI in retaliation for Henry's October 2005 comment to Dunn are untimely and waived.[8] See <u>Lyman</u>, 364 F. App'x

---

[7] The Amended Complaint does allege that in or after March 2007, Henry's supervisor wrote on his application for promotion to Captain that he was "emotionally unstable" and that "because of this" Henry was denied an interview for promotion (Am. Compl. ¶ 141); this allegation of retaliatory failure to promote is considered <u>infra</u> Parts II.D.2 and II.D.3.

[8] The Court will, however, consider Henry's factual allegations of retaliatory animosity in the Memorandum and Order, to follow, determining Henry's race-based hostile work environment claims. While Henry has not pled a claim of retaliatory hostile work environment, "his allegations of [retaliatory] animosity can nevertheless be considered by a trier-of-fact when evaluating [his] [race]-based claim." <u>Feingold v. New York</u>, 366 F.3d 138, 151 (2d Cir. 2004); <u>see also</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 150 (2d Cir. 2003) (noting that "one type of hostility can exacerbate the [e]ffect of another" and that retaliation-based hostility could have exacerbated the effect of hostile racial attitudes in creating a hostile work environment). Plaintiff's Opposition brief argues that the Court should consider his

at 701-02; <u>Malmsteen</u>, 940 F. Supp. 2d at 135; <u>Greenidge</u>, 312 F.

Supp. 2d at 436—37.


    2. Title VII and NYSHRL Claims

    Plaintiff alleges that MTA retaliated against him for his

December 12, 2004 email to Terrett,[9] July 11, 2006 SDHR

Complaint, and March 29, 2007 PBA Complaint by denying his

application for promotion to Captain in 2007.[10] (Am. Compl. ¶

140; Defs.' Mem. 18; Pl.'s Opp'n 20-21.)

---

allegations of retaliation when determining his race-based
hostile work environment claims (Pl.'s Opp'n 16 n.32), and
Defendants do not oppose that argument on reply.

[9] Although Plaintiff's Amended Complaint does not mention the
December 12, 2004 email, Defendants had notice of and moved for
summary judgment on Henry's claim that Defendants denied his
2007 promotion application in retaliation for the December 2004
email. (Defs.' Mem. 18 ("Henry asserts that MTA PD's decision
not to interview him for and promote him to Captain in 2007 was
retaliation because of his [complaint to the SDHR] and/or in his
December 14 [sic], 2004 email to Terrett."); <u>see also</u> Defs.'
Reply 8-9.) Because Defendants will not be prejudiced by the
Court's consideration of this claim, the Court will consider it
here. <u>See Cruz</u>, 202 F.3d at 569 (in case where discovery
disputes put defendants on notice of plaintiff's hostile work
environment claim, holding that plaintiff's failure explicitly
to plead that claim did not preclude district court's
consideration of claim, and stating that "a district court may
consider claims outside those raised in the pleadings so long as
doing so does not cause prejudice").

[10] Plaintiff's Amended Complaint alleges that MTA retaliated
against him for the internal and external complaints he made in
2006 by ordering him to complete menial tasks. (Am. Compl. ¶
140.) Defendants' moving memorandum specifically addresses this
claim, but Plaintiff's Opposition brief fails to mention it in
any way. (Defs.' Mem. 19-20.) Accordingly, the Court deems

"Federal and state law retaliation claims are reviewed under the burden-shifting approach of McDonnell Douglas." Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013). "Under the first step of the McDonnell Douglas framework, the plaintiff must establish a prima facie case of retaliation by showing 1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" Id. at 844 (citation omitted). "[I]f the plaintiff meets this burden, the defendant employer must then articulate a legitimate, non-discriminatory reason for its adverse employment action." Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 568 n.6 (2d Cir. 2011). The Supreme Court has recently held that if the employer does so, the plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer" for his or her Title VII claim to survive. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013). Although it is not yet clear whether the "but-for" standard applies to NYSHRL claims or whether Plaintiff

_____

Plaintiff to have abandoned this retaliation claim. See supra n.4 (citing cases). However, the Court will consider these allegations of retaliatory animosity when determining Henry's race-based hostile work environment claim. See supra n.8 (citing cases).

need only "demonstrate that a retaliatory motive was 'a substantial or motivating factor behind the adverse action,'" see Kwan, 737 F.3d at 846 n.5, 847 n.7 (citation and alteration omitted), the Court need not address which standard applies because on this record, the distinction does not alter the Court's conclusions.

Defendants do not dispute that Plaintiff has established a prima facie case of retaliation with regard to the 2007 promotion denial. (Defs.' Mem. 18-19.)[11] Instead, they argue that

---

[11] In their Reply submission, Defendants summarily state that "the portion of the December 12, 2004 email setting forth allegations of discrimination against past supervisors between 1985 and 2001 . . . [is] *the only portion of [Henry's] email that is arguably protected.*" (Defs.' Reply 9.) However, a reasonable juror could find that a much larger portion of the email constitutes protected activity, including Henry's discussion of Terrett's behavior on pages D00005361 and D00005363. (Fuchs Decl. Ex. 17, at D00005361, D00005363.) To establish a retaliation claim, a plaintiff must show that "she had a good faith, reasonable belief that the conduct she opposed violated Title VII and that the employer could reasonably have understood that Title VII-prohibited discrimination was the subject of her protest." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 287 (2d Cir. 1998). Here, Henry's statements that Terrett's behavior had "developed into a hostile work environment," Terrett's email was "threatening, punitive and hostile," Terrett was engaging in "harassment," Henry "[f]or almost 20 years [had] had to deal with various forms of racism, vicious hostility and discrimination," and Henry was not willing to "be treated the way Wanderman, Esserman, Masciana(s), Loverso, Eurhardt, Niland, Lynch, O'Donnell, Rehbein and now you would treat me" is strong evidence that Henry had a good faith belief that Terrett, in 2004, was violating Title VII. (Fuchs Decl. Ex. 17, at D00005361, D00005363.) Moreover, a reasonable juror could find MTA "understood, or could reasonably have understood" that the portions of Henry's email discussing Terrett constituted a complaint that Terrett had violated Title

MTA did not promote Plaintiff for legitimate, nondiscriminatory

reasons: Henry's documented work performance issues and erratic

behavior. (Defs.' Mem. 18-19; see id. 5-7.)

Henry has raised evidence sufficient for a reasonable juror

to find these rationales to be pretexts for retaliation. Dunn's

Recommendation, in which he refused to endorse Henry's candidacy

for promotion, states:

> It is also necessary to mention that in December of 2004,
> Lt Henry sent an insubordinate e-mail to Deputy
> Inspector Terrett regarding assignments he (Lt Henry)
> was instructed to address. This e-mail detailed
> perceived injustices throughout his career with what
> appears to be every supervisor he has worked for. . . .
> Lieutenant Henry continues to relate his perception that
> he is regularly singled out for undesirable assignments
> and that he is being set up to fail.

Jeremias Decl. Ex. S, at D00007557. The direct references to

Plaintiff's December 2004 email and, arguably, to his June 2006

SDHR Complaint (see Jeremias Decl. Ex. N ¶¶ 5-6) are strong

evidence that Dunn refused to endorse Henry's promotion

application because of Henry's complaints of race

discrimination. See Amin v. Akzo Nobel Chems., Inc., 282 F.

App'x 958, 962 (2d Cir. 2008) (holding that jury could find

legitimate rationales pretextual where plaintiff's supervisor

told plaintiff to stop making complaints and stated that

plaintiff was complaining about discrimination "on what seemed

---

VII. Galdieri-Ambrosini, 136 F.3d at 292; (see Fuchs Decl. Ex.
17, at D00005361, D00005363; Terrett Dep. 211:19-212:19).

to be a weekly basis"); <u>Sutton v. N.Y.C. Transit Auth.</u>, No. 02 Civ. 1441, 2009 WL 5092989, at *7 (E.D.N.Y. Sept. 30, 2009) ("Plaintiff nonetheless raises genuine factual issues regarding pretext, especially in light of [Plaintiff's supervisor]'s comments to [Plaintiff's co-worker] about Plaintiff's being a 'problem' employee by virtue of her history of filing sexual harassment complaints."). Moreover, Dunn's deposition testimony contains evidence that Dunn found "insubordinate" not only the tone of Henry's December 2004 email, but also the substantive complaints of discrimination therein. (Dunn Dep. 94:20-97:12 (finding "insubordinate" Henry's statements that "[f]or almost 20 years I've had to deal with the various form [sic] of racism, vicious hostility and discrimination" and that Terrett and prior supervisors had subjected him to harassment and hostility).) While an employer may refuse to promote an individual because of his insubordinate behavior, said insubordination does not "effectively immunize the [employer] from liability when there is evidence supporting the inference that an unlawful [retaliatory] motive" was the but-for cause of the promotion denial. <u>See</u> <u>Wolinsky v. Standard Oil of Conn., Inc.</u>, 712 F. Supp. 2d 46, 57 (D. Conn. 2010).

Dunn's contemporaneous citation of Henry's complaints as a basis for his refusal to endorse Henry, his statements that he found the substance of Henry's complaints to be insubordinate,

and MTA's admitted refusal to consider for promotion to Captain any applicant who had not secured the endorsement of his immediate supervisor and commanding officer (Jeremias Decl. Ex. P) could convince a reasonable juror that, but for Dunn's retaliatory response to Henry's complaints of discrimination, Henry's promotion application would not have been denied. See Kwan, 737 F.3d at 846 ("'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."). Defendants argue that the evidence that McConville asked Finneran to conduct a review of the promotion denial and that Finneran may have conducted that review precludes as a matter of law a finding that MTA had a retaliatory motive. (Defs.' Mem. 19.) However, the cases that Defendants cite for this proposition are inapposite. The "independent review" in Collins v. N.Y.C. Transit Auth., 305 F.3d 113 (2d Cir. 2002) was performed by an "undisputedly independent, neutral, and unbiased" arbitration board, which "conducted three days of hearings, at which [plaintiff] was represented by his union and evidence was received." 305 F.3d at 119. Here, in contrast, Plaintiff disputes Finneran's neutrality and there is no evidence that Finneran conducted hearings or even spoke to Henry about the promotion denial. The opinion Defendants cite to in Fullard v.

City of New York, 274 F. Supp. 2d 347 (S.D.N.Y. 2003) followed a bench trial, and constituted the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). While a jury may find, after a trial, that Finneran did conduct an investigation and that her investigation is probative of MTA's lack of retaliatory motive, that finding will be one of fact, not law. See Kwan, 737 F.3d at 846 n.5 ("The determination of whether retaliation was a "but—for" cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact.").

Accordingly, Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's Title VII and NYSHRL retaliation claims regarding the denial of his 2007 application for promotion.


3. NYCHRL Claim

"[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Mihalik, 715 F.3d at 112 (citations omitted). "[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part

50

by . . . retaliatory motives, or if the defendant proves the
conduct was nothing more than 'petty slights or trivial
inconveniences.'" Id. at 113 (citations omitted).

Because "federal and state civil rights laws [are] a floor
below which the City's Human Rights law cannot fall," N.Y.C.
Local Law No. 85 of 2005, at § 1 (Oct. 3, 2005), the Court
DENIES, without further analysis, Defendants' Motion for Summary
Judgment on Plaintiff's NYCHRL retaliation claim regarding the
denial of his 2007 application for promotion. See Clarke v.
Intercontinental Hotels Grp., PLC, No. 12 Civ. 2671, 2013 WL
2358596, at *11 n.13 (S.D.N.Y. May 30, 2013) (denying motion to
dismiss NYCHRL retaliation claim, "without further analysis,"
because court had denied defendant's motion to dismiss
plaintiff's Title VII retaliation claim).


   E. Pattern or Practice of Discrimination Claims
       Plaintiff maintains that Defendants' conduct towards racial
minorities in MTA PD amounted to a pattern or practice of
discrimination. (Pl.'s Opp'n 21-22.) Although Title VII
initially envisioned that the government would pursue pattern or
practice claims, 42 U.S.C. § 2000e-6, courts have unequivocally
granted private individuals the right to vindicate those claims.
See Cooper v. Fed. Reserve Bank of Richmond, 467 U.S. 867, 876
n.9 (1984). However, "no such pattern-or-practice theory of

liability is available to the private non-class plaintiffs in this case." Chin v. Port Auth. of N.Y. & N.J. Inc., 685 F.3d 135, 146 (2d Cir. 2012); see United States v. City of New York, 631 F. Supp. 2d 419, 427 (S.D.N.Y. 2009) ("[I]ndividuals cannot maintain a private, non-class, pattern-or-practice claim.).

Here, Henry and his fellow plaintiffs have not brought their claims as a class action, and thus cannot assert pattern or practice claims of discrimination. Defendants' Motion for Summary Judgment on these claims is hereby GRANTED.

F. Claims Against MTA and Individual Defendants in their
   Official Capacities Under 42 U.S.C. §§ 1981 and 1983

Plaintiff alleges that MTA is liable under 42 U.S.C. §§ 1981 and 1983 for engaging in discriminatory conduct by subjecting him to disparate treatment, a hostile work environment, retaliation, and a pattern and practice of discrimination. Plaintiff also asserts claims under §§ 1981 and 1983 against individual Defendants Culhane, McConville, Morange, and Sander in their official capacities. Plaintiff alleges that Defendants' actions deprived him of "rights, privileges and immunities secured by the United States Constitution and laws and [§ 1983]." (Am. Compl. ¶ 216.)

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a

contractual relationship, such as employment." Patterson, 375
F.3d at 224. Section 1983 provides for an action at law against
a "person who, under color of any statute, ordinance,
regulation, custom, or usage of any State . . . subjects or
causes to be subjected, any citizen of the United States . . .
to the deprivation of any rights, privileges, or immunities
secured by the Constitution and law." 42 U.S.C. § 1983. Sections
1981 and 1983 encompass retaliation claims. CBOCS W., Inc. v.
Humphries, 553 U.S. 442, 446 (2008); Hicks v. Baines, 593 F.3d
159, 164, 171 (2d Cir. 2010); see Lewis v. City of Norwalk, No.
13-2485, 2014 WL 1408463, at *3 & n.5 (2d Cir. Apr. 14, 2014).
"Section 1983 'is not itself a source of substantive rights'";
instead, it "merely provides 'a method for vindicating federal
rights elsewhere conferred,' such as those conferred by § 1981."
Patterson, 375 F.3d at 225 (quoting Baker v. McCollan, 443 U.S.
137, 144 n.3 (1979)). Indeed, "the express cause of action for
damages created by § 1983 constitutes the exclusive federal
remedy for violation of the rights guaranteed in § 1981 by state
governmental units . . . ." Id. (quoting Jett v. Dall. Indep.
Sch. Dist., 491 U.S. 701, 733 (1989)). Although a § 1983 action
may not be brought to vindicate rights conferred only by a
statute that contains its own enforcement structure, such as
Title VII, id., a Title VII plaintiff may bring a concurrent §
1983 claim "if some law other than Title VII is the source of

the right alleged to have been denied." Saulpaugh v. Monroe
Cmty. Hosp., 4 F.3d 134, 143 (2d Cir. 1993); see also Patterson,
375 F.3d at 225 ("'A Title VII plaintiff is not precluded from
bringing a concurrent § 1983 cause of action' . . . 'so long as
the § 1983 claim is based on a distinct violation of a
constitutional right.'") (citation omitted). Here, the sources
of Plaintiff's § 1983 claim are 42 U.S.C. § 1981 and the U.S.
Constitution. (Am. Compl. ¶ 216); see also Reed v. Conn. Dep't
of Transp., 161 F. Supp. 2d 73, 85 (D. Conn. 2001) (noting that
the source of plaintiff's § 1983 claim was § 1981).

     "[W]hen the defendant sued for discrimination under § 1981
or § 1983 is a municipality - or an individual sued in his
official capacity - the plaintiff is required to show that the
challenged acts were performed pursuant to a municipal policy or
custom." Patterson, 375 F.3d at 226 (citations omitted). The
policy or custom need not be an express rule or regulation; it
is sufficient for a plaintiff to show that the discriminatory
conduct is so "persistent and widespread . . . so permanent and
well settled as to constitute a custom or usage with the force
of law." Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870-71
(2d Cir. 1992). Additionally, "a plaintiff pursuing a claimed
violation of § 1981 or denial of equal protection under § 1983
must show that the discrimination was intentional." Tolbert v.
Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001).

In support of his claim that MTA had a custom or policy of discrimination, Henry argues that Defendants and supervisors took no affirmative steps in response to the complaints of discrimination they received, ignored or acquiesced in retaliation, and permitted Caucasian individuals to be promoted to higher ranks than African-American employees. In particular, he argues that Morange and McConville signed off on promotion to command staff positions of Caucasian individuals who were less qualified than Henry and permitted them to skip ranks at a statistically faster rate than racial minorities. Plaintiff also alleges that not all MTA supervisors were well trained in the MTA's EEO policy. (Pl.'s Opp'n 22-24.)

These claims do not sufficiently allege a policy or practice of discrimination. Plaintiff has not provided evidence sufficient to show that promotions to command staff positions were made in a racially discriminatory manner. The statistical report of Plaintiff's expert discusses promotions from Police Officer to Detective or to "rank above police officer" and has no analysis specific to promotions to command staff. (See Jeremias Decl. Ex. CC.) The evidence that minorities were underutilized in command staff positions (Jeremias Decl. Ex. UU) is also insufficient to show a practice of discrimination, as Plaintiff has presented no evidence showing that said underutilization was racially discriminatory. Moreover, although

there is evidence that Plaintiff's application for promotion was denied in retaliation for his discrimination complaints, Plaintiff has not provided evidence sufficient to show that Defendants engaged in a widespread pattern or practice of retaliation or of responding to discrimination complaints in a manner so insufficient as to violate §§ 1981 and 1983. Nor do Plaintiff's mostly-generalized allegations about a lack of training suffice to show a policy or practice. Plaintiff has not, as required, "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" as to whether MTA had a policy or custom of discrimination. Great Am. Ins. Co., 607 F.3d at 292. Therefore, Henry is unable to state claims against MTA or the individual Defendants in their official capacities under §§ 1981 or 1983, and Defendants' Motion for Summary Judgment on these claims is GRANTED.


   G. Claims Against Individual Defendants in Their Individual
      Capacities Under 42 U.S.C. §§ 1981 and 1983

      Henry also asserts claims under §§ 1981 and 1983 against Defendants McConville and Culhane in their individual capacities. To make out a claim for individual liability under § 1981, "a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action . . .

. [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." Patterson, 375 F.3d at 229 (citation omitted). Similarly, a plaintiff must establish an individual defendant's personal involvement in the claimed violation to find him liable in his individual capacity under § 1983. Id. "A supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others." Rolon v. Ward, 345 F. App'x 608, 611 (2d Cir. 2009) (citing Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003)).

A reasonable jury could find that McConville was personally involved in the retaliatory denial of Plaintiff's application for promotion to Captain in 2007. At the time that Henry's application was denied, McConville was aware that Henry had made complaints of discrimination. (McConville Decl. ¶ 10.) According to Finneran, before any interviews were conducted for the position, McConville told her that he had "pulled [Henry's] abstract" from the pile of promotion candidates and that Henry "was not going to be interviewed." (Finneran Dep. 108:6-17.) This evidence and the evidence discussed supra Part II.D.2 create an issue of material fact as to whether McConville was directly and personally involved in the retaliatory denial of

57

Henry's application. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's §§ 1981 and 1983 individual capacity claims against McConville is DENIED with regard to the claim that the 2007 denial of Henry's application for promotion was retaliatory.

Plaintiff also alleges that McConville "personally issued him a LOI." (Pl.'s Opp'n 24.) It is not clear whether Plaintiff is arguing that McConville's issuance of the LOI was an instance of retaliation or race-based discrimination, but any claim that the May 2006 LOI was issued in retaliation for Plaintiff's complaints is untimely and waived. (See supra Part II.D.1.) Assuming arguendo that Plaintiff has established a prima facie case of race-based discrimination, Defendants have set forth a reasonable, nondiscriminatory rationale for issuing the LOI: Henry received the LOI because he violated MTA PD's chain of command by sending sensitive security information to a civilian MTA employee without the knowledge of his supervisors. (Defs.' Mem. 9-11, 24); see Ruiz, 609 F.3d at 491 ("[Plaintiff's] claims for race . . . discrimination under Sections 1981 and 1983 are analyzed under the burden-shifting framework set forth in McDonnell Douglas.). Without relying on the presumption of discrimination raised by his prima facie case, a reasonable jury could not find by a preponderance of the evidence that the LOI was issued at least in part because of Henry's race. See

Holcomb, 521 F.3d at 141. Although there is some evidence that Defendants' rationale is pretextual (see supra Part II.B.2), Plaintiff's Opposition brief does not even attempt to connect the LOI issuance with Henry's race. (Pl.'s Opp'n 24; see also id. 2-12); see Jeune, 2014 WL 83851, at *4 ("The plaintiff must produce 'not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason' for the challenged actions.") (citation omitted). Nothing in the record indicates that a Caucasian MTA PD member would not have received an LOI for engaging in conduct similar to Henry's. Nor could anything else in the record convince a reasonable juror that the LOI was issued even partly on the basis of Henry's race.

Plaintiff also alleges that McConville had policy-making authority and took no affirmative steps with regard to complaints of discrimination and that Culhane had decision-making authority and engaged or acquiesced in widespread discriminatory conduct throughout his career. (Pl.'s Opp'n 24.) These general allegations are insufficient to raise an issue of material fact regarding McConville and Culhane's individual liability and fail to demonstrate that McConville and Culhane were aware that "constitutional violations [were] occurring."

*Patterson*, 375 F.3d at 229. Accordingly, Defendants' Motion for Summary Judgment is GRANTED with regard to Plaintiff's §§ 1981 and 1983 claims against the individual Defendants in their individual capacities, except for those related to McConville and Culhane's alleged involvement in sustaining a hostile work environment, on which the Court reserves judgment, and the claim against McConville regarding the retaliatory denial of Henry's 2007 application for promotion, on which summary judgment is DENIED.[12]

H. Claims Against Individual Defendants in Their Individual
     Capacities Under the NYSHRL and NYCHRL

Plaintiff asserts that McConville and Culhane should be held individually liable under the NYSHRL and NYCHRL as aiders and abettors. Under the NYSHRL and NYCHRL, it is unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this [provision], or to attempt to do so." N.Y. Exec. Law § 296(6); Admin. Code N.Y.C. § 8-107(6). Actual participation in conduct giving rise to a discrimination claim may support liability under both statutes.

---

[12] Because the Court reserves judgment on Plaintiff's hostile work environment claims, the Court also reserves judgment as to Plaintiff's § 1981, § 1983, NYSHRL, and NYCHRL hostile work environment claims brought against McConville and Culhane in their individual capacities.

See Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012). Liability "may extend to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct." Morgan v. N.Y. State Att'y Gen.'s Office, No. 11 Civ. 9389, 2013 WL 491525, at *13 (S.D.N.Y. Feb. 8, 2013). However, "aiding and abetting 'is only a viable theory where an underlying violation has taken place.'" Petrisch v. HSBC Bank USA, Inc., No. 07 Civ. 3303, 2013 WL 1316712, at *21 (E.D.N.Y. Mar. 28, 2013) (citation omitted). Finally, under both statutes, "'an individual may not be held liable merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating' that law." Malena, 886 F. Supp. 2d at 367-68 (citation and alterations omitted).

As discussed supra, Plaintiff has only raised an issue of material fact as to whether the 2007 promotion denial was retaliatory. A reasonable juror could find that McConville aided and abetted Dunn's retaliation by removing Henry from the list of interviewees following Dunn's refusal to endorse Henry. (See Finneran Dep. 108:6-17.) However, Plaintiff has failed to show that Culhane participated in the denial of Plaintiff's 2007 application for promotion. Plaintiff has not raised genuine issues of material fact regarding the other alleged NYSHRL or NYCHRL violations. Accordingly, the Court reserves judgment on

whether Culhane and McConville aided and abetted the creation and maintenance of a hostile work environment, DENIES Defendants' Motion for Summary Judgment as to Plaintiff's NYSHRL and NYCHRL aiding-and-abetting claims against McConville with regard to the allegedly retaliatory denial of Henry's 2007 application for promotion, and GRANTS Defendants' Motion for Summary Judgment as to all other NYSHRL and NYCHRL aiding-and-abetting claims.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part, DENIED in part, and decision is reserved in part, as follows:

(1) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's disparate treatment claims brought under Title VII, NYSHRL, NYCHRL, § 1981, and § 1983;

(2) Plaintiff's only timely, non-waived, and non-abandoned retaliation claims regard the denial of his 2007 application for promotion to Captain. Defendants' Motion for Summary Judgment is DENIED as to Plaintiff's retaliation claims brought against MTA under Title VII, NYSHRL, and NYCHRL, and brought against McConville in his individual capacity under § 1981, § 1983, NYSHRL, and NYCHRL; but it is GRANTED as to Plaintiff's retaliation claims brought against MTA and the individual

Defendants in their official capacities under § 1981 and § 1983, and brought against Culhane in his individual capacity under § 1981, § 1983, NYSHRL, and NYCHRL;

(3) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's pattern or practice claims brought under Title VII, NYSHRL, NYCHRL, § 1981, and § 1983;

(4) Defendants' Motion for Summary Judgment is GRANTED as to Plaintiff's § 1981 and § 1983 claims brought against MTA and the individual Defendants in their official capacities;

(5) Decision is reserved with respect to Plaintiff's hostile work environment claims brought against MTA under Title VII, NYSHRL, and NYCHRL, and brought against McConville and Culhane in their individual capacities under § 1981, § 1983, the NYSHRL, and the NYCHRL.


SO ORDERED.

Dated:
          New York, New York
          September 25, 2014


                         _Deborah a. Batts_
                         Deborah A. Batts
                    United States District Judge